## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BRIAN MEHLMAN.,

      Plaintiff,

    v.

NETWORK APPLIANCE, INC.,

      Defendant.

CIVIL ACTION NO. 04-12533-WGY

## DECLARATION OF MICHAEL S. D'ORSI IN SUPPORT OF
## NETAPP'S REQUEST FOR JUDICIAL NOTICE

I, Michael S. D'Orsi, on oath, hereby declare as follows:

1.     I am a member of the law firm of Donnelly, Conroy & Gelhaar, counsel to defendant Network Appliance, Inc. ("NetApp").  I make this Declaration in Support of NetApp's Motion to Dismiss Counts 1-5 of the Complaint for Failure to State a Claim.  The following matters are true of my own personal knowledge.

2.     Attached as Exhibit A is a true and correct copy of the S-8 filed with the Securities and Exchange Commission dated January 16, 2001.

3.     The attached S-8 was accessed and printed from the publicly accessible Internet site located at www.sec.gov.

4.     Attached as Exhibit B is a true and correct copy an explanation of the Internet Archive accessible at www.archive.org which is a library of archived web pages.

5.    Attached at Exhibit C is a true and correct copy of the search term entered to locate archived versions of the www.sec.gov site.

6.    Attached at Exhibit D is a true and correct copy of the search results from the Internet Archive for www.sec.gov.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 31, 2005, at Boston, Massachusetts.


        /s/ Michael S. D'Orsi
        Michael S. D'Orsi

# EXHIBIT A – PART 1

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 WrcK+SKxHXvC66SUXqv0JQcEajh3oTNN/rLIj+L+8doLQB2KTXwxEJzkDxhcCyRs
 mxzktsJeTiAqy50hhb3tKA==
```

```
<SEC-DOCUMENT>0000891618-01-000051.txt : 20010123
<SEC-HEADER>0000891618-01-000051.hdr.sgml : 20010123
ACCESSION NUMBER:        0000891618-01-000051
CONFORMED SUBMISSION TYPE:    S-8
PUBLIC DOCUMENT COUNT:        12
FILED AS OF DATE:        20010116
EFFECTIVENESS DATE:        20010116

FILER:

    COMPANY DATA:
        COMPANY CONFORMED NAME:        NETWORK APPLIANCE INC
        CENTRAL INDEX KEY:        0001002047
        STANDARD INDUSTRIAL CLASSIFICATION:    SERVICES-COMPUTER INTEGRATED
        IRS NUMBER:            770307520
        STATE OF INCORPORATION:        CA
        FISCAL YEAR END:        0430

    FILING VALUES:
        FORM TYPE:        S-8
        SEC ACT:
        SEC FILE NUMBER:    333-53776
        FILM NUMBER:        1509677

    BUSINESS ADDRESS:
        STREET 1:        495 EAST JAVA DR
        CITY:            SUNNYVALE
        STATE:            CA
        ZIP:            94089
        BUSINESS PHONE:        4088226000

    MAIL ADDRESS:
        STREET 1:        495 EAST JAVA DR
        CITY:            SUNNYVALE
        STATE:            CA
        ZIP:            94089
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-8
<SEQUENCE>1
<FILENAME>f68554ors-8.txt
<DESCRIPTION>FORM S-8
<TEXT>

<PAGE>    1
```

As filed with the Securities and Exchange Commission on January 16, 2001

Registration No. 333-_____

====================================================================

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM S-8

REGISTRATION STATEMENT

Under

The Securities Act of 1933

NETWORK APPLIANCE, INC.
(Exact name of registrant as specified in its charter)

```
<TABLE>
<S>                                          <C>
          CALIFORNIA                                      77-0307520
   (State or other jurisdiction              (IRS Employer Identification No.)
of incorporation or organization)
</TABLE>
```

495 EAST JAVA DRIVE, SUNNYVALE, CA 94089
(Address of principal executive offices) (Zip Code)

WEBMANAGE TECHNOLOGIES, INC. 1997 STOCK OPTION PLAN
(AS ASSUMED BY NETWORK APPLIANCE, INC.)

WEBMANAGE TECHNOLOGIES, INC. 1999 STOCK OPTION PLAN
(AS ASSUMED BY NETWORK APPLIANCE, INC.)

WEBMANAGE TECHNOLOGIES, INC. 2000 STOCK INCENTIVE PLAN
(AS ASSUMED BY NETWORK APPLIANCE, INC.)
----------------------
(Full title of the Plans)

DANIEL J. WARMENHOVEN
CHIEF EXECUTIVE OFFICER AND DIRECTOR
NETWORK APPLIANCE, INC.
495 EAST JAVA DRIVE, SUNNYVALE, CA 94089
(Name and address of agent for service)
(408) 822-6000
(Telephone number, including area code, of agent for service)

CALCULATION OF REGISTRATION FEE

```
<TABLE>
<CAPTION>
===================================================================================
```

| Title of Securities to be Registered | Amount to be Registered (1) | Proposed Maximum Offering Price per Share |
|---|---|---|
| ---------- | -------------- | --------- |
| `<S>` WebManage Technologies, Inc. 1997 Stock Option Plan | `<C>` | `<C>` `<C` |

| | | |
|---|---|---|
| Common Stock, $0.001 par value | 15,003 shares | 3.94 (2) |
| WebManage Technologies, Inc. 1999 Stock Option Plan | | |
| Common Stock, $0.001 par value | 74,050 shares | 17.10 (2) |
| WebManage Technologies, Inc. 2000 Stock Incentive Plan | | |
| Common Stock, $0.001 par value | 166,288 shares | 33.04 (2) |

Ag

=======================================================================

</TABLE>

(1)     This Registration Statement shall also cover any additional shares of
        Registrant's Common Stock which become issuable under the WebManage
        Technologies, Inc. 1997 Stock Option Plan (as assumed by Registrant),
        WebManage Technologies, Inc. 1999 Stock Option Plan (as assumed by
        Registrant) and/or the WebManage Technologies, Inc. 2000 Stock Incentive
        Plan (as assumed by Registrant) by reason of any stock dividend, stock
        split, recapitalization or other similar transaction effected without
        the Registrant's receipt of consideration which results in an increase
        in the number of the Registrant's outstanding shares of Common Stock.

(2)     Calculated solely for purposes of this offering under Rule 457(h) of the
        Securities Act of 1933, as amended, on the basis of the weighted average
        exercise price of the outstanding options.

21

<PAGE>   2

PART II

INFORMATION REQUIRED IN THE REGISTRATION STATEMENT

Item 3. Incorporation of Documents by Reference

        Network Appliance, Inc. (the "Registrant") hereby incorporates by
reference into this Registration Statement the following documents previously
filed with the Securities and Exchange Commission (the "Commission"):

        (a)     The Registrant's Annual Report on Form 10-K and Form 10-K/A for
                the fiscal year ended April 30, 2000, filed with the Commission
                on July 12, 2000, pursuant to Section 13 of the Securities
                Exchange Act of 1934, as amended (the "1934 Act"), and as
                amended on July 13, 2000;

        (b)     The Registrant's Quarterly Reports on Form 10-Q for the fiscal
                quarters ended July 28, 2000 and October 27, 2000, filed with
                the Commission on September 11, 2000 and December 11, 2000,
                respectively; and

        (c)     The Registrant's Registration Statement No. 000-27130 on Form
                8-A filed with the Commission on November 1, 1995, in which
                there is described the terms, rights and provisions applicable
                to the Registrant's Common Stock.

All reports and definitive proxy or information statements filed pursuant to Section 13(a), 13(c), 14 or 15(d) of the 1934 Act after the date of this Registration Statement and prior to the filing of a post-effective amendment which indicates that all securities offered hereby have been sold or which de-registers all securities then remaining unsold shall be deemed to be incorporated by reference into this Registration Statement and to be a part hereof from the date of filing of such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Registration Statement to the extent that a statement contained herein or in any subsequently filed document which also is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Registration Statement.

Item 4. Description of Securities

        Not Applicable.

Item 5. Interests of Named Experts and Counsel

        Not Applicable.

Item 6. Indemnification of Directors and Officers

        Section 317 of the California Corporations Code authorizes a court to award, or a corporation's Board of Directors to grant, indemnity to directors and officers in terms sufficiently broad to permit indemnification (including reimbursement of expenses incurred) under certain circumstances for liabilities arising under the Securities Act of 1933, as amended, (the "1933 Act"). The Registrant's Restated Articles of Incorporation, as amended, and Bylaws provide for indemnification of its directors, officers, employees and other agents to the maximum extent permitted by the California Corporations Code.

Item 7. Exemption from Registration Claimed

        Not Applicable.


                                II-1

<PAGE>    3

Item 8. Exhibits

<TABLE>
<CAPTION>
Exhibit Number          Exhibit
- --------------         -------
<S>                     <C>
   4                    Instruments Defining the Rights of Stockholders. Reference
                        is made to Registrant's Registration Statements No.
                        000-27130 on Form 8-A, together with the amendments and
                        exhibits thereto, which are incorporated herein by
                        reference pursuant to Items 3(c).

   5                    Opinion and consent of Brobeck, Phleger & Harrison LLP.

  23.1                  Independent Auditors' Consent.

| | |
|---|---|
| 23.2 | Consent of Brobeck, Phleger & Harrison LLP is contained in Exhibit 5. |
| 24 | Power of Attorney. Reference is made to page II-4 of this Registration Statement. |
| 99.1 | WebManage Technologies, Inc. 1997 Stock Option Plan. |
| 99.2 | Form of WebManage Technologies, Inc. Stock Option Agreement for 1997 Stock Option Plan. |
| 99.3 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 1997 Stock Option Plan. |
| 99.4 | WebManage Technologies, Inc. 1999 Stock Option Plan. |
| 99.5 | Form of WebManage Technologies, Inc. Stock Option Agreement for 1999 Stock Option Plan. |
| 99.6 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 1999 Stock Option Plan. |
| 99.7 | WebManage Technologies, Inc. 2000 Stock Incentive Plan. |
| 99.8 | Form of WebManage Technologies, Inc. Stock Option Agreement for 2000 Stock Incentive Plan. |
| 99.9 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 2000 Stock Incentive Plan. |

</TABLE>

Item 9. Undertakings

A. The undersigned Registrant hereby undertakes: (1) to file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement: (i) to include any prospectus required by Section 10(a)(3) of the 1933 Act, (ii) to reflect in the prospectus any facts or events arising after the effective date of this Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this Registration Statement and (iii) to include any material information with respect to the plan of distribution not previously disclosed in this Registration Statement or any material change to such information in this Registration Statement; provided, however, that clauses (1)(i) and (1)(ii) shall not apply if the information required to be included in a post-effective amendment by those clauses is contained in periodic reports filed by the Registrant pursuant to Section 13 or Section 15(d) of the 1934 Act that are incorporated by reference into this Registration Statement; (2) that for the purpose of determining any liability under the 1933 Act each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof; and (3) to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the WebManage Technologies, Inc. 1997 Stock Option Plan (as assumed by Registrant), WebManage Technologies, Inc. 1999 Stock Option Plan (as assumed by Registrant) and the WebManage Technologies, Inc. 2000 Stock Incentive Plan (as assumed by Registrant).

B. The undersigned Registrant hereby undertakes that, for purposes of determining any liability under the 1933 Act, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the 1934 Act that is incorporated by reference into this Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

C. Insofar as indemnification for liabilities arising under the 1933 Act may be permitted to directors, officers or controlling persons of the Registrant pursuant to the indemnification provisions summarized in Item 6 or otherwise, the Registrant has been advised that, in the opinion of the Commission, such indemnification is

II-2

<PAGE>    4

against public policy as expressed in the 1933 Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the 1933 Act and will be governed by the final adjudication of such issue.

II-3

<PAGE>    5

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-8, and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Sunnyvale, State of California on this 15th day of January, 2001.

NETWORK APPLIANCE, INC.

By: /s/ DANIEL J. WARMENHOVEN
    ------------------------------------
    Daniel J. Warmenhoven
    Chief Executive Officer and Director

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Daniel J. Warmenhoven and Jeffry R. Allen, and each of them, as such person's true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for such person and in such person's name, place and stead, in

any and all capacities, to sign any and all amendments (including post-effective amendments) to this Registration Statement, and to file same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as such person might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or his or her substitutes, may lawfully do or cause to be done by virtue thereof.

          Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

```
<TABLE>
<CAPTION>
Signature                                 Title
- ---------                               -----
<S>                                       <C>                                    <C>

/s/ DANIEL J. WARMENHOVEN                  Chief Executive Officer                Jan
- ------------------------------------        and Director
Daniel J. Warmenhoven                     (Principal Executive Officer)


/s/ JEFFRY A. ALLEN                        Executive Vice President, Finance      Jan
- ------------------------------------        and Operations, Chief Financial
Jeffry R. Allen                           Officer and Secretary
                                          (Principal Financial and Accounting
                                          Officer)


/s/ DONALD T. VALENTINE                    Chairman of the Board and Director     Jan
- ------------------------------------
Donald T. Valentine


/s/ SANJIV AHUJA                           Director                               Jan
- ------------------------------------
Sanjiv Ahuja
</TABLE>


                                          II-4
<PAGE>    6

<TABLE>
<CAPTION>
<S>                                       <C>                                    <C>

/s/ CAROL A. BARTZ                         Director                               Jan
- ------------------------------------
Carol A. Bartz


/s/ LARRY R. CARTER                        Director                               Jan
- ------------------------------------
Larry R. Carter


/s/ MICHAEL R. HALLMAN                     Director                               Jan
- ------------------------------------
```

Michael R. Hallman

/s/ ROBERT T. WALL                     Director                                    Jan
- ------------------------------------
Robert T. Wall

/s/ DR. SACHIO SEMMOTO                  Director                                    Jan
- ------------------------------------
Dr. Sachio Semmoto
</TABLE>


                                    II-5
<PAGE>    7

                     SECURITIES AND EXCHANGE COMMISSION

                          WASHINGTON, D.C. 20549


                                 EXHIBITS

                                    TO

                                FORM S-8

                                  UNDER

                         SECURITIES ACT OF 1933


                       NETWORK APPLIANCE, INC.


<PAGE>    8


                             EXHIBIT INDEX


<TABLE>
<CAPTION>
Exhibit Number          Exhibit
- --------------          -------
<S>                     <C>
    4                   Instruments Defining the Rights of Stockholders. Reference
                        is made to Registrant's Registration Statements No.
                        000-27130 on Form 8-A, together with the amendments and
                        exhibits thereto, which are incorporated herein by
                        reference pursuant to Items 3(c).

    5                   Opinion and consent of Brobeck, Phleger & Harrison LLP.

   23.1                 Independent Auditors' Consent.

   23.2                 Consent of Brobeck, Phleger & Harrison LLP is contained in
                        Exhibit 5.

   24                   Power of Attorney. Reference is made to page II-4 of this
                        Registration Statement.

| 99.1 | WebManage Technologies, Inc. 1997 Stock Option Plan. |
| 99.2 | Form of WebManage Technologies, Inc. Stock Option Agreement for 1997 Stock Option Plan. |
| 99.3 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 1997 Stock Option Plan. |
| 99.4 | WebManage Technologies, Inc. 1999 Stock Option Plan. |
| 99.5 | Form of WebManage Technologies, Inc. Stock Option Agreement for 1999 Stock Option Plan. |
| 99.6 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 1999 Stock Option Plan. |
| 99.7 | WebManage Technologies, Inc. 2000 Stock Incentive Plan. |
| 99.8 | Form of WebManage Technologies, Inc. Stock Option Agreement for 2000 Stock Incentive Plan. |
| 99.9 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 2000 Stock Incentive Plan. |

```
</TABLE>


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-5
<SEQUENCE>2
<FILENAME>f68554orex5.txt
<DESCRIPTION>EXHIBIT 5
<TEXT>

<PAGE>    1
```

                                                            EXHIBIT 5

              OPINION AND CONSENT OF BROBECK, PHLEGER & HARRISON LLP


                            January 16, 2001


Network Appliance, Inc.
495 East Java Drive
Sunnyvale, CA 94089

        Re:    Network Appliance, Inc. - Registration Statement for Offering of
               an Aggregate of 255,341 Shares of Common Stock

Dear Ladies and Gentlemen:

        We have acted as counsel to Network Appliance, Inc., a California
corporation (the "Company"), in connection with the registration on Form S-8
(the "Registration Statement") under the Securities Act of 1933, as amended, of
(a) 15,003 shares of the Company's common stock reserved for issuance under the
WebManage Technologies, Inc. 1997 Stock Option Plan as assumed by the Company
(the "1997 Plan"), (b) 74,050 shares of the Company's common stock reserved for

issuance under the WebManage Technologies, Inc. 1999 Stock Option Plan as assumed by the Company (the "1999 Plan") and (c) 166,288 shares of the Company's common stock reserved for issuance under the WebManage Technologies, Inc. 2000 Stock Incentive Plan as assumed by the Company (the "2000 Plan")

This opinion is being furnished in accordance with the requirements of Item 8 of Form S-8 and Item 601(b)(5)(i) of Regulation S-K.

We have reviewed the Company's charter documents and the corporate proceedings taken by the Company with respect to the assumption of the 1997 Plan, the 1999 Plan, and the 2000 Plan and the options outstanding thereunder in connection with the Company's acquisition of WebManage Technologies, Inc. Based on such review, we are of the opinion that if, as and when the shares of the Company's common stock are issued and sold (and the consideration therefor received) pursuant to the provisions of option agreements for the outstanding options assumed under the 1997 Plan, the 1999 Plan, and the 2000 Plan and in accordance with the Registration Statement, such shares will be duly authorized, legally issued, fully paid and nonassessable.

We consent to the filing of this opinion letter as Exhibit 5 to the Registration Statement.

This opinion letter is rendered as of the date first written above and we disclaim any obligation to advise you of facts, circumstances, events or developments which hereafter may be brought to our attention and which may alter, affect or modify the opinion expressed herein. Our opinion is expressly limited to the matters set forth above and we render no opinion, whether by implication or otherwise, as to any other matters relating to the Company, the 1997 Plan, the 1999 Plan, the 2000 Plan or the shares of the Company's common stock issuable under such plans.

Very truly yours,

/s/ Brobeck, Phleger & Harrison LLP

BROBECK, PHLEGER & HARRISON LLP

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>3
<FILENAME>f68554orex23-1.txt
<DESCRIPTION>EXHIBIT 23.1
<TEXT>

<PAGE>    1
```

EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT

We consent to the incorporation by reference in this Registration Statement of Network Appliance, Inc. on Form S-8 of our report dated May 16, 2000 (June 13, 2000 as to Note 11), appearing in the Annual Report on Form 10-K of Network Appliance, Inc. for the year ended April 30, 2000.

/s/ Deloitte & Touche LLP
Deloitte & Touche LLP

San Jose, California
January 15, 2001

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>4
<FILENAME>f68554orex99-1.txt
<DESCRIPTION>EXHIBIT 99.1
<TEXT>

<PAGE>     1

EXHIBIT 99.1

WebManage Technologies, Inc.
Stock Option Plan 1997

WEBMANAGE TECHNOLOGIES. INC.

1997 STOCK OPTION PLAN

1.     PURPOSE OF THE PLAN

The WebManage Technologies, Inc. 1997 Stock Option Plan (the "Plan") is intended
to promote the growth of the WebManage Technologies, Inc. (the "Company") by
attracting and motivating directors, officers, employees, consultants,
independent contractors, vendors, suppliers and other persons whose efforts are
deemed worthy of encouragement through the incentive effects of stock options.

2.     DEFINITIONS

As used herein, the following definitions shall apply:

(a) "Board" shall mean the Committee if one has been appointed or, if no
Committee has been appointed, the Board of Directors of the Company.

(b) "Code" shall mean the Internal Revenue Code of 1986, as amended, the rules
and regulations promulgated thereunder and the interpretations thereof, all as
from time to time in effect.

(c) "Committee" shall mean the Committee appointed by the Board in accordance
with Section 3(a) below, if one is appointed.

(d) "Common Stock" shall mean the no par value common stock of the Company.

(e) "Company" shall mean WebManage Technologies, Inc., a Delaware corporation.

(f) "Consultant" shall mean any person who is engaged by the Company or any
Parent or Subsidiary of the Company to render consulting or advisory services,
whether or not compensation is paid to such individual.

(g) "Continuous Status" shall mean the absence of any interruption or

termination of service as an Employee, Consultant or other person providing services on a regular basis to the Company or its Parent or any Subsidiary. Continuous Status shall not be considered interrupted in the case of sick leave, military leave, or any other leave of absence approved by the Board, provided that either such leave is for a period of not more than ninety (90) days or reemployment upon the expiration of such leave is provided or guaranteed by contract or statute.

(h) "Director" shall mean any person serving on the Board.

"Employee" shall mean any person, including Officers and Directors, employed by the Company or its Parent or any Subsidiary of the Company.

0) "Fair Market Value" shall mean the value of a share of Common Stock on the date of the grant of the Option as determined, in good faith, by the Board or the Committee and such determination shall be conclusive for all purposes. The Board or Committee shall take into account such factors affecting value as it, in its sole and absolute discretion, may deem relevant.

<PAGE>    2
WebManage Technologies, Inc.
Stock Option Plan 1997

(k) "Officer" shall mean any person, which may include Directors, employed by the Company or its Parent or any Subsidiary of the Company who has been elected an officer by the respective Board of Directors.

(1) "Option" shall mean a stock option issued pursuant to the Plan. Options may be either "Incentive Options," which are defined as options intended to meet the requirements of Section 422 of the Code, or "Nonqualified Options," which are defined as Options not intended to meet such requirements of the Code.

(M) "Option Agreement" shall mean the written agreement setting forth the terms and conditions of an Option.

(n) "Optioned Stock" shall mean the Common Stock subject to an option.

(o) "Optionee" shall mean a person or entity to whom an Option has been granted.

(p) "Parent" shall mean a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(q) "Plan" shall mean the WebManage Technologies, Inc. 1997 Stock Option Plan.

(r) "Share" shall mean a share of Common Stock of the Company, as may be adjusted in accordance with Section 6 below.

(s) "Subsidiary" shall mean a "subsidiary corporation" of the Company, whether now or hereafter existing, as defined in Section 424(f) of the Code.

3.    ADMINISTRATION OF THE PLAN

(a) By the Board or by the Committee. The Plan shall be administered by the Board or, if appointed by the Board, by a Committee; provided, however, if the Company shall have registered a class of equity securities pursuant to Section 12 of the Securities Exchange Act of 1934, then the Plan shall be administered

by the Board or, if appointed, by a Committee of two or more directors, all of which shall be "disinterested" as defined in Rule 16b-3 under the Securities Exchange Act of 1934. The Board and the Committee shall have full authority to administer the Plan, including authority to interpret and construe any provision of the Plan and to adopt such rules and regulations for administering the Plan as it may deem necessary in order to comply with the requirements of the Plan, or in order that any Option that is intended to be an Incentive Option will be classified as an incentive stock option under the Code, or in order to conform to any regulation or to any change in any law or regulation applicable thereto. The Board may reserve to itself any of the authority granted to the Committee as set forth herein, and it may perform and discharge all of the functions and responsibilities of the Committee at any time that a duly constituted Committee is not appointed and serving.

(b) Actions of the Board and the Committee. All actions taken and all interpretations and determinations made by the Board or by the Committee in good faith (including determinations of Fair Market Value) shall be final and binding upon all Optionees, the Company and all other interested persons. No member of the Board or the Committee shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan, and all

<PAGE>    3
WebManage Technologies, Inc.
Stock Option Plan 1997

members of the Board or the Committee shall, in addition to their rights as directors, be fully protected by the Company with respect to any such action, determination or interpretation.

(c) Powers of the Board and the Committee. Subject to the provisions of the Plan, the Board and, if appointed, the Committee shall have the authority, in their discretion to:

(i) determine, upon review of the relevant information, the Fair Market Value of the Common Stock;

(ii) determine the persons to whom Options shall be granted, the time or times at which Options shall be granted, the number of shares to be represented by each Option and the exercise price per share;

(iii) interpret the Plan;

(iv) prescribe, amend, and rescind rules and regulations relating to the Plan;

(v) determine whether an Option granted shall be an Incentive Option or a Nonqualified option and to determine the terms and provisions of each Option granted (which need not be identical) and, with the consent of the holder thereof, to modify or amend each Option, including reductions in the exercise price thereof;

(vi) accelerate or defer (with the consent of the Optionee) the exercise date of any Option;

(vii) authorize any person to execute on behalf of the Company any instrument required to effectuate the grant of an Option previously granted by the Board; and

(viii) make all other determinations deemed necessary or advisable for the administration of the Plan.

4.    ELIGIBILITY AND PARTICIPATION

(a) Eligibility. Grants of Options may be made to any Employee or Consultant (which may include Officers and/or Directors) of the Company or of its Parent or Subsidiary, or any independent contractor, vendor, supplier or any other person providing services to the Company or a Parent or Subsidiary whose efforts are deemed worthy of encouragement by the Board; provided, however, that an Incentive Option may only be granted to an Employee.

(b) Participation by Director. Members of the Board who are either eligible for Options or have been granted Options may vote on any matters affecting the administration of the Plan or the grant of any Options pursuant to the Plan, except that no such member shall act upon the granting of an Option to himself, but any such member may be counted in determining the existence of a quorum at any meeting of the Board and may be counted as part of an action by unanimous written consent during or with respect to which action is taken to grant Options to him.

5.    EXERCISE PRICE; CONSIDERATION; AND FORM OF OPTION AGREEMENT

(a) Exercise Price. The exercise price of any Incentive Option shall be not less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the date of the grant of the Option. The exercise price of a Nonqualified Option shall be determined in the sole discretion of the Board and may be at less than the Fair Market Value on the date of the grant of the Option. If an Incentive Option is granted to an Optionee who then owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Company or its

<PAGE>    4
WebManage Technologies, Inc.
Stock Option Plan 1997

Parent or any Subsidiary, then the exercise price of such Incentive Option shall be at least one hundred ten percent (1 10 %) of the Fair Market Value of the Company's Common Stock on the date of the grant of such Option.

(b) Consideration. The exercise price shall be paid in full, at the time of exercise of the Option, by personal or bank cashier's check or in such other form of lawful consideration as the Board or the Committee may approve from time to time, including, without limitation, the transfer of outstanding shares of Common Stock as provided in Section 7(c) or the Optionee's promissory note in form satisfactory to the Company and bearing interest at a rate of not less than the relevant applicable federal rate as defined in Section 1274(d)(1) of the Code as in effect at such time, as determined by the then most recently published applicable Revenue Ruling by the Internal Revenue Service.

(c)    Form of Option Agreement. Each Option shall be evidenced by an Option Agreement specifying the number of shares which may be purchased upon exercise of the Option and containing such terms and provisions as the Board or the Committee may determine, subject to the provisions of the Plan.

6.    SHARES OF COMMON STOCK SUBJECT TO THE PLAN

(a) Number. The aggregate number of shares of Common Stock subject to Options
which may be granted under the Plan shall be 2,000,000 subject to adjustment as
herein below provided. To the extent any Option granted under the Plan shall
expire or terminate unexercised or for any reason become unexercisable, the
shares subject to such Option shall thereafter be available for future grants
under the Plan.

(b) Capital Changes. Except as hereinafter provided, no adjustment shall be made
in the number of shares of Common Stock issued to an Optionee, or in any other
rights of the Optionee upon exercise of an Option, by reason of any dividend,
distribution or other right granted to stockholders for which the record date is
prior to the date of exercise of the Optionee's Option. In the event any change
is made to the shares of Common Stock (whether by reason of a merger,
consolidation, reorganization, recapitalization, stock dividend, stock split,
combination of shares, exchange of shares, change in corporate structure or
otherwise), appropriate adjustments shall be made in: (i) the number of shares
of Common Stock theretofore made subject to Options, and in the exercise price
of such shares; and (ii) the aggregate number of shares which may be made
subject to Options.

7.    EXERCISE OF STOCK OPTIONS

(a) Time of Exercise. Subject to the provisions of the Plan, including without
limitation Section 7(d) and Section 8, the Board or the Committee, in its
discretion, shall determine the time when an Option, or a portion of an Option,
shall become exercisable, and the time when an Option, or a portion of an
Option, shall expire; provided, however, that (i) an Incentive Option shall
expire, to the extent not exercised, no later than the tenth (10th) anniversary
of the date on which it was granted; and (ii) any Incentive Option granted to
any person who owns shares possessing more than 10% of the total combined voting
power or value of all classes of stock of the Company or of its Parent or a
Subsidiary shall have a term of not to exceed five (5) years. Such time or times
shall be set forth in the Option Agreement evidencing such Option.

(b) Notice of Exercise. An Optionee electing to exercise an Option shall give
written notice to the Company, as specified by the Option Agreement, of the
Optionee's election to purchase a specified number of shares, such notice shall
be accompanied by the instrument evidencing such Option and any other documents
required by the Company, and shall tender the exercise price of

<PAGE>    5
WebManage Technologies, Inc.
Stock Option Plan 1997

the shares that the Optionee has elected to purchase. If the notice of election
to exercise is given by the executor or administrator of a deceased Optionee, or
by the person or persons to whom the Option has been transferred by the
Optionee's will or the applicable laws of descent and distribution, the Company
will be under no obligation to deliver shares pursuant to such exercise unless
and until the Company is satisfied that the person or persons giving such notice
is or are entitled to exercise the Option.

(c) Exchange of Outstanding Stock. The Board, in its sole discretion, may permit
an Optionee to surrender to the Company shares of Common Stock previously

acquired by the Optionee at least six (6) months prior to such surrender as part or full payment for the exercise of an Option. Such surrendered shares shall be valued at their Fair Market Value on the date of exercise of the Option.

(d) Termination of Continuous Status Before Exercise. Unless otherwise provided in the terms of an Option Agreement, the vested portion of an Option held by an Optionee who is an Employee or a Consultant, as the case may be, at the date of grant of such Option, may be exercised by the Optionee at any time while the Optionee is an Employee or a Consultant, respectively, or within 30-days of termination, and has maintained Continuous Status with the Company or its Parent or any Subsidiary from the date of the grant of the Option (other than the Optionee's death, retirement or disability as provided below) until 30-days prior to the date of the exercise of the Option. Any Option held by the Optionee at such time as he/she is no longer an Employee or Consultant or Continuous Status is not maintained shall be deemed to have been forfeited and be of no further force or effect. In no event, however, may any Option be exercised after the expiration of its term.

(e) Death. If an Optionee dies at a time when the Optionee is entitled to exercise an Option, then at any time or times within thirty (30) days after the Optionee's death (or such further period as the Board may allow) such Option may be exercised, as to all or any of the shares which the Optionee was entitled to purchase immediately prior to the Optionee's death by (i) the Optionee's executor or administrator or the person(s) to whom the Option is transferred by will or the applicable laws of descent and distribution or (ii) the Optionee's designated beneficiary, and except as so exercised such Option will expire at the end of such period. In no event, however, may any Option be exercised after the expiration of its term.

(f) Retirement and Disability. If an Optionee retires from service at age 65 or older or retires at less than age 65 with the consent of the Board or becomes "disabled" (as hereinafter defined) at a time when the Optionee is entitled to exercise an Option, then, at any time or times within thirty (30) days of the date of such retirement or within thirty (30) days of the date of such disability, the Optionee may exercise such Option as to all or any of the shares which the Optionee was entitled to purchase under such Option immediately prior to such retirement or disability. Except as so exercised, such Option shall expire at the end of such period. In no event, however, may any Option be exercised after the expiration of its term. As used herein, "disabled" shall mean that the Optionee is permanently and totally disabled so as to be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than three (3) months.

(g) Disposition of Terminated Stock Options. Any shares of Common Stock subject to Options which have been terminated as provided above shall not thereafter be eligible for purchase by the Optionee but shall again be available for grant by the Board to other Optionees.

<PAGE>   6
WebManage Technologies, Inc.
Stock Option Plan 1997

          (h)      Stock Redemption Agreement. As a condition to the exercise of an
                   Option by an Optionee, the Board or Committee may require the
                   Optionee to execute and deliver a Stock Redemption Agreement,
                   Shareholder Agreement or other agreement in such form as the

Board or Committee shall approve and providing for appropriate
restrictions on transfer of the Common Stock acquired pursuant
to such exercise.

8.    SPECIAL PROVISIONS RELATING TO INCENTIVE OPTIONS

(a) $100,000.00 Limit. The Company shall not grant Incentive Options under the
Plan to any Optionee to the extent that the aggregate Fair Market Value
(determined as of the date of grant) of the Common Stock covered by such
Incentive Options which are exercisable for the first time during any calendar
year, when combined with the aggregate Fair Market Value of all stock covered by
Incentive Options granted to such Optionee after December 31, 1986 by the
Company, its Parent or a Subsidiary thereof which are exercisable for the first
time during the same calendar year, exceeds $100,000.

(b) Grants to Employees Only. Incentive Options shall be granted only to persons
who, on the date of grant, are Employees of the Company or its Parent or a
Subsidiary of the Company.

9.    NO CONTRACT OF EMPLOYMENT

Unless otherwise expressed in a writing signed by an authorized officer of the
Company, all Employees of the Company are hired for an unspecified period of
time and are considered to be "at-will employees." Nothing in this Plan shall
confer upon any Optionee the right to continue in the employ of the Company, its
Parent or any Subsidiary, nor shall it limit or restrict in any way the right of
the Company, its Parent or any such Subsidiary to discharge the Optionee at any
time for any reason whatsoever, with or without cause.

10.    NO RIGHTS AS A STOCKHOLDER

An Optionee shall have no rights as a stockholder with respect to any shares of
Common Stock subject to an Option.

11.    NONTRANSFERABILITY OF OPTIONS; DEATH OF OPTIONEE

No Option acquired by an Optionee under the Plan shall be assignable or
transferable by an Optionee, other than by will or the laws of descent and
distribution, and such Options are exercisable, during the Optionee's lifetime,
only by Optionee; provided, however, that (i) a transfer may be made pursuant to
a qualified domestic relations order (as defined in the Code or as permitted by
Title I of the Employee Retirement Income Security Act ("ERISA") or the rules
thereunder) and (ii) any Option Agreement issued under the Plan may provide for
the designation of a beneficiary of the Optionee (which may be an individual or
trustee) who may exercise the Option after the Optionee's death and enjoy the
economic benefits thereof, subject to the consent of Optionee's spouse where
required by law. Subject to Section 7(e), in the event of Optionee's death, the
Option may be exercised by the personal representative of the Optionee's estate
or, if

<PAGE>    7
WebManage Technologies, Inc.
Stock Option Plan 1997

no personal representative has been appointed, by the successor(s) in interest determined under the Optionee's will or under the applicable laws of descent and distribution.

12.    LIQUIDATION OR MERGER OF THE COMPANY

(a) Liquidation. In the event of a proposed dissolution or liquidation of the Company, the Option shall terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board. The Board may, in the exercise of its sole discretion in such instances, declare that any Option shall terminate as of a date fixed by the Board and give each Optionee the right to exercise such Option as to all or any part of the Shares covered by an Option, including Shares as to which the Option would not otherwise be exercisable.

(b) Sale of Assets, Merger or Consolidation or Change of Control. The Board may provide for immediate vesting of any or all Options, and allow such Options to be fully exercised without regard to the normal vesting schedule of such Options, in the event of a proposed sale of all or substantially all of the assets of the Company, or a merger or consolidation of the Company with or into another corporation, a liquidation, or a "change of control" (as defined below); provided, however, that if the Board determines that such immediate vesting is not appropriate, then the Options, if the event is a merger or consolidation, shall be assumed or an equivalent option shall be substituted by such successor corporation (or a parent or subsidiary of such successor corporation) as a condition to the completion of such transaction. The term "Change in Control" shall be deemed to have occurred if (i) any "person" or "group" (as defined in or as pursuant to section 13(d) and (14)d of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), becomes a "beneficial owner" (as defined in Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of securities of the Company representing thirty percent (30%) or more of the combined voting power of the Common Stock (and the preferred stock, if any) outstanding which votes generally for the election of directors; or (ii) the Company or any of its Subsidiaries sell, in one or more transactions, other than in the ordinary course of business, assets constituting in the aggregate all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis.

13.    AMENDMENTS; DISCONTINUATION OF PLAN

The Board may from time to time alter, amend, suspend or discontinue the Plan, including, where applicable, any modifications or amendments as it shall deem advisable for any reason, including satisfying the requirements of any law or regulation or any change thereof; provided, however, that no such action shall adversely affect the rights and obligations with respect to Options at any time outstanding under the Plan; and provided further, that no such action shall, without the approval of the stockholders of the Company, (i) materially increase the maximum number of shares of Common Stock that may be made subject to Options (unless necessary to effect the adjustments required by Section 6(b)), (ii) materially increase the benefits accruing to Optionees under the Plan, or (iii) materially lessen the requirements as to eligibility for participation in the Plan. No such amendment shall materially adversely affect the rights of any Optionee under any Option previously granted without such Optionee's prior consent.

14.    REGISTRATION OF OPTIONED STOCK

The Options shall not be exercisable unless the purchase of such Optioned Stock

is pursuant to an applicable effective registration statement under the Securities Act of 1933, as amended, or unless, in the opinion of counsel to the Company, the proposed purchase of such Optioned Stock would be exempt from the registration requirements of the Securities Act of 1933, as amended.

<PAGE>    8
WebManage Technologies, Inc.
Stock Option Plan 1997

15.    WITHHOLDING TAXES; SATISFIED BY WITHHOLDING OPTIONED SHARES

(a) General. The Company, its Parent or any Subsidiary may take such steps as it may deem necessary or appropriate for the withholding of any taxes which the Company, its Parent or any Subsidiary is required by law or regulation of any governmental authority, whether Federal, state or local, domestic or foreign, to withhold in connection with any Option including, but not limited to, requiring the Optionee to pay such tax at the time of exercise or the withholding of issuance of shares of Common Stock to be issued upon the exercise of any Option until the Optionee reimburses the Company for the amount the Company is required to withhold with respect to such taxes, or, at the Company's sole discretion, canceling any portion of such issuance of Common Stock in any amount sufficient to reimburse itself for the amount it is required to so withhold.

(b) Satisfying Taxes by Withholding Optioned Shares. Option Agreements under the Plan may, at the discretion of the Board, contain a provision to the effect that all Federal and state taxes required to be withheld or collected from an Optionee upon exercise of an Option may be satisfied by the withholding of a sufficient number of exercised Optioned Stock which, valued at Fair Market Value on the date or exercise, would be equal to the total withholding obligation of the Optionee for the exercise of such Option; provided, however, that if the Company is a public reporting corporation, no person who is an "officer" of the Company as such term is defined in Rule 3b-2 under the Securities Exchange Act of 1934 may elect to satisfy the withholding of Federal and state taxes upon the exercise of an option by the withholding of Optioned Stock unless such election is made either (i) at least six (6) months prior to the date that the exercise of the Option becomes a taxable event or (ii) during any of the periods beginning on the third business day following the date on which the Company issues a news release containing the operating results of a fiscal quarter or fiscal year and ending on the twelfth business day following such date. Such election shall be deemed made upon receipt of notice thereof by an officer of the Company, by mail, personal delivery or by facsimile message, and shall (unless notice to the contrary is provided to the Company) be operative for all option exercises which occur during the twelve (12) month period following election.

16.    EFFECTIVE DATE AND TERM OF PLAN

The Plan is effective as of the date of adoption by the Board and Options may be granted at any time on or after such date; provided, however, that the Plan shall terminate if the stockholders of the Company do not approve and adopt it within twelve (12) months of such date. No Options shall be granted subsequent to ten (10) years after the effective date of the Plan; however, Options outstanding subsequent to ten (10) years after the effective date of the Plan shall continue to be governed by the provisions of the Plan until exercised or terminated in accordance with the Plan or the respective Option Agreements.

```
ADOPTED BY THE BOARD OF DIRECTORS
ON _____, 199___


APPROVED BY THE STOCKHOLDERS
ON _____, 199___



ATTEST:



<PAGE>    9
WebManage Technologies, Inc.
Stock Option Plan 1997


- --------------------------------
Secretary


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.2
<SEQUENCE>5
<FILENAME>f68554orex99-2.txt
<DESCRIPTION>EXHIBIT 99.2
<TEXT>

<PAGE>    1
```

<div align="right">EXHIBIT 99.2</div>

<div align="center">WEBMANAGE TECHNOLOGIES, INC.

STOCK OPTION AGREEMENT
UNDER ITS
1997 STOCK OPTION PLAN</div>

        This STOCK OPTION AGREEMENT (this "Agreement") is issued to the Optionee
hereinbelow set forth pursuant to the WebManage Technologies, Inc. 1997 Stock
Option Plan (the "Plan") of WebManage Technologies, Inc., a New Hampshire
corporation (the "Company").

1. OPTIONEE; BASIC TERMS.

        The Optionee is hereby granted an option to purchase the number of fully
paid and non-assessable shares of the Common Stock of the Company at the option
price hereinbelow set forth, subject to the terms and conditions of this
Agreement.

2. DEFINITIONS.

        (a) "CODE" shall mean the Internal Revenue Code of 1986, as amended, the
rules and regulations promulgated thereunder and the interpretations thereof,
all as from time to time in effect.

(b) "EXERCISE DATES" shall mean the following dates after which the
Option may be exercised in the increments set forth below:

```
        Exercise Dates           Optioned Stock
        --------------           --------------


        --------------           --------------

        --------------           --------------

        --------------           --------------

        --------------           --------------
```

(c) "GRANT DATE" shall mean the date of grant of the Option, being
_____, 199___.

(d) "INCENTIVE OPTION" shall mean an option described in Section 422 of
the Code. To qualify for favorable tax treatment provided by an incentive
option, the shares purchased upon exercise must be held for a period of two (2)
years from the date of the option grant and for a period of one (1) year after
the shares are transferred to Optionee.

(e) "NONQUALIFIED OPTION" shall mean an option other than an Incentive
Option, the exercise of which generally results in an immediate taxable event.

(f) "OPTION" shall have the meaning set forth in Section 3(a) hereof.


<PAGE>    2

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan


(g) "OPTIONED STOCK" shall mean _____ (___) shares of the no
par value Common Stock of the Company.

(h) "OPTIONEE" shall mean _____.

(i) "PURCHASE PRICE" shall mean the price per share for the Optioned
Stock and shall be $ _____.

(j) "VESTING PERIOD" shall mean a period of _____(___) years
commencing on the Grant Date.

(k) Unless otherwise indicated, all capitalized terms set forth in this
Agreement shall have the meaning provided to them under the Plan, a copy of
which Optionee acknowledges having received.

3. GRANT OF OPTION.

(a) As of the Grant Date, the Company hereby grants to the Optionee an
option (the "Option") to purchase the Optioned Stock upon the terms and
conditions set forth below.

(b) This Option is intended to be a(n) (check one only):

    [ ]    Incentive Option (only employees of the Company are eligible)

    [ ]    Nonqualified Option

(c) The Optionee's relationship to the Company is as a(n) (if applicable, check more than one):

    [ ]    Officer

    [ ]    Director

    [ ]    Employee

    [ ]    Consultant

    [ ]    Other Person providing services

-2-

<PAGE>   3

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

4. DURATION OF OPTION.

(a) INCENTIVE OPTION: If this Option is an Incentive Option, as designated in Section 3(b), it shall expire one day short of ten (10) years from the Grant Date, provided, however, for any Optionee who owns more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company, this Option shall expire one day short of five (5) years from the Grant Date.

(b) NONQUALIFIED OPTION: If this Option is a Nonqualified Option, as designated in Section 3(b), it shall expire ten (10) years from the Grant Date.

5. PURCHASE PRICE.

The Purchase Price for the Optioned Stock has been determined by the Board of Directors of the Company and: (a) may or may not be less than the Fair Market Value on the Grant Date if the Option is a Nonqualified Option, (b) shall be equal to at least one-hundred percent (100%) of the Fair Market Value if the Option is an Incentive Option, or (c) shall be equal to at least one-hundred ten percent (110%) of the Fair Market Value if the Option is an Incentive Option and Optionee holds more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company or of its Parent or any Subsidiary.

6. EXERCISABILITY. Subject to the provisions of this Agreement, including without limitation Section 10 regarding termination of Optionee's employment, consulting or other relationship with the Company and Section 14(b) regarding Incentive Options, this Option shall vest in annual increments over the Vesting Period equal to the total number of shares of Optioned Stock divided by the number of years in the Vesting Period. Optioned Stock, to the extent vested

shall become exercisable, in one or more installments (to the nearest whole number) on the Exercise Dates, to the extent of the total number of Shares of the Optioned Stock set forth next to such Exercise Date in the definition thereof. The number of shares of Optioned Stock which become exercisable each year, to the extent not previously exercised, shall accumulate until exercised in accordance with and subject to the terms and conditions of this Agreement.

7. METHOD OF EXERCISE AND PAYMENT.

    (a) EXERCISE. This Option may be exercised from time to time, in whole or in part, to the extent exercisable, only by delivery to an officer of the Company of the original of this Option with an appropriate Notice of Exercise of Stock Option duly signed by the Optionee, together                    .

-3-

<PAGE>    4

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

with the full Purchase Price of the shares purchased pursuant to the exercise of the Option and an executed Stock Redemption Agreement pursuant to Section 7(b) hereof; provided, however, that this Option may not be exercised if such exercise would violate any law or governmental order or regulation. Payment for the shares of Optioned Stock purchased pursuant to any exercise shall be made in full at the time of such exercise, in any of the following methods, as determined by the Board of Directors and as may be elected by the Optionee:

    (i)     may ____ or may not ____ pay in cash or by check payable to the
            order of the Company;

    (ii)    may ____ or may not ____ pay in Common Stock of the Company
            already owned by the Optionee for a period of six (6) months
            prior to such exercise, valued as of the date of exercise of the
            Option at Fair Market Value; or

    (iii)   may ____ or may not ____ pay by a promissory note payable to the
            order of the Company; if a promissory note is tendered, such
            note shall bear interest at an interest rate determined by, and
            shall be subject to such terms and conditions as are prescribed
            by, the Board as set forth in the form of promissory note then
            utilized under the Plan.

    (b) STOCK REDEMPTION AGREEMENT. The Optionee shall execute and deliver to the Company, together with the Notice of Exercise of Stock Option and payment in full of the Purchase Price, duplicate originals of a Stock Redemption Agreement in the form set forth in Exhibit 1 attached to this Agreement. The Company shall not issue any shares of Optioned Stock to the Optionee unless and until Optionee executes and delivers such Stock Redemption Agreement.

    (c) TAX WITHHOLDINGS. Optionee agrees to have withheld from any remuneration payable to such Optionee by the Company and/or to pay to the Company, at the time of exercise of the Option, an amount which is required to be withheld or paid pursuant to any Federal, state or local tax or revenue laws or regulations, as may be determined by the Company. The Optionee may not satisfy such tax withholding by instructing the Company to withhold such number of shares of Optioned Stock that would equal the total tax obligations required

to be withheld.

8. NON-TRANSFERABILITY. This Option shall not be transferred, sold, pledged, assigned, hypothecated, or disposed of in any manner by Optionee other than by will or the laws of descent and distribution to the extent hereinafter set forth; provided, however, that a transfer hereof may be made pursuant to a qualified domestic relations order (as defined in the Code or as permitted

-4-

<PAGE>    5

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

by Title I of the Employee Retirement Income Security Act ("ERISA") or the rules thereunder) and, provided further, that Optionee may designate a beneficiary (which may be an individual or trustee) who may exercise the Option after Optionee's death and enjoy the economic benefits thereof, subject to the consent of Optionee's spouse where required by law. This Option may be exercised during the Optionee's lifetime only by the Optionee or, upon the Optionee's legal incapacity to act on the Optionee's own behalf, by the Optionee's conservator or other lawful representative. The Option shall be null and void and without effect upon any attempted assignment or transfer, except as hereinabove provided, including without limitation, any purported assignment, whether voluntary of by operation of law, pledge, hypothecation or other disposition contrary to the provisions hereof, or levy of execution, attachment, trustee process or similar process, whether legal or equitable, upon the Option.

9. TERMINATION. To the extent that this Option shall not have been exercised in full prior to its termination or expiration date, whichever shall be sooner, it shall terminate and become void and of no effect.

10. CESSATION OF CONTINUOUS STATUS -- TERMINATION, RETIREMENT, DEATH OR DISABILITY. If the Optionee shall voluntarily or involuntarily cease Continuous Status (as such term is defined in the Plan) (hereinafter referred to as a "Termination"), the Option of the Optionee shall terminate immediately upon the Termination and the Optionee in such event shall have no right after such Termination to exercise any unexercised Option that the Optionee might have exercised on or prior to the Termination; provided, however, that if the Termination is due to (i) retirement by the Optionee on or after attaining the age of sixty-five (65) years, (ii) the disability of the Optionee or (iii) the death of the Optionee, then the Optionee or the representative of the estate of the Optionee shall have the privilege of exercising the entire unexercised vested portion of this Option, provided that such exercise be accomplished (a) prior to the expiration of this Option and (b) either within thirty (30) days of the Optionee's retirement, within thirty (30) days of the Optionee's disability, or within thirty (30) days after the date of death of the Optionee, as the case may be.

11. STOCK SPLITS AND CAPITAL ADJUSTMENTS. If, prior to the complete exercise of this Option, there shall be declared and paid a stock dividend upon the Common Stock of the Company or if such stock shall be split up, converted, exchanged or reclassified, this Option, to the extent that it has not been exercised, shall entitle the holder, upon the future exercise of this Option, to such number and kind of securities or other property, subject to the terms of the Option, to which the holder would be entitled had he actually owned the stock subject to the unexercised portion of the Option at the time of the occurrence of such

stock dividend, split up, conversion, exchange, reclassification or
substitution; and the aggregate purchase price upon the future exercise of the

-5-

<PAGE>    6

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

Option shall be the same as if shares of Common Stock of the Company originally
optioned were being purchased as provided herein.

12. ACCELERATION OF EXERCISE DATE.

    (a) SALE OF ASSETS, MERGER, CONSOLIDATION AND CHANGE OF CONTROL. The
Board of Directors of the Company may, but shall not be required, to provide for
immediate vesting of any or all outstanding unexercised Options in the event of
any proposed merger, acquisition or sale of the Company (other than a merger,
acquisition or sale with respect to which a majority of the members of the Board
of Directors of the Company prior to the merger, acquisition or sale continue to
be a majority of the Board of Directors of the resulting corporation after such
merger, acquisition or sale), all pursuant to and subject to the terms and
conditions of the Plan including, without limitation, the limitations upon
vesting imposed by Section 8 of the Plan.

13. COMPLIANCE WITH SECURITIES LAWS.

    (a) POSTPONE ISSUANCE. Notwithstanding any provision of this Option to
the contrary, the Company may postpone the issuance and delivery of shares upon
any exercise of this Option until one of the following conditions shall be met:

        (i) The shares of Optioned Stock with respect to which such Option
has been exercised are at the time of the issue of such shares effectively
registered under applicable Federal and state securities laws now in force or
hereafter enacted or amended; or

        (ii) Counsel for the Company shall have given an opinion that
registration of such shares under applicable Federal and state securities laws,
as now in force or hereafter enacted or amended, is not required.

    (b) INVESTMENT REPRESENTATION. In the event that for any reason the
shares of Optioned Stock to be issued upon exercise of the Option shall not be
effectively registered under the Securities Act of 1933 (the "1933 Act"), upon
any date on which the Option is exercised in whole or in part, the Company shall
be under no further obligation to issue shares of Optioned Stock unless the
Optionee shall give a written representation to the Company, in form
satisfactory to the Company, that such person is acquiring the shares of
Optioned Stock issued pursuant to such exercise of the Option for investment and
not with a view to, or for sale in connection with, the distribution of any such
shares, and that he/she will make no transfer of the same except in compliance
with the 1933 Act and the rules and regulations promulgated

-6-

<PAGE>    7

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

thereunder and then in force, and in such event, the Company may place an
"investment legend" upon any certificate for the shares of Optioned Stock issued
by reason of such exercise.

14. SPECIAL RULES REGARDING INCENTIVE OPTIONS.

     (a) NOTICE OF TRANSFER. If this Option is an Incentive Option, then the
employee-Optionee hereby agrees to notify the Company in writing within three
(3) days after any sale, transfer or other disposition of shares acquired upon
the exercise of this Option which occurs within either twelve (12) months
following the date of exercise or twenty-four (24) months following the Grant
Date.

     (b) $100,000 PER YEAR EXERCISE LIMIT. If this option is an Incentive
Option, then it shall be exercisable in accordance with the above schedule of
Section 6, but in no event shall it be exercised to the extent that the
aggregate fair market value of Optioned Stock, which is exercisable for the
first time during any calendar year, when combined with the aggregate fair
market value of all stock covered by incentive stock options (as defined in the
Code) granted to Optionee after December 31, 1986 by the Company, its parent or
a subsidiary of the Company which are exercisable for the first time during the
same calendar year, exceeds $100,000.

15. NO AGREEMENT OF EMPLOYMENT. Neither the grant of this Option nor this
Agreement shall be deemed to create any agreement with, or obligation by, the
Company to employ the Optionee for any period of time, it being understood that
employment is strictly "at will" in the absence of any written agreement to the
contrary and, in the absence of such written agreement, such person may be
terminated by the Company at any time, with or without cause.

16. ASSIGNMENT OF INVENTIONS, ETC.; NON-DISCLOSURE OF CONFIDENTIAL INFORMATION.
As further consideration for the issuance of the Option, the Optionee, if the
Optionee is an Employee of the Company, agrees as follows:

     (a) ASSIGNMENT OF INVENTIONS. Any and all trade secrets, inventions and
proprietary information which either (i) relates at the time of conception or
reduction to practice to the company or its business, or actual or demonstrably
anticipated research or development of the Company or (ii) results from any work
performed by the Optionee for the Company is hereby assigned to, and shall
become the absolute property of, the Company and shall at all times and for all
purposes be regarded as acquired and held by the Optionee in a fiduciary
capacity for the sole benefit of the Company, and the Optionee agrees that, upon
request, the Optionee will promptly make all disclosures, execute all
assignments, instruments and papers, and perform all acts whatsoever necessary
or desired by the Company to vest and confirm in it, its successors,

                                    -7-

<PAGE>    8

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

assigns and nominees, all rights created or contemplated by this subsection (a) and which may be necessary or desirable to enable the Company, its successors, assigns, and nominees to secure and enjoy the full benefits and advantages thereof.

(b) NONDISCLOSURE OF CONFIDENTIAL INFORMATION. The Optionee shall not, during the period of employment by the Company or at any time thereafter, directly or indirectly use, divulge, furnish or make accessible to anyone other than the Company, its directors and officers other than in the regular course of the business of the Company or any of its subsidiaries, any knowledge or information with respect to (i) confidential, secret or proprietary plans, data (including financial and cost data), specifications, procedures and techniques, methods, technology, "knowhow" or material relating to the business, products, services (whether existing or under development) or activities of the Company or its subsidiaries, (ii) any confidential business plans or surveys of the Company or its subsidiaries, (iii) any other confidential or secret aspect of the business, products, services or activities of the Company or its subsidiaries, or (iv) any customer usages and requirements or any customer lists of the Company or its subsidiaries. The Optionee shall not, upon leaving the employ of the Company, without the prior written consent of the Board of Directors of the Company, take any data, customer lists, reports, studies, compilations, business plans, presentations/proposals, letters, memoranda, notes or other writings or documents whatever, or copies thereof, which reflect or deal with any of the confidential information described in this Section 16(b).

(c) REMEDIES. The Optionee acknowledges that a breach of the provisions of this Agreement will cause the Company irreparable injury for which the Company cannot be reasonably or adequately compensated in damages. The Company shall, therefore, be entitled, in addition to all other remedies available to it, to injunctive and/or other equitable relief to prevent a breach of this Agreement, or any part of it, and to secure its enforcement, and any termination of Optionee as a result of a violation of this Section 16 shall be deemed "for cause."

17. SUBJECT TO PLAN. This Option is issued subject and pursuant to the provisions of the Plan, receipt of a copy of which the Optionee acknowledges. A determination of the Board of Directors or the Committee established pursuant to the Plan as to any questions which may arise with respect to the interpretation of the provisions of this Option and of the Plan shall be final. The Board of Directors or the Committee may authorize and establish such rules and regulations, and revisions thereof, not inconsistent with the provisions of the Plan, as it may deem advisable. Any provision hereof which is inconsistent with, or contrary to, the terms and conditions of the Plan shall be superseded and governed by the Plan.

-8-

<PAGE>   9

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

18. SEVERABILITY. If any condition, term or provision of this Agreement is determined by a court to be illegal or in conflict with any law, state or Federal, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if this Agreement did not contain the particular condition, term or

provision determined to be unenforceable.

19. ENTIRE AGREEMENT; NEW HAMPSHIRE LAW. This Agreement contains the entire understanding and agreement between the parties hereto respecting the within subject matter, and there are no representations, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this Agreement that are not fully expressed herein. The Company is a New Hampshire corporation, and this Agreement shall be governed by and construed in accordance with the laws of the State of New Hampshire.

WITNESS the signature of its duly authorized officer of the Company as of the date of grant hereof.

THE COMPANY:

WEBMANAGE TECHNOLOGIES, INC.

By:

- -----------------------            ------------------------------
Witness
                                     Title:
                                            ---------------------------

-9-

&lt;PAGE&gt;   10

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

THE OPTIONEE:

Acknowledged and Agreed to*:

- -----------------------------------
Signature

- -----------------------------------
Print Name

- -----------------------------------
Street Address

- -----------------------------------
City, State, Zip Code

- -----------------------------------
Social Security No.

*IF you have any "Inventions" to except from Section 16, you must IDENTIFY ALL SUCH INVENTIONS below, or, if the statement is not applicable, you must write

NONE below.

        None.
- --------------------------------------------------------------------

- --------------------------------------------------------------------

- --------------------------------------------------------------------


                                  -10-


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.3
<SEQUENCE>6
<FILENAME>f68554orex99-3.txt
<DESCRIPTION>EXHIBIT 99.3
<TEXT>

<PAGE>   1

                                                        EXHIBIT 99.3


                        NETWORK APPLIANCE, INC.

                   STOCK OPTION ASSUMPTION AGREEMENT
                     WEBMANAGE TECHNOLOGIES, INC.

                       1997 STOCK OPTION PLAN


OPTIONEE:     _____,

            STOCK OPTION ASSUMPTION AGREEMENT effective as of the 13th day
of November, 2000.

            WHEREAS, the undersigned individual ("Optionee") holds one or
more outstanding options to purchase shares of the common stock of WebManage
Technologies, Inc., a Delaware corporation ("WebManage"), which were granted to
Optionee under WebManage Technologies, Inc. 1997 Stock Option Plan (the "Plan").

            WHEREAS, each of those options is evidenced by a Stock Option
Agreement (the "Option Agreement") issued to Optionee under the Plan.

            WHEREAS, WebManage has been acquired by Network Appliance, Inc.,
a California corporation ("NetApp"), through the merger of WebManage with and
into NetApp (the "Merger") pursuant to the Agreement and Plan of Merger by and
among NetApp and WebManage, dated August 31, 2000 (the "Merger Agreement").

            WHEREAS, the provisions of the Merger Agreement require the

obligations of WebManage under each outstanding option under the Plan to be assumed by NetApp at the consummation of the Merger and the holder of each outstanding option to be issued an agreement evidencing the assumption of such option.

WHEREAS, pursuant to the provisions of the Merger Agreement, the exchange ratio (the "Exchange Ratio") in effect for the Merger is 0.02543 of a share of NetApp common stock ("NetApp Stock") for each outstanding share of WebManage common stock ("WebManage Stock") (rounded down to the nearest whole number of shares of NetApp Stock).

WHEREAS, the purpose of this Agreement is to evidence the assumption by NetApp of the outstanding options held by Optionee at the time of the consummation of the Merger (the "Effective Time") and to reflect certain adjustments to those options which have become necessary in connection with their assumption by NetApp in the Merger.

NOW, THEREFORE, it is hereby agreed as follows:

1. The number of shares of WebManage Stock subject to the options held by Optionee immediately prior to the Effective Time (the "WebManage Options") and the exercise price payable per share are set forth below. NetApp hereby assumes, as of the Effective Time, all

<PAGE>    2

the duties and obligations of WebManage under each of the WebManage Options. In connection with such assumption, the number of shares of NetApp Stock purchasable under each WebManage Option hereby assumed and the exercise price payable thereunder have been adjusted to reflect the Exchange Ratio. Accordingly, the number of shares of NetApp Stock subject to each WebManage Option hereby assumed shall be as specified for that option below, and the adjusted exercise price payable per share of NetApp Stock under the assumed WebManage Option shall also be as indicated for that option below.

<TABLE>
<CAPTION>

| WEBMANAGE STOCK OPTIONS | | NETAPP ASSUMED OPTIONS | |
|---|---|---|---|
| # of Shares of WebManage Common Stock | Exercise Price per Share | # of Shares of NetApp Common Stock | Adjusted Price pe |
| <S> | <C> $ | <C> | <C> $ |

</TABLE>

2. The intent of the foregoing adjustments to each assumed WebManage Option is to assure that the spread between the aggregate fair market value of the shares of NetApp Stock purchasable under each such option and the aggregate exercise price as adjusted pursuant to this Agreement will not, immediately after the consummation of the Merger, be greater than the spread which existed, immediately prior to the Merger, between the then aggregate fair market value of the WebManage Stock subject to the WebManage Option and the aggregate exercise price in effect at such time under the Option Agreement. Such adjustments are also intended to preserve, immediately after the Merger, on a per share basis, the same ratio of exercise price per option share to fair market value per share which existed under the WebManage Option immediately prior to the Merger.

3. Each WebManage Option shall continue to have a maximum term of ten (10) years from the date of grant, subject to earlier termination (as provided in the applicable Option Agreement) following Optionee's cessation of service or employment.

4. The following provisions shall govern each WebManage Option hereby assumed by NetApp:

(a) Unless the context otherwise requires, all references in each Option Agreement and the applicable Plan (to the extent incorporated into such Option Agreement) shall be adjusted as follows: (i) all references to the "Company" shall mean NetApp, (ii) all references to "Stock," "Common Stock" or "Shares" shall mean shares of NetApp Stock, (iii) all references to the "Board" shall mean the Board of Directors of NetApp and (iv) all references to the "Committee" shall mean the Compensation Committee of the NetApp Board of Directors.

(b) Except as modified by this Agreement, the grant date and the expiration date of each assumed WebManage Option and all other provisions which govern either the exercise or the termination of the assumed WebManage Option shall remain the same as set forth in the Option Agreement applicable to that option, and the provisions of the applicable Plan and the Option Agreement

2

<PAGE>    3

shall accordingly govern and control Optionee's rights under this Agreement to purchase NetApp Stock under the assumed WebManage Option.

(c) Each WebManage Option assumed by NetApp which was originally designated as an Incentive Stock Option under the federal tax laws shall retain such Incentive Stock Option status to the maximum extent allowed by law.

(d) Each WebManage Option hereby assumed by NetApp shall continue to vest and become exercisable in accordance with the same installment vesting schedule in effect for that option under the applicable Option Agreement immediately prior to the Effective Time; except, that the number of shares subject to each such installment shall be adjusted to reflect the Exchange Ratio.

(e) For purposes of applying any and all provisions of the Option Agreement and the applicable Plan relating to Optionee's status as an employee or a consultant of WebManage, Optionee shall be deemed to continue in such status as an employee or a consultant for so long as Optionee renders services as an employee or a consultant to NetApp or any present or future majority-owned NetApp subsidiary. Accordingly, the provisions of the Option Agreement governing the termination of the assumed WebManage Options upon Optionee's cessation of service as an employee or a consultant of WebManage shall hereafter be applied on the basis of Optionee's cessation of

employee or consultant status with NetApp and its subsidiaries, and each assumed WebManage Option shall accordingly terminate, within the designated time period in effect under the Option Agreement for that option, following such cessation of employee or consultant status.

(f) The adjusted exercise price payable for the NetApp Stock subject to each assumed WebManage Option shall be payable in any of the forms authorized under the Option Agreement applicable to that option. For purposes of determining the holding period of any shares of NetApp Stock delivered in payment of such adjusted exercise price, the period for which such shares were held as WebManage Stock prior to the Merger shall be taken into account.

(g) In order to exercise each assumed WebManage Option, Optionee must deliver to NetApp a written notice of exercise in which the number of shares of NetApp Stock to be purchased thereunder must be indicated. The exercise notice must be accompanied by payment of the adjusted exercise price payable for the purchased shares of NetApp Stock and should be delivered to NetApp at the following address:

> Network Appliance, Inc.
> 495 East Java Drive
> Sunnyvale, CA 94089
> Attention:  Janice Mahoney

3

<PAGE>    4

5. Except to the extent specifically modified by this Option Assumption Agreement, all of the terms and conditions of each Option Agreement as in effect immediately prior to the Merger shall continue in full force and effect and shall not in any way be amended, revised or otherwise affected by this Stock Option Assumption Agreement.

IN WITNESS WHEREOF, Network Appliance, Inc. has caused this Stock Option Assumption Agreement to be executed on its behalf by its duly-authorized officer as of the 13th day of November, 2000.

> NETWORK APPLIANCE, INC.

> By:
> --------------------------------
> Name:
> Title:

ACKNOWLEDGMENT

The undersigned acknowledges receipt of the foregoing Stock Option Assumption Agreement and understands that all rights and liabilities with respect to each of his or her WebManage Options hereby assumed by NetApp are as set forth in the Option Agreement, the applicable Plan and such Stock Option

Assumption Agreement.

-------------------------------------------

_____, OPTIONEE

DATED: _____, 2000

4

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.4
<SEQUENCE>7
<FILENAME>f68554orex99-4.txt
<DESCRIPTION>EXHIBIT 99.4
<TEXT>

<PAGE>    1
```

EXHIBIT 99.4

WebManage Technologies, Inc.
Stock Option Plan 1999

WEBMANAGE TECHNOLOGIES, INC.

1999 STOCK OPTION PLAN

1.    PURPOSE OF THE PLAN

The WebManage Technologies, Inc. 1999 Stock Option Plan (the "Plan") is intended
to promote the growth of the WebManage Technologies, Inc. (the "Company") by
attracting and motivating directors, officers, employees, consultants,
independent contractors, vendors, suppliers and other persons whose efforts are
deemed worthy of encouragement through the incentive effects of stock options.

2.    DEFINITIONS

As used herein, the following definitions shall apply:

(a) "Board" shall mean the Committee if one has been appointed or, if no
Committee has been appointed, the Board of Directors of the Company.

(b) "Code" shall mean the Internal Revenue Code of 1986, as amended, the rules
and regulations promulgated thereunder and the interpretations thereof, all as
from time to time in effect.

(c) "Committee" shall mean the Committee appointed by the Board in accordance
with Section 3(a) below, if one is appointed.

(d) "Common Stock" shall mean the no par value common stock of the Company.

(e) "Company" shall mean WebManage Technologies, Inc., a Delaware corporation.

(f) "Consultant" shall mean any person who is engaged by the Company or any

Parent or Subsidiary of the Company to render consulting or advisory services, whether or not compensation is paid to such individual.

(g) "Continuous Status" shall mean the absence of any interruption or termination of service as an Employee, Consultant or other person providing services on a regular basis to the Company or its Parent or any Subsidiary. Continuous Status shall not be considered interrupted in the case of sick leave, military leave, or any other leave of absence approved by the Board, provided that either such leave is for a period of not more than ninety (90) days or reemployment upon the expiration of such leave is provided or guaranteed by contract or statute.

(h) "Director" shall mean any person serving on the Board.

"Employee" shall mean any person, including Officers and Directors, employed by the Company or its Parent or any Subsidiary of the Company.

0) "Fair Market Value" shall mean the value of a share of Common Stock on the date of the grant of the Option as determined, in good faith, by the Board or the Committee and such determination shall be conclusive for all purposes. The Board or Committee shall take into account such factors affecting value as it, in its sole and absolute discretion, may deem relevant.

<PAGE>    2

WebManage Technologies, Inc.
Stock Option Plan 1999

(k) "Officer" shall mean any person, which may include Directors, employed by the Company or its Parent or any Subsidiary of the Company who has been elected an officer by the respective Board of Directors.

(1) "Option" shall mean a stock option issued pursuant to the Plan. Options may be either "Incentive Options," which are defined as options intended to meet the requirements of Section 422 of the Code, or "Nonqualified Options," which are defined as Options not intended to meet such requirements of the Code.

(M) "Option Agreement" shall mean the written agreement setting forth the terms and conditions of an Option.

(n) "Optioned Stock" shall mean the Common Stock subject to an option.

(o) "Optionee" shall mean a person or entity to whom an Option has been granted.

(p) "Parent" shall mean a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(q) "Plan" shall mean the WebManage Technologies, Inc. 1999 Stock Option Plan.

(r) "Share" shall mean a share of Common Stock of the Company, as may be adjusted in accordance with Section 6 below.

(s) "Subsidiary" shall mean a "subsidiary corporation" of the Company, whether now or hereafter existing, as defined in Section 424(f) of the Code.

3.    ADMINISTRATION OF THE PLAN

(a) By the Board or by the Committee. The Plan shall be administered by the Board or, if appointed by the Board, by a Committee; provided, however, if the Company shall have registered a class of equity securities pursuant to Section 12 of the Securities Exchange Act of 1934, then the Plan shall be administered by the Board or, if appointed, by a Committee of two or more directors, all of which shall be "disinterested" as defined in Rule 16b-3 under the Securities Exchange Act of 1934. The Board and the Committee shall have full authority to administer the Plan, including authority to interpret and construe any provision of the Plan and to adopt such rules and regulations for administering the Plan as it may deem necessary in order to comply with the requirements of the Plan, or in order that any Option that is intended to be an Incentive Option will be classified as an incentive stock option under the Code, or in order to conform to any regulation or to any change in any law or regulation applicable thereto. The Board may reserve to itself any of the authority granted to the Committee as set forth herein, and it may perform and discharge all of the functions and responsibilities of the Committee at any time that a duly constituted Committee is not appointed and serving.

(b) Actions of the Board and the Committee. All actions taken and all interpretations and determinations made by the Board or by the Committee in good faith (including determinations of Fair Market Value) shall be final and binding upon all Optionees, the Company and all other interested persons. No member of the Board or the Committee shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan, and all

<PAGE>    3

WebManage Technologies, Inc.
Stock Option Plan 1999

members of the Board or the Committee shall, in addition to their rights as directors, be fully protected by the Company with respect to any such action, determination or interpretation.

(c) Powers of the Board and the Committee. Subject to the provisions of the Plan, the Board and, if appointed, the Committee shall have the authority, in their discretion to:

(i) determine, upon review of the relevant information, the Fair Market Value of the Common Stock;

(ii) determine the persons to whom Options shall be granted, the time or times at which Options shall be granted, the number of shares to be represented by each Option and the exercise price per share;

(iii) interpret the Plan;

(iv) prescribe, amend, and rescind rules and regulations relating to the Plan;

(v) determine whether an Option granted shall be an Incentive Option or a Nonqualified option and to determine the terms and provisions of each Option granted (which need not be identical) and, with the consent of the holder thereof, to modify or amend each Option, including reductions in the exercise price thereof;

(vi) accelerate or defer (with the consent of the Optionee) the exercise date of any Option;

(vii) authorize any person to execute on behalf of the Company any instrument required to effectuate the grant of an Option previously granted by the Board; and

(viii) make all other determinations deemed necessary or advisable for the administration of the Plan.

4.    ELIGIBILITY AND PARTICIPATION

(a) Eligibility. Grants of Options may be made to any Employee or Consultant (which may include Officers and/or Directors) of the Company or of its Parent or Subsidiary, or any independent contractor, vendor, supplier or any other person providing services to the Company or a Parent or Subsidiary whose efforts are deemed worthy of encouragement by the Board; provided, however, that an Incentive Option may only be granted to an Employee.

(b) Participation by Director. Members of the Board who are either eligible for Options or have been granted Options may vote on any matters affecting the administration of the Plan or the grant of any Options pursuant to the Plan, except that no such member shall act upon the granting of an Option to himself, but any such member may be counted in determining the existence of a quorum at any meeting of the Board and may be counted as part of an action by unanimous written consent during or with respect to which action is taken to grant Options to him.

5.    EXERCISE PRICE; CONSIDERATION; AND FORM OF OPTION AGREEMENT

(a) Exercise Price. The exercise price of any Incentive Option shall be not less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the date of the grant of the Option. The exercise price of a Nonqualified Option shall be determined in the sole discretion of the Board and may be at less than the Fair Market Value on the date of the grant of the Option. If an Incentive Option is granted to an Optionee who then owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Company or its

<PAGE>    4

WebManage Technologies, Inc.
Stock Option Plan 1999

Parent or any Subsidiary, then the exercise price of such Incentive Option shall be at least one hundred ten percent (1 10 %) of the Fair Market Value of the Company's Common Stock on the date of the grant of such Option.

(b) Consideration. The exercise price shall be paid in full, at the time of exercise of the Option, by personal or bank cashier's check or in such other form of lawful consideration as the Board or the Committee may approve from time to time, including, without limitation, the transfer of outstanding shares of Common Stock as provided in Section 7(c) or the Optionee's promissory note in form satisfactory to the Company and bearing interest at a rate of not less than the relevant applicable federal rate as defined in Section 1274(d)(1) of the Code as in effect at such time, as determined by the then most recently published applicable Revenue Ruling by the Internal Revenue Service.

        (c)     Form of Option Agreement. Each Option shall be evidenced by an
                Option Agreement specifying the number of shares which may be

# EXHIBIT A – PART 2

purchased upon exercise of the Option and containing such terms
and provisions as the Board or the Committee may determine,
subject to the provisions of the Plan.


6.    SHARES OF COMMON STOCK SUBJECT TO THE PLAN

(a) Number. The aggregate number of shares of Common Stock subject to Options
which may be granted under the Plan shall be 2,000,000 subject to adjustment as
herein below provided. To the extent any Option granted under the Plan shall
expire or terminate unexercised or for any reason become unexercisable, the
shares subject to such Option shall thereafter be available for future grants
under the Plan.

(b) Capital Changes. Except as hereinafter provided, no adjustment shall be made
in the number of shares of Common Stock issued to an Optionee, or in any other
rights of the Optionee upon exercise of an Option, by reason of any dividend,
distribution or other right granted to stockholders for which the record date is
prior to the date of exercise of the Optionee's Option. In the event any change
is made to the shares of Common Stock (whether by reason of a merger,
consolidation, reorganization, recapitalization, stock dividend, stock split,
combination of shares, exchange of shares, change in corporate structure or
otherwise), appropriate adjustments shall be made in: (i) the number of shares
of Common Stock theretofore made subject to Options, and in the exercise price
of such shares; and (ii) the aggregate number of shares which may be made
subject to Options.


7.    EXERCISE OF STOCK OPTIONS

(a) Time of Exercise. Subject to the provisions of the Plan, including without
limitation Section 7(d) and Section 8, the Board or the Committee, in its
discretion, shall determine the time when an Option, or a portion of an Option,
shall become exercisable, and the time when an Option, or a portion of an
Option, shall expire; provided, however, that (i) an Incentive Option shall
expire, to the extent not exercised, no later than the tenth (10th) anniversary
of the date on which it was granted; and (ii) any Incentive Option granted to
any person who owns shares possessing more than 10% of the total combined voting
power or value of all classes of stock of the Company or of its Parent or a
Subsidiary shall have a term of not to exceed five (5) years. Such time or times
shall be set forth in the Option Agreement evidencing such Option.

(b) Notice of Exercise. An Optionee electing to exercise an Option shall give
written notice to the Company, as specified by the Option Agreement, of the
Optionee's election to purchase a specified number of shares, such notice shall
be accompanied by the instrument evidencing such Option and any other documents
required by the Company, and shall tender the exercise price of


<PAGE>    5

WebManage Technologies, Inc.
Stock Option Plan 1999

the shares that the Optionee has elected to purchase. If the notice of election
to exercise is given by the executor or administrator of a deceased Optionee, or
by the person or persons to whom the Option has been transferred by the
Optionee's will or the applicable laws of descent and distribution, the Company
will be under no obligation to deliver shares pursuant to such exercise unless
and until the Company is satisfied that the person or persons giving such notice

is or are entitled to exercise the Option.

(c) Exchange of Outstanding Stock. The Board, in its sole discretion, may permit an Optionee to surrender to the Company shares of Common Stock previously acquired by the Optionee at least six (6) months prior to such surrender as part or full payment for the exercise of an Option. Such surrendered shares shall be valued at their Fair Market Value on the date of exercise of the Option.

(d) Termination of Continuous Status Before Exercise. Unless otherwise provided in the terms of an Option Agreement, the vested portion of an Option held by an Optionee who is an Employee or a Consultant, as the case may be, at the date of grant of such Option, may be exercised by the Optionee at any time while the Optionee is an Employee or a Consultant, respectively, or within 30-days of termination, and has maintained Continuous Status with the Company or its Parent or any Subsidiary from the date of the grant of the Option (other than the Optionee's death, retirement or disability as provided below) until 30-days prior to the date of the exercise of the Option. Any Option held by the Optionee at such time as he/she is no longer an Employee or Consultant or Continuous Status is not maintained shall be deemed to have been forfeited and be of no further force or effect. In no event, however, may any Option be exercised after the expiration of its term.

(e) Death. If an Optionee dies at a time when the Optionee is entitled to exercise an Option, then at any time or times within thirty (30) days after the Optionee's death (or such further period as the Board may allow) such Option may be exercised, as to all or any of the shares which the Optionee was entitled to purchase immediately prior to the Optionee's death by (i) the Optionee's executor or administrator or the person(s) to whom the Option is transferred by will or the applicable laws of descent and distribution or (ii) the Optionee's designated beneficiary, and except as so exercised such Option will expire at the end of such period. In no event, however, may any Option be exercised after the expiration of its term.

(f) Retirement and Disability. If an Optionee retires from service at age 65 or older or retires at less than age 65 with the consent of the Board or becomes "disabled" (as hereinafter defined) at a time when the Optionee is entitled to exercise an Option, then, at any time or times within thirty (30) days of the date of such retirement or within thirty (30) days of the date of such disability, the Optionee may exercise such Option as to all or any of the shares which the Optionee was entitled to purchase under such Option immediately prior to such retirement or disability. Except as so exercised, such Option shall expire at the end of such period. In no event, however, may any Option be exercised after the expiration of its term. As used herein, "disabled" shall mean that the Optionee is permanently and totally disabled so as to be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than three (3) months.

(g) Disposition of Terminated Stock Options. Any shares of Common Stock subject to Options which have been terminated as provided above shall not thereafter be eligible for purchase by the Optionee but shall again be available for grant by the Board to other Optionees.

<PAGE>    6

WebManage Technologies, Inc.
Stock Option Plan 1999

(h)     Stock Redemption Agreement. As a condition to the exercise of an Option by an Optionee, the Board or Committee may require the Optionee to execute and deliver a Stock Redemption Agreement, Shareholder Agreement or other agreement in such form as the Board or Committee shall approve and providing for appropriate restrictions on transfer of the Common Stock acquired pursuant to such exercise.

8.     SPECIAL PROVISIONS RELATING TO INCENTIVE OPTIONS

(a) $100,000.00 Limit. The Company shall not grant Incentive Options under the Plan to any Optionee to the extent that the aggregate Fair Market Value (determined as of the date of grant) of the Common Stock covered by such Incentive Options which are exercisable for the first time during any calendar year, when combined with the aggregate Fair Market Value of all stock covered by Incentive Options granted to such Optionee after December 31, 1986 by the Company, its Parent or a Subsidiary thereof which are exercisable for the first time during the same calendar year, exceeds $100,000.

(b) Grants to Employees Only. Incentive Options shall be granted only to persons who, on the date of grant, are Employees of the Company or its Parent or a Subsidiary of the Company.

9.     NO CONTRACT OF EMPLOYMENT

Unless otherwise expressed in a writing signed by an authorized officer of the Company, all Employees of the Company are hired for an unspecified period of time and are considered to be "at-will employees." Nothing in this Plan shall confer upon any Optionee the right to continue in the employ of the Company, its Parent or any Subsidiary, nor shall it limit or restrict in any way the right of the Company, its Parent or any such Subsidiary to discharge the Optionee at any time for any reason whatsoever, with or without cause.

10.     NO RIGHTS AS A STOCKHOLDER

An Optionee shall have no rights as a stockholder with respect to any shares of Common Stock subject to an Option.

11.     NONTRANSFERABILITY OF OPTIONS; DEATH OF OPTIONEE

No Option acquired by an Optionee under the Plan shall be assignable or transferable by an Optionee, other than by will or the laws of descent and distribution, and such Options are exercisable, during the Optionee's lifetime, only by Optionee; provided, however, that (i) a transfer may be made pursuant to a qualified domestic relations order (as defined in the Code or as permitted by Title I of the Employee Retirement Income Security Act ("ERISA") or the rules thereunder) and (ii) any Option Agreement issued under the Plan may provide for the designation of a beneficiary of the Optionee (which may be an individual or trustee) who may exercise the Option after the Optionee's death and enjoy the economic benefits thereof, subject to the consent of Optionee's spouse where required by law. Subject to Section 7(e), in the event of Optionee's death, the Option may be exercised by the personal representative of the Optionee's estate or, if

<PAGE>    7

WebManage Technologies, Inc.
Stock Option Plan 1999

no personal representative has been appointed, by the successor(s) in interest
determined under the Optionee's will or under the applicable laws of descent and
distribution.

12.     LIQUIDATION OR MERGER OF THE COMPANY

(a) Liquidation. In the event of a proposed dissolution or liquidation of the
Company, the Option shall terminate immediately prior to the consummation of
such proposed action, unless otherwise provided by the Board. The Board may, in
the exercise of its sole discretion in such instances, declare that any Option
shall terminate as of a date fixed by the Board and give each Optionee the right
to exercise such Option as to all or any part of the Shares covered by an
Option, including Shares as to which the Option would not otherwise be
exercisable.

(b) Sale of Assets, Merger or Consolidation or Change of Control. The Board may
provide for immediate vesting of any or all Options, and allow such Options to
be fully exercised without regard to the normal vesting schedule of such
Options, in the event of a proposed sale of all or substantially all of the
assets of the Company, or a merger or consolidation of the Company with or into
another corporation, a liquidation, or a "change of control" (as defined below);
provided, however, that if the Board determines that such immediate vesting is
not appropriate, then the Options, if the event is a merger or consolidation,
shall be assumed or an equivalent option shall be substituted by such successor
corporation (or a parent or subsidiary of such successor corporation) as a
condition to the completion of such transaction. The term "Change in Control"
shall be deemed to have occurred if (i) any "person" or "group" (as defined in
or as pursuant to section 13(d) and (14)d of the Securities Exchange Act of
1934, as amended (the "Exchange Act"), becomes a "beneficial owner" (as defined
in Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of
securities of the Company representing thirty percent (30%) or more of the
combined voting power of the Common Stock (and the preferred stock, if any)
outstanding which votes generally for the election of directors; or (ii) the
Company or any of its Subsidiaries sell, in one or more transactions, other than
in the ordinary course of business, assets constituting in the aggregate all or
substantially all of the assets of the Company and its Subsidiaries on a
consolidated basis.

13.     AMENDMENTS; DISCONTINUATION OF PLAN

The Board may from time to time alter, amend, suspend or discontinue the Plan,
including, where applicable, any modifications or amendments as it shall deem
advisable for any reason, including satisfying the requirements of any law or
regulation or any change thereof; provided, however, that no such action shall
adversely affect the rights and obligations with respect to Options at any time
outstanding under the Plan; and provided further, that no such action shall,
without the approval of the stockholders of the Company, (i) materially increase
the maximum number of shares of Common Stock that may be made subject to Options
(unless necessary to effect the adjustments required by Section 6(b)), (ii)
materially increase the benefits accruing to Optionees under the Plan, or (iii)
materially lessen the requirements as to eligibility for participation in the
Plan. No such amendment shall materially adversely affect the rights of any

Optionee under any Option previously granted without such Optionee's prior consent.

14.    REGISTRATION OF OPTIONED STOCK

The Options shall not be exercisable unless the purchase of such Optioned Stock is pursuant to an applicable effective registration statement under the Securities Act of 1933, as amended, or unless, in the opinion of counsel to the Company, the proposed purchase of such Optioned Stock would be exempt from the registration requirements of the Securities Act of 1933, as amended.


<PAGE>    8

WebManage Technologies, Inc.
Stock Option Plan 1999

15.    WITHHOLDING TAXES; SATISFIED BY WITHHOLDING OPTIONED SHARES

(a) General. The Company, its Parent or any Subsidiary may take such steps as it may deem necessary or appropriate for the withholding of any taxes which the Company, its Parent or any Subsidiary is required by law or regulation of any governmental authority, whether Federal, state or local, domestic or foreign, to withhold in connection with any Option including, but not limited to, requiring the Optionee to pay such tax at the time of exercise or the withholding of issuance of shares of Common Stock to be issued upon the exercise of any Option until the Optionee reimburses the Company for the amount the Company is required to withhold with respect to such taxes, or, at the Company's sole discretion, canceling any portion of such issuance of Common Stock in any amount sufficient to reimburse itself for the amount it is required to so withhold.

(b) Satisfying Taxes by Withholding Optioned Shares. Option Agreements under the Plan may, at the discretion of the Board, contain a provision to the effect that all Federal and state taxes required to be withheld or collected from an Optionee upon exercise of an Option may be satisfied by the withholding of a sufficient number of exercised Optioned Stock which, valued at Fair Market Value on the date or exercise, would be equal to the total withholding obligation of the Optionee for the exercise of such Option; provided, however, that if the Company is a public reporting corporation, no person who is an "officer" of the Company as such term is defined in Rule 3b-2 under the Securities Exchange Act of 1934 may elect to satisfy the withholding of Federal and state taxes upon the exercise of an option by the withholding of Optioned Stock unless such election is made either (i) at least six (6) months prior to the date that the exercise of the Option becomes a taxable event or (ii) during any of the periods beginning on the third business day following the date on which the Company issues a news release containing the operating results of a fiscal quarter or fiscal year and ending on the twelfth business day following such date. Such election shall be deemed made upon receipt of notice thereof by an officer of the Company, by mail, personal delivery or by facsimile message, and shall (unless notice to the contrary is provided to the Company) be operative for all option exercises which occur during the twelve (12) month period following election.


16.    EFFECTIVE DATE AND TERM OF PLAN

The Plan is effective as of the date of adoption by the Board and Options may be granted at any time on or after such date; provided, however, that the Plan shall terminate if the stockholders of the Company do not approve and adopt it within twelve (12) months of such date. No Options shall be granted subsequent

to ten (10) years after the effective date of the Plan; however, Options
outstanding subsequent to ten (10) years after the effective date of the Plan
shall continue to be governed by the provisions of the Plan until exercised or
terminated in accordance with the Plan or the respective Option Agreements.


ADOPTED BY THE BOARD OF DIRECTORS
ON _____, 199____


APPROVED BY THE STOCKHOLDERS
ON _____, 199____


ATTEST:


<PAGE>    9


WebManage Technologies, Inc.
Stock Option Plan 1999


- --------------------------------
Secretary


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.5
<SEQUENCE>8
<FILENAME>f68554orex99-5.txt
<DESCRIPTION>EXHIBIT 99.5
<TEXT>

<PAGE>    1


                                                          EXHIBIT 99.5


                    WEBMANAGE TECHNOLOGIES, INC.

                       STOCK OPTION AGREEMENT
                             UNDER ITS
                      1999 STOCK OPTION PLAN


        This STOCK OPTION AGREEMENT (this "Agreement") is issued to the Optionee
hereinbelow set forth pursuant to the WebManage Technologies, Inc. 1999 Stock
Option Plan (the "Plan") of WebManage Technologies, Inc., a New Hampshire
corporation (the "Company").

1. OPTIONEE; BASIC TERMS.

        The Optionee is hereby granted an option to purchase the number of fully

paid and non-assessable shares of the Common Stock of the Company at the option price hereinbelow set forth, subject to the terms and conditions of this Agreement.

2. DEFINITIONS.

(a) "CODE" shall mean the Internal Revenue Code of 1986, as amended, the rules and regulations promulgated thereunder and the interpretations thereof, all as from time to time in effect.

(b) "EXERCISE DATES" shall mean the following dates after which the Option may be exercised in the increments set forth below:

| Exercise Dates | Optioned Stock |
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |

(c) "GRANT DATE" shall mean the date of grant of the Option, being _____, 199___.

(d) "INCENTIVE OPTION" shall mean an option described in Section 422 of the Code. To qualify for favorable tax treatment provided by an incentive option, the shares purchased upon exercise must be held for a period of two (2) years from the date of the option grant and for a period of one (1) year after the shares are transferred to Optionee.

(e) "NONQUALIFIED OPTION" shall mean an option other than an Incentive Option, the exercise of which generally results in an immediate taxable event.

(f) "OPTION" shall have the meaning set forth in Section 3(a) hereof.

<PAGE>    2

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

(g) "OPTIONED STOCK" shall mean _____ (___) shares of the no par value Common Stock of the Company.

(h) "OPTIONEE" shall mean_____.

(i) "PURCHASE PRICE" shall mean the price per share for the Optioned Stock and shall be $_____.

(j) "VESTING PERIOD" shall mean a period of_____(___) years commencing on the Grant Date.

(k) Unless otherwise indicated, all capitalized terms set forth in this Agreement shall have the meaning provided to them under the Plan, a copy of which Optionee acknowledges having received.

3. GRANT OF OPTION.

(a) As of the Grant Date, the Company hereby grants to the Optionee an option (the "Option") to purchase the Optioned Stock upon the terms and conditions set forth below.

(b) This Option is intended to be a(n) (check one only):

[ ]         Incentive Option (only employees of the Company are eligible)

[ ]         Nonqualified Option

(c) The Optionee's relationship to the Company is as a(n) (if applicable, check more than one):

[ ]         Officer

[ ]         Director

[ ]         Employee

[ ]         Consultant

[ ]         Other Person providing services


-2-

<PAGE>    3

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

4. DURATION OF OPTION.

(a) INCENTIVE OPTION: If this Option is an Incentive Option, as designated in Section 3(b), it shall expire one day short of ten (10) years from the Grant Date, provided, however, for any Optionee who owns more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company, this Option shall expire one day short of five (5) years from the Grant Date.

(b) NONQUALIFIED OPTION: If this Option is a Nonqualified Option, as designated in Section 3(b), it shall expire ten (10) years from the Grant Date.

5. PURCHASE PRICE.

The Purchase Price for the Optioned Stock has been determined by the Board of Directors of the Company and: (a) may or may not be less than the Fair Market Value on the Grant Date if the Option is a Nonqualified Option, (b) shall be equal to at least one-hundred percent (100%) of the Fair Market Value if the Option is an Incentive Option, or (c) shall be equal to at least one-hundred ten

percent (110%) of the Fair Market Value if the Option is an Incentive Option and Optionee holds more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company or of its Parent or any Subsidiary.

6. EXERCISABILITY. Subject to the provisions of this Agreement, including without limitation Section 10 regarding termination of Optionee's employment, consulting or other relationship with the Company and Section 14(b) regarding Incentive Options, this Option shall vest in annual increments over the Vesting Period equal to the total number of shares of Optioned Stock divided by the number of years in the Vesting Period. Optioned Stock, to the extent vested shall become exercisable, in one or more installments (to the nearest whole number) on the Exercise Dates, to the extent of the total number of Shares of the Optioned Stock set forth next to such Exercise Date in the definition thereof. The number of shares of Optioned Stock which become exercisable each year, to the extent not previously exercised, shall accumulate until exercised in accordance with and subject to the terms and conditions of this Agreement.

7. METHOD OF EXERCISE AND PAYMENT.

(a) EXERCISE. This Option may be exercised from time to time, in whole or in part, to the extent exercisable, only by delivery to an officer of the Company of the original of this Option with an appropriate Notice of Exercise of Stock Option duly signed by the Optionee, together

-3-

<PAGE>    4

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

with the full Purchase Price of the shares purchased pursuant to the exercise of the Option and an executed Stock Redemption Agreement pursuant to Section 7(b) hereof; provided, however, that this Option may not be exercised if such exercise would violate any law or governmental order or regulation. Payment for the shares of Optioned Stock purchased pursuant to any exercise shall be made in full at the time of such exercise, in any of the following methods, as determined by the Board of Directors and as may be elected by the Optionee:

(i)     may ___ or may not ___ pay in cash or by check payable to the order of the Company;

(ii)    may ___ or may not ___ pay in Common Stock of the Company already owned by the Optionee for a period of six (6) months prior to such exercise, valued as of the date of exercise of the Option at Fair Market Value; or

(iii)   may ___ or may not ___ pay by a promissory note payable to the order of the Company; if a promissory note is tendered, such note shall bear interest at an interest rate determined by, and shall be subject to such terms and conditions as are prescribed by, the Board as set forth in the form of promissory note then utilized under the Plan.

(b) STOCK REDEMPTION AGREEMENT. The Optionee shall execute and deliver to the Company, together with the Notice of Exercise of Stock Option and payment in full of the Purchase Price, duplicate originals of a Stock Redemption Agreement in the form set forth in Exhibit 1 attached to this Agreement. The

Company shall not issue any shares of Optioned Stock to the Optionee unless and until Optionee executes and delivers such Stock Redemption Agreement.

(c) TAX WITHHOLDINGS. Optionee agrees to have withheld from any remuneration payable to such Optionee by the Company and/or to pay to the Company, at the time of exercise of the Option, an amount which is required to be withheld or paid pursuant to any Federal, state or local tax or revenue laws or regulations, as may be determined by the Company. The Optionee may not satisfy such tax withholding by instructing the Company to withhold such number of shares of Optioned Stock that would equal the total tax obligations required to be withheld.

8. NON-TRANSFERABILITY. This Option shall not be transferred, sold, pledged, assigned, hypothecated, or disposed of in any manner by Optionee other than by will or the laws of descent and distribution to the extent hereinafter set forth; provided, however, that a transfer hereof may be made pursuant to a qualified domestic relations order (as defined in the Code or as permitted

-4-

<PAGE>   5

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

by Title I of the Employee Retirement Income Security Act ("ERISA") or the rules thereunder) and, provided further, that Optionee may designate a beneficiary (which may be an individual or trustee) who may exercise the Option after Optionee's death and enjoy the economic benefits thereof, subject to the consent of Optionee's spouse where required by law. This Option may be exercised during the Optionee's lifetime only by the Optionee or, upon the Optionee's legal incapacity to act on the Optionee's own behalf, by the Optionee's conservator or other lawful representative. The Option shall be null and void and without effect upon any attempted assignment or transfer, except as hereinabove provided, including without limitation, any purported assignment, whether voluntary of by operation of law, pledge, hypothecation or other disposition contrary to the provisions hereof, or levy of execution, attachment, trustee process or similar process, whether legal or equitable, upon the Option.

9. TERMINATION. To the extent that this Option shall not have been exercised in full prior to its termination or expiration date, whichever shall be sooner, it shall terminate and become void and of no effect.

10. CESSATION OF CONTINUOUS STATUS -- TERMINATION, RETIREMENT, DEATH OR DISABILITY. If the Optionee shall voluntarily or involuntarily cease Continuous Status (as such term is defined in the Plan) (hereinafter referred to as a "Termination"), the Option of the Optionee shall terminate immediately upon the Termination and the Optionee in such event shall have no right after such Termination to exercise any unexercised Option that the Optionee might have exercised on or prior to the Termination; provided, however, that if the Termination is due to (i) retirement by the Optionee on or after attaining the age of sixty-five (65) years, (ii) the disability of the Optionee or (iii) the death of the Optionee, then the Optionee or the representative of the estate of the Optionee shall have the privilege of exercising the entire unexercised vested portion of this Option, provided that such exercise be accomplished (a) prior to the expiration of this Option and (b) either within thirty (30) days of the Optionee's retirement, within thirty (30) days of the Optionee's disability, or within thirty (30) days after the date of death of the Optionee, as the case

may be.

11. STOCK SPLITS AND CAPITAL ADJUSTMENTS. If, prior to the complete exercise of this Option, there shall be declared and paid a stock dividend upon the Common Stock of the Company or if such stock shall be split up, converted, exchanged or reclassified, this Option, to the extent that it has not been exercised, shall entitle the holder, upon the future exercise of this Option, to such number and kind of securities or other property, subject to the terms of the Option, to which the holder would be entitled had he actually owned the stock subject to the unexercised portion of the Option at the time of the occurrence of such stock dividend, split up, conversion, exchange, reclassification or substitution; and the aggregate purchase price upon the future exercise of the

-5-

<PAGE>    6

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

Option shall be the same as if shares of Common Stock of the Company originally optioned were being purchased as provided herein.

12. ACCELERATION OF EXERCISE DATE.

        (a) SALE OF ASSETS, MERGER, CONSOLIDATION AND CHANGE OF CONTROL. The Board of Directors of the Company may, but shall not be required, to provide for immediate vesting of any or all outstanding unexercised Options in the event of any proposed merger, acquisition or sale of the Company (other than a merger, acquisition or sale with respect to which a majority of the members of the Board of Directors of the Company prior to the merger, acquisition or sale continue to be a majority of the Board of Directors of the resulting corporation after such merger, acquisition or sale), all pursuant to and subject to the terms and conditions of the Plan including, without limitation, the limitations upon vesting imposed by Section 8 of the Plan.

13. COMPLIANCE WITH SECURITIES LAWS.

        (a) POSTPONE ISSUANCE. Notwithstanding any provision of this Option to the contrary, the Company may postpone the issuance and delivery of shares upon any exercise of this Option until one of the following conditions shall be met:

            (i) The shares of Optioned Stock with respect to which such Option has been exercised are at the time of the issue of such shares effectively registered under applicable Federal and state securities laws now in force or hereafter enacted or amended; or

            (ii) Counsel for the Company shall have given an opinion that registration of such shares under applicable Federal and state securities laws, as now in force or hereafter enacted or amended, is not required.

        (b) INVESTMENT REPRESENTATION. In the event that for any reason the shares of Optioned Stock to be issued upon exercise of the Option shall not be effectively registered under the Securities Act of 1933 (the "1933 Act"), upon any date on which the Option is exercised in whole or in part, the Company shall be under no further obligation to issue shares of Optioned Stock unless the Optionee shall give a written representation to the Company, in form

satisfactory to the Company, that such person is acquiring the shares of Optioned Stock issued pursuant to such exercise of the Option for investment and not with a view to, or for sale in connection with, the distribution of any such shares, and that he/she will make no transfer of the same except in compliance with the 1933 Act and the rules and regulations promulgated

-6-

<PAGE>    7

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

thereunder and then in force, and in such event, the Company may place an "investment legend" upon any certificate for the shares of Optioned Stock issued by reason of such exercise.

14. SPECIAL RULES REGARDING INCENTIVE OPTIONS.

(a) NOTICE OF TRANSFER. If this Option is an Incentive Option, then the employee-Optionee hereby agrees to notify the Company in writing within three (3) days after any sale, transfer or other disposition of shares acquired upon the exercise of this Option which occurs within either twelve (12) months following the date of exercise or twenty-four (24) months following the Grant Date.

(b) $100,000 PER YEAR EXERCISE LIMIT. If this option is an Incentive Option, then it shall be exercisable in accordance with the above schedule of Section 6, but in no event shall it be exercised to the extent that the aggregate fair market value of Optioned Stock, which is exercisable for the first time during any calendar year, when combined with the aggregate fair market value of all stock covered by incentive stock options (as defined in the Code) granted to Optionee after December 31, 1986 by the Company, its parent or a subsidiary of the Company which are exercisable for the first time during the same calendar year, exceeds $100,000.

15. NO AGREEMENT OF EMPLOYMENT. Neither the grant of this Option nor this Agreement shall be deemed to create any agreement with, or obligation by, the Company to employ the Optionee for any period of time, it being understood that employment is strictly "at will" in the absence of any written agreement to the contrary and, in the absence of such written agreement, such person may be terminated by the Company at any time, with or without cause.

16. ASSIGNMENT OF INVENTIONS, ETC.; NON-DISCLOSURE OF CONFIDENTIAL INFORMATION. As further consideration for the issuance of the Option, the Optionee, if the Optionee is an Employee of the Company, agrees as follows:

(a) ASSIGNMENT OF INVENTIONS. Any and all trade secrets, inventions and proprietary information which either (i) relates at the time of conception or reduction to practice to the company or its business, or actual or demonstrably anticipated research or development of the Company or (ii) results from any work performed by the Optionee for the Company is hereby assigned to, and shall become the absolute property of, the Company and shall at all times and for all purposes be regarded as acquired and held by the Optionee in a fiduciary capacity for the sole benefit of the Company, and the Optionee agrees that, upon request, the Optionee will promptly make all disclosures, execute all assignments, instruments and papers, and perform all acts whatsoever necessary or desired by the Company to vest and confirm in it, its successors,

-7-

<PAGE>    8

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

assigns and nominees, all rights created or contemplated by this subsection (a) and which may be necessary or desirable to enable the Company, its successors, assigns, and nominees to secure and enjoy the full benefits and advantages thereof.

(b) NONDISCLOSURE OF CONFIDENTIAL INFORMATION. The Optionee shall not, during the period of employment by the Company or at any time thereafter, directly or indirectly use, divulge, furnish or make accessible to anyone other than the Company, its directors and officers other than in the regular course of the business of the Company or any of its subsidiaries, any knowledge or information with respect to (i) confidential, secret or proprietary plans, data (including financial and cost data), specifications, procedures and techniques, methods, technology, "knowhow" or material relating to the business, products, services (whether existing or under development) or activities of the Company or its subsidiaries, (ii) any confidential business plans or surveys of the Company or its subsidiaries, (iii) any other confidential or secret aspect of the business, products, services or activities of the Company or its subsidiaries, or (iv) any customer usages and requirements or any customer lists of the Company or its subsidiaries. The Optionee shall not, upon leaving the employ of the Company, without the prior written consent of the Board of Directors of the Company, take any data, customer lists, reports, studies, compilations, business plans, presentations/proposals, letters, memoranda, notes or other writings or documents whatever, or copies thereof, which reflect or deal with any of the confidential information described in this Section 16(b).

(c) REMEDIES. The Optionee acknowledges that a breach of the provisions of this Agreement will cause the Company irreparable injury for which the Company cannot be reasonably or adequately compensated in damages. The Company shall, therefore, be entitled, in addition to all other remedies available to it, to injunctive and/or other equitable relief to prevent a breach of this Agreement, or any part of it, and to secure its enforcement, and any termination of Optionee as a result of a violation of this Section 16 shall be deemed "for cause."

17. SUBJECT TO PLAN. This Option is issued subject and pursuant to the provisions of the Plan, receipt of a copy of which the Optionee acknowledges. A determination of the Board of Directors or the Committee established pursuant to the Plan as to any questions which may arise with respect to the interpretation of the provisions of this Option and of the Plan shall be final. The Board of Directors or the Committee may authorize and establish such rules and regulations, and revisions thereof, not inconsistent with the provisions of the Plan, as it may deem advisable. Any provision hereof which is inconsistent with, or contrary to, the terms and conditions of the Plan shall be superseded and governed by the Plan.

-8-

<PAGE>    9

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

18. SEVERABILITY. If any condition, term or provision of this Agreement is
determined by a court to be illegal or in conflict with any law, state or
Federal, the validity of the remaining portions or provisions shall not be
affected, and the rights and obligations of the parties shall be construed and
enforced as if this Agreement did not contain the particular condition, term or
provision determined to be unenforceable.

19. ENTIRE AGREEMENT; NEW HAMPSHIRE LAW. This Agreement contains the entire
understanding and agreement between the parties hereto respecting the within
subject matter, and there are no representations, agreements, arrangements or
understandings, oral or written, between the parties hereto relating to the
subject matter of this Agreement that are not fully expressed herein. The
Company is a New Hampshire corporation, and this Agreement shall be governed by
and construed in accordance with the laws of the State of New Hampshire.

        WITNESS the signature of its duly authorized officer of the Company as
of the date of grant hereof.

                              THE COMPANY:

                              WEBMANAGE TECHNOLOGIES, INC.


                                        By:
- -----------------------------          -------------------------------------
Witness
                                        Title:
                                               -----------------------------


                              -9-
<PAGE>    10

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

THE OPTIONEE:

Acknowledged and Agreed to*:


- ----------------------------------
Signature

- ----------------------------------
Print Name

- ----------------------------------
Street Address

- ----------------------------------

City, State, Zip Code

- ----------------------------------
Social Security No.


*IF you have any "Inventions" to except from Section 16, you must IDENTIFY ALL
SUCH INVENTIONS below, or, if the statement is not applicable, you must write
NONE below.



        None.
- ---------------------------------------------------------------------

- ---------------------------------------------------------------------

- ---------------------------------------------------------------------



                              -10-
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.6
<SEQUENCE>9
<FILENAME>f68554orex99-6.txt
<DESCRIPTION>EXHIBIT 99.6
<TEXT>

<PAGE>    1


                                                        EXHIBIT 99.6


                    NETWORK APPLIANCE, INC.

                STOCK OPTION ASSUMPTION AGREEMENT
                  WEBMANAGE TECHNOLOGIES, INC.

                    1999 STOCK OPTION PLAN


OPTIONEE:   _____,

            STOCK OPTION ASSUMPTION AGREEMENT effective as of the 13th day
of November, 2000.

            WHEREAS, the undersigned individual ("Optionee") holds one or
more outstanding options to purchase shares of the common stock of WebManage
Technologies, Inc., a Delaware corporation ("WebManage"), which were granted to
Optionee under WebManage Technologies, Inc. 1999 Stock Option Plan (the "Plan").

            WHEREAS, each of those options is evidenced by a Stock Option
Agreement (the "Option Agreement") issued to Optionee under the Plan.

            WHEREAS, WebManage has been acquired by Network Appliance, Inc.,
a California corporation ("NetApp"), through the merger of WebManage with and
into NetApp (the "Merger") pursuant to the Agreement and Plan of Merger by and

among NetApp and WebManage, dated August 31, 2000 (the "Merger Agreement").

WHEREAS, the provisions of the Merger Agreement require the obligations of WebManage under each outstanding option under the Plan to be assumed by NetApp at the consummation of the Merger and the holder of each outstanding option to be issued an agreement evidencing the assumption of such option.

WHEREAS, pursuant to the provisions of the Merger Agreement, the exchange ratio (the "Exchange Ratio") in effect for the Merger is 0.02543 of a share of NetApp common stock ("NetApp Stock") for each outstanding share of WebManage common stock ("WebManage Stock") (rounded down to the nearest whole number of shares of NetApp Stock).

WHEREAS, the purpose of this Agreement is to evidence the assumption by NetApp of the outstanding options held by Optionee at the time of the consummation of the Merger (the "Effective Time") and to reflect certain adjustments to those options which have become necessary in connection with their assumption by NetApp in the Merger.

NOW, THEREFORE, it is hereby agreed as follows:

1. The number of shares of WebManage Stock subject to the options held by Optionee immediately prior to the Effective Time (the "WebManage Options") and the exercise price payable per share are set forth below. NetApp hereby assumes, as of the Effective Time, all

<PAGE>    2

the duties and obligations of WebManage under each of the WebManage Options. In connection with such assumption, the number of shares of NetApp Stock purchasable under each WebManage Option hereby assumed and the exercise price payable thereunder have been adjusted to reflect the Exchange Ratio. Accordingly, the number of shares of NetApp Stock subject to each WebManage Option hereby assumed shall be as specified for that option below, and the adjusted exercise price payable per share of NetApp Stock under the assumed WebManage Option shall also be as indicated for that option below.

<TABLE>
<CAPTION>

| WEBMANAGE STOCK OPTIONS | | NETAPP ASSUMED OPTIONS | |
|---|---|---|---|
| # of Shares of WebManage Common Stock | Exercise Price per Share | # of Shares of NetApp Common Stock | Adjusted Price pe |
| <S> | <C> | <C> | <C> |
| | $ | | $ |

</TABLE>

2. The intent of the foregoing adjustments to each assumed WebManage Option is to assure that the spread between the aggregate fair market value of the shares of NetApp Stock purchasable under each such option and the aggregate exercise price as adjusted pursuant to this Agreement will not, immediately after the consummation of the Merger, be greater than the spread which existed, immediately prior to the Merger, between the then aggregate fair market value of the WebManage Stock subject to the WebManage Option and the aggregate exercise price in effect at such time under the Option Agreement. Such adjustments are also intended to preserve, immediately after the Merger, on a

per share basis, the same ratio of exercise price per option share to fair market value per share which existed under the WebManage Option immediately prior to the Merger.

        3. Each WebManage Option shall continue to have a maximum term of ten (10) years from the date of grant, subject to earlier termination (as provided in the applicable Option Agreement) following Optionee's cessation of service or employment.

        4. The following provisions shall govern each WebManage Option hereby assumed by NetApp:

        (a) Unless the context otherwise requires, all references in each Option Agreement and the applicable Plan (to the extent incorporated into such Option Agreement) shall be adjusted as follows: (i) all references to the "Company" shall mean NetApp, (ii) all references to "Stock," "Common Stock" or "Shares" shall mean shares of NetApp Stock, (iii) all references to the "Board" shall mean the Board of Directors of NetApp and (iv) all references to the "Committee" shall mean the Compensation Committee of the NetApp Board of Directors.

        (b) Except as modified by this Agreement, the grant date and the expiration date of each assumed WebManage Option and all other provisions which govern either the exercise or the termination of the assumed WebManage Option shall remain the same as set forth in the Option Agreement applicable to that option, and the provisions of the applicable Plan and the Option Agreement

2

<PAGE>    3

shall accordingly govern and control Optionee's rights under this Agreement to purchase NetApp Stock under the assumed WebManage Option.

        (c) Each WebManage Option assumed by NetApp which was originally designated as an Incentive Stock Option under the federal tax laws shall retain such Incentive Stock Option status to the maximum extent allowed by law.

        (d) Each WebManage Option hereby assumed by NetApp shall continue to vest and become exercisable in accordance with the same installment vesting schedule in effect for that option under the applicable Option Agreement immediately prior to the Effective Time; except, that the number of shares subject to each such installment shall be adjusted to reflect the Exchange Ratio.

        (e) For purposes of applying any and all provisions of the Option Agreement and the applicable Plan relating to Optionee's status as an employee or a consultant of WebManage, Optionee shall be deemed to continue in such status as an employee or a consultant for so long as Optionee renders services as an employee or a consultant to NetApp or any present or future majority-owned NetApp subsidiary. Accordingly, the provisions of the Option Agreement governing the termination of

the assumed WebManage Options upon Optionee's cessation of
service as an employee or a consultant of WebManage shall
hereafter be applied on the basis of Optionee's cessation of
employee or consultant status with NetApp and its subsidiaries,
and each assumed WebManage Option shall accordingly terminate,
within the designated time period in effect under the Option
Agreement for that option, following such cessation of employee
or consultant status.

(f) The adjusted exercise price payable for the NetApp
Stock subject to each assumed WebManage Option shall be payable
in any of the forms authorized under the Option Agreement
applicable to that option. For purposes of determining the
holding period of any shares of NetApp Stock delivered in
payment of such adjusted exercise price, the period for which
such shares were held as WebManage Stock prior to the Merger
shall be taken into account.

(g) In order to exercise each assumed WebManage Option,
Optionee must deliver to NetApp a written notice of exercise in
which the number of shares of NetApp Stock to be purchased
thereunder must be indicated. The exercise notice must be
accompanied by payment of the adjusted exercise price payable
for the purchased shares of NetApp Stock and should be delivered
to NetApp at the following address:

              Network Appliance, Inc.
              495 East Java Drive
              Sunnyvale, CA 94089
              Attention:  Janice Mahoney


                                    3

<PAGE>    4

        5. Except to the extent specifically modified by this Option
Assumption Agreement, all of the terms and conditions of each Option Agreement
as in effect immediately prior to the Merger shall continue in full force and
effect and shall not in any way be amended, revised or otherwise affected by
this Stock Option Assumption Agreement.

        IN WITNESS WHEREOF, Network Appliance, Inc. has caused this
Stock Option Assumption Agreement to be executed on its behalf by its
duly-authorized officer as of the 13th day of November, 2000.

                              NETWORK APPLIANCE, INC.


                              By:
                                 --------------------------------
                              Name:
                              Title:


                         ACKNOWLEDGMENT

The undersigned acknowledges receipt of the foregoing Stock

Option Assumption Agreement and understands that all rights and liabilities with respect to each of his or her WebManage Options hereby assumed by NetApp are as set forth in the Option Agreement, the applicable Plan and such Stock Option Assumption Agreement.

------------------------------------
_____, OPTIONEE

DATED: _____, 2000

                                    4

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.7
<SEQUENCE>10
<FILENAME>f68554orex99-7.txt
<DESCRIPTION>EXHIBIT 99.7
<TEXT>

<PAGE>    1

                                                    EXHIBIT 99.7

                        WEBMANAGE TECHNOLOGIES, INC.
                        2000 STOCK INCENTIVE PLAN

                                ARTICLE ONE

                            GENERAL PROVISIONS


        I.    PURPOSE OF THE PLAN

                This 2000 Stock Incentive Plan is intended to promote the interests of WebManage Technologies, Inc., a Delaware corporation, by providing eligible persons with the opportunity to acquire a proprietary interest, or otherwise increase their proprietary interest, in the Corporation as an incentive for them to remain in the service of the Corporation.

                Capitalized terms shall have the meanings assigned to such terms in the attached Appendix.

        II.   STRUCTURE OF THE PLAN

                A. The Plan shall consist of the Discretionary Option Grant Program under which eligible persons may, at the discretion of the Plan Administrator, be granted options to purchase shares of Common Stock.

                B. The provisions of Articles One and Three shall apply to the equity program under the Plan and shall accordingly govern the interests of all persons under the Plan.

        III.  ADMINISTRATION OF THE PLAN

                A. Administration of the Discretionary Option Grant with respect to all persons eligible to participate in those programs may, at the Board's

discretion, be vested in the Primary Committee or a Secondary Committee, or the Board may retain the power to administer those programs with respect to all such persons.

B. Members of the Primary Committee or any Secondary Committee shall serve for such period of time as the Board may determine and may be removed by the Board at any time. The Board may also at any time terminate the functions of any Secondary Committee and reassume all powers and authority previously delegated to such committee.

C. Each Plan Administrator shall, within the scope of its administrative functions under the Plan, have full power and authority to establish such rules and regulations as it may deem appropriate for proper administration of the Discretionary Option Grant and to make such determinations under, and issue such interpretations of, the provisions of such program and any outstanding options or stock issuances thereunder as it may deem necessary or advisable. Decisions of the Plan Administrator within the scope of its administrative functions under the Plan shall be final and binding on all parties who have an interest in the Discretionary Option Grant under its jurisdiction or any stock option or stock issuance thereunder.

<PAGE>    2

D. Service on the Primary Committee or the Secondary Committee shall constitute service as a Board member, and members of each such committee shall accordingly be entitled to full indemnification and reimbursement as Board members for their service on such committee. No member of the Primary Committee or the Secondary Committee shall be liable for any act or omission made in good faith with respect to the Plan or any option grants or stock issuances under the Plan.

IV.    ELIGIBILITY

A. The persons eligible to participate in the Discretionary Option Grant are as follows:

(i) Employees,

(ii) non-employee members of the Board or the board of directors of any Parent or Subsidiary, and

(iii) consultants and other independent advisors who provide services to the Corporation (or any Parent or Subsidiary).

B. Each Plan Administrator shall, within the scope of its administrative jurisdiction under the Plan, have full authority (subject to the provisions of the Plan) to determine, with respect to the option grants under the Discretionary Option Grant Program, which eligible persons are to receive option grants, the time or times when such option grants are to be made, the number of shares to be covered by each such grant, the status of the granted option as either an Incentive Option or a Non-Statutory Option, the time or times when each option is to become exercisable, and the vesting schedule (if any) applicable to the option shares and the maximum term for which the option is to remain outstanding.

V.    STOCK SUBJECT TO THE PLAN

A. The stock issuable under the Plan shall be shares of

authorized but unissued or reacquired Common Stock. The maximum number of shares of Common Stock which may be issued over the term of the Plan shall not exceed 5,000,000 shares.

B. No one person participating in the Plan may receive options and direct stock issuances for more than 5,000,000 shares of Common Stock in the aggregate per calendar year, beginning with the 2000 calendar year.

C. Shares of Common Stock subject to outstanding options shall be available for subsequent issuance under the Plan to the extent (i) the options expire or terminate for any reason prior to exercise in full or (ii) the options are cancelled in accordance with the cancellation-regrant provisions of Article Two. In addition, any unvested shares issued under the Plan and subsequently repurchased by the Corporation, at the option exercise or direct issue price paid per share, pursuant to the Corporation's repurchase rights under the Plan shall be added back to the number of shares of Common Stock reserved for issuance under the Plan and shall

2

<PAGE>    3

accordingly be available for reissuance through one or more subsequent option grants. Should the exercise price of an option under the Plan be paid with shares of Common Stock or should shares of Common Stock otherwise issuable under the Plan be withheld by the Corporation in satisfaction of the withholding taxes incurred in connection with the exercise of an option or the vesting of a stock issuance under the Plan, then the number of shares of Common Stock available for issuance under the Plan shall be reduced by the gross number of shares for which the option is exercised or which vest under the stock issuance, and not by the net number of shares of Common Stock issued to the holder of such option or stock issuance.

D. Should any change be made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration, appropriate adjustments shall be made to (i) the maximum number and/or class of securities issuable under the Plan, (ii) the maximum number and/or class of securities for which any one person may be granted options and direct stock issuances per calendar year, and (iii) the number and/or class of securities and the exercise price per share in effect under each outstanding option in order to prevent the dilution or enlargement of benefits thereunder. The adjustments determined by the Plan Administrator shall be final, binding and conclusive.

3

<PAGE>    4

ARTICLE TWO

DISCRETIONARY OPTION GRANT PROGRAM

I.    OPTION TERMS

Each option shall be evidenced by one or more documents in the form approved by the Plan Administrator; provided, however, that each such

document shall comply with the terms specified below. Each document evidencing an Incentive Option shall, in addition, be subject to the provisions of the Plan applicable to such options.

A.    Exercise Price.

1. The exercise price per share shall be fixed by the Plan Administrator but shall not be less than one hundred percent (100%) of the Fair Market Value per share of Common Stock on the option grant date.

2. The exercise price shall become immediately due upon exercise of the option and shall be payable in one or more of the forms specified below:

(i) cash or check made payable to the Corporation,

(ii) shares of Common Stock held for the requisite period necessary to avoid a charge to the Corporation's earnings for financial reporting purposes and valued at Fair Market Value on the Exercise Date, or

(iii) to the extent the option is exercised for vested shares, through a special sale and remittance procedure pursuant to which the Optionee shall concurrently provide irrevocable instructions to (a) the Corporation to effect the immediate sale of the purchased shares and remit to the Corporation, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate exercise price payable for the purchased shares plus all applicable Federal, state and local income and employment taxes required to be withheld by the Corporation by reason of such exercise and (b) the Corporation to deliver the certificates for the purchased shares directly to such brokerage firm in order to complete the sale transaction.

Except to the extent such sale and remittance procedure is utilized, payment of the exercise price for the purchased shares must be made on the Exercise Date.

B. Exercise and Term of Options. Each option shall be exercisable at such time or times, during such period and for such number of shares as shall be determined by the Plan Administrator and set forth in the documents evidencing the option. However, no option shall have a term in excess of ten (10) years measured from the option grant date.

4

<PAGE>    5

C.    Effect of Termination of Service.

1. The following provisions shall govern the exercise of any options held by the Optionee at the time of cessation of Service or death:

(i) Any option outstanding at the time of the Optionee's cessation of Service for any reason shall remain exercisable for such period of time thereafter as shall be determined by the Plan Administrator and set forth in the documents evidencing the option, but

no such option shall be exercisable after the expiration of the option term.

(ii) Any option exercisable in whole or in part by the Optionee at the time of death may be exercised subsequently by the personal representative of the Optionee's estate or by the person or persons to whom the option is transferred pursuant to the Optionee's will or in accordance with the laws of descent and distribution.

(iii) During the applicable post-Service exercise period, the option may not be exercised in the aggregate for more than the number of vested shares for which the option is exercisable on the date of the Optionee's cessation of Service. Upon the expiration of the applicable exercise period or (if earlier) upon the expiration of the option term, the option shall terminate and cease to be outstanding for any vested shares for which the option has not been exercised. However, the option shall, immediately upon the Optionee's cessation of Service, terminate and cease to be outstanding to the extent the option is not otherwise at that time exercisable for vested shares.

(iv) Should the Optionee's Service be terminated for Misconduct, then all outstanding options held by the Optionee shall terminate immediately and cease to be outstanding.

2. The Plan Administrator shall have the discretion, exercisable either at the time an option is granted or at any time while the option remains outstanding, to:

(i) extend the period of time for which the option is to remain exercisable following the Optionee's cessation of Service from the period otherwise in effect for that option to such greater period of time as the Plan Administrator shall deem appropriate, but in no event beyond the expiration of the option term, and/or

(ii) permit the option to be exercised, during the applicable post-Service exercise period, not only with respect to the number of vested shares of Common Stock for which such option is exercisable at the time of the Optionee's cessation of Service but also with respect to one or more additional installments in which the Optionee would have vested under the option had the Optionee continued in Service.

5

<PAGE>    6

D. Stockholder Rights. The holder of an option shall have no stockholder rights with respect to the shares subject to the option until such person shall have exercised the option, paid the exercise price and become a holder of record of the purchased shares.

E. Repurchase Rights. The Plan Administrator shall have the discretion to grant options which are exercisable for unvested shares of Common Stock. Should the Optionee cease Service while holding such unvested shares, the Corporation shall have the right to repurchase, at the exercise price paid per share, any or all of those unvested shares. The terms upon which such repurchase right shall be exercisable (including the period and procedure for exercise and the appropriate vesting schedule for the purchased shares) shall be established

by the Plan Administrator and set forth in the document evidencing such repurchase right.

F. Limited Transferability of Options. During the lifetime of the Optionee, Incentive Options shall be exercisable only by the Optionee and shall not be assignable or transferable other than by will or by the laws of descent and distribution following the Optionee's death. Non-Statutory Options shall be subject to the same limitation, except that a Non-Statutory Option may, in connection with the Optionee's estate plan, be assigned in whole or in part during the Optionee's lifetime to one or more members of the Optionee's immediate family or to a trust established exclusively for one or more such family members. The assigned portion may only be exercised by the person or persons who acquire a proprietary interest in the option pursuant to the assignment. The terms applicable to the assigned portion shall be the same as those in effect for the option immediately prior to such assignment and shall be set forth in such documents issued to the assignee as the Plan Administrator may deem appropriate.

II.    INCENTIVE OPTIONS

The terms specified below shall be applicable to all Incentive Options. Except as modified by the provisions of this Section II, all the provisions of Articles One, Two and Three shall be applicable to Incentive Options. Options which are specifically designated as Non-Statutory Options when issued under the Plan shall not be subject to the terms of this Section II.

A. Eligibility. Incentive Options may only be granted to Employees.

B. Exercise Price. The exercise price per share shall not be less than one hundred percent (100%) of the Fair Market Value per share of Common Stock on the option grant date.

C. Dollar Limitation. The aggregate Fair Market Value of the shares of Common Stock (determined as of the respective date or dates of grant) for which one or more options granted to any Employee under the Plan (or any other option plan of the Corporation or any Parent or Subsidiary) may for the first time become exercisable as Incentive Options during any one (1) calendar year shall not exceed the sum of One Hundred Thousand Dollars ($100,000). To the extent the Employee holds two (2) or more such options which become exercisable for the first time in the same calendar year, the foregoing limitation on the exercisability of such options as Incentive Options shall be applied on the basis of the order in which such options are granted.

6

<PAGE>    7

D. 10% Stockholder. If any Employee to whom an Incentive Option is granted is a 10% Stockholder, then the exercise price per share shall not be less than one hundred ten percent (110%) of the Fair Market Value per share of Common Stock on the option grant date, and the option term shall not exceed five (5) years measured from the option grant date.

III.    CORPORATE TRANSACTION/CHANGE IN CONTROL

A. In the event of any Corporate Transaction, each outstanding option shall automatically accelerate so that each such option shall, immediately prior to the effective date of the Corporate Transaction, become

fully exercisable with respect to the total number of shares of Common Stock at
the time subject to such option and may be exercised for any or all of those
shares as fully-vested shares of Common Stock. However, an outstanding option
shall not so accelerate if and to the extent: (i) such option is, in connection
with the Corporate Transaction, either to be assumed by the successor
corporation (or parent thereof) or to be replaced with a comparable option to
purchase shares of the capital stock of the successor corporation (or parent
thereof), (ii) such option is to be replaced with a cash incentive program of
the successor corporation which preserves the spread existing on the unvested
option shares at the time of the Corporate Transaction and provides for
subsequent payout in accordance with the same vesting schedule applicable to
such option or (iii) the acceleration of such option is subject to other
limitations imposed by the Plan Administrator at the time of the option grant.
The determination of option comparability under clause (i) above shall be made
by the Plan Administrator, and its determination shall be final, binding and
conclusive.

        B. All outstanding repurchase rights shall also terminate
automatically, and the shares of Common Stock subject to those terminated rights
shall immediately vest in full, in the event of any Corporate Transaction,
except to the extent: (i) those repurchase rights are to be assigned to the
successor corporation (or parent thereof) in connection with such Corporate
Transaction or (ii) such accelerated vesting is precluded by other limitations
imposed by the Plan Administrator at the time the repurchase right is issued.

        C. Immediately following the consummation of the Corporate
Transaction, all outstanding options shall terminate and cease to be
outstanding, except to the extent assumed by the successor corporation (or
parent thereof).

        D. Each option which is assumed in connection with a Corporate
Transaction shall be appropriately adjusted, immediately after such Corporate
Transaction, to apply to the number and class of securities which would have
been issuable to the Optionee in consummation of such Corporate Transaction had
the option been exercised immediately prior to such Corporate Transaction.
Appropriate adjustments to reflect such Corporate Transaction shall also be made
to (i) the exercise price payable per share under each outstanding option,
provided the aggregate exercise price payable for such securities shall remain
the same, (ii) the maximum number and/or class of securities available for
issuance over the remaining term of the Plan and (iii) the maximum number and/or
class of securities for which any one person may be granted stock options and
direct stock issuances under the Plan per calendar year.

                                        7

<PAGE>    8

        E. The Plan Administrator shall have full power and authority to
grant options under the Discretionary Option Grant Program which will
automatically accelerate in whole or in part in the event the Optionee's Service
subsequently terminates by reason of an Involuntary Termination within a
designated period (not to exceed twelve (12) months) following the effective
date of any Corporate Transaction in which those options are assumed or replaced
and do not otherwise accelerate. Any options so accelerated shall remain
exercisable for fully-vested shares until the earlier of (i) the expiration of
the option term or (ii) the expiration of the one (1)-year period measured from
the effective date of the Involuntary Termination. In addition, the Plan
Administrator may provide that one or more of the Corporation's outstanding
repurchase rights with respect to shares held by the Optionee at the time of

such Involuntary Termination shall immediately terminate in whole or in part, and the shares subject to those terminated rights shall accordingly vest.

F. The Plan Administrator shall have full power and authority to grant options under the Discretionary Option Grant Program which will automatically accelerate in whole or in part in the event the Optionee's Service subsequently terminates by reason of an Involuntary Termination within a designated period (not to exceed twelve (12) months) following the effective date of any Change in Control. Each option so accelerated shall remain exercisable for fully-vested shares until the earlier of (i) the expiration of the option term or (ii) the expiration of the one (1)-year period measured from the effective date of the Involuntary Termination. In addition, the Plan Administrator may provide that one or more of the Corporation's outstanding repurchase rights with respect to shares held by the Optionee at the time of such Involuntary Termination shall immediately terminate in whole or in part, and the shares subject to those terminated rights shall accordingly vest.

G. The portion of any Incentive Option accelerated in connection with a Corporate Transaction or Change in Control shall remain exercisable as an Incentive Option only to the extent the applicable One Hundred Thousand Dollar limitation is not exceeded. To the extent such dollar limitation is exceeded, the accelerated portion of such option shall be exercisable as a Non-Qualified Option under the Federal tax laws.

H. The outstanding options shall in no way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

IV.    CANCELLATION AND REGRANT OF OPTIONS

The Plan Administrator shall have the authority to effect, at any time and from time to time, with the consent of the affected option holders, the cancellation of any or all outstanding options under the Discretionary Option Grant Program and to grant in substitution new options covering the same or different number of shares of Common Stock but with an exercise price per share based on the Fair Market Value per share of Common Stock on the new grant date.

8

&lt;PAGE&gt;    9

ARTICLE THREE

MISCELLANEOUS

I.    TAX WITHHOLDING

A. The Corporation's obligation to deliver shares of Common Stock upon the exercise of stock options or the issuance or vesting of such shares under the Plan shall be subject to the satisfaction of all applicable Federal, state and local income and employment tax withholding requirements.

B. The Plan Administrator may, in its discretion, provide any or all holders of Non-Statutory Options or unvested shares of Common Stock under the Plan with the right to use shares of Common Stock in satisfaction of all or part of the Withholding Taxes to which such holders may become subject in

connection with the exercise of their options or the vesting of their shares. Such right may be provided to any such holder in either or both of the following formats:

(i) Stock Withholding: The election to have the Corporation withhold, from the shares of Common Stock otherwise issuable upon the exercise of such Non-Statutory Option or the vesting of such shares, a portion of those shares with an aggregate Fair Market Value equal to the percentage of the Withholding Taxes (not to exceed one hundred percent (100%)) designated by the holder.

(ii) Stock Delivery: The election to deliver to the Corporation, at the time the Non-Statutory Option is exercised or the shares vest, one or more shares of Common Stock previously acquired by such holder (other than in connection with the option exercise or share vesting triggering the Withholding Taxes) with an aggregate Fair Market Value equal to the percentage of the Withholding Taxes (not to exceed one hundred percent (100%)) designated by the holder.

II.    EFFECTIVE DATE AND TERM OF THE PLAN

A. The Plan became effective on the Plan Effective Date.

B. The Plan shall terminate upon the earliest of (i) August 31, 2010, (ii) the date on which all shares available for issuance under the Plan shall have been issued as fully-vested shares pursuant to option exercises or direct stock issuances under the Plan or (iii) the termination of all outstanding options in connection with a Corporate Transaction. Upon such Plan termination, all outstanding stock options and unvested stock issuances shall continue to have force and effect in accordance with the provisions of the documents evidencing such options or issuances.

9

<PAGE>    10

III.    AMENDMENT OF THE PLAN

A. The Board shall have complete and exclusive power and authority to amend or modify the Plan in any or all respects. However, no such amendment or modification shall adversely affect any rights and obligations with respect to options or unvested stock issuances at the time outstanding under the Plan unless the Optionee or the Participant consents to such amendment or modification. In addition, certain amendments may require stockholder approval pursuant to applicable laws or regulations. Subject to the foregoing limitations, the Plan Administrator may make option grants and direct stock issuances under the Plan at any time before the date fixed herein for the termination of the Plan.

B. Options to purchase shares of Common Stock may be granted under the Discretionary Option Grant that are in each instance in excess of the number of shares then available for issuance under the Plan, provided any excess shares actually issued under those programs are held in escrow until there is obtained stockholder approval of an amendment sufficiently increasing the number of shares of Common Stock available for issuance under the Plan. If such stockholder approval is not obtained within twelve (12) months after the date the first such excess grants or issuances are made, then (i) any unexercised options granted on the basis of such excess shares shall terminate and cease to be outstanding and (ii) the Corporation shall promptly refund to the Optionees

and the Participants the exercise or purchase price paid for any excess shares issued under the Plan and held in escrow, together with interest (at the applicable Short Term Federal Rate) for the period the shares were held in escrow, and such shares shall thereupon be automatically cancelled and cease to be outstanding.

IV.    REGULATORY APPROVALS

A. The implementation of the Plan, the granting of any option under the Plan and the issuance of any shares of Common Stock either upon the exercise of any option shall be subject to the Corporation's procurement of all approvals and permits required by regulatory authorities having jurisdiction over the Plan, the options granted under it and the shares of Common Stock issued pursuant to it.

B. No shares of Common Stock or other assets shall be issued or delivered under the Plan unless and until there shall have been compliance with all applicable requirements of Federal and state securities laws.

V.    USE OF PROCEEDS

Any cash proceeds received by the Corporation from the sale of shares of Common Stock under the Plan shall be used for general corporate purposes.

VI.    NO EMPLOYMENT/SERVICE RIGHTS

Nothing in the Plan shall confer upon the Optionee or the Participant any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Corporation (or any Parent or Subsidiary employing or retaining such

10

<PAGE>    11

person) or of the Optionee or the Participant, which rights are hereby expressly reserved by each, to terminate such person's Service at any time for any reason, with or without cause.

11

<PAGE>    12

APPENDIX

The following definitions shall be in effect under the Plan:

A. BOARD shall mean the Corporation's Board of Directors.

B. CHANGE IN CONTROL shall mean a change in ownership or control of the Corporation effected through either of the following transactions:

(i) the acquisition, directly or indirectly, by any person or related group of persons (other than the Corporation or a person that directly or indirectly controls, is controlled by, or is under common control with, the Corporation), of beneficial ownership

(within the meaning of Rule 13d-3 of the 1934 Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities pursuant to a tender or exchange offer made directly to the Corporation's stockholders, or

(ii) a change in the composition of the Board over a period of thirty-six (36) consecutive months or less such that a majority of the Board members ceases, by reason of one or more contested elections for Board membership, to be comprised of individuals who either (A) have been Board members continuously since the beginning of such period or (B) have been elected or nominated for election as Board members during such period by at least a majority of the Board members described in clause (A) who were still in office at the time the Board approved such election or nomination.

C. CODE shall mean the Internal Revenue Code of 1986, as amended.

D. COMMON STOCK shall mean the Corporation's common stock.

E. CORPORATE TRANSACTION shall mean either of the following stockholder-approved transactions to which the Corporation is a party:

(i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction; or

(ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

A-1

<PAGE>    13

F. CORPORATION shall mean WebManage Technologies, Inc., a Delaware corporation, and any corporate successor to all or substantially all of the assets or voting stock of WebManage Technologies, Inc. which shall by appropriate action adopt the Plan.

G. DISCRETIONARY OPTION GRANT PROGRAM shall mean the discretionary option grant program in effect under the Plan.

H. EMPLOYEE shall mean an individual who is in the employ of the Corporation (or any Parent or Subsidiary), subject to the control and direction of the employer entity as to both the work to be performed and the manner and method of performance.

I. EXERCISE DATE shall mean the date on which the Corporation shall have received written notice of the option exercise.

J. FAIR MARKET VALUE per share of Common Stock on any relevant date shall be determined by the Board of Directors.

K. INCENTIVE OPTION shall mean an option which satisfies the requirements of Code Section 422.

L. INVOLUNTARY TERMINATION shall mean the termination of the Service of any individual which occurs by reason of:

(i) such individual's involuntary dismissal or discharge by the Corporation for reasons other than Misconduct, or

(ii) such individual's voluntary resignation following (A) a change in his or her position with the Corporation which materially reduces his or her level of responsibility, (B) a reduction in his or her level of compensation (including base salary, fringe benefits and participation in corporate-performance based bonus or incentive programs) by more than fifteen percent (15%) or (C) a relocation of such individual's place of employment by more than fifty (50) miles, provided and only if such change, reduction or relocation is effected by the Corporation without the individual's consent.

M. MISCONDUCT shall mean the commission of any act of fraud, embezzlement or dishonesty by the Optionee or Participant, any unauthorized use or disclosure by such person of confidential information or trade secrets of the Corporation (or any Parent or Subsidiary), or any other intentional misconduct by such person adversely affecting the business or affairs of the Corporation (or any Parent or Subsidiary) in a material manner. The foregoing definition shall not be deemed to be inclusive of all the acts or omissions which the Corporation (or any Parent or Subsidiary) may consider as grounds for the dismissal or discharge of any Optionee, Participant or other person in the Service of the Corporation (or any Parent or Subsidiary).

N. 1934 ACT shall mean the Securities Exchange Act of 1934, as amended.

A-2

<PAGE>    14

O. NON-STATUTORY OPTION shall mean an option not intended to satisfy the requirements of Code Section 422.

P. OPTIONEE shall mean any person to whom an option is granted under the Discretionary Option Grant Program.

Q. PARENT shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, provided each corporation in the unbroken chain (other than the Corporation) owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

R. PERMANENT DISABILITY OR PERMANENTLY DISABLED shall mean the inability of the Optionee or the Participant to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment expected to result in death or to be of continuous duration of twelve (12) months or more.

S. PLAN shall mean the Corporation's 2000 Stock Incentive Plan, as set forth in this document.

T. PLAN ADMINISTRATOR shall mean the particular entity, whether the Primary Committee, the Board or the Secondary Committee, which is authorized to administer the Discretionary Option Grant Program with respect to one or more

classes of eligible persons, to the extent such entity is carrying out its administrative functions under those programs with respect to the persons under its jurisdiction.

       U. PLAN EFFECTIVE DATE shall mean _____.

       V. PRIMARY COMMITTEE shall mean the committee of two (2) or more non-employee Board members appointed by the Board to administer the Discretionary Option Grant Program.

       W. SECONDARY COMMITTEE shall mean a committee of two (2) or more Board members appointed by the Board to administer the Discretionary Option Grant Program with respect to eligible persons.

       X. SERVICE shall mean the provision of services to the Corporation (or any Parent or Subsidiary) by a person in the capacity of an Employee, a non-employee member of the board of directors or a consultant or independent advisor, except to the extent otherwise specifically provided in the documents evidencing the option grant or stock issuance.

       Y. SUBSIDIARY shall mean any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, provided each corporation (other than the last corporation) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

<div align="center">A-3</div>

&lt;PAGE&gt;    15

       Z. 10% STOCKHOLDER shall mean the owner of stock (as determined under Code Section 424(d)) possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Corporation (or any Parent or Subsidiary).

       AA. WITHHOLDING TAXES shall mean the Federal, state and local income and employment withholding taxes to which the holder of Non-Statutory Options or unvested shares of Common Stock may become subject in connection with the exercise of those options or the vesting of those shares.

<div align="center">A-4</div>

&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;
&lt;DOCUMENT&gt;
&lt;TYPE&gt;EX-99.8
&lt;SEQUENCE&gt;11
&lt;FILENAME&gt;f68554orex99-8.txt
&lt;DESCRIPTION&gt;EXHIBIT 99.8
&lt;TEXT&gt;

&lt;PAGE&gt;    1

<div align="right">EXHIBIT 99.8</div>

<div align="center">WEBMANAGE TECHNOLOGIES, INC.</div>

STOCK OPTION AGREEMENT

RECITALS

A. The Board has adopted the Plan for the purpose of retaining the services of selected Employees, non-employee members of the Board and consultants and other independent advisors who provide services to the Corporation.

B. Optionee is to render valuable services to the Corporation, and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the Corporation's grant of an option to Optionee.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in the attached Appendix.

NOW, THEREFORE, it is hereby agreed as follows:

1. GRANT OF OPTION. The Corporation hereby grants to Optionee, as of the Grant Date, an option to purchase up to the number of Option Shares specified in the Grant Notice. The Option Shares shall be purchasable from time to time during the option term specified in Paragraph 2 at the Exercise Price.

2. OPTION TERM. This option shall have a term of ten (10) years measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 5 or 6.

3. LIMITED TRANSFERABILITY. This option shall be neither transferable nor assignable by Optionee other than by will or by the laws of descent and distribution following Optionee's death and may be exercised, during Optionee's lifetime, only by Optionee. However, if this option is designated a Non-Statutory Option in the Grant Notice, then this option may also be assigned, in whole or in part during Optionee's lifetime in accordance with the Optionee's estate plan, to one or more members of the Optionee's immediate family or to a trust established exclusively for one or more such family members. The assigned portion may only be exercised by the person or persons who acquire a proprietary interest in the option pursuant to the assignment. The terms applicable to the assigned portion shall be the same as those in effect for the option immediately prior to such assignment and shall be set forth in such documents issued to the assignee as the Plan Administrator may deem appropriate.

4. DATES OF EXERCISE. This option shall become exercisable for the Option Shares in one or more installments as specified in the Grant Notice. As the option becomes exercisable for such installments, those installments shall accumulate and the option shall remain exercisable for the accumulated installments until the Expiration Date or sooner termination of the option term under Paragraph 5 or 6.

5. CESSATION OF SERVICE. The option term specified in Paragraph 2 shall terminate (and this option shall cease to be outstanding) prior to the Expiration Date should any of the following provisions become applicable:

(i) Should Optionee cease to remain in Service for any reason (other than death, Permanent Disability or Misconduct) while this option is outstanding, then Optionee shall have a period of three (3) months (commencing with the date of such cessation of Service) during which to exercise this option, but in no event shall this option be exercisable at any time after the Expiration Date.

(ii) Should Optionee die while this option is outstanding, then the personal representative of Optionee's estate or the person or persons to whom the option is transferred pursuant to Optionee's will or in accordance with the laws of descent and distribution shall have the right to exercise this option. Such right shall lapse, and this option shall cease to be outstanding, upon the earlier of (A) the expiration of the twelve (12)- month period measured from the date of Optionee's death or (B) the Expiration Date.

(iii) Should Optionee cease Service by reason of Permanent Disability while this option is outstanding, then Optionee shall have a period of twelve (12) months (commencing with the date of such cessation of Service) during which to exercise this option. In no event shall this option be exercisable at any time after the Expiration Date.

1.

<PAGE>    2

(iv) Should Optionee's Service be terminated for Misconduct, then this option shall terminate immediately and cease to remain outstanding.

(v) During the applicable post-Service exercise period, this option may not be exercised in the aggregate for more than the number of vested Option Shares for which this option is exercisable at the time of Optionee's cessation of Service. Upon the expiration of such exercise period or (if earlier) upon the Expiration Date, this option shall terminate and cease to be outstanding for any vested Option Shares for which the option has not been exercised. However, this option shall, immediately upon Optionee's cessation of Service for any reason, terminate and cease to be outstanding with respect to any Option Shares in which Optionee is not otherwise at that time vested or for which this option is not otherwise at that time exercisable.

6. SPECIAL ACCELERATION OF OPTION.

(a) This option, to the extent outstanding at the time of a Corporate Transaction but not otherwise fully exercisable, shall automatically accelerate so that this option shall, immediately prior to the effective date of the Corporate Transaction, become exercisable for all of the Option Shares at the time subject to this option and may be exercised for any or all of those Option Shares as fully-vested shares of Common Stock. No such acceleration of this option, however, shall occur if and to the extent: (i) this option is, in connection with the Corporate Transaction, either to be assumed by the successor corporation (or parent thereof) or to be replaced with a comparable option to purchase shares of the capital stock of the successor corporation (or parent thereof) or (ii) this option is to be replaced with a cash incentive program of the successor corporation which preserves the spread existing on the Option Shares at the time of the Corporate Transaction (the excess of the Fair Market Value of those Option Shares over the aggregate Exercise Price payable for such shares) and provides for subsequent pay-out in accordance with the option exercise schedule set forth in the Grant Notice. The determination of option comparability under clause (i) shall be made by the Plan Administrator, and such determination shall be final, binding and conclusive.

(b) Immediately following the Corporate Transaction, this option, to the extent not previously exercised, shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c) If this option is assumed in connection with a Corporate Transaction, then this option shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to Optionee in consummation of such Corporate Transaction had the option been exercised immediately prior to such Corporate Transaction, and appropriate adjustments shall also be made to the Exercise Price, provided the aggregate Exercise Price shall remain the same.

(d) This Agreement shall not in any way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

7. ADJUSTMENT IN OPTION SHARES. Should any change be made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration, appropriate adjustments shall be made to (i) the total number and/or class of securities subject to this option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

8. STOCKHOLDER RIGHTS. The holder of this option shall not have any stockholder rights with respect to the Option Shares until such person shall have exercised the option, paid the Exercise Price and become a holder of record of the purchased shares.

9. MANNER OF EXERCISING OPTION.

(a) In order to exercise this option with respect to all or any part of the Option Shares for which this option is at the time exercisable, Optionee (or any other person or persons exercising the option) must take the following actions:

(i) Execute and deliver to the Corporation a Notice of Exercise for the Option Shares for which the option is exercised.

2.

<PAGE>    3

(ii) Pay the aggregate Exercise Price for the purchased shares in one or more of the following forms:

(A) cash or check made payable to the Corporation;

(B) shares of Common Stock held by Optionee (or any other person or persons exercising the option) for the requisite period necessary to avoid a charge to the Corporation's earnings for financial reporting purposes and valued at Fair Market Value on the Exercise Date; or

(C) through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the option) shall concurrently provide irrevocable instructions (I) to a Corporation to effect the immediate sale of the purchased shares and remit to the Corporation, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price

payable for the purchased shares plus all applicable Federal, state and local income and employment taxes required to be withheld by the Corporation by reason of such exercise and (II) to the Corporation to deliver the certificates for the purchased shares in order to complete the sale transaction.

Except to the extent the sale and remittance procedure is utilized in connection with the option exercise, payment of the Exercise Price must accompany the Notice of Exercise delivered to the Corporation in connection with the option exercise.

(iii) Furnish to the Corporation appropriate documentation that the person or persons exercising the option (if other than Optionee) have the right to exercise this option.

(iv) Make appropriate arrangements with the Corporation (or Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all Federal, state and local income and employment tax withholding requirements applicable to the option exercise.

(b) As soon as practical after the Exercise Date, the Corporation shall issue to or on behalf of Optionee (or any other person or persons exercising this option) a certificate for the purchased Option Shares, with the appropriate legends affixed thereto.

(c) In no event may this option be exercised for any fractional shares.

10. COMPLIANCE WITH LAWS AND REGULATIONS.

(a) The exercise of this option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Corporation and Optionee with all applicable requirements of law relating thereto.

(b) The inability of the Corporation to obtain approval from any regulatory body having authority deemed by the Corporation to be necessary to the lawful issuance and sale of any Common Stock pursuant to this option shall relieve the Corporation of any liability with respect to the non-issuance or sale of the Common Stock as to which such approval shall not have been obtained. The Corporation, however, shall use its best efforts to obtain all such approvals.

11. SUCCESSORS AND ASSIGNS. Except to the extent otherwise provided in Paragraphs 3 and 6, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Corporation and its successors and assigns and Optionee, Optionee's assigns and the legal representatives, heirs and legatees of Optionee's estate.

12. NOTICES. Any notice required to be given or delivered to the Corporation under the terms of this Agreement shall be in writing and addressed to the Corporation at its principal corporate offices. Any notice required to be given or delivered to Optionee shall be in writing and addressed to Optionee at the address indicated below Optionee's signature line on the Grant Notice. All notices shall be deemed effective upon personal delivery or upon deposit in the U.S. mail, postage prepaid and properly addressed to the party to be notified.

3.

<PAGE>    4

        13. CONSTRUCTION. This Agreement and the option evidenced hereby
are made and granted pursuant to the Plan and are in all respects limited by and
subject to the terms of the Plan. All decisions of the Plan Administrator with
respect to any question or issue arising under the Plan or this Agreement shall
be conclusive and binding on all persons having an interest in this option.

        14. GOVERNING LAW. The interpretation, performance and enforcement
of this Agreement shall be governed by the laws of the State of Delaware without
resort to that State's conflict-of-laws rules.

        15. EXCESS SHARES. If the Option Shares covered by this Agreement
exceed, as of the Grant Date, the number of shares of Common Stock which may
without stockholder approval be issued under the Plan, then this option shall be
void with respect to those excess shares, unless stockholder approval of an
amendment sufficiently increasing the number of shares of Common Stock issuable
under the Plan is obtained in accordance with the provisions of the Plan.

        16. ADDITIONAL TERMS APPLICABLE TO AN INCENTIVE OPTION. In the
event this option is designated an Incentive Option in the Grant Notice, the
following terms and conditions shall also apply to the grant:

            (a) This option shall cease to qualify for favorable tax
    treatment as an Incentive Option if (and to the extent) this option is
    exercised for one or more Option Shares: (A) more than three (3) months
    after the date Optionee ceases to be an Employee for any reason other
    than death or Permanent Disability or (B) more than twelve (12) months
    after the date Optionee ceases to be an Employee by reason of Permanent
    Disability.

            (b) No installment under this option shall qualify for
    favorable tax treatment as an Incentive Option if (and to the extent)
    the aggregate Fair Market Value (determined at the Grant Date) of the
    Common Stock for which such installment first becomes exercisable
    hereunder would, when added to the aggregate value (determined as of the
    respective date or dates of grant) of the Common Stock or other
    securities for which this option or any other Incentive Options granted
    to Optionee prior to the Grant Date (whether under the Plan or any other
    option plan of the Corporation) first become exercisable during the same
    calendar year, exceed One Hundred Thousand Dollars ($100,000) in the
    aggregate. Should such One Hundred Thousand Dollar ($100,000) limitation
    be exceeded in any calendar year, this option shall nevertheless become
    exercisable for the excess shares in such calendar year as a
    Non-Statutory Option.

            (c) Should the exercisability of this option be accelerated
    upon a Corporate Transaction, then this option shall qualify for
    favorable tax treatment as an Incentive Option only to the extent the
    aggregate Fair Market Value (determined at the Grant Date) of the Common
    Stock for which this option first becomes exercisable in the calendar
    year in which the Corporate Transaction occurs does not, when added to
    the aggregate value (determined as of the respective date or dates of
    grant) of the Common Stock or other securities for which this option or
    one or more other Incentive Options granted to Optionee prior to the
    Grant Date (whether under the Plan or any other option plan of the
    Corporation) first become exercisable during the same calendar year,
    exceed One Hundred Thousand Dollars ($100,000) in the aggregate. Should
    the applicable One Hundred Thousand Dollar ($100,000) limitation be
    exceeded in the calendar year of such Corporate Transaction, the option

may nevertheless be exercised for the excess shares in such calendar year as a Non-Statutory Option.

(d) Should Optionee hold, in addition to this option, one or more other options to purchase Common Stock which become exercisable for the first time in the same calendar year as this option, then the foregoing limitations on the exercisability of such options as Incentive Options shall be applied on the basis of the order in which such options are granted.

17. LEAVE OF ABSENCE. The following provisions shall apply upon the Optionee's commencement of an authorized leave of absence:

(a) The exercise schedule in effect under the Grant Notice shall be frozen as of the first day of the authorized leave, and the option shall not become exercisable for any additional installments of the Option Shares during the period Optionee remains on such leave.

4.

<PAGE>   5

(b) Should Optionee resume active Employee status within sixty (60) days after the start date of the authorized leave, Optionee shall, for purposes of the exercise schedule set forth in the Grant Notice, receive Service credit for the entire period of such leave. If Optionee does n

# EXHIBIT B



Web | Moving Images | Texts | Audio | Patron Info



Internet Archive Home | Forums | FAQs | Contributions | About IA | Terms, Privacy, & Copyright | Contact

**Search:** [_____]  All Media Types [___]  Anonymous User (login or join us)

GO!

---

**Read More**

**Why the Archive is Building an 'Internet Library'**

**Future Libraries**

**Related Projects and Research**

**Storage and Preservation**

**Server Statistics**

---

Media Coverage
[more]

NPR - Talk of the Nation about the future of Digital Libraries

NY Times: Google Is Adding Major Libraries to Its Database

Fight for Public Domain Goes On - Wired News on Kahle vs. Ashcroft

Internet Archive's Web Page Snapshots Held Admissible as Evidence

Internet Archive receives IP3 award from Public Knowledge

Universal access to all knowledge picked up by the BBC

Guilt Free

---

the Wayback Machine

**Wayback Machine Online Press Kit**

### The Internet Archive Introduces a Next Generation Library

Wednesday, October 24, 2001. 6:30 p.m.
Bancroft Library, University of California Berkeley

INTERNET ARCHIVE
**WayBackMachine**

http://web.archive.org/

▷ Press Release
▷ Wayback Machine Overview
▷ Internet Archive Background
▷ Speaker Biographies
▷ Wayback Machine Partners
▷ Directions to the Event
▷ News from the Event

**Press Release**

Contact:
Anne-miek Hamelinck
Antenna Group
annemiek@antennagroup.com
415-977-1923

**INTERNET ARCHIVE LAUNCHES WAYBACK MACHINE**

Free Service Enables Users to Access Archived Versions of Web Sites Dating from 1996

SAN FRANCISCO (October 24, 2001) - The Internet Archive, a comprehensive library of Internet sites and other cultural artifacts in digital form, today launched the Wayback Machine, a free service allowing people to access and use archived versions of past web pages. For the first time, all

Downloading at the
Archive

Rural Kids in Africa
Print, Bind and Read
with Anywhere Books-
article in wired news

Outfoxed footage
hosted at archive.org

NY Times: Preserving
the Past

members of the public will be able to search and view the
Internet Archive's enormous collection of web sites, dating
back to 1996 and comprising over 10 billion web pages.

The service, which was unveiled tonight at a ceremony at the
University of California at Berkeley's Bancroft Library, is
available at web.archive.org. To use the Wayback Machine,
visitors simply type in a URL in the provided search box,
select a date, and then begin surfing on an archived version of
the web.

"In 1996, we created the Internet Archive because we felt it
was critical to preserve a permanent record of this historically
significant new medium for the public," said Internet Archive
founder Brewster Kahle. "To date, the Archive has catalogued
over ten billion web pages that might otherwise have been
lost, giving us both a record of the origins and evolution of
the Internet, as well as snapshots of our society as a whole
around the turn of the century. For our fifth anniversary, we
are opening up the Archive to the public by launching the
Wayback Machine, so that everyone can travel back in time
and view the Internet as it was in the past-and as it matures
into the future."

Since 1996, when the Internet Archive was founded in order
to create a permanent collection of digital material for the
public, the Internet Archive has been storing and recording
web pages. Collaborating with institutions including the
Library of Congress and the Smithsonian Institution, the
Internet Archive's comprehensive library of the Web's digital
past comprises 100 terabytes of data and is growing at a rate
of 10 terabytes per month, eclipsing the amount of data
contained in every library in the world including the Library
of Congress, and making it the largest known database in
existence.

"By keeping an historical record of what Web sites looked
like and how they evolved over time, the Internet Archive is
an invaluable resource for journalism educators, academic
researchers and people who just want to see how the media
and our culture marked important historical events," said Paul
Grabowicz, Director of the New Media Program and
Assistant Dean at Northgate UC Berkeley Graduate School of
Journalism. "Now, thanks to the Archive's new Wayback
Machine, everyone has the opportunity to revisit, study and
enjoy these important 'first drafts of history'."

**About the Internet Archive**

The Internet Archive was founded in 1996 in order to build a digital library and other cultural artifacts in digital form, with the purpose of offering permanent and free access to researchers, historians, scholars, and the general public. The Archive holds a collection of archived web pages, dating from 1996 and comprising 100 terabytes. Since 1999, the Archive has expanded its collections to include: a September 11 television and online catalog; an Election 2000 online library; archived movies from 1903-1973; and other documents. Located in San Francisco, the Archive is a 501(c)(3) public nonprofit whose benefactors include Alexa Internet, AT&T Research, Compaq, the Kahle/Austin Foundation, Prelinger Archives, Quantum DLT, Xerox PARC, the Library of Congress, and the National Science Foundation.

# EXHIBIT C



**Web | Moving Images | Texts | Audio | Software | Patron Info**



Internet Archive Home | Forums | FAQs | Contributions | About IA | Terms, Privacy, & Copyright | Contact | Jobs

**Search:** [_____] [All Media Types_____] [__] [GO!]    **Anonymous User** (login or
Advanced Search                                                                  join us)

---

**Announcements**
(more)

Orphan Works
lawsuit appeal
filed

Open-Access
Text Archives

New book
collection: color
scans, djvu,
some pdf

**Archive Collections**    [RSS]

The Internet Archive is building a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public. **Browse the Archive**



http://www.sec.gov
[ Take Me Back ]

Advanced Search | About the Wayback Machine

---

**Moving Images**: Prelinger Archives | Open Source Movies | Feature Films | Game Videos | Computer Chronicles | Net Café | Election 2004 | Independent News | Youth Media | SIGGRAPH | MSRI Math Lectures | Open Mind | Shaping San Francisco | Brick Films | Mosaic Middle East News | AV Geeks | SabuCat Movie Trailers

**This Just In** (more)    [RSS]

Phil Lesh &
Friends: 1994-
05-11
8 minutes ago

Democracy
Now! Thursday,
26 January,
2005
6 hours ago

untitled
17 hours ago

La Science
Sociale -
Suivant La
Mé˜ode
D'observation
6 days ago

Add your own
concert, audio
recording or
movie to the
Internet Archive.

From the staff pick list:



**Tribune-American Dream Picture**
Astonishing film sponsored by a newspaper which held a contest for the most unusual dream and then made it into a short film. A woman dreams of losing her baby, rowing across San Francisco Bay and fin...

**Audio**: Live Music Archive | Netlabels | Open Source Audio | Presidential Recordings | Democracy Now | Other Minds Archive | Conference Proceedings | Naropa Audio Archives | GenderTalk | Berkeley Groks Science Radio | Tse Chen Ling Buddhist Lectures

From the staff pick list:



**Gras - Gras [gruen005]**
The Infinite Process Of Absorbing The monotonous noise of bypassing cars drags me away from sleep and into another day. Time doesn't exist, there are just processes and my whole life seems to be ti...

**Texts**: Canadian Libraries | Million Book Project | Open Source Books | Project Gutenberg | Children's Library | Arpanet

From the staff pick list:

**A litil boke the whiche traytied and reherced many gode thinges necessaries for the pestilence ...**

## Recent Reviews

Umphrey's
McGee: 2004-
02-21
Smokin Show

Grateful Dead:
1974-08-06
Fence Climbing
Idiot

Grateful Dead:
1994-03-27
Listen to the
DEW!

Tsunami -
Penang Beach
The wizard that
lives in the
clouds...

Tsunami -
Penang Beach
The wizard that
lives in the
clouds...

## Institutional Support

Alexa Internet
HP Computer
The
Kahle/Austin
Foundation
Prelinger
Archives
National Science
Foundation
Library of
Congress
Siggraph
LizardTech
Sloan
Foundation
Hewlett
Foundation

**Individual
contributors**



**made by the ... Bisshop of Arusiens**
London, 1485 Reproduced in facsimile from the copy
in the John Rylands library. With an introduction by
Guthrie Vine. This is the first book written in English
about preventative practices for dis...

| Most recent posts (write a post by going to a forum) | | | | | more,,, |
|---|---|---|---|---|---|
| Subject | Poster | Forum | Replies | Views | Date |
| Re: Phil and Friends | DrediKnight | etree | 0 | 1 | January 27, 2005 02:42:19pm |
| Mystified - Rain 3 [wh047] | cpmcdill [Webbed Hand] | netlabels | 0 | 2 | January 27, 2005 02:26:35pm |
| Keller @ HorningsHideout?? | OR_saTiVa | etree | 0 | 29 | January 27, 2005 12:09:30pm |
| Electronic Music Videos | op.cab.pol | forums | 0 | 23 | January 27, 2005 11:43:36am |
| Re: Help with md5 Checksum | Deadorphishing | etree | 0 | 18 | January 27, 2005 11:28:11am |
| Re: Tell US Copyright Office to let you use orphan works! | akb | prelinger | 0 | 11 | January 27, 2005 11:19:00am |
| Re: Phil and Friends | pt | etree | 1 | 35 | January 27, 2005 11:09:51am |
| Re: Phil and Friends | Brad Leblanc | etree | 1 | 22 | January 27, 2005 10:59:38am |
| Re: Help with md5 Checksum | O_H_Lee | etree | 1 | 12 | January 27, 2005 10:54:56am |
| Re: Frozen by curator. Uploader will be / has been contacted to resolve outstanding issues?? | Tyler | etree | 0 | 12 | January 27, 2005 10:48:47am |

Terms, Privacy, Copyright | Contact Us
Internet Archive Home | About the Internet Archive

# EXHIBIT D



**INTERNET ARCHIVE**

Enter Web Address: http://     All ▦     [ Take Me Back ]    Adv. Search  Compare Archi

Searched for http://www.sec.gov     **435** Results

Note some duplicates are not shown. See all.
* denotes when site was updated.

## Search Results for Jan 01, 1996 - Jan 27, 2005

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|------|------|------|------|------|------|------|
| 3 pages | 4 pages | 6 pages | 7 pages | 21 pages | 134 pages | 81 pages |

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|------|------|------|------|------|------|------|
| Nov 14, 1996 * | Jun 05, 1997 * | Feb 01, 1998 * | Jan 17, 1999 * | Mar 01, 2000 * | Jan 18, 2001 * | Jan 24, 2002 * |
| Dec 12, 1996 * | Jul 11, 1997 * | Feb 24, 1998 * | Jan 25, 1999 * | Mar 02, 2000 | Jan 30, 2001 * | Jan 27, 2002 |
| Dec 24, 1996 | Jul 28, 1997 * | Jun 28, 1998 * | Feb 08, 1999 * | Mar 02, 2000 * | Feb 02, 2001 | Feb 06, 2002 * |
| | Dec 10, 1997 * | Jul 07, 1998 * | Mar 02, 1999 | Mar 02, 2000 * | Feb 06, 2001 | May 23, 2002 * |
| | | Jul 08, 1998 | Apr 17, 1999 * | Mar 03, 2000 | Feb 24, 2001 * | Jul 19, 2002 * |
| | | Dec 12, 1998 * | Apr 23, 1999 * | Mar 04, 2000 * | Feb 26, 2001 * | Aug 02, 2002 * |
| | | | Apr 28, 1999 * | May 10, 2000 * | Mar 01, 2001 * | Aug 08, 2002 * |
| | | | | May 10, 2000 * | Mar 01, 2001 * | Aug 12, 2002 * |
| | | | | May 11, 2000 | Mar 02, 2001 | Aug 13, 2002 |
| | | | | May 12, 2000 | Mar 04, 2001 * | Aug 21, 2002 * |
| | | | | May 20, 2000 * | Mar 22, 2001 * | Aug 23, 2002 * |
| | | | | Jun 20, 2000 * | Mar 31, 2001 * | Aug 27, 2002 * |
| | | | | Jun 21, 2000 * | Apr 13, 2001 * | Aug 31, 2002 * |
| | | | | Jun 22, 2000 | Apr 18, 2001 * | Sep 01, 2002 |
| | | | | Jul 06, 2000 * | May 03, 2001 | Sep 02, 2002 |
| | | | | Aug 15, 2000 * | May 14, 2001 * | Sep 03, 2002 |
| | | | | Oct 18, 2000 * | May 15, 2001 * | Sep 06, 2002 * |
| | | | | Nov 09, 2000 * | May 24, 2001 * | Sep 09, 2002 * |
| | | | | Nov 21, 2000 * | May 25, 2001 | Sep 10, 2002 |
| | | | | Dec 03, 2000 * | May 26, 2001 | Sep 11, 2002 |
| | | | | Dec 06, 2000 * | May 31, 2001 | Sep 13, 2002 * |
| | | | | | May 31, 2001 * | Sep 14, 2002 |
| | | | | | Jun 06, 2001 | Sep 17, 2002 |
| | | | | | Jun 16, 2001 * | Sep 18, 2002 |
| | | | | | Jun 19, 2001 * | Sep 19, 2002 * |
| | | | | | Jun 22, 2001 | Sep 20, 2002 * |
| | | | | | Jun 27, 2001 | Sep 21, 2002 |
| | | | | | Jun 28, 2001 | Sep 22, 2002 |
| | | | | | Jun 28, 2001 * | Sep 23, 2002 |
| | | | | | Jun 30, 2001 | Sep 24, 2002 |
| | | | | | Jul 02, 2001 | Sep 25, 2002 * |
| | | | | | Jul 09, 2001 | Sep 26, 2002 |
| | | | | | Jul 11, 2001 * | Sep 27, 2002 * |
| | | | | | Jul 12, 2001 * | Sep 28, 2002 |
| | | | | | Aug 13, 2001 * | Sep 29, 2002 |
| | | | | | Sep 13, 2001 * | Sep 30, 2002 |
| | | | | | Sep 13, 2001 * | Oct 10, 2002 * |
| | | | | | Sep 14, 2001 | Oct 11, 2002 |
| | | | | | Sep 15, 2001 * | Oct 12, 2002 * |
| | | | | | Sep 16, 2001 | Oct 14, 2002 |
| | | | | | Sep 16, 2001 * | Oct 21, 2002 |

Sep 17, 2001
Sep 18, 2001
Sep 19, 2001
Sep 19, 2001  *
Sep 20, 2001
Sep 21, 2001
Sep 22, 2001  *
Sep 23, 2001
Sep 24, 2001
Sep 25, 2001
Sep 25, 2001  *
Sep 26, 2001
Sep 26, 2001  *
Sep 27, 2001
Sep 28, 2001
Sep 29, 2001  *
Sep 30, 2001
Oct 01, 2001
Oct 02, 2001  *
Oct 03, 2001  *
Oct 04, 2001
Oct 05, 2001
Oct 06, 2001
Oct 07, 2001
Oct 08, 2001
Oct 09, 2001  *
Oct 10, 2001
Oct 11, 2001
Oct 11, 2001  *
Oct 12, 2001
Oct 13, 2001
Oct 14, 2001
Oct 14, 2001  *
Oct 15, 2001  *
Oct 16, 2001  *
Oct 17, 2001
Oct 18, 2001
Oct 19, 2001  *
Oct 20, 2001  *
Oct 21, 2001
Oct 21, 2001  *
Oct 22, 2001  *
Oct 23, 2001
Oct 24, 2001  *
Oct 25, 2001
Oct 26, 2001  *
Oct 27, 2001
Oct 28, 2001
Oct 29, 2001
Oct 29, 2001  *
Oct 30, 2001
Oct 31, 2001
Nov 01, 2001
Nov 02, 2001  *
Nov 03, 2001
Nov 04, 2001
Nov 05, 2001
Nov 06, 2001

Oct 25, 2002  *
Oct 26, 2002  *
Oct 27, 2002
Oct 28, 2002
Oct 28, 2002  *
Oct 29, 2002  *
Oct 30, 2002  *
Oct 31, 2002  *
Nov 01, 2002
Nov 02, 2002
Nov 03, 2002
Nov 04, 2002
Nov 05, 2002  ›
Nov 06, 2002  ›
Nov 07, 2002  ›
Nov 08, 2002  ›
Nov 09, 2002  ›
Nov 09, 2002  ›
Nov 10, 2002
Nov 11, 2002
Nov 12, 2002
Nov 13, 2002  ›
Nov 14, 2002  ›
Nov 15, 2002
Nov 16, 2002  ›
Nov 17, 2002
Nov 18, 2002
Nov 19, 2002  ›
Nov 21, 2002  ›
Nov 22, 2002  ›
Nov 22, 2002  ›
Nov 24, 2002
Nov 25, 2002  ›
Nov 27, 2002  ›
Nov 28, 2002
Nov 29, 2002
Nov 30, 2002
Dec 02, 2002
Dec 03, 2002  ›
Dec 04, 2002  ›

Nov 06, 2001 *
Nov 07, 2001 *
Nov 07, 2001 *
Nov 08, 2001
Nov 09, 2001
Nov 10, 2001
Nov 11, 2001
Nov 12, 2001
Nov 13, 2001
Nov 14, 2001
Nov 16, 2001 *
Nov 17, 2001 *
Nov 19, 2001 *
Nov 20, 2001
Nov 21, 2001
Nov 21, 2001 *
Nov 22, 2001
Nov 23, 2001
Nov 24, 2001
Nov 25, 2001
Nov 27, 2001
Nov 28, 2001
Nov 29, 2001
Nov 30, 2001
Dec 01, 2001
Dec 02, 2001
Dec 03, 2001
Dec 04, 2001 *
Dec 05, 2001 *
Dec 07, 2001 *
Dec 09, 2001
Dec 11, 2001
Dec 12, 2001 *
Dec 14, 2001 *
Dec 16, 2001

Home | Help

Copyright © 2001, Internet Archive | Terms of Use | Privacy Policy