# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BRIAN MEHLMAN,

      Plaintiff,

v.

NETWORK APPLIANCE, INC.,

      Defendant.

CIVIL ACTION NO. 04-12533-WGY

Hon. Judge William G. Young

## DEFENDANT NETWORK APPLIANCE, INC.'S
## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS ................................................................................................................ 3

    A.    Network Appliance Acquired WebManage and Offered Mr. Mehlman a Job. ........................................................................................... 3

    B.    Mr. Mehlman Understood That The Agreement Did Not Guarantee Income From Stock Options. .................................................................. 4

    C.    Mr. Mehlman's First Breach of Contract Allegation. ............................. 6

    D.    Mr. Mehlman's Second Breach of Contract Allegation. ......................... 7

    E.    Mr. Mehlman's Third Breach of Contract Allegation. ........................... 8

    F.    Mr. Mehlman's Quantum Meruit Claim. ................................................ 9

III.  ARGUMENT:  CONTRACT CLAIM ............................................................... 10

    A.    Legal Standard:  Summary Judgment. ................................................... 10

    B.    Legal Standard:  Contract Interpretation. .............................................. 10

    C.    Network Appliance is Entitled to Summary Judgment on the Contract Claim. ...................................................................................... 11

        1.    Mr. Mehlman's allegation about his start date is not based on a promise by Network Appliance. ................................................. 11

        2.    Mr. Mehlman's allegation about when he was to receive the stock options is inconsistent with the contract. ................................... 12

        3.    Mr. Mehlman's adjustment claim is inconsistent with the contract. ........ 16

IV.   ARGUMENT:  QUANTUM MERUIT CLAIM. .............................................. 17

    A.    Legal Standard:  Quantum Meruit Claim. ............................................. 17

    B.    Network Appliance is Entitled to Summary Judgment on the Quantum Meruit Claim. ........................................................................ 18

V.    CONCLUSION .................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

*Boswell v. Zephry Lines, Inc.*, 414 Mass. 241, 606 N.E.2d 1336 (Mass. 1993) ........................... 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 10

*Citation Insurance Co. v. Gomez*, 426 Mass. 379, 688 N.E.2d 951 (1998) ................................ 10

*Debreceni v. Healthco-D.G. Stoughton Co.*, 579 F. Supp. 296 (D. Mass 1984) .................... 12, 14

*Enron Corp. v. Banca Nazionale Del Lavoro, S.p.A., et al.*, 292 B.R. 752 (Bankr. S.D.N.Y. 2003) ..................................................................................................... 15

*Hazen v. Warwick*, 152 N.E. 342, 256 Mass. 302 (Mass. 1926) ......................................... 14

*In re Lernout & Hauspie Secs. Litig. v. Lernout*, 286 B.R. 33 (D. Mass. 2002) ......................... 15

*J.A. Sullivan Corp. v. Commonwealth*, 391 Mass. 789, 494 N.E.2d 374 (Mass. 1986) ........................................................................................................................ 17

*JML Care Ctr., Inc. v. Bishop*, 2004 Mass. App. Div. 63, 2004 WL 692164 (Mass. Dist. Ct. 2004) ......................................................................................................... 17

*King v. Connors*, 110 N.E. 289, 222 Mass. 261 (Mass. 1915) ......................................... 14

*MCI Worldcom Comm., Inc. v. Department of Telecomm. & Energy*, 442 Mass. 103, 810 N.E.2d 802 (Mass. 2004) ................................................................................. 17

*Okmyansky v. Herbalife International of Am., Inc.*, 415 F.3d 154 (1st Cir. 2005) ............ 10, 11, 14

*Phoenix Spring Beverage Co. v. Harvard Brewing Co.*, 45 N.E. 2d 473, 312 Mass. 501 (Mass. 1942) ................................................................................. 12

*Stewart v. Johnson*, 147 N.E. 850, 252 Mass. 287 (Mass. 1925) ..................................... 12

*The Lexington Insurance Co. v. All Regions Chemical Labs, Inc.*, 419 Mass. 712 (1995) ....................................................................................................................... 11

*Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158 (1st Cir. 1992) ..................... 14

*U.S.S. Industrial Park Assoc. v. Mid-States Packaging and Distribution, Inc.*, 2004 WL 1427165 (Mass. Super. 2004) ...................................................................... 11

*Zarum v. Brass Mill Materials Corp.*, 334 Mass. 81, 134 N.E.2d 141 (Mass. 1956) .................. 17

## RULES

Federal Rules of Civil Procedure 56(c) ......................................................................... 10

Federal Rules of Civil Procedure 56(e) ......................................................................... 10

## MISCELLANEOUS

Corbin on Contracts § 1.15 (1993 ed.) .......................................................................... 12

Memo.DOC

## I.    INTRODUCTION

This case presents a simple contract dispute.    Defendant Network Appliance respectfully requests summary judgment on Plaintiff Brian Mehlman's causes of action for (1) breach of contract and (2) quantum meruit.

In mid-November 2000, Network Appliance acquired the company Mr. Mehlman worked for – a private company called WebManage.    As in most such acquisitions, the acquiring company took over the acquiree's employee stock option plan once the acquisition closed and the proper paperwork was filed with the Securities and Exchange Commission.

In September 2000, in view of the coming acquisition, Network Appliance offered Mr. Mehlman a job through an offer letter.    Mr. Mehlman accepted the job offer, and now contends that Network Appliance breached the terms of that offer letter in three ways.    The integrated contract is unambiguous, and the Court therefore may construe it as a matter of law.

In the offer letter, Network Appliance stated that "The effective date of the position will be upon the close of the acquisition of WebManage by Network Appliance, which is anticipated to be around October 1, 2000.    Following commencement of your full-time employment with Network Appliance, the Company will grant you options that have an approximate value at the closing of $600,000."    Mr. Mehlman alleges three breaches of contract:

- **The Start Date Claim**:  The offer letter stated an anticipation that the acquisition of WebManage would take place around October 1, 2000, and it took place in mid-November. Mr. Mehlman calls this a breach.

- **The Option Delivery Claim**:    The offer letter stated that as a result of the acquisition, Mr. Mehlman would receive stock options, some vested.    The letter stated "Following the commencement of your full-time employment with Network Appliance, the Company will grant you options[.]"    Mr. Mehlman construes the phrase "*Following* the commencement of your employment" to mean "*Immediately upon* the commencement of your employment" and thus contends that Network Appliance breached the contract by not giving

him everything necessary to be able to sell the vested portion of his stock options on the market *as of his first day of work* in November 2000.

- **The Adjustment Claim**: The offer letter stated that Mr. Mehlman's stock options would have a value of "approximately $600,000 at the closing." In mid-November 2000, the date of the closing, the options in fact had such a value. Because Network Appliance had to register the shares with the Securities and Exchange Commission before they became tradeable on the market, and because the NASDAQ market declined in the meantime as a result of the national recession, Mr. Mehlman contends that Network Appliance breached the contract by not *adjusting the value of his shares back to $600,000* many weeks *after* the closing (presumably by issuing him additional options or by adjusting his "strike price" to pay for the options).

The text of the contract is inconsistent with all three claims. First, the contract's estimate of when the close of the acquisition would occur (and thus when Mr. Mehlman would become a Network Appliance employee) was expressly a best guess, not a binding promise. Second, reasonable minds would agree that the phrase "Following the commencement of your full time employment with Network Appliance, the Company will grant you shares" means a time *after* the commencement of Mr. Mehlman's employment, and does not mean "*Immediately upon* the commencement of your employment." Mr. Mehlman therefore had no entitlement to options he could sell on his very first day of work. Indeed, Network Appliance was required by law to first file a Form S-8 with the Securities and Exchange Commission in order to register the shares.

Third, the contract states only that the shares would have an "approximate value" of $600,000 "at the closing." That, in fact, was the case. Mr. Mehlman was only provided with an approximate value because the stock market's minute by minute fluctuations make it impossible to guarantee a precise value. The contract did not promise any future adjustment or additional shares should the NASDAQ decline after the close. Mr. Mehlman concedes that the offer letter does not guarantee him *any* income from the stock options, and stock options are –

by their nature – subject to the fluctuations of the national markets.  More important, he admitted that the contract contains no term promising that Network Appliance would adjust the value of the options at any point after the closing.

As to the second cause of action, although Mr. Mehlman has asserted a claim for quantum meruit, he admitted in deposition that this claim merely duplicates his breach of contract claim regarding his stock options.  As a matter of law, a quantum meruit claim cannot duplicate a breach of contract claim.

In summary, this is a case where an employee became dissatisfied when the "dot-com" recession of 2000-01 caused the value of his stock options to decline.  He now seeks to rewrite his employment contract to provide a guaranteed monetary value for his options, even though he has always known that such options are subject to constant market fluctuation.

## II.    FACTS

### A.    Network Appliance Acquired WebManage and Offered Mr. Mehlman a Job.

Mr. Mehlman worked for WebManage, a private company, from 1998 to November 2000.  Statement of Material Facts ("SF") at ¶4.  In mid-2000, Network Appliance announced its intent to acquire WebManage.  SF at ¶4.  On September 8, 2000, Network Appliance sent Mr. Mehlman a letter offering employment at Network Appliance upon the close of the WebManage acquisition.  SF at ¶5.  Mr. Mehlman accepted the offer of employment by signing the letter on September 14, 2000.  SF at ¶7.

The letter was integrated:  "This letter sets forth the terms of your employment with us and supersedes any prior representations or agreements, whether written or oral."  SF at ¶8.  Mr. Mehlman agrees that the writing is complete.  SF at ¶9.

Network Appliance completed its acquisition of WebManage on or about November 13, 2000.  SF at ¶17.  Mr. Mehlman began working for Network Appliance on or about November 15, 2000.  SF at ¶20.  On that date, the NASDAQ value of a Network Appliance share was $76.12; on November 13 it was $84.50.  SF at ¶19.  Mr. Mehlman received 7,605 options

pursuant to his offer letter. SF at ¶18. On November 13, the market value of his shares was $642,622.50. On November 15, the market value was $578,892.60.

Network Appliance filed a Form S-8 with the Securities and Exchange Commission to register the shares associated with its acquisition of WebManage on January 16, 2001. SF at ¶21. During late 2000, the NASDAQ experienced a substantial decline as the nation became mired in recession. Network Appliance's NASDAQ share value was not immune to the recession. It declined from $76.12 on November 15, 2000 to $58.12 on January 16, 2001, and then to $45.00 on February 15, 2001. SF at ¶19.

On January 19, 2001, Network Appliance notified Mr. Mehlman of his ability to exercise his vested options and about the registration of the WebManage converted shares. SF at ¶22. On or before February 9, Network Appliance provided Mr. Mehlman with Stock Option Assumption Agreements for each of the three options grants that Mr. Mehlman received at WebManage. SF at ¶23. Mr. Mehlman ceased working at Network Appliance in July 2004. SF at ¶25.

Mr. Mehlman filed this lawsuit in December 2004. Leu Decl. Ex. A. He admitted in his deposition that he did not form his current beliefs about breach of contract until sometime in 2003. SF at ¶27. Mr. Mehlman agrees that this is not the type of shareholder lawsuit where the company is accused of doing something unethical:

> Q. You are not contending in this lawsuit, are you, that Network Appliance did anything unethical or wrong that caused its stock values to go down?
>
> A. No.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 119:2-5.

### B.    Mr. Mehlman Understood That The Agreement Did Not Guarantee Income From Stock Options.

When Network Appliance acquired WebManage, it took over the WebManage employee stock option program, under which Mr. Mehlman had both vested and unvested shares. (A vested share is a share that the employee has earned, and a vested share can be sold on the market if the company's stock is publicly traded.)

Memo.DOC

Mr. Mehlman understands that the NASDAQ market value of shares fluctuates, for many reasons. Leu Decl. Ex. B (Mehlman Depo. Tr.) at 16:18-17:15, 18:18-21. With regard to his offer letter contract with Network Appliance, Mr. Mehlman admits that the agreement did not guarantee him any income from stock options:

> Q. Is it your position in this lawsuit that under the terms of this offer letter, Network Appliance owed you $600,000 worth of shares –
>
> A. No.
>
> Q. –whenever you happened to sell the shares?
>
> Q. No.
>
> Q. Is it your position that Network Appliance owes you your $600,000 worth of shares no matter how the NASDAQ market performed?
>
> [question repeated by court reporter]
>
> A. No.
>
> Leu Decl. Ex. B (Mehlman Depo. Tr.) at 57:24-58:14.
>
> Q. Well, let's put it this way. Are you contending in this lawsuit that under this offer letter you were promised $600,000 in guaranteed income?
>
> A. No.
>
> Leu Decl. Ex. B (Mehlman Depo. Tr.) at 58:24-59:4.
>
> Q. My question was, looking at the text you mentioned in your interrogatory response, is there any language here that guarantees you any certain amount of income from the sale of the stock options?
>
> A. No, no.
>
> Q. At the time you received this letter, did you believe that the NASDAQ value of Network Appliance's stock is something that might go up and might go down?
>
> A. Yes.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 57:24-59:4, 60:1-11. These answers are consistent with Mr. Mehlman's own viewpoint that, during his employment history, he has considered stock options to be "gravy":

> Q: Is it your belief that stock options represent guaranteed income or is it possible or potential income?

A: I have always called it gravy.

Q: When you say gravy, what does that mean?

A: Don't count on them.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 18:4-9.

### C.    Mr. Mehlman's First Breach of Contract Allegation.

Mr. Mehlman's first breach of contract allegation concerns the sentence in the offer letter that says "The effective date of the position will be upon the close of the acquisition of WebManage by Network Appliance, which is anticipated to be around October 1, 2000." Mr. Mehlman alleges that Network Appliance made a binding promise that his employment at Network Appliance would begin around October 1, 2000, and that November 15, 2000 was not around October 1, 2000 (SF at ¶¶11, 12):

Q: Let's look in the sentence about the effective date of position. It was your understanding that Network Appliance was telling you that your job would start at Network Appliance when the acquisition closed?

A: That is correct.

Q: What part of this sentence here do you claim in this lawsuit that Network Appliance breached?

A: The date wasn't October 1. It wasn't around October 1 in my mind.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 49:22-50:8. Mr. Mehlman admitted that the contract does not contain a firm date for the closing:

Q. There wasn't any date certain for the closing in the offer letter, was there?

A. Approximate.

Q. Only approximate?

A. October, whatever was in the letter.

Q. That was approximate?

A. I don't think six weeks is approximate.

Q. It wasn't a date certain listed in the offer letter, was it?

A. Approximately – was it October 1? It closed six weeks later. That's a long time. That's not approximate.

Q. That's actually not my question. My question is, there's not a date certain for the closing listed in the offer letter, is there?

A. It says approximate.

Q. So to answer the question –

A. There is no firm date, that is correct.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 155:18-156:11.

### D.    Mr. Mehlman's Second Breach of Contract Allegation.

Mr. Mehlman's second breach of contract allegation concerns the phrase "Following commencement of your full-time employment with Network Appliance, the Company will grant you options that have an approximate value at the closing of $600,000." Mr. Mehlman alleges that the phrase "Following the commencement" means "Immediately upon the commencement," and thus that Network Appliance breached the contract by not giving him the paperwork necessary to sell his vested stock options on the day he started work (SF at ¶¶13, 14):

Q. But the text here does not say, does it, any words that say you will receive shares on the day you start?

A. "Grant." Grant to me means receive. We can look it up.

Q. But it doesn't say that the grant will take place on the day you start, does it?

A. Yes, it does: Following the commencement of your full-time employment, the company, Network Appliance, will grant, that is, they will give, I will receive options. Options to me is a piece of paper that has options that on that day have a specific value based on the market value of $600,000.

Q. Okay. But the language that appears here says following the commencement of your employment. It does not say on the day you start. Is that right?

A. Isn't commencement the day you start?

Q. Doesn't it say following the commencement?

A. So, to me, following the commencement is immediately after I start.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 55:22-56:18.

Q.  Is it your belief that this offer letter guaranteed that you would receive the paperwork for the stock options as of the day that you began working for Network Appliance?

A.  Yes.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 62:17-21.

A.  The company was required to grant me my options on the commencement of my employment.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 70:14-15.

Q.  So you interpreted this sentence that starts with the words "following the commencement" to mean that on the day you officially became a Network Appliance employee, you were to have physically in your hands the paperwork that would allow you to sell these stock options?

A.  That was my expectation.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 71:18-24.  Mr. Mehlman recognizes that Network Appliance – like any company which acquires another company and takes over its stock option plan – must file a Form S-8 with the SEC to register the stock options:

Q.  Do you know whether companies have to, when they acquire other companies, prepare any forms and paperwork for the SEC before they can –

A.  I do.

Q.  And what's your understanding?

A.  There's an S8, I believe.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 63:5-10.

Q.  It sounds like you are agreeing that an S8 filing has to take place for these types of acquisitions.  Is that right?

A.  I've learned that since the contract, yes.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 70:5-8.

**E.  Mr. Mehlman's Third Breach of Contract Allegation.**

Mr. Mehlman's third breach of contract allegation is that the offer letter contained a promise that Network Appliance would adjust either the number of stock options granted to Mr. Mehlman or adjust the "strike price" he needed to pay before selling shares to guarantee

-8-

that the market value of the stock options would be around $600,000 not just "at the closing," but after the S-8 filing when Mr. Mehlman received the paperwork to sell the shares in early 2001. SF at ¶15.

> Q. You're not contending that this contract required the company to always make sure that the shares that you had were sufficient to be worth $600,000?
>
> A: I believe – I would have to go back and read the claim. But I believe it would have been in NetApp's jurisdiction knowing that there was a dramatic difference in price between when they negotiated the deal and when they physically gave me my option papers to grant additional options or to adjust the strike price. NetApp does that all the time for different situations, they will adjust the strike price.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 61:18-62:9. But Mr. Mehlman, as noted above, conceded that the offer letter did not guarantee him any income from stock options. He also admitted that the contract does not contain any term where Network Appliance promised to adjust strike prices or options:

> Q: Is there any text in the offer letter that we are looking at in Exhibit 2 that tells you that Network Appliance might adjust strike prices with regard to shares that you were to receive or options that you were to receive?
>
> A. There is none, nor is there – no.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 62:11-16.

**F.    Mr. Mehlman's Quantum Meruit Claim.**

Mr. Mehlman's second cause of action is a claim for quantum meruit. SF at ¶3. He stated in deposition that the claim is based on the same allegations about the value of his stock options:

> Q: Is there any other component to your quantum meruit allegation, the second in your claims against Network Appliance, other than your allegation about the value of the stock options that you received from Network Appliance?
>
> A. No.
>
> Q. Apart from the stock options, you don't contend in this lawsuit that Network Appliance owes you any extra money for work that you did at WebManage?
>
> A. No.

Memo.DOC

Q.  And you, apart from the stock options, you don't contend that Network Appliance owes you any extra money for the work that you did at Network Appliance?

A.  No.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 38:12-39:3.

## III.  ARGUMENT: CONTRACT CLAIM

### A.    Legal Standard:  Summary Judgment.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to its claim and upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Where the evidence on file shows that there is no genuine issue of material fact as to one or more of those essential elements, the burden then shifts to the non-movant to set forth "specific facts" and competent summary judgment evidence to raise a genuine issue of material fact. Fed. R. Civ. P. 56(e).

### B.    Legal Standard:  Contract Interpretation.

Massachusetts contract law applies in this diversity case.  *See Okmyansky v. Herbalife International of Am., Inc.,* 415 F.3d 154, 159 (1st Cir. 2005); SF at ¶¶1, 2.   Under Massachusetts law, the text of an unambiguous contract dictates the contract's meaning. *See id.*  A contract is not ambiguous just because there is a controversy between the parties, or just because each party favors a contrary interpretation.  Rather, a contract term is ambiguous only if reasonably intelligent people would disagree as to the meaning of the term. *See Citation Insurance Co. v. Gomez*, 426 Mass. 379, 381, 688 N.E.2d 951, 952-53 (1998) (stating rule; holding that term "vacant land" was not ambiguous because reasonably intelligent persons would have the same understanding of it).  If any ambiguity exists, fact finders look to the intent of the parties at the time that contract was entered ignoring any uncommunicated views.

Memo.DOC

*See U.S.S. Industrial Park Assoc. v. Mid-States Packaging and Distribution, Inc.,* 2004 WL 1427165, *4 (Mass. Super. 2004) (dismissing complaint based on unambiguous contract).

Interpretation of an unambiguous contract is a question of law appropriate for a summary judgment motion. *See The Lexington Insurance Co. v. All Regions Chemical Labs, Inc.,* 419 Mass. 712, 713 (1995) (affirming summary judgment regarding contract interpretation). Contracts are construed such that no word or phrase is made meaningless by another word or phrase, and interpretation should favor a valid and enforceable contract. *See Gomez,* 426 Mass. at 381 (stating rule). Courts may rely on standard dictionaries to interpret the meaning of a contractual term. *See Okmyansky,* 415 F.3d at 159 (stating rule).

### C.    Network Appliance is Entitled to Summary Judgment on the Contract Claim.

Mr. Mehlman has brought a cause of action for breach of contract. As discussed previously, both parties agree that the integrated writing is complete. Moreover, Mehlman did not communicate any contrary intent at the time the contract was executed. Mr. Mehlman admitted that he did not even *form* his beliefs about the meaning of the contract terms until well after the contract was in effect. SF at ¶27. Here, there is no extrinsic evidence to consider. Thus, the Court may construe the unambiguous contract as a matter of law.

### 1.    Mr. Mehlman's allegation about his start date is not based on a promise by Network Appliance.

Mr. Mehlman's first breach of contract claim is that Network Appliance breached the provision "The effective date of the position will be upon the close of the acquisition of WebManage by Network Appliance, which is anticipated to be around October 1, 2000" because the acquisition closed on or about November 13, 2000. The problem with Mr. Mehlman's allegation is that the phrase in question was expressly a statement of expectation, not a binding promise on his start date.

As a matter of law, a contract stating an "anticipated" time for an event is not definite enough to support an allegation of breach. This is so because expressions of expectation are

not binding promises. The case law in this area is old – perhaps because such questions do not often arise in contemporary cases – but the rule is sound. *See Phoenix Spring Beverage Co. v. Harvard Brewing Co.*, 45 N.E. 2d 473, 312 Mass. 501, 505-06 (Mass. 1942) (ruling that expectations do not form a binding agreement; portion of contract stating that party "will get in touch with you, within the very near future, and discuss with you our future mutual relations, in detail" held not to form a promise and thus "cannot be regarded as a part of the contract that was made."); *Stewart v. Johnson*, 147 N.E. 850, 252 Mass. 287, 290 (Mass. 1925) (statements such as "It is my expectation to take advantage of the panic prices in copper" and "when the proper time comes, will buy for you" not binding promises because "not sufficiently distinct and unequivocal to support an action."); Corbin on Contracts § 1.15 (1993 ed.) ("Expressions of Intention, Hope, Desire, or Opinion"; describing rule and collecting nationwide cases).

Reasonable minds could only interpret the phrase above to mean that (1) Network Appliance would give Mr. Mehlman a job at the close of the WebManage acquisition; and (2) Network Appliance did not know when that would be, expected that it might be around October 1, 2000, and was merely communicating that expectation to Mr. Mehlman. Mr. Mehlman, by contrast, seeks to omit the word "anticipated" and insert promissory language such that the contract reads instead "The effective date of the position *will be* on or about October 1, 2000."

Mr. Mehlman's approach violates the canon of contract interpretation under which courts do not add to or rewrite contracts to pencil in new terms. *See Debreceni v. Healthco-D.G. Stoughton Co.*, 579 F. Supp. 296, 298 (D. Mass 1984) (granting summary judgment and stating that the court was "not authorized to and will not rewrite" a contract where the terms are clear). Network Appliance is entitled to summary judgment with regard to Mr. Mehlman's first breach of contract claim.

### 2. Mr. Mehlman's allegation about when he was to receive the stock options is inconsistent with the contract.

Mr. Mehlman's second claim is that because Network Appliance stated that he would receive his stock options "Following the commencement of your full time employment," he

was entitled to those options on the day he started work at Network Appliance – as he put it in deposition, "on the commencement" of his employment.

The parties agree that Mr. Mehlman began work at Network Appliance on or around November 15, 2000. The parties agree on the number of Mr. Mehlman's vested options (1,588 as of November 15, 2000). SF at ¶18. The parties agree that Network Appliance did not provide Mr. Mehlman with the paperwork necessary to sell those vested options on November 15, 2000. Thus, the sole question is whether the contract required Network Appliance to give Mr. Mehlman that paperwork *on November 15, his first day of work*, such that the shares could have been sold that day on the market.

The reason Mr. Mehlman argues that he was promised his options of his first day of work is that the NASDAQ value of the Network Appliance shares declined between November 2000 and January/February 2001. He thus wishes he could have sold his vested options in November when the value was (in hindsight) higher. Had the NASDAQ values instead increased during that period, we can be certain that he would not be offering this strained contract interpretation.

Mr. Mehlman's proposed interpretation is unreasonable as a matter of law, for four reasons. First, nothing in the contract states that Mr. Mehlman was to be able to sell his shares as of his first day of work; at best, Mr. Mehlman seeks to imply that term. Second, the plain meaning of the phrase "Following the commencement of your employment" is sometime *after* commencement, not "*upon* the commencement," or "*on* the commencement," or "*at* the commencement," or "*during* the commencement." The key here is that Network Appliance used "following" as a prepositional phrase, not as a verb, noun, or adjective.

The dictionaries are consistent: when "following" is used as a preposition, it means "subsequent to, "after," "after something," and similar phrases. *See, e.g.,* <www.m-w.com> (Merriam-Webster Dictionary); <www.dictionary.cambridge.org> (Cambridge University Dictionary of American English); <www.bartelby.com> (American Heritage Dictionary of the English Language); <www.encarta.msn.com/dictionary_/following.html> (Microsoft Encarta

Dictionary). As noted above, courts may consider dictionary definitions when construing a contract. *See Okmyansky*, 415 F.3d at 159 (stating rule). The prepositional phrase "Following the commencement of your employment" simply cannot be read to say "on the commencement of your employment" as Mr. Mehlman asserts. Leu Decl. Ex. B (Mehlman Depo. Tr.) at 70:14-15 (Mr. Mehlman stating that "The company was required to grant me my options *on* the commencement of my employment." (emphasis added)).

Third, Mr. Mehlman's proposed interpretation violates the canon of contract interpretation, described above, under which courts do not insert new terms or rewrite contracts. *See Debreceni*, 579 F. Supp. at 298 (applying rule in summary judgment context).

Fourth, Mr. Mehlman's proposed interpretation also violates the long–established rule that unless a contract expressly states that "time is of the essence," the parties have a reasonable time to perform. *See Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1164 (1st Cir. 1992) (stating rule under Massachusetts law); *Hazen v. Warwick*, 152 N.E. 342, 256 Mass. 302, 307 (Mass. 1926) (applying rule); *King v. Connors*, 110 N.E. 289, 222 Mass. 261, 262 (Mass. 1915) (applying rule). This is so because Mr. Mehlman argues that Network Appliance breached its promise to supply his options on his first day of work, when there is no term stating that "time was of the essence."

Indeed, Mr. Mehlman's proposed interpretation is demonstrably unreasonable because Network Appliance was legally required to make a Securities and Exchange Commission filing before making the options available to Mr. Mehlman to sell. Network Appliance was required to register the employee options resulting from its WebManage acquisition with the SEC. Mr. Mehlman does not dispute that the SEC requires public companies who register shares for an employee plan to file a Form S-8, a registration statement for Network Appliance's employee

Memo.DOC

option plan, which contains several categories of reported information. The Court can take judicial notice of the SEC's Form S-8 requirement.[1]

No SEC rule contemplates filing a Form S-8 for shares that the would-be registrant does not yet possess. *See* <www.sec.gov/divisions/corpfin/forms/s-8.htm>. One registers shares that one possesses. Thus, even if Mr. Mehlman believed that Network Appliance should have filed the Form S-8 ahead of the close of its acquisition of WebManage, that belief would be manifestly unreasonable because Network Appliance did not yet legally possess the WebManage options it was soon to take over. In turn, a reasonable interpretation of the phrase granting shares "Following the commencement of your employment" in a contract where (1) the closing of the acquisition and commencement of employment are the same or nearly the same; and (2) the promisor must first register the shares with the SEC, is that the share paperwork is to be delivered sometime *after* the promissee's first day of work – to allow Network Appliance a reasonable time to perform.

Plaintiff is attempting to alter the contract's clear text and substitute one word for another word with an entirely different meaning. Mr. Mehlman's proposed interpretation is unreasonable. Reasonable minds would agree that "following the commencement" does not mean "on the commencement." Network Appliance is thus entitled to summary judgment that it did not breach its contract with Mr. Mehlman when it did not file the Form S-8 and deliver the paperwork associated with Mr. Mehlman's stock options on his first day of work at Network Appliance in November 2000.

---

[1]    *See generally* <www.sec.gov/divisions/corpfin/forms/s-8.htm>. The Court may take judicial notice of this material, and Network Appliance respectfully requests that it do so. *See In re Lernout & Hauspie Secs. Litig. v. Lernout*, 286 B.R. 33, 37 (D. Mass. 2002) (taking judicial notice of SEC filing); *Enron Corp. v. Banca Nazionale Del Lavoro, S.p.A., et al.*, 292 B.R. 752, 789 n. 21 (Bankr. S.D.N.Y. 2003) (taking judicial notice of SEC filing from Internet website of SEC).

Memo.DOC

### 3.     Mr. Mehlman's adjustment claim is inconsistent with the contract.

Mr. Mehlman's third and final breach of contract claim – that Network Appliance promised to adjust the number of options he received or to adjust his "strike price" for them to ensure that the market value of the options would be around $600,000 after the Form S-8 filing and when his paperwork was delivered in early 2001 also fails. The claim is inconsistent with the unambiguous language of the contract.

Network Appliance promised Mr. Mehlman a grant of options that would have "an approximate value at the closing of $600,000." This is indeed what Network Appliance provided. The stock options to be granted Mr. Mehlman did, in fact, have an approximate NASDAQ value of $600,000 "at the closing": $642,622.50 on November 13, 2000, the closing date. SF at ¶¶19, 20.

The only date the contract states that the options would be worth around $600,000 is the closing date of the Network Appliance/WebManage acquisition. Indeed, Mr. Mehlman agrees that the "value" mentioned in the contract has temporal language stating when that value would exist:

> Q. So – and you told me earlier that the phrase "at the closing" gives some sort of temporal time period for the approximate value?
>
> A. That is correct.

Leu Decl. Ex. B (Mehlman Depo. Tr.) at 53:14-17.

There is nothing in the contract promising any adjustment of that valuation after the S-8 was filed and paperwork was delivered – a fact Mr. Mehlman admits, and that accordingly defeats his claim. Leu Decl. Ex. B (Mehlman Depo. Tr.) at 62:11-16. As discussed above, courts do not rewrite contracts to add terms that were never there. *See* citations, *supra*, at page 12. Mr. Mehlman's breach of contract allegation about an obligation to make adjustments is an effort to rewrite the contract and add a nonexistent term. Because Network Appliance did not promise to adjust anything, and promised only a value "at the closing," it did not breach the contract by not adjusting anything *after* the closing.

-16-

Memo.DOC

## IV.    ARGUMENT:  QUANTUM MERUIT CLAIM.

### A.    Legal Standard:  Quantum Meruit Claim.

Mr. Mehlman also brings a quantum meruit claim.  A quantum meruit claim – also known as "unjust enrichment" – is an equitable theory under which a plaintiff can recover compensation for services rendered to a defendant.  *See Boswell v. Zephry Lines, Inc.*, 414 Mass. 241, 250, 606 N.E.2d 1336, 1342 (Mass. 1993); *J.A. Sullivan Corp. v. Commonwealth*, 391 Mass. 789, 794, 494 N.E.2d 374, 377 (Mass. 1986) (explaining claim).  A quantum meruit claim can be valid where there is no contract, where a contract is found to be void, or where one side has substantially performed a contract that is not fully completed.  *See id.*

At the same time, however, a quantum meruit claim is invalid where an existing contract between the parties already covers the same subject matter as the alleged services rendered.  Put differently, a plaintiff who alleges breach of contract cannot use a quantum meruit claim as an alternative theory of recovery on the same subject matter, regardless whether the plaintiff or the defendant prevails on the contract claim.  The law on this point is well settled.  *See, e.g., Boswell*, 414 Mass. at 250 ("Recovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute."; finding claim precluded by contract); *MCI Worldcom Comm., Inc. v. Department of Telecomm. & Energy*, 442 Mass. 103, 116, 810 N.E.2d 802, 812 (Mass. 2004) (same, quoting *Boswell*); *Zarum v. Brass Mill Materials Corp.*, 334 Mass. 81, 85, 134 N.E.2d 141, 143 (Mass. 1956) (same; "The law will not imply a contract where there is an existing express contract covering the same subject matter."); *JML Care Ctr., Inc. v. Bishop*, 2004 Mass. App. Div. 63, 2004 WL 692164, *2 (Mass. Dist. Ct. 2004) ("concerning the dismissal of plaintiff's quantum meruit claim, it is clear that recovery on such a theory will generally not like where the court finds the existence of a valid and enforceable contract.").

This rule makes good policy sense. If this were not the law, every contract plaintiff could evade the parol evidence rule by asserting an extra-contractual claim for compensation under a quantum meruit theory, regardless what the contract says.

**B.    Network Appliance is Entitled to Summary Judgment on the Quantum Meruit Claim.**

Network Appliance is entitled to summary judgment on Mr. Mehlman's quantum meruit claim because Mr. Mehlman admitted that the claim is wholly based on the exact same subject matter as his breach of contract claim. First, both sides agree that the offer letter contract was valid and enforceable; Mr. Mehlman's breach of contract claim is premised on that agreement. Second, both sides agree that Mr. Mehlman performed under the contract – indeed, he worked at Network Appliance for about four years – so there is no issue here regarding substantial performance of an uncompleted contract.

Most important, and as noted above, Mr. Mehlman admitted that his quantum meruit claim duplicates his breach of contract claim in which he alleges that Network Appliance did not timely provide him with stock options of a certain value, and that there was nothing else to it. *See* discussion, *supra*, at page 9 (quoting deposition transcript).

Given these admissions, Network Appliance is entitled to summary judgment on Mr. Mehlman's quantum meruit claim. Regardless which side prevails on the interpretation of the contract, Mr. Mehlman has conceded that his alternative claim is duplicative of his breach of contract claim. It therefore is invalid as a matter of law. *See* citations, *supra*, at page 17.

Memo.DOC

## V.    CONCLUSION

For the reasons described above, Network Appliance respectfully requests an order granting it summary judgment on Mr. Mehlman's quantum meruit and breach of contract claims in their entirety.

DATED: December 2, 2005                    NETWORK APPLIANCE, INC.

By its attorneys,


/S/ Tait Graves
James A. DiBoise (*pro hac vice*)
Tait Graves, (*pro hac vice*)
Alda C. Leu, (*pro hac vice*)
Wilson Sonsini Goodrich & Rosati
Professional Corporation
One Market, Spear Street Tower, Suite 3300
San Francisco, CA  94105
(415) 947-2156

/S/ Michael D. D'Orsi
Of Counsel:

Michael S. D'Orsi (BBO #566960)
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA  02108
(617) 720-2880

Memo.DOC