## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BRIAN MEHLMAN,

        Plaintiff,

    v.

NETWORK APPLIANCE, INC.,

        Defendant.

CIVIL ACTION NO. 04-12533-WGY

Hon. Judge William G. Young

## DECLARATION OF ALDA C. LEU
## IN SUPPORT OF NETWORK APPLIANCE, INC.'S
## MOTION FOR SUMMARY JUDGMENT

I, Alda C. Leu, declare:

1.     I am an attorney duly licensed to practice law in the State of California and am admitted *pro hac vice* to practice before this Court. I am an associate in the law firm of Wilson Sonsini Goodrich & Rosati, counsel of record for Defendant Network Appliance, Inc., in this action. I have personal knowledge of the facts set forth below and if called as a witness could and would competently testify thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of Plaintiff Brian Mehlman's First Amended Complaint against Defendant Network Appliance, Inc.

3.     Attached hereto as Exhibit B is a true and correct copy of Mr. Brian Mehlman's deposition transcript, and exhibits that were introduced therein. Exhibit 1 to Mr. Mehlman's deposition is Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories. Exhibit 2 to Mr. Mehlman's deposition is the Offer Letter sent to Mr. Mehlman around September 8, 2000. Exhibit 8 to Mr. Mehlman's deposition is an email he received on January 19, 2001, from Chris Liotta.

4.     Attached hereto as Exhibit C is a true and correct copy of the Court Docket of March 3, 2005 and April 12, 2005.

5.     Attached hereto as Exhibit D is a true and correct copy of The Parties'

-1-

2745671_1.DOC

Stipulation Regarding Complaint.

6.      Attached hereto as Exhibit E is a true and correct copy of the Certificate of Merger between Network Appliance, Inc. and WebManage, Inc. filed in Delaware on November 13, 2000.

7.      Attached hereto as Exhibit F are true and correct copies of the Agreement of Merger between Network Appliance, Inc. and WebManage, Inc., Officers' Certificate of Network Appliance, Inc. and Officers' Certificate of WebManage, Inc. filed in California on November 13, 2000.

8.      Attached hereto as Exhibit G is a true and correct copy of historical pricing information for Network Appliance stock, ticker symbol "NTAP," printed from Yahoo! Finance.

9.      Attached hereto as Exhibit H is a true and correct copy of the Form S-8 filed by Network Appliance, Inc. registering its shares related to its acquisition of WebManage, Inc., filed on January 16, 2001.

10.     Attached hereto as Exhibit I is a true and correct copy of Defendant Network Appliance, Inc.'s Objections and Responses to Plaintiff's First Set of Interrogatories dated April 25, 2005.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed this 29th day of November 2005 in San Francisco, California.

_Alda C. Leu_

Alda C. Leu

2745671_1.DOC

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * *
                                   *
Brian Mehlman                      *
                       Plaintiff   *       Civil Action No. 04-12533-WGY
                                   *
v.                                 *
                                   *
Network Appliance, Inc.            *
                                   *       JURY DEMANDED
                       Defendants  *
                                   *
* * * * * * * * * * * * * * * * * * * * * * *
```

## FIRST AMENDED COMPLAINT

Plaintiff Brian Mehlman ("Mehlman"), by his undersigned attorneys, for his complaint against defendant alleges as follows:

### PARTIES

1.    Plaintiff Brian Mehlman is an individual residing at 25 Hazel Avenue, Nashua, New Hampshire 03062.

2.    Defendant Network Appliance, Inc. ("Network Appliance") is, upon information and belief, a Delaware corporation with its corporate headquarters at 495 East Java Drive, Sunnyvale, California and a corporate office located at 375 Totten Pond Road, Waltham, Massachusetts. Network Appliance was and is in the business of producing, distributing and selling software and hardware products and services relating to data storage. Network Appliance regularly solicits and transacts business in Massachusetts in that it markets and sells software, hardware and services within Massachusetts on a regular basis and has been doing so for a number of years.

## JURSIDICTION AND VENUE

3.    Jurisdiction in this Court is based on 28 U.S.C. §1332. The parties are citizens of different states and the amount in controversy is greater than $75,000.

4.    Venue in this Court is proper under 28 U.S.C. §§1391(a) and (c).

5.    As described below in more detail, a substantial part of the events giving rise to the claims in this matter took place in Massachusetts.

## COUNT I (BREACH OF CONTRACT)

6.    Plaintiff incorporates and restates as though fully set forth herein the allegations contained in Paragraphs 1 through 5 of this complaint.

7.    In the fall of 2000, Network Appliance acquired WebManage Technologies, Inc. ("WebManage"), a company based in Chelmsford, Massachusetts by whom plaintiff was employed at the time. As of the time of Network Appliance's acquisition of WebManage, Mehlman was entitled to and owned stock options of WebManage pursuant to WebManage's employee stock option plan.

8.    On or about September 8, 2000, Network Appliance forwarded to Mehlman an employment offer setting forth the terms of proposed employment with Network Appliance. Mehlman was persuaded by the terms of that offer to accept employment with Network Appliance and he accepted that offer. The September 8, 2000 letter (the "September 8, 2000 Letter Agreement") constituted the terms of employment between Mehlman and Network Appliance.

9.    Pursuant to the September 8, 2000 Letter Agreement, Network Appliance stated that it would

2

"grant to you options that have an approximate value at the closing of $600,000. This value is comprised of a value assigned shares currently owned ($347,264) with WebManage and options given upon joining Network Appliance ($252,736)."

According to press releases issued by Network Appliance, Network Appliance closed the transaction whereby it acquired WebManage on or about November 13, 2000.

10.     As of that date, plaintiff had vested and exercisable WebManage options that were to be converted to 1600 shares of Network Appliance options at a "strike" price of $10. Based on the stock value at that time, such shares had a value of over $170,000 at that time. Additional options for approximately 300 shares of stock with the same strike price fully vested as of the beginning of January, 2001.

11.     The plaintiff attempted to exercise his fully vested options after November 13, 2000 but was not permitted to do so by Network Appliance. He was precluded from exercising any options until approximately February 5, 2001.

12.     Upon information and belief, the inability to exercise the fully vested options was the result of the failure of Network Appliance to promptly file a Form S-8 with the Securities and Exchange Commission. Upon information and belief, Network Appliance filed an S-8 with respect to at least one other acquisition within two weeks of the closing of that transaction. Plaintiff had no reason to believe that the inability to exercise the fully vested options was the result of the failure of Network Appliance to promptly file a form S-8 with the Securities and Exchange Commission until approximately January, 2003.

13.     During the period of time in which plaintiff should have been able to exercise his fully vested options but was unable to do so (i.e., November 13, 2000 through February 5, 2001, the value of Network Appliance stock diminished by approximately $60 per share.

3

14.    In approximately early February, plaintiff was provided with documentation concerning his stock options. As of the date that he was provided with documentation concerning stock options from Network Appliance, those stock options did not have a value of $600,000 as stated in the Employment Agreement. Instead, the stock options had a value of substantially less than half of that amount because of the diminution of value of Network Appliance stock. Nevertheless, Network Appliance took no actions either in terms of adjusting strike prices of stock or providing more stock, to provide stock options at the closing with a "value of" $600,000.

15.    During the period of time in which plaintiff should have been able to exercise his fully vested options but was unable to do so executives and other employees of Network Appliance were able to exercise options.

16.    Defendant Network Appliance's failure to permit plaintiff to exercise his vested options immediately following the commencement of his full time employment with Network Appliance as of November 13, 2000, represents a breach of the September 8, 2000 Letter Agreement. In addition, the failure to provide options at the closing with a value of $600,000 also represents a breach of the September 8, 2000 Letter Agreement. As a result of the breaches of the September 8, 2000 Letter Agreement, plaintiff has been damaged in an amount to be determined at trial with such damages including, but not necessarily limited to, the difference between the value that he received and the value he was supposed to receive. Plaintiff also is entitled to appropriate interest and cost of this action.

## COUNT II (BREACH OF FIDUCIARY DUTY)

17.    Plaintiff incorporates and restates as though fully set forth herein the allegations contained in Paragraphs 1 through 16 of this complaint.

4

18.    Defendant sought and plaintiff reposed special trust and confidence in defendant. Defendant managed the stock options on behalf of plaintiff and other employees without interference and with no supervision by plaintiff and other employees. Defendant had a duty to act in plaintiff's best interest.

19.    Upon information and belief, defendant's actions as set forth above, including failure to file the S-8 on a timely basis, breached defendant's fiduciary duties to the plaintiff and caused damage to plaintiff in an amount described above and to be determined at trial. Plaintiff also is entitled to appropriate interest and costs of this lawsuit.

## COUNT III (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

20.    Plaintiff incorporates and restates as though fully set forth herein the allegations contained in Paragraphs 1 through 19 of this complaint.

21.    Plaintiff's agreement with defendant included an implied covenant of good faith and fair dealing.

22.    Defendant's actions and inactions as described above constitute breaches of the implied covenant of good faith and fair dealing. As a direct and proximate result of defendant's breach of the covenant of good faith and fair dealing, plaintiff has been damaged in an amount to be determined at trial including the damages described above. Plaintiff also is entitled to appropriate interest and costs.

## COUNT IV (NEGLIGENCE)

23.    Plaintiff incorporates and restates as though fully set forth herein the allegations contained in Paragraphs 1 through 22 of this complaint.

24.    Defendant owed plaintiff a duty of care with respect to its responsibilities with respect to the employee stock option plans.

5

25.    Upon information and belief, defendant breached its duties of care by, among other things, failing to file the Form S-8 on a timely basis.

26.    As a direct and proximate result of defendant's breaches of duty, plaintiff has been damaged, including the damages described above, in an amount to be determined at trial. Plaintiff also is entitled to appropriate interest and costs of this lawsuit.

## COUNT V (QUANTUM MERUIT/UNJUST UNENRICHMENT)

27.    Plaintiff incorporates and restates as though fully set forth herein the allegations contained in Paragraphs 1 through 26 of this complaint.

28.    By securing Mehlman's services through promises of compensation, and compensating Mehlman at a lower compensation than promised or appropriate, defendant obtained the benefit of Mehlman's services without paying him the reasonable value of his services. Defendant was unjustly enriched by such conduct.

29.    As a result of such conduct, plaintiff is entitled receive damages including difference between the reasonable value of his services as set forth in the September 8, 2000 Letter Agreement and the compensation he actually received. Plaintiff also is entitled to appropriate interest and costs of this lawsuit.

## JURY DEMAND

30.    Plaintiff requests a jury on all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against defendant:

A.    Awarding plaintiff damages to be determined at trial;

B.    Awarding plaintiff reasonable attorneys' fees and costs of this action;

C.    Awarding appropriate interest; and

D.    Granting plaintiff such other and further relief as may be just and proper.

Respectfully submitted,

Brian Mehlman
by his attorneys,

COOK, LITTLE, ROSENBLATT
& MANSON, P.L.L.C.

Dated:    12/10/14                     By: _____

Arnold Rosenblatt (BBO# 638526)
650 Elm Street
Manchester, NH  03101
(603) 621-7102

7

**EXHIBIT B – PART 1**

Exhibits:  1 - 13

Volume 1, Pages 1 - 163

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12533-WGY

- - - - - - - - - - - - - - - - - - - - - - - - - -

BRIAN MEHLMAN

Plaintiff

vs.

NETWORK APPLIANCE, INC.

Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF BRIAN MEHLMAN

Thursday, August 4, 2005, 9:29 a.m.

Donnelly, Conroy & Gelhaar, LLP

One Beacon Street

Boston, Massachusetts

- - - - - - - Reporter:  David A. Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

2 (Pages 2 to 5)

Brian Mehlman
Volume 1 - August 4, 2005

**2**

1   APPEARANCES:
2
3
4   Cook Little Rosenblatt & Manson, PLLC
5         Arnold Rosenblatt, Esq.
6         650 Elm Street
7         Manchester, New Hampshire  03101
8         603.621.7102  fax: 603.621.7111
9         a.rosenblatt@clrm.com
10        for Plaintiff
11
12
13  Wilson Sonsini Goodrich & Rosati, PC
14        C. Tait Graves, Esq.
15        One Market, Spear Tower, Suite 3300
16        San Francisco, California 94105
17        415.947.2000  fax: 415.947.2099
18        tgraves@wsgr.com
19        for Defendant
20
21  Videographer:  National Video Reporters, Inc.,
22  Lauren Anderson, 800.551.2440
23
24

**3**

1           PROCEEDINGS - 9:29 a.m.
2
3         THE VIDEOGRAPHER:  We are now recording
4   and on the record.  My name is Lauren Anderson.  I'm
5   a legal video specialist for National Video
6   Reporters, Incorporated.  Our business address is 58
7   Batterymarch Street, Suite 243, Boston,
8   Massachusetts 02110.  Today is August 4, 2005.  The
9   time is 9:29 a.m.
10        This is the deposition of Brian Mehlman
11  in the matter of Brian Mehlman, plaintiff, versus
12  Network Appliance, Incorporated, defendant, in Civil
13  Action 04-12533-WGY.  This deposition is being taken
14  at One Beacon Street, Boston, Massachusetts on
15  behalf of the defendant.  The court reporter is
16  David Arsenault.  Counsel will state their
17  appearances and the court reporter will administer
18  the oath.
19        MR. ROSENBLATT:  On behalf of the
20  plaintiff, Arnold Rosenblatt from Cook Little
21  Rosenblatt & Manson.
22        MR. GRAVES:  Tait Graves, Wilson Sonsini
23  Goodrich & Rosati, for defendant Network Appliance.
24  ------------------------

**4**

1           BRIAN MEHLMAN, sworn
2   ------------------------
3              EXAMINATION
4   BY MR. GRAVES:
5       Q.  Good morning, Mr. Mehlman.
6       A.  Good morning.
7       Q.  Could you please spell your full name for
8   the record.
9       A.  Brian.  B R I A N, David, D A V I D,
10  Mehlman, M E H L M A N.
11      Q.  And you are the plaintiff in this lawsuit?
12      A.  That is correct.
13      Q.  Have you ever had your deposition taken
14  before?
15      A.  I have not.
16      Q.  I'm going to ask you a series of questions.
17  If you don't understand any of my questions, then
18  you should ask for clarification so that when you
19  answer a question, you always answer a question that
20  you understand.
21      A.  Sure.
22      Q.  As your attorney, Mr. Rosenblatt, may have
23  told you, you should not testify what you talked
24  about to your attorneys.  Those communications are

**5**

1   privileged.  I won't ask you about that and you
2   shouldn't talk about it.
3       A.  Okay.
4       Q.  Any reason you can't give competent and
5   truthful testimony this morning?
6       A.  No.
7       Q.  Let's back up a little bit.  You used to
8   work for a company called WebManage Technologies?
9       A.  That is correct.
10      Q.  What kind of company was that?
11      A.  A software startup company.
12      Q.  When did you join WebManage?
13      A.  It was '98.  I'm sorry, yeah, '98 in the
14  late summer.
15      Q.  Did you work someplace else before that or
16  was that right out of high school?
17      A.  No.  I did work someplace prior to that.
18      Q.  Where was that?
19      A.  3Com Corporation.
20      Q.  How did you end up joining WebManage?
21      A.  So, I was looking to find another
22  opportunity.  I was at a trade show, I don't
23  remember where it was, and I bumped into this
24  little, small startup out of Nashua, New Hampshire,

Brian Mehlman
Volume 1 - August 4, 2005

**Page 6**

1  which is the town I happened to live in at the time.
2  I sent my resume on and got connected with the
3  company and worked through negotiations and I got
4  hired late that summer.
5      Q. And when you joined WebManage,
6  approximately how many employees were employed by
7  the company?
8      A. In the U.S., I think there was maybe five
9  or six. At that point I'm not sure if we had
10 offshore development. It was a very small company.
11     Q. Over the next couple of years before the
12 acquisition by Network Appliance, eventually how
13 many employees did you have?
14     A. I don't know the exact number but I know it
15 was in excess of 60, 65, 70, somewhere in that
16 ballpark.
17     Q. Somewhere in there?
18     A. Yes.
19     Q. What were you doing when you were first
20 hired by WebManage?
21     A. When I was first hired my title was
22 business development. Being a small company, I did
23 many things. I migrated more toward product
24 management, which has been my forte over the years.

**Page 7**

1      Q. When you say business development and
2  product management, maybe you can tell me a little
3  bit more what specifically that meant for you at
4  WebManage.
5      A. My whole career has been made up of many
6  titles but basically doing the same job. My area of
7  specialization is working with all of the different
8  teams that make a software product successful:
9  engineering, sales, marketing, customers, outside
10 influences and analysts, press; figure out from a
11 technology perspective what to build, how to go out
12 and build it. It is product management title.
13     Q. Specifically focusing on WebManage when you
14 first got involved in 1998, were you helping to plan
15 the company's technologies?
16     A. I would say, yes, sure.
17     Q. What was your role in that?
18     A. Again, working with customers, figuring out
19 what the market needs, what the customer needed,
20 influencing how we develop the products, all of
21 those facets.
22     Q. What specific products was WebManage
23 selling or planning?
24     A. There were three products, really, that we

**Page 8**

1  had developed. One was a software load-balancing
2  product where you would load-balance Web traffic.
3  There was a reporting product that would take
4  information from Web servers and report on it. And
5  then there was a third product which took,
6  essentially, information and distributed it around
7  the network.
8      Q. One thing I should have mentioned when we
9  got started this morning, the court reporter has to
10 write everything that you and I say so that we have
11 a written record at the end.
12     A. Sure.
13     Q. I will promise to be careful not to speak
14 over you. And I'll ask you to wait until I am done
15 before you start talking. That will make his job
16 easier.
17     A. Sure.
18     Q. I think we both talk a little fast. We
19 have to be careful not to speak over one another.
20     With any of the three products that you
21 just described, did you actually create any of the
22 technology yourself that was incorporated into those
23 products?
24     A. I did not.

**Page 9**

1      Q. So you were helping -- is it accurate to
2  say that you were helping to plan how to market
3  those in the market?
4      A. Yes.
5      Q. Working with the engineers --
6      A. Correct.
7      Q. -- to working with the customers?
8      A. Correct.
9      Q. Who were you reporting to at WebManage?
10     A. It would have been the CEO.
11     Q. What was his name?
12     A. Vijay Basani.
13     Q. Did your job responsibilities change into
14 anything else over the next two years before the
15 acquisition, or was that all that you did during
16 those years?
17     A. Being a small company, I had many roles.
18 We wear a lot of hats. At one point I was managing
19 the QA team. There was lots of things that I did,
20 but my primary focus was product success.
21     Q. And at any point in time before the
22 acquisition, did you ever actually yourself create
23 any of the technology that the company was selling?
24     A. I did not.

4 (Pages 10 to 13)

Brian Mehlman
Volume 1 - August 4, 2005

10

1  Q. You mentioned that you had worked at
2  3Com --
3  A. Correct.
4  Q. -- before WebManage.
5     What were you doing at 3Com?
6  A. I was a technical marketing engineer.
7  Q. Was that your first job out of school?
8  A. It was not.
9  Q. Maybe you could tell me --
10 A. From day one?
11 Q. -- when you finished school and what
12 companies you worked for?
13 A. I graduated undergraduate in 1988. That
14 was in computer science and mathematics. I worked
15 for three years for a company called JEOL. It was a
16 company that made scientific instrumentation. I did
17 that for three years. I left to go back to school
18 full time to get my master's from the University of
19 Vermont in computer science.
20     After that I came back to New Hampshire.
21 And I started at a startup called Metrix Network
22 Systems as a systems engineer. I worked at Metrix
23 for about two years. Then we were bought by
24 Hewlett-Packard. I was at Hewlett-Packard for a

11

1  little over a year. And then after Hewlett-Packard
2  I went to Fidelity Investments for one year where I
3  was a network management specialist. After Fidelity
4  I went to 3Com; 3Com to WebManage.
5  Q. When you were at WebManage, did you sign an
6  employment contract?
7  A. I did.
8  Q. You were paid a salary?
9  A. I was.
10 Q. Did you get bonuses?
11 A. There was various bonuses and compensation,
12 being a startup.
13 Q. Did you have any kind of contract that gave
14 you joint ownership over any of WebManage's assets?
15 A. I don't know the answer to that. I had
16 stock options, which I imagine converted to stock
17 would get some equity.
18 Q. More specifically, did you have any
19 contract with WebManage that gave you joint
20 ownership over any of their intellectual property?
21 A. No.
22 Q. Do you recall if the employment contract
23 you signed with WebManage assigned any inventions
24 that you might come up with to your employer?

12

1  A. At that time I don't know. I know after we
2  were acquired I signed one with NetApp. I'd have to
3  go back to my records. I don't remember signing
4  one, but that doesn't mean it didn't exist.
5  Q. Now, you mentioned that you worked for some
6  technology companies before; you mentioned JEOL,
7  Metrix Network Systems, HP and 3Com.
8  A. Correct.
9  Q. Did you ever receive stock options from any
10 of those companies?
11 A. Yes.
12 Q. Which ones?
13 A. From Metrix and from 3Com.
14 Q. What kind of stock options did you get from
15 Metrix?
16 A. I don't remember what they were.
17 Q. Was it something that you got when you
18 joined the company or was it awarded as a bonus?
19 A. I don't remember signing anything when I
20 started. They give them to us when we got bought.
21 I don't know if it was an agreement with HP when
22 they bought us. I don't remember.
23 Q. And when you got the shares, were they HP
24 shares or Metrix shares at that point?

13

1  A. I imagine they were HP shares at that
2  point.
3  Q. So you are not actually sure whether you
4  got shares from Metrix. It could have been?
5  A. I don't remember getting an option
6  agreement from Metrix.
7  Q. With 3Com did you get stock options just by
8  joining the company or was it awarded to you?
9  A. I had both kinds of grants. I had initial
10 employee, and I had performance-based.
11 Q. When you got the shares from either HP or
12 Metrix, whichever one it was, were they on a vesting
13 schedule?
14 A. They were both on a vesting schedule.
15 Q. What was your understanding of how that
16 vesting schedule operated?
17 A. I believe they were both four-year vests.
18 They all have similar policies. One year of service
19 you get a quarter vested, and then monthly after
20 that. One of them may have been a three-year vest.
21 I don't remember.
22 Q. And when you said both of them, were you
23 answering for both 3Com and HP, or did you mean
24 Metrix and HP?

FARMER ARSENAULT BROCK LLC

Brian Mehlman
Volume 1 - August 4, 2005

**Page 14**

1    A. That would have been HP and 3Com.
2    Q. So you were giving the same answer for
3    both?
4    A. Yeah, they were similar vesting schedules.
5    I was less knowledgeable with the HP ones. That was
6    back in, I don't know what year, about ten years
7    ago.
8    Q. When you say less knowledgeable, you just
9    mean you can't remember the details now?
10   A. I can't remember the details, but I didn't
11   really understand at that time what they were.
12   Q. Based on your personal background, when you
13   are granted a stock option, what does that mean?
14   A. You're given the option to buy a stock at a
15   certain price.
16   Q. And is that an option to buy a stock at a
17   certain price at a certain point in time?
18   A. It is based on the vesting schedule.
19   Q. So you're not getting stock immediately,
20   but you are getting an option that will allow you to
21   purchase the stock at a fixed price at a later date?
22   A. That's correct.
23   Q. When you mentioned the price that you
24   needed to pay, what exactly is your understanding of

**Page 15**

1    that, based on your personal experience?
2    A. It is called -- I've always called it the
3    strike price. That's the price that's determined
4    when that pool of options are granted. It is
5    usually written somewhere in an option agreement as
6    to what that strike price is.
7    Q. And that's money that you --
8    A. I pay.
9    Q. -- you have to pay in order to do what?
10   A. To buy the stock.
11   Q. What's been your understanding of how the
12   price of a stock is determined?
13   A. Can you clarify the question?
14   Q. Has it been your understanding that there
15   are national markets where the price of a stock
16   fluctuates day by day?
17   A. Sure.
18   Q. You are aware of the NASDAQ?
19   A. I am.
20   Q. Were the shares that you got from 3Com and
21   either HP or Metrix, whichever it was, were those
22   all listed on the NASDAQ?
23   A. I believe HP and 3Com are both listed with
24   NASDAQ, but I'm not positive.

**Page 16**

1    Q. Or another?
2    A. Or another. They are public companies.
3    Q. And were you eventually able to exercise
4    your stock options with either of those companies?
5    A. Yes.
6    Q. How did you go about doing so?
7    A. This is going back. I mean, I imagine I
8    put in a call to stock administration, said I wanted
9    to exercise the shares and do what was called a
10   same-day sale where they buy it and then they sell
11   it right away and then send you the proceeds.
12   Q. And the price there, was it based on
13   whatever national exchange those shares were listed
14   on that day?
15   A. Yes. What I would be paying was the delta
16   between the market price on that day and what the
17   stock option that I bought was granted at.
18   Q. Has it been your experience, based on your
19   knowledge, that the stock prices can change day by
20   day on these exchanges like the NASDAQ?
21   A. Sure.
22   Q. What are some of the reasons in your own
23   experience and your own knowledge that share values
24   can fluctuate on exchanges like the NASDAQ?

**Page 17**

1    A. That's a very difficult question to ask.
2    I'm sure there are thousands of reasons.
3    Q. What are some that you are aware of, to
4    your knowledge?
5    A. Bad news that the company comes out with,
6    bad news that makes the stock go down. A product
7    announcement that's really exciting can make the
8    stock go up. Thousands of reasons.
9    Q. A bad earnings report?
10   A. Yes.
11   Q. Lower revenues than expected?
12   A. Sure.
13   Q. What about national economic conditions,
14   like a recession?
15   A. Sure.
16   Q. Effects from competition could have an
17   effect?
18   A. Sure.
19   Q. In your past experience with stock options,
20   did you hope that your company's stock prices
21   performed well in national markets so that you could
22   get the maximum amount for your shares?
23   A. No, not really.
24   Q. You didn't have a hope that they would do

6 (Pages 18 to 21)

Brian Mehlman
Volume 1 - August 4, 2005

18

1  as well as possible?
2     A. There's always hope that it does better,
3  sure.
4     Q. Is it your belief that stock options
5  represent guaranteed income or is it possible or
6  potential income?
7     A. I have always called it gravy.
8     Q. When you say gravy, what does that mean?
9     A. Don't count on them. I live on my salary.
10 I don't even count on my bonuses. My whole life and
11 lifestyle is purely based on my salary. If I get a
12 windfall from a bonus or stock, it goes to the
13 retirement fund. I live pretty meager.
14    Q. Have you had friends or relatives or other
15 people you've known over time who also got stock
16 options during this period of time?
17    A. Sure, sure.
18    Q. Have you ever known anybody who got stock
19 options that turned out to be worthless over the
20 long term?
21    A. I know a lot of people, sure.
22    Q. For example, did you know anybody that got
23 burned by the dot-com crash and got nothing when
24 they thought they had something?

19

1     A. Sure.
2     Q. Some companies went out of business during
3  that period?
4     A. Sure.
5     Q. Moving forward a little bit, so at one
6  point in time in approximately the fall of 2000, you
7  became an employee at Network Appliance?
8     A. That is correct.
9     Q. What was your position at Network
10 Appliance?
11    A. Senior product manager, marketing manager I
12 think is what the title was.
13    Q. What were your responsibilities in that job
14 title?
15    A. Similar to what I discussed before, product
16 management, driving the success of different
17 products at Appliance.
18    Q. Were you working with the products suite
19 that was associated with WebManage or did you
20 diversify to other Web products also?
21    A. For the first year or so at NetApp, yes. I
22 don't remember the exact time frames, but I did
23 diversify after some period of time, yes.
24    Q. And you left, I guess, sometime in 2003,

20

1  2004?
2     A. 2004.
3     Q. 2004?
4     A. July of 2004.
5     Q. Are you working somewhere else now?
6     A. I am.
7     Q. Where are you working now?
8     A. A company called EIQ Networks.
9     Q. EIQ Networks. Why did you end up leaving
10 Network Appliance?
11    A. I made a decision to go back to school to
12 work on my Ph.D. It seemed like the right time to
13 do it.
14    Q. Did you earn your Ph.D.?
15    A. I did not, no.
16    Q. Still working on it?
17    A. Taking a hiatus.
18    Q. When you worked for Network Appliance, were
19 you working in Massachusetts or where were you
20 working?
21    A. My first year I was working in
22 Massachusetts, maybe a year and a half. They closed
23 our office down after some period of time. I think
24 it was a little after a year. And then for the last

21

1  two, two and a half years I worked out of my home
2  traveling to California one week a month.
3     Q. When you say they closed the office, is
4  that the office, I guess it is Chelmsford,
5  Massachusetts?
6     A. It started in Chelmsford. We moved to
7  Tewksbury. It was in Tewksbury.
8     Q. When you worked from home, you were living
9  in New Hampshire?
10    A. I was living in New Hampshire.
11    Q. Telecommuting to California?
12    A. Right.
13    Q. Who were you reporting to over the year
14 that you worked at Network Appliance?
15    A. My first manager was Ed Chow. I worked
16 with him for the first period, the first tenure.
17 After that I had a short tenure with a guy by the
18 name of Dan McCormack. After that I worked for a
19 guy by the name of Narayanan Venkat.
20    Q. You mentioned a few minutes ago that
21 approximately at the time of the acquisition
22 WebManage had had something like 65 or 70 employees?
23    A. Yes.
24    Q. Were you still working with a group of

FARMER ARSENAULT BROCK LLC

Brian Mehlman
Volume 1 - August 4, 2005

---

22

1  people from WebManage when you came over to Network
2  Appliance?
3      A.  When I first came over, yes.
4      Q.  And did that change over time?
5      A.  It did, most definitely.
6      Q.  How did it change?
7      A.  They came in and closed the office and laid
8  off 60 of the 65 people.
9      Q.  And when you were retained to keep working,
10  were you told by anyone why they had not laid you
11  off?
12      A.  Not really, no.  I mean I think -- I have
13  my own thoughts as to why.  I mean, I was a good
14  employee.  That had a lot to do with it.
15      Q.  So when you said you had your own thoughts,
16  that's what you meant, you thought you had been
17  doing a good job and that's why they kept you on?
18      A.  Sure.
19      Q.  Do you know if they told the others why
20  they were laid off?
21      A.  I do not.
22      Q.  There was not an all-hands meeting where
23  that happened?
24      A.  There was and I was at it.  I don't think

---

23

1  they told them.
2      Q.  What was your general understanding of why
3  the layoffs happened?
4      A.  Personal opinion?
5      Q.  Just based on your own knowledge, that's
6  all I'm asking.
7      A.  I think it was very hard to manage a remote
8  office of 65 people; or NetApp had difficulty
9  managing an office of 65 people remotely.
10      Q.  Based on your own knowledge, what were the
11  difficulties that you just mentioned?
12      A.  We were predominantly engineering.  I think
13  NetApp is a very engineering focused center company.
14  To manage 40 engineers remotely can be a very big
15  challenge without the right type of people, and I
16  don't think they had the right type of people.
17      Q.  When you said they didn't have the right
18  type of people, what did you mean when you used
19  those words?
20      A.  Having worked with offshore and remote
21  development groups, you really need to pair people
22  on either side that have very good communication and
23  very good management skills.  And I think that on
24  both sides that was lacking.  So they weren't

---

24

1  terribly successful at developing things with the
2  remote office.
3      Q.  You were a paid employee for Network
4  Appliance?
5      A.  Correct.
6      Q.  I think you mentioned earlier that you had
7  signed a contract where you assigned anything that
8  you invented to the company?
9      A.  Yes.
10      Q.  Apart from the shares that relate to the
11  WebManage acquisition, and we'll get to that later,
12  did you get any other stock options over time when
13  you were at Network Appliance?
14      A.  I did.
15      Q.  Can you tell me what those are?
16      A.  I don't know the exact title, but they were
17  for performance, is my understanding.  And there
18  were six grants.  They were given three grants at a
19  time and they were staggered, I believe, both of
20  them over three months; that's why there were six.
21  They were in response, I believe, to two performance
22  reviews where I was given stock options as part of
23  the performance review.
24      Q.  Were those a reward for getting a good

---

25

1  performance review?
2      A.  Yes.
3      Q.  You also received a salary over the years?
4      A.  I did.
5      Q.  And you got -- you were in fact, paid your
6  salary?
7      A.  I was.
8      Q.  Did you get any bonuses on top of your
9  regular salary?
10      A.  I was on what was called a 10 percent bonus
11  plan.  I don't know -- I'd have to go back and look.
12  Out of the four years I was there, I wasn't given it
13  every year.  I believe I was given it two out of the
14  four years.
15      Q.  When you refer to a 10 percent plan, what
16  did that mean?
17      A.  Essentially 10 percent of my salary based
18  on both my own individual performance and the
19  performance of the company.
20      Q.  Okay.  Did you ever sign any contract with
21  Network Appliance where you jointly owned any of the
22  Network Appliance's intellectual property?
23      A.  No.
24      Q.  Did you contend in this lawsuit that you

---

8 (Pages 26 to 29)

Brian Mehlman
Volume 1 - August 4, 2005

26

1  own or jointly own any of Network Appliance's
2  intellectual property?
3      A. Can you give me more detail?  No, no.
4      Q. Now, in this lawsuit, you have two
5  different causes of action.  One is breach of
6  contract.  One is what's known as quantum meruit; is
7  that correct?
8      A. That is correct.
9      Q. During the deposition I'll pull out
10 exhibits that I'll hand to you.  You should take a
11 moment to look over them carefully.  When you're
12 ready, I'll ask you questions about them.
13     A. Sure.
14     Q. I'm going to mark as Exhibit 1 a document
15 called Plaintiff's Objections and Responses to
16 Defendant's First Set of Interrogatories.
17     A. Sure.
18     Q. If you could take a moment to just look
19 over that.
20        (Marked, Exhibit 1, Plaintiff's
21 Objections and Responses to Defendant's First Set of
22 Interrogatories.)
23     Q. If you could turn over to Page 6.
24     A. Sure.

27

1      Q. You'll see that there's some text that says
2  Interrogatory Number 6?
3      A. Yes.
4      Q. And then there's an answer underneath it?
5      A. Sure.
6      Q. You'll see that the Interrogatory Number 6
7  basically asks you to describe in detail any duty
8  that you claim that Network Appliance owes you under
9  a quantum meruit theory.  Do you see that?
10     A. I do.
11     Q. There's two paragraphs of text beneath that
12 with the answer?
13     A. Yes.
14     Q. This is your answer to that question?
15     A. That is correct.
16     Q. If you look at the second paragraph of the
17 answer, it says, and I'll quote: "In addition,
18 prior to joining Network Appliance plaintiff had
19 been employed at WebManage Technologies as a
20 significant contributor in the development of
21 technologies that greatly benefited Network
22 Appliance."
23     A. Correct.
24     Q. "Plaintiff received stock options as

28

1  partial compensation for time served at WebManage
2  Technologies.  Plaintiff alleges that defendant
3  gained a significant benefit from plaintiff's
4  efforts during his employment at WebManage
5  Technologies, although plaintiff was not compensated
6  commensurate with the value gained by defendant."
7        Do you see that?
8      A. I do.
9      Q. Let's break it down a little bit.  The
10 first sentence refers to plaintiff being a, quote,
11 "significant contributor in the development of
12 technologies"?
13     A. That is correct.
14     Q. What did you mean when you wrote those
15 words?
16     A. When you are developing a product, there
17 are many facets to the development process.  If you
18 study product management and you study from
19 conception to grave, is sometimes what people will
20 say, of a product, there are many things that go
21 into that.  Part of it is physical development where
22 you are writing code.  But part of that is also
23 gathering requirements, interacting with the
24 different contributors, and developing a successful

29

1  product, which includes market message, market
2  strategy, and developing the technology.
3      Q. All right.  So you've listed broadly, it
4  sounds like, four different categories of things.
5  You talked about building the requirements for the
6  product?
7      A. Yes.
8      Q. You talked about working and interfacing
9  with the contributors to the product?
10     A. Correct.
11     Q. You talked about developing market strategy
12 and marketing for the product.  And then you talked
13 about developing the technology.
14     A. The engineering aspect of the technology,
15 sure.
16     Q. And when you were at WebManage, you're
17 saying these are the four categories of
18 contributions that you made to the products?
19     A. Can you read them back?
20     Q. I'm trying to get a full list.  You talked
21 so far, one more time, about requirements for the
22 product, interfacing with the contributors to the
23 product, developing the marketing strategy in the
24 marketing and developing the technology?

FARMER ARSENAULT BROCK LLC

Brian Mehlman
Volume 1 - August 4, 2005

**Page 30**

1   A. That is correct. I didn't develop the
2   technology, I mean the actual engineering of the
3   product. I wasn't a coder. I did not sit and write
4   C, C++, Java.
5   **Q. The first three categories that you listed,**
6   **those were things that you did for the product**
7   **suites at WebManage?**
8   A. Right.
9   **Q. Let's break those down a little bit more.**
10  **The first you talked about, working with the**
11  **requirements of the product, what specifically did**
12  **that mean at WebManage?**
13  A. It is true with all aspects of requirement
14  gathering. I look at myself always as the -- I try
15  to become the industry expert or an industry expert
16  on the area to guide what customers need to do or
17  the paying points they are looking to solve and
18  turning that into product.
19  **Q. I understand that these job functions are**
20  **common to many companies. I was hoping you could**
21  **tell me specifically what you did with specific**
22  **requirements for the products at WebManage, if you**
23  **could, please.**
24  A. Sure. Take a step back. This is just

**Page 31**

1   WebManage we are talking about now?
2   **Q. That's right. What I'm trying to have you**
3   **do, based on this answer here, I'm trying to learn**
4   **about you being a significant contributor at**
5   **WebManage. I'm going specifically to WebManage and**
6   **specifically to your product suite and the products.**
7   A. I can go over the two years and give you a
8   little history and flavor, if you would like.
9   **Q. Please do.**
10  A. I started when there were five individuals.
11  We did have a CTO at that point. I look at myself
12  as becoming a peer with the CTO in the small
13  environment. We were at that time a startup trying
14  to break ground. I had many conversations with
15  potential customers, we actually didn't have any
16  real customers at that point in time, to understand
17  what they were looking for in a product. I worked
18  very closely with the CTO and the couple of
19  engineers that we did have and tried to make a go of
20  that product at that point in time.
21      It wasn't a successful product. But
22  from my influence, we moved into two new product
23  areas, the load-balancing product that I spoke of
24  and the content distribution product that I spoke

**Page 32**

1   of. That enabled us to actually go and get funding.
2       Another one that I would add to the list
3   is I spent a fair amount of time with the companies
4   that were looking to invest/acquire doing due
5   diligence. You can add that to the list. That's
6   the requirements gathering, spending time with
7   potential customers and partners and driving
8   requirements into the product, or features into the
9   product.
10  **Q. The next category that you mentioned was**
11  **interfacing with contributors?**
12  A. Yes.
13  **Q. Again specific to WebManage, what you were**
14  **doing there, what were the contributions you**
15  **made when you were there at WebManage products with**
16  **regard to interfacing with contributors?**
17  A. Many varied tasks. When you divide and
18  conquer the teams. You've got engineering, pretty
19  much what I just talked about, driving requirements.
20  Sales. One thing I do, we call them sales tools,
21  but making pieces of collateral that are built to
22  enable the sales team to be successful at selling
23  and marketing the product. Dealing with the press,
24  outside influences as well, to get them to write

**Page 33**

1   good reviews about the product. Executive team; at
2   the time our VP of sales and our CEO and our CTO,
3   sometimes I would be involved in some business
4   strategy discussions. Those types of players.
5   **Q. I didn't quite understand some of the**
6   **differences between requirements, the first**
7   **category, and interfacing with contributors, the**
8   **second. It sounded like there may be some overlap?**
9   A. There may be some overlap, sure.
10  Engineering is really the recipient of the
11  requirements.
12  **Q. You also talked as the third category about**
13  **developing the marketing plans and strategies?**
14  A. Correct.
15  **Q. What specific contributions did you make at**
16  **WebManage that you intended when you wrote you were**
17  **a significant contributor here?**
18  A. So, once you have a product and it is a new
19  product launch, you develop a go-to market strategy,
20  putting those plans together.
21  **Q. Now, when you mentioned in your**
22  **interrogatory response that you are a significant**
23  **contributor, in this text here, apart from what you**
24  **just told me, is there anything else that you meant**

10 (Pages 34 to 37)

Brian Mehlman
Volume 1 - August 4, 2005

34

1  to include?
2     A. No. That's probably a good basis.
3     Q. Now, you were paid for your work at
4  WebManage, right?
5     A. That is right.
6     Q. Did you have any kind of joint development
7  contract with WebManage?
8     A. No.
9     Q. Any sort of royalty-sharing or
10 profit-sharing agreement with WebManage?
11    A. No. There was a bonus plan.
12    Q. The bonus plan was what?
13    A. I'd have to go back and look at the
14 contract. There was a lot of things based on
15 performance of the company, performance of myself,
16 performance of those two things.
17    Q. Did you receive any bonuses there?
18    A. Yes, I did.
19    Q. When you worked at WebManage, did you ever
20 express any belief to anyone at WebManage that you
21 had not been compensated for something that you
22 contributed?
23    A. Can you clarify the question?
24    Q. During the period that you were an employee

35

1  there, I guess it was a little over two years, did
2  you ever communicate to anybody at WebManage -- when
3  I say communicate, I mean speak, email, or write --
4  and express any belief that there was any
5  contributions that you had made to WebManage for
6  which you had not been compensated?
7     A. I would say no, no to the way you -- no.
8     Q. During the period that you were an employee
9  there, did you have a belief in your own mind that
10 you hadn't been compensated for contributions that
11 you made to WebManage?
12    A. I do believe that going into the job that I
13 went in at a low salary. And I did that on purpose.
14 And there was a verbal agreement that when the
15 company was more successful that my pay would be
16 increased to be commensurate with what the market
17 should have been paying me. But that was a personal
18 choice.
19    Q. Let me ask one more time, just to make sure
20 I wrap up the answer. So during the approximate
21 two-year period that you were working at WebManage,
22 did you have a belief or a feeling in your own mind
23 that you had made contributions to the company for
24 which you had not been compensated?

36

1     A. No, no.
2     Q. The next sentence in the answer here that
3  you wrote says: "Plaintiff received stock options
4  as partial compensation for time served at WebManage
5  Technologies"?
6     A. Mm-hmm.
7     Q. When you wrote that, did you mean received
8  stock options from WebManage or Network Appliance?
9     A. I had received stock options from
10 WebManage.
11    Q. You referred to the phrase "partial
12 compensation for time served"?
13    A. Yes.
14    Q. What did you mean when you wrote that?
15    A. I had a compensation package. It was made
16 up of salary, bonus and stock options.
17    Q. So the one part was stock?
18    A. Correct.
19    Q. The other part was salary and bonuses?
20    A. Correct.
21    Q. And those, each of those things were
22 partial, but if you put them together, that made the
23 whole?
24    A. The whole compensation package, yes. And

37

1  health insurance.
2     Q. Employee benefits?
3     A. Employee benefits.
4     Q. The next sentence of your answer is an
5  allegation. You say that, quote: "Defendant gained
6  significant benefit from plaintiff's effort during
7  his effort at WebManage Technologies, although
8  plaintiff was not compensated commensurate with the
9  value gained by the defendant."
10       What did you mean when you wrote those
11 words?
12    A. That I had assisted in the development of a
13 product that was purchased by Network Appliance.
14 The efforts that I put into the product that we just
15 discussed helped Network Appliance, once we were
16 acquired, to grow a business unit significantly. I
17 believe the business unit had significant growth.
18 And the stock options were part of my compensation
19 for the time at WebManage that in my mind was, call
20 it blood — sweat equity in WebManage that was
21 purchased.
22    Q. When you say that the defendant gained
23 significant benefit from plaintiff's efforts at
24 WebManage, you're referring to those categories of

Brian Mehlman
Volume 1 - August 4, 2005

**38**

1  contributions that you discussed earlier?
2      A. Sure.
3      Q. And when you say that plaintiff was not
4  compensated, you're referring to compensation from
5  Network Appliance and not WebManage?
6      A. From the stock options.
7      Q. Okay. And so that was my next question
8  actually. In this sentence here, you're referring
9  to the dispute over the stock options between
10  yourself --
11      A. Sure, the stock options.
12      Q. Is there any other component to your
13  quantum merit allegation, the second in your claims
14  against Network Appliance, other than your
15  allegation about the value of the stock options that
16  you received from Network Appliance?
17      A. No.
18      Q. Apart from the stock options, you don't
19  contend in this lawsuit that Network Appliance owes
20  you any extra money for work that you did at
21  WebManage?
22      A. No.
23      Q. And you, apart from the stock options, you
24  don't contend that Network Appliance owes you any

**39**

1  extra money for the work that you did at Network
2  Appliance?
3      A. No.
4          MR. ROSENBLATT: I will mark as Exhibit
5  2 a document, NetApp 1 through 2, which is a
6  September 8, 2000 offer letter.
7      Q. If you could take a moment to look it over.
8          (Marked, Exhibit 2, NetApp 1 through 2.)
9      Q. Do you recognize this document?
10      A. I do.
11      Q. What is this document?
12      A. This is my employment contract with NetApp.
13      Q. I guess there was an invention assignment
14  contract and also some employee benefit documents
15  that you signed when you joined the company?
16      A. Yes.
17      Q. Apart from the health benefit, or employee
18  benefit documents and the invention assignment
19  agreement and this document, are there any other
20  components of the employment contract that you had
21  when you first joined?
22      A. It's all here.
23      Q. When you say it is all here, doesn't that
24  also include the --

**40**

1      A. Yes, the proprietary information and
2  inventions agreement, yes.
3      Q. How did you get those? Did they come in
4  the mail or fax?
5      A. I honestly don't remember. I believe it
6  was probably a all-hands meeting where they said
7  we've been bought. You will get this letter. I'm
8  sure it was distributed -- I'm vaguely thinking that
9  it was Chris Liota that came by, welcome to NetApp,
10  here is your letter.
11      Q. Let's back up for a moment. You were
12  working at WebManage. At some point in the late
13  summer you heard that the company was going to be
14  acquired by Network Appliance?
15      A. That is correct.
16      Q. Were you involved in any way in the
17  acquisition itself?
18      A. I did some due diligence, I'm sure, with
19  different technology people at NetApp. I did so
20  much due diligence, I may or may not have known what
21  was in the works.
22      Q. Were you working -- let me strike that and
23  ask a different question. Who were the people at
24  WebManage who were directly involved in organizing

**41**

1  the acquisition?
2      A. The three folks that I think had their
3  predominant hands in it was the CEO, which was Vijay
4  Basani. Our VP of sales, I'm guessing, which is
5  Rich Destrempe.
6      Q. Can you spell Mr. Destrempe's name?
7      A. Richard Destrempe, D E S T R E M P E. And
8  then Lynne Murach, L Y N N E, I believe, M U R A C
9  H, who was either director or VP of engineering.
10      Q. As you mention different people's names
11  today, I'll ask you to spell them for the record so
12  the court reporter has them. So those three people
13  were the main people at WebManage working or
14  organizing the acquisition. Do you know who the
15  main people at Network Appliance were organizing the
16  acquisition?
17      A. I know a few of them. I came to know a few
18  of them.
19      Q. Who were they?
20      A. Mason Stubblefield, I believe was one. I'm
21  sure James Lau had his hands in it. He was the M&A
22  guy. Dan McCormack had his hand in it. Amit
23  Pandey; Nawaf, I don't know his last name.
24      Q. Do you know how to spell his first name?

12 (Pages 42 to 45)

Brian Mehlman
Volume 1 - August 4, 2005

42

1     A. N A W A F. Those are the short list of
2  people I would imagine were involved.
3     Q. You mentioned doing some due diligence
4  earlier. Did you ever do any work directly to
5  assist the people you just named either at Network
6  Appliance or WebManage to assist in organizing the
7  acquisition?
8     A. Of WebManage?
9     Q. Yes.
10    A. I worked with most of them over my tenure
11  at NetApp. The only one that I don't think I ever
12  worked with was Mason in any capacity.
13    Q. I'm sorry I wasn't clear. What I mean to
14  ask was: In the period leading up to the
15  acquisition, did you work with any of those people
16  from either company to help assist in the
17  acquisition?
18    A. I don't believe so. I don't believe so.
19    Q. Did you ever sit in on any of the meetings
20  between the different attorneys involved who were
21  doing the paperwork?
22    A. No.
23    Q. Were you kept abreast of developments as
24  the acquisition was being organized?

43

1     A. No.
2     Q. Did WebManage have any way of providing
3  news or updates or information about the upcoming
4  acquisition to the employees?
5     A. We were all told at the same point in time.
6  Preacquisition, everybody was pretty much in the
7  dark.
8     Q. And how did you come to learn about it?
9     A. There was an announcement one day. I think
10  it was the day the press release went out.
11    Q. Was it an all-hands meeting?
12    A. I imagine it was an all-hands meeting.
13    Q. What was your reaction to the news?
14    A. I really didn't know much about NetApp. I
15  went, of course, to go see who they were, what they
16  were. All of that. The first indication is that
17  they were good guys. I was excited to join the
18  company and try to make the product successful.
19    Q. Did you, for example, look at their Website
20  to get information about them?
21    A. Sure.
22    Q. Things like that?
23    A. Sure.
24    Q. After the first announcement, how long was

44

1  it between that announcement and you getting the
2  letter that we're looking at here as Exhibit 2?
3     A. It was pretty quick. It was within two
4  weeks.
5     Q. And during the time between that first
6  announcement and the actual acquisition itself, were
7  the employees at WebManage kept updated in any way
8  on the oncoming acquisition by the company?
9     A. I'm sure there were things. I don't
10  remember what they were. But I'm sure there were
11  lots of things.
12    Q. How did the transition actually occur when
13  you became a Network Appliance employee rather than
14  a WebManage employee? Did you need to change your
15  office space or do anything different?
16    A. It was pretty seamless.
17    Q. Stationary change?
18    A. Yes.
19    Q. You reported to the same people?
20    A. A lot more travel.
21    Q. But your basic organization was the same,
22  at least in the initial period?
23    A. That's correct.
24    Q. Was there ever any sort of announcement

45

1  that said as of this moment or as of this day you
2  were now a Network Appliance employee or anything
3  like that?
4     A. There was never an announcement. It is in
5  this letter.
6     Q. What I'm getting at is, at some point the
7  acquisition officially closed. I'm just curious if
8  you guys were ever told on a certain day that now it
9  has happened and you are now an employee of the new
10  company?
11    A. I think it was this letter that specified
12  that.
13    Q. So let's take a closer look at this letter.
14  You're being offered a position of product
15  marketing?
16    A. Mm-hmm.
17    Q. Did you have an understanding in advance
18  about what that would mean?
19    A. It's a pretty generic term. I mean there
20  were conversations at the time that it would be, you
21  know, do as what you are doing, not a lot of change.
22  So, I think this was picked out of a hat, the title.
23    Q. I understand. When you say you had
24  conversations, who did you have those conversations

FARMER ARSENAULT BROCK LLC

Brian Mehlman
Volume 1 - August 4, 2005

46
```
1   with?
2       A.  At the time my new boss had come out to the
3   office.  I had had conversations with him.
4       Q.  And he was?
5       A.  Ed Chow.  It is Edwin.  At the time the
6   general manager, Chris Liota.  There were so many
7   NetApp people in the office.  There were lots.  They
8   did a good job of welcome to NetApp.  There was a --
9   I don't remember the date, but at one point there
10  was a party that they threw where the CEO of NetApp
11  came out.  It seemed like they wanted to make it a
12  good environment.
13      Q.  Now, did you have other coworkers who
14  received offer letters with this general form and
15  format on the same day too?
16      A.  I'm guessing they did.  I didn't see any.
17      Q.  You didn't sit there with anyone and look
18  at them?
19      A.  No.
20      Q.  Do you know if everyone was offered the
21  same product or job title at Network Appliance that
22  they held at WebManage?
23      A.  I'm guessing.  Repeat the question.
24      Q.  Was everyone at WebManage offered the same
```

47
```
1   job title at Network Appliance that they had been
2   holding at WebManage?
3       A.  For the most part, yeah.
4       Q.  When this says product marketing, capital
5   P, capital M, that was your same title at WebManage?
6       A.  I was product marketing manager, but for
7   all intents and purposes.
8       Q.  Also looking at this first paragraph,
9   there's a salary that's listed and there's also a
10  bonus that's listed?
11      A.  Mm-hmm.
12      Q.  And it looks like this first paragraph
13  gives an anticipated date for the close of the
14  acquisition?
15      A.  That is correct.
16      Q.  And it tells you that your position will
17  start upon the close of the acquisition?
18      A.  Correct.
19      Q.  That last sentence here uses the words
20  "anticipated" and "around."
21      A.  Mm-hmm.
22      Q.  What's your general understanding of what
23  those words mean?
24      A.  Within a couple of weeks either way,
```

48
```
1   earlier or later.
2       Q.  So those are words that indicate there's an
3   estimate being made?
4       A.  Mm-hmm.
5       Q.  One thing I should tell you --
6       A.  Yes.
7       Q.  I should have told you this morning, you
8   have to answer yes or no.  If you say uh-huh, it
9   won't come out on the transcript and we won't know
10  what the answer was.
11      A.  Yes.
12      Q.  Now, the next paragraph refers to some
13  options that you're going to be granted; is that
14  right?
15      A.  That is correct.
16      Q.  And if we look back over at Exhibit 1,
17  which was your interrogatory responses, if you look
18  on Page 5, Interrogatory Number 4 essentially says:
19  Describe every term of every contract that you claim
20  that Network Appliance breached.
21      A.  Mm-hmm.
22      Q.  You answered by setting forth a chunk of
23  the paragraph, the second paragraph on this offer
24  letter, Exhibit 2; is that right?
```

49
```
1       A.  That is correct.
2       Q.  Are there any other contracts that you
3   claim in this lawsuit that Network Appliance
4   breached?
5       A.  No.
6       Q.  Is there any other portion of this offer
7   letter that you claim Network Appliance breached
8   other than the portion that you wrote here in your
9   answer?
10      A.  One second.
11      Q.  Sure.  Take your time.
12      A.  No.
13      Q.  Just so we are clear, the sentence that
14  begins, actually the last sentence of the first
15  paragraph, the sentence that begins "the effective
16  date."  Then we skip down to a sentence that starts
17  with, "The new options granted under the WebManage
18  2000 option plan."  It's those sentences and
19  everything in between them, that's the part that you
20  claim in this lawsuit that was breached.
21      A.  That's correct.
22      Q.  Let's look in the sentence about the
23  effective date of position.  It was your
24  understanding that Network Appliance was telling you
```

14 (Pages 50 to 53)

Brian Mehlman
Volume 1 - August 4, 2005

50

1  that your job would start at Network Appliance when
2  the acquisition closed?
3      A. That is correct.
4      Q. What part of this sentence here do you
5  claim in this lawsuit that Network Appliance
6  breached?
7      A. The date wasn't October 1. It wasn't
8  around October 1 in my mind.
9      Q. The acquisition closed sometime in
10 mid-November, approximately?
11     A. Yeah, early to mid-November.
12     Q. Okay. Do you contend that this sentence in
13 this offer letter gave you a guaranteed start date?
14     A. So, the word in this that stands out as
15 being breached in my mind is the word "close." To
16 me "close" means everything related to this contract
17 with respect to me is done and complete.
18     Q. Putting aside the stock options issue that
19 we'll get to in a few minutes. Is there anything
20 other than the stock option dispute that you claim
21 was breached by Network Appliance telling you that
22 the close would be around or anticipated to be
23 October 1 of 2000?
24     A. No. In fact, I believe I was getting paid

51

1  by NetApp prior to even the October 1st date.
2      Q. Okay. So the breach that you're leading to
3  is the stock option dispute?
4      A. That is correct.
5      Q. Now, the next sentence of this says, quote:
6  "Following the commencement of your full-time
7  employment with Network Appliance, the company will
8  grant to you options that have an approximate value
9  at the closing of $600,000"?
10     A. That is correct.
11     Q. This was not a promise to give you exactly
12 $600,000, was it?
13     A. That is correct.
14     Q. The English language word "approximately"
15 suggests some degree of inexactness; is that right?
16     A. Some degree, yes.
17     Q. Is there any text in this sentence that
18 states when the approximate value would be?
19     A. That was covered in the previous sentence.
20     Q. Doesn't it say they will have an
21 approximate value at the closing?
22     A. That is correct. And the closing is
23 anticipated to be around October 1.
24     Q. So there is some temporal language there

52

1  for the approximate value?
2      A. Mm-hmm.
3          MR. ROSENBLATT: You should say yes or
4  no.
5      Q. I should be clear on that too.
6      A. Yes.
7      Q. When it says at the closing, it is
8  referring to the close of the acquisition that's
9  upcoming between WebManage and Network Appliance?
10     A. That is correct.
11     Q. Do you contend that the approximate value
12 was to be calculated on a date other than the
13 closing?
14     A. Can you clarify the question?
15     Q. Yeah. Do you contend in this lawsuit that
16 the approximate value that's mentioned in Exhibit
17 Number 2 was to be calculated on a date other than
18 the closing?
19     A. I still don't understand the question.
20     Q. Do you contend in this lawsuit that the
21 approximate value, that is mentioned in the sentence
22 here of Exhibit 2, was going to be calculated at any
23 date other than the date of the closing of the
24 acquisition?

53

1      A  I find the word "was" very confusing. I
2  mean I can ask for the clarification?
3      Q. When I say "was" I'm going back to the time
4  frame we are looking at, which was a few years ago.
5  That's why I'm using the past tense.
6      A. I mean, this number was based on some magic
7  stock price that they had figured out was the magic
8  stock price to come up with that number. I don't
9  know if that's the answer you're looking for.
10     Q. Actually, what I was asking about was the,
11 it says here, quote, "an approximate value at the
12 closing." You see that phrase?
13     A. Yes.
14     Q. So -- and you told me earlier that the
15 phrase "at the closing" gives some sort of temporal
16 time period for the approximate value?
17     A. That is correct.
18     Q. I didn't mean to speak over you. Are you
19 contending in this lawsuit that there's any date
20 other than the closing at which this approximate
21 value was to be calculated?
22     A. I mean the contract says closing, so I have
23 to stick with the date that the transaction was
24 closed. My preference would have been the date that

Brian Mehlman
Volume 1 - August 4, 2005

**54**

1  they stipulated in the contract. But there was a
2  closing approximately to October 1.
3      Q. Now, the text of this document doesn't say
4  that the approximate value is going to be calculated
5  as of the date that you are actually able to sell
6  the shares, does it?
7      A. Can you repeat the question?
8          MR. GRAVES: Is there any way you can
9  read that back?
10         (Question read by the reporter.)
11     A. My interpretation is that it would have
12 approximate value of $600,000 on the day that I was
13 given the paperwork to assume the stock, is my
14 interpretation.
15     Q. Okay. Let's break that down a little bit.
16 There's no language in the text of the document that
17 says that the approximate value will be calculated
18 as of the day that you are able to sell the shares.
19     A. That isn't what I just said.
20     Q. I know. I'm just asking you a question
21 about the text that appears on the page. The text
22 that appears on the page does not say, does it, that
23 the approximate value is going to be calculated as
24 of the date that you can sell the shares?

**55**

1      A. No. But it does say that the value of the
2  shares on the day that I receive them, which is on
3  the closing, is $600,000.
4      Q. Now, the sentence here says: "Following
5  the commencement of your employment, the company
6  will grant to you options"?
7      A. That is correct.
8      Q. This sentence here doesn't say that you
9  receive all of the shares the day that you start
10 working for Network Appliance, does it?
11     A. I receive the options, not the shares.
12     Q. I should have worded the question better.
13 The text doesn't say that you will receive the
14 option as of the day you start working for Network
15 Appliance, does it?
16     A. It says following the commencement of your
17 full-time employment, which would be around October
18 1, I will receive options. To me receiving options
19 means receiving a piece of paperwork that has
20 options with a specific value. The value that they
21 stipulate is an approximate value of $600,000.
22     Q. But the text here does not say, does it,
23 any words that say you will receive shares on the
24 day you start?

**56**

1      A. "Grant." Grant to me means receive. We
2  can look it up.
3      Q. But it doesn't say that the grant will take
4  place on the day you start, does it?
5      A. Yes, it does: Following the commencement
6  of your full-time employment, the company, Network
7  Appliance, will grant, that is, they will give, I
8  will receive options. Options to me is a piece of
9  paper that has options on that on that day have a
10 specific value based on market value of $600,000.
11     Q. Okay. But the language that appears here
12 says following the commencement of your employment.
13 It does not say on the day you start. Is that
14 right?
15     A. Isn't commencement the day you start?
16     Q. Doesn't it say following the commencement?
17     A. So, to me, following the commencement is
18 immediately after I start.
19     Q. But the text of the document itself does
20 not say "upon the commencement," does it?
21     A. No. But "following" in my mind is,
22 following means — tomorrow is the following day.
23 So following the commencement means to me
24 immediately after.

**57**

1      Q. There's no text in this paragraph, is
2  there, that says that the value of the shares will
3  be calculated as of a date in 2001?
4      A. No. The date would have been 2000.
5      Q. It doesn't refer to any dates after 2001
6  either, does it?
7      A. Can you repeat the question?
8      Q. It doesn't refer to any dates after 2001
9  either, does it?
10     A. It shouldn't have happened in 2001.
11     Q. But just answer my question. There's no
12 text there about any later dates.
13     A. I don't understand the question.
14     Q. It's just a question on the text of the
15 document here.
16     A. This whole contract was signed and dated in
17 2000, that is correct, with anticipated dates in
18 2000, yes.
19     Q. Now, the text of this document doesn't tell
20 you that the approximate value gets to be calculated
21 in a manner that you yourself choose, does it?
22     A. Nor did I expect that. I expected it to be
23 on the date that the contract stipulates.
24     Q. Is it your position in this lawsuit that

16 (Pages 58 to 61)

Brian Mehlman
Volume 1 - August 4, 2005

58

1  under the terms of this offer letter, Network
2  Appliance owed you $600,000 worth of shares --
3      A. No.
4      Q. -- whenever you happened to sell the
5  shares?
6      A. No.
7      Q. Is it your position that Network Appliance
8  owes you your $600,000 worth of shares no matter how
9  the NASDAQ market performed?
10     A. Can you repeat the question?
11         MR. GRAVES: Can you repeat that one
12  back, please.
13         (Question read by the reporter.)
14     A. No.
15     Q. Is it your position in this lawsuit that
16  Network Appliance owes you $600,000 worth of shares
17  no matter what the NASDAQ value of the company's
18  stock was after the acquisition?
19         MR. ROSENBLATT: That one, can you
20  repeat.
21         (Question read by the reporter.)
22         MR. ROSENBLATT: Objection as to form.
23     A. I don't quite understand it.
24     Q. Well, let's put it this way. Are you

59

1  contending in this lawsuit that under this offer
2  letter you were promised $600,000 in guaranteed
3  income?
4      A. No.
5      Q. Is there any text in the letter here that
6  guarantees you any specific amount of income from
7  the sale of shares?
8      A. There's language to me that says I will
9  receive stock option, stock options. To me that's a
10  physical piece of paper that says these stock
11  options on this day, which to me should have been
12  around this time frame of the close, that had the
13  value near this. So, yes, the stock market does
14  fluctuate. But on this day or around this time
15  frame, these stock options would have had this
16  value.
17     Q. Okay. I'm going to ask you about your own
18  beliefs too. Right now I'm only asking you about
19  the text of the document.
20     A. Sure.
21     Q. I'll try to make it clear which I'm asking
22  so that you always understand what you're being
23  asked.
24     A. Sure.

60

1      Q. My question was, looking at the text that
2  you mentioned in your interrogatory response, is
3  there any language here that guarantees you any
4  certain amount of income from the sale of the stock
5  options?
6      A. No, no.
7      Q. At the time that you received this letter,
8  did you believe that the NASDAQ value of Network
9  Appliance's stock is something that might go up and
10  might go down?
11     A. Yes.
12     Q. Is it your position in this lawsuit that if
13  the NASDAQ value of NetApp stock decreased during
14  the time period after the acquisition, that Network
15  Appliance was required to give you additional shares
16  so that you would always have a market value of
17  $600,000?
18     A. Only in these circumstances. Because if
19  they had physically given me the contract, I mean
20  the stock assumptions in this time frame, then,
21  yeah, I probably would have had to have lived with
22  it. But they didn't. So when I physically received
23  my stock assumption papers, the value of the stock
24  on that day, which is the day physically I received

61

1  what was obliged by NetApp in this contract, it had
2  significantly less value.
3      Q. Okay. And my question was, is it your
4  position in this lawsuit that this contract required
5  Network Appliance, in the event that the NASDAQ
6  share values went down, to give you additional
7  shares to make sure that you always had shares that
8  were worth $600,000?
9      A. My position is that in the closing time
10  period I would have been locked into the option
11  value and price on that particular day, yes.
12     Q. So when you say, when you state the belief
13  about being locked into that position, you were also
14  saying, then, you are not saying that Network
15  Appliance was required to always give you enough
16  shares?
17     A. Can you repeat the question?
18     Q. Yes. You're not contending that this
19  contract required the company to always make sure
20  that the shares that you had were sufficient to be
21  worth $600,000?
22         MR. ROSENBLATT: Objection as to form.
23     Q. That's okay.
24         MR. ROSENBLATT: Go forward.

Brian Mehlman
Volume 1 - August 4, 2005

62

1    A. I believe — I would have to go back and
2    read the claim. But I believe it would have been in
3    NetApp's jurisdiction knowing that there was a
4    dramatic difference in price between when they
5    negotiated the deal and when they physically gave me
6    my option papers to grant additional options or to
7    adjust the strike price. NetApp does that all the
8    time for different situations, they will adjust the
9    strike price. So, yeah, I think the delay harmed
10   me. That's my conjecture.
11       Q. Is there any text in the offer letter that
12   we are looking at in Exhibit 2 that tells you that
13   Network Appliance might adjust strike prices with
14   regard to shares that you were to receive or options
15   that you were to receive?
16       A. There is none, nor is there -- no.
17       Q. Is it your belief that this offer letter
18   guaranteed that you would receive the paperwork for
19   the stock options as of the day that you began
20   working for Network Appliance?
21       A. Yes.
22       Q. Tell me in your own belief why you believe
23   the text leads to that?
24       A. "Grant."

63

1    Q. The word "grant."
2    A. The word "grant" means that I will receive.
3    To me, receive means physically getting the
4    paperwork.
5    Q. Do you know whether companies have to, when
6    they acquire other companies, prepare any forms and
7    paperwork for the SEC before they can --
8    A. I do.
9    Q. And what's your understanding?
10   A. There's an S8, I believe.
11   Q. What is an S8?
12   A. I don't know much. I believe it is the
13   document that transfers the stock assets from one
14   company to another. I don't have detailed
15   knowledge.
16   Q. You are not a lawyer or a financial
17   analyst?
18   A. I am not.
19   Q. Just based on your own understanding, what
20   kind of work has to go into the creation of an S8
21   filing?
22   A. My understanding is that it is not a
23   difficult process.
24   Q. And upon what do you base that

64

1    understanding?
2    A. I've done some Internet research,
3    predominantly.
4    Q. What Internet research have you done?
5    A. I've gone out and looked at other companies
6    that have bought other companies and looked at the
7    filings and the times. I've looked at NetApp
8    filings and NetApp filing times.
9    Q. Let's start with other companies first.
10   What other companies did you look into?
11   A. I don't remember. I was browsing.
12   Q. Did you print anything out?
13   A. I did not.
14   Q. Did you save anything in a bookmark?
15   A. I did not.
16   Q. You looked at Network Appliance?
17   A. I did.
18   Q. How many would you say there were two or
19   three years before this period?
20   A. Before?
21   Q. Yes.
22   A. Before there weren't many.
23   Q. What about the two or three years after?
24   A. A handful.

65

1    Q. You said you explored the timing of the S8
2    with regard to the acquisitions?
3    A. Yeah.
4    Q. And what did you learn?
5    A. Most of them I believe were timely, within
6    a month or so.
7    Q. Were there any that weren't?
8    A. I don't believe so. Ours was the longest,
9    by far.
10   Q. Were there any that had to be done more
11   than once?
12   A. That I don't know.
13   Q. Do you know yourself anything about the
14   internal processes of Network Appliance in terms of
15   what work goes into the S8?
16   A. No. But in the discovery I noticed that
17   there weren't any emails specifying work done on it
18   until after the first of the year and that's when
19   they started. I mean, they should have known way
20   back in August that this was something that should
21   have been done.
22   Q. But as you sit here, you yourself don't
23   know what different types of things have to go in --
24   A. I do not.

18 (Pages 66 to 69)

Brian Mehlman
Volume 1 - August 4, 2005

66

1    Q. Let's make sure that I finish before you
2  start.
3    A. Okay.
4       MR. ROSENBLATT: I was about to say the
5  same thing.
6    Q. Sometimes you anticipate questions I ask
7  and you start answering and it is not quite what I
8  even meant to ask. Let's make sure. We have plenty
9  of time. It is not going to last all day, so let's
10  go slowly.
11    A. Sure.
12    Q. Do you know internally if Network Appliance
13  ever made any mistakes in any of the S8s that they
14  did for any of these others?
15    A. I did not.
16    Q. Do you know if Network Appliance ever had
17  to do redo any of the S8s that they had done for
18  others?
19    A. I do not.
20    Q. Do you know what other responsibilities for
21  other filings that people at Network Appliance had
22  for, during the same period they were doing the S8
23  for --
24    A. I do not.

67

1    Q. Is there any text in Exhibit 2 that tells
2  you that the S8 will be filed with the SEC on a
3  certain day?
4    A. No.
5    Q. You mentioned that you had done some
6  looking on the Web. Was it the SEC's Website?
7    A. I'm sure it was a combination. It was
8  financial reports and press releases and stuff like
9  that.
10    Q. I think you mentioned a moment ago, and I
11  don't mean to misquote you, but I think you said
12  most of them took about a month?
13    A. That was my understanding. I would have to
14  go back and look again, but it seemed like most of
15  them were within two weeks to a month time frame,
16  specific to acquisitions.
17    Q. Specific to acquisitions. Do you mean by
18  that two weeks to a month before the acquisition, or
19  two weeks to a month after the acquisition?
20    A. After the announcement of the close of the
21  acquisition, I believe is the date I used.
22    Q. So these other S8s for these other
23  acquisitions would take place roughly two weeks to a
24  month after the announcement of the acquisition?

68

1    A. That was my interpretation.
2    Q. Do you know what dates those acquisitions
3  actually closed?
4    A. Usually there was a press release. I went
5  on the press release.
6    Q. Why do you believe that Network Appliance
7  would have done the S8 as of the day that you joined
8  the company when for other acquisitions it took
9  place two weeks to a month afterwards?
10    A. That was the filing. It doesn't mean the
11  preparation for the filing. Actually, I think the
12  filing, signed and dotted on the line within two
13  weeks. I don't know the filing process.
14    Q. I understand that. I'm not asking you
15  detailed questions about the filing process. What I
16  mean is, it sounded like you told me earlier that
17  your contention in the lawsuit is that you should
18  have gotten your share of stock option paperwork on
19  the day you started on the day of the closing; is
20  that correct?
21    A. That's correct, but there was a month
22  between the announcement of the acquisition and the
23  closing, more than a month. It was September 8th to
24  November 15th, let's say. That's a month and a

69

1  half. So I would have expected it to be well under
2  way and in process, sure.
3    Q. When do you expect it to be under way, you
4  mean the S8?
5    A. Sure, yes.
6    Q. Just so I'm clear, it is your contention in
7  this lawsuit that on the roughly mid-November date
8  when this all closed and you actually started
9  working for Network Appliance, that they were
10  required by contract, in this contract to you, to do
11  the S8 and have it all done and ready as of the day
12  that you were starting?
13       MR. ROSENBLATT: Objection as to form.
14    Q. Is that what you meant to say?
15    A. I expected them to fulfill this contract,
16  which was to give to me, grant to me options as
17  specified in the contract.
18    Q. I'm just trying to understand --
19    A. My knowledge of the S8 to me is moot. It
20  is what's in this contract. I've researched it
21  because I've needed to learn about it. Part of this
22  is why it took them so long. But I'm going by
23  what's written here.
24    Q. I didn't mean to interrupt you, and we'll

FARMER ARSENAULT BROCK LLC

Brian Mehlman
Volume 1 - August 4, 2005

70

1  take a break in a few minutes because we've been
2  going for about an hour and a half. But just to
3  wrap up this line of questioning, I'm just trying to
4  get to your underlying beliefs about what the
5  contract required. It sounds like you are agreeing
6  that an S8 filing has to take place for these types
7  of acquisitions. Is that right?
8    A. I've learned that since the contract, yes.
9    Q. Based on that belief, it sounds like you're
10  saying that the company was required to have that
11  done as of the day that you started and the
12  acquisition closed so that they could then give you
13  the paperwork immediately?
14    A. The company was required to grant me my
15  options on the commencement of my employment.
16    Q. And that meant that they had to do the S8?
17    A. If that's an underlying requirement for
18  granting my options, then yes. That's what I'm
19  going by. What they had to do to make this happen,
20  that's a NetApp thing; that's a SEC thing. This is
21  what they promised to me.
22    Q. Do you know if it is actually possible to
23  file with the SEC an S8 contemporaneous with the
24  date of the closing of an acquisition?

71

1    A. I'm not privy.
2    Q. What if it is not possible?
3      MR. ROSENBLATT: Objection as to form.
4    A. Can you restate the question?
5    Q. Does it affect your belief about the
6  interpretation of this contract if it were not
7  possible with the SEC to actually file the S8 on the
8  date that the acquisition closes?
9    A. To me, it is not closed. The transaction
10  shouldn't have been called closed, to me.
11    Q. Until the S8 is closed?
12    A. If you're going to use the words "close"
13  and "grant" on a date, all the things in a position
14  to make this happen, to me the transaction is not
15  closed until all the things are in place. I don't
16  know what the definitions are, but that's my
17  interpretation.
18    Q. So you interpreted this sentence that
19  starts with the words "following the commencement,"
20  to mean that on the day that you officially became a
21  Network Appliance employee, you were to have
22  physically in your hands the paperwork that would
23  allow you to sell these stock options?
24    A. That was my expectation.

72

1    Q. All of them?
2    A. The options, yes. The piece of paper that
3  had the options, the strike prices, the vesting
4  schedules, the option assumption papers, that
5  transferred my physical option papers from WebManage
6  options to NetApp options, the paperwork that I
7  didn't receive until early February.
8    Q. Was there a vesting schedule for the shares
9  that you eventually got?
10    A. Sure, yes.
11    Q. You don't mean to contend, then that you
12  should have been able to sell on the market in
13  mid-November every one of them?
14    A. No.
15    Q. What portion do you contend in this lawsuit
16  that you should have been able to sell in November?
17    A. The vested shares.
18    Q. Those that were vested as of that time
19  frame?
20    A. That's correct.
21      MR. ROSENBLATT: Off the record.
22      THE VIDEOGRAPHER: The time is 10:55.
23  Off the record.
24      (Discussion off the record.)

73

1      (A recess was taken.)
2      THE VIDEOGRAPHER: The time is 11:06.
3  We are back on the record. This is the beginning of
4  cassette 2.
5    Q. You mentioned earlier this morning that you
6  had once work for a company called Metrix Network
7  Systems?
8    A. That's correct.
9    Q. And HP had acquired that company and you
10  had received some stock options from either Metrix
11  or HP that had to do with the acquisition?
12    A. Mm-hmm.
13    Q. Did you get all the paperwork and
14  everything for those shares on the day that you
15  became an HP employee?
16    A. I believe we did actually.
17    Q. How did that come about?
18    A. It was eight or ten years ago. I don't
19  remember. I do -- the day that they announced it,
20  we didn't really understand what options were. They
21  had an all-hands where everybody came in and they
22  explained how options worked and all of that. We
23  received them on the day we were told, give or take
24  a day.

20 (Pages 74 to 77)

Brian Mehlman
Volume 1 - August 4, 2005

74

1  Q. The day that you were told?
2  A. That we had been bought by HP.
3  Q. Do you still have paperwork in your
4  possession that relates to all of that?
5  A. I do not.
6  Q. You got rid of it?
7  A. It is long gone.
8  Q. Was that Matrix?
9  A. Metrix, M E T R I X.
10  Q. With an X?
11  A. With an X.
12  Q. Before we broke you were mentioning that
13  you had a vesting schedule with the shares that you
14  got with the offer letter, Exhibit 2. Some were
15  vested at a certain point in time and some were
16  vested later in the future; is that right?
17  A. That is correct.
18  Q. You are not contending, are you, in this
19  lawsuit, that as to the unvested shares, that you
20  had a right to go out and sell those in the fall of
21  2000?
22  A. That is correct.
23  Q. The portion of the shares of the stock
24  options that you received through this offer letter

75

1  that we are quarreling about in this litigation is
2  the portion that vested during the fall of 2000 time
3  frame?
4  A. For selling, yes.
5  Q. I'm sorry?
6  A. For selling.
7  Q. Are you making any contentions about the
8  shares that vested later in time?
9  A. Yes.
10  Q. What are you contending?
11  A. That the day I received my option papers,
12  that typically locked in a strike price and I agreed
13  to that. My expectation was that I was going to be
14  locked into something commensurate with what was
15  here. The day that I locked in, it was
16  significantly different than the picture painted
17  here.
18  Q. Is there a stock price listed in this
19  document?
20  A. There was not, but it was calculatable.
21  Q. And how was the strike price calculatable?
22  A. For this number?
23  Q. Yes.
24  A. There was some magic number determined of

76

1  the stock price of NetApp. It was somewhere just
2  shy of a hundred dollars.
3  Q. When you used the phrase magic number, what
4  did you mean by those words?
5  A. At the time that the acquisition happened,
6  there were so many outstanding shares. It was an
7  announced acquisition at a certain dollar value
8  which converted into a certain price that was
9  determined by the negotiations, I imagine, that was
10  also communicated to the employees that that's what
11  it was based on.
12  Q. So there was a magic number that was
13  communicated to the employees?
14  A. Yeah, this whole formula was.
15  Q. When you say communicated, through this
16  offer letter?
17  A. Through all-hands and verbal
18  communications.
19  Q. And that was approximately when?
20  A. It would have been in this time frame.
21  Q. Was that the all-hands meeting that you
22  mentioned where they announced the acquisition?
23  A. I would imagine. I don't remember exactly
24  when it happened. It was in this time frame,

77

1  though. I mean, there was a known number that at
2  some point was communicated one way or another of
3  what the -- not related to this, but related to the
4  acquisition. It was a $77 million acquisition.
5  That was in a press release. There were so many
6  outstanding shares, both common and options, you
7  could do the math.
8  Q. When you said not related to this, you
9  pointed to the offer letter. What did you mean by
10  that?
11  A. I'm sure -- you asked for -- repeat the
12  question. I believe it was the dollar value that
13  the conversions were all done at. So I guess it is
14  related to this as well.
15  Q. Who communicated that magic number that you
16  mentioned to you?
17  A. I don't remember.
18  Q. You mentioned also that you could calculate
19  a strike price using the offer letter here.
20  A. No, not the strike price. You could
21  calculate roughly the value of a NetApp -- I mean of
22  a WebManage share based on the acquisition. The
23  conversion was a numerical conversion.
24  Q. All right. So is it true there's no

21 (Pages 78 to 81)

Brian Mehlman
Volume 1 - August 4, 2005

78

1  language in the offer letter that tells you how to
2  calculate a strike price?
3      A. That is correct. That would be in the
4  option paperwork. I mean they must have had some
5  precision to be able to get to this number. How
6  they exactly did it? I don't know. Could I sit
7  down with a spreadsheet and get to a similar number
8  within a couple thousand dollars because of the math
9  at this time? The answer is yes.
10     Q. Strike prices sometimes change over time?
11     A. No.
12     Q. They stay constant?
13     A. When you lock into an option, yes.
14     Q. When you use the words "lock into an
15  option," what did you have in mind when you use
16  those words?
17     A. When I get my option paper and I agree that
18  that's the strike price that I'm agreeing to.
19     Q. Now, apart from the strike price that you
20  mentioned, do you raise any other accusations in
21  this lawsuit with regard to the shares that were
22  unvested during this fall of 2000 time period?
23         MR. ROSENBLATT: Objection as to form.
24     A. What I stated before.

79

1      Q. Which was the issue of the strike price?
2      A. I would have to go back and read exactly
3  what I said. I made a statement around that exact
4  same question previous.
5      Q. That's what I was trying to get to, to see
6  if there was anything else that was part of your
7  allegations with regard to the unvested shares.
8      A. I think I communicated my issue around the
9  unvested shares previously.
10     Q. Okay, Fair enough. You mentioned earlier
11  with regard to the word "following the
12  commencement," you said the following day would mean
13  the next day. I think you mentioned that earlier.
14     A. Following, sure, following.
15     Q. Following means after?
16     A. Correct.
17     Q. So if someone, for example, says following
18  the meeting or following the deposition, that means
19  after the meeting or after the deposition?
20     A. It has some timeliness to it, sure. After
21  the meeting we are going to lunch. We are not,
22  but....
23     Q. Are there any words that tell you in this
24  text in Exhibit 2 that you will have an immediate

80

1      right to sell any options that you received?
2      A. To me it is inferred.
3      Q. In your belief it is inferred but it is not
4  explicit?
5      A. The new options granted under the WebManage
6  2000 option plan will be converted to Network
7  Appliance option plan. So it is determined by what
8  those option plans say.
9      Q. When you say it is determined, you meant
10  what?
11     A. What was your previous question?
12     Q. Asking about the day that you could first
13  sell those shares.
14     A. Yeah, I mean it was based on what I was
15  vested in the conversion, sure.
16     Q. So there's no language in this document
17  that explicitly says that you can go out and sell
18  options as of the day you start working for Network
19  Appliance?
20     A. It refers to another document that does
21  specify that.
22     Q. This offer letter doesn't tell you what
23  income you would actually receive from any sales,
24  does it?

81

1      A. Inherently, yes.
2      Q. It doesn't explicitly tell you any income
3  that you would receive, does it?
4      A. No. But again, it's the same thing. There
5  are vested shares out of this pool of shares that
6  they are articulating, according to an existing
7  WebManage plan that would be converted to a NetApp
8  plan. So, yes, I could have sold following the
9  commencement -- I should have been able to sell
10  following the commencement vested shares of the
11  stocks that were eligible to be sold on that date.
12  It is specified, but it is related to other
13  documents, but this contract stipulates that, yes.
14     Q. That actually wasn't quite my question. My
15  question was: There isn't anything in this document
16  that tells you a specific income, like actual income
17  that you are going to get, is there?
18     A. The salary, but not in this section.
19     Q. All my questions are focused on this
20  section. Does this offer letter guarantee that you
21  would definitely receive any income at all from the
22  sale of stock options?
23     A. My interpretation is that the vested shares
24  following the commencement of my employment should

22 (Pages 82 to 85)

Brian Mehlman
Volume 1 - August 4, 2005

---

82

1    have been sellable, which would have been guaranteed
2    income, yes.
3        Q. Well, if something terrible had happened to
4    the economy or to the market, it's possible that the
5    shares could have been worth zero, isn't it?
6        A. No. In theory, within a couple days, yeah.
7    But I'm sticking to what, the dates and when I
8    should have received it.
9        Q. And my question is, even under your own
10   view of the offer letter --
11       A. Yeah.
12       Q. -- it is possible, isn't it, that had
13   something terrible happened to America or to the
14   market, in fact the shares could have been worth
15   zero?
16       A. It is possible, yes. Not probable, but
17   possible.
18       Q. It is possible. That's all I'm asking.
19           So there isn't in fact any guaranteed
20   income that's guaranteed to you in this letter as to
21   the stock options?
22       A. I disagree. There's vested shares. Those
23   are shares that I owned of WebManage that on this
24   day should have been transferred to me, according to

---

83

1    this contract, which to me could have been real
2    income on that day. So yes, there was a level of
3    guarantee of due care of my stock. And that's how I
4    interpret the contract.
5        Q. There's nothing in the contract, is there,
6    that sets forth exactly what income you should
7    receive minus taxes and strike price and all of
8    that?
9        A. Again, it is interpretation. I could have
10   done the math on that day that I should have
11   received the stock option. I could do it on a
12   spreadsheet based on the numerical strike price on
13   the stock of that day, real income that should have
14   been granted on that day.
15       Q. Not quite my question. I understand that
16   that's your belief.
17       A. Yes.
18       Q. What I'm asking is that there's nothing in
19   this letter that sets forth what income you are to
20   receive minus whatever taxes you have to pay minus
21   the strike price.
22       A. Again, I disagree. There's physical
23   paperwork that could be pieced together that told me
24   income I should have received, if I had chosen, on

---

84

1    that day.
2        Q. You said there was paperwork. What did you
3    have in mind when you used that word?
4        A. There was this document. There was my
5    WebManage option plans that had stipulated in it the
6    number of shares. There was the announced
7    conversion rate. There was the close of market
8    stock value on that day.
9        Q. When you mentioned the announced conversion
10   rate, is that the same thing you meant to refer to
11   when you used the phrase the magic number?
12       A. There was another -- I don't know if they
13   mentioned it in here. I don't think they do. If
14   you do the math and the WebManage plans and NetApp
15   plans and you divide them, it's like a 37 to 1
16   conversion or 39 to 1. I don't know the exact
17   number.
18       Q. Just so I make sure I have got all this, so
19   when you mentioned the paperwork, there's the offer
20   letter?
21       A. Yes.
22       Q. There's the WebManage stock grant
23   documents?
24       A. Options, yes.

---

85

1        Q. There was the -- you mentioned the market
2    price of NetApp shares on NASDAQ, I think you
3    mentioned?
4        A. Correct.
5        Q. Market price. You mentioned the conversion
6    formula?
7        A. Correct.
8        Q. Which was contained?
9        A. It was verbal at that time. It was 37 to
10   1. When I received the paperwork you could do it as
11   well.
12       Q. So when you used the word "paperwork," was
13   there anything else that you meant to refer to other
14   than what we've just gone through?
15       A. That's probably the majority of it. I
16   could have done the math on those pieces, yes.
17       Q. I'm just trying to make sure that there's
18   no other paperwork or anything else that's included
19   in your answer.
20       A. I don't think so. I mean, I can't commit
21   to it, but I think that's the majority of it.
22       Q. We are both talking a little too fast. So
23   slow down for the court reporter.
24           Looking at the phrase approximate value

---

Brian Mehlman
Volume 1 - August 4, 2005

86

1  at the closing of $600,000, this is not an
2  approximate value minus the strike price, is it?
3      A.  No.  That's the real value.
4      Q.  When you say the real value, that's the
5  market?
6      A.  They had a numerical calculation.  I don't
7  know exactly what it was.  I can give you a ballpark
8  that that value was stock options granted, stock on
9  the price the day that they determined this number,
10  less all my strike prices, to get the net.
11      Q.  So your income, and sticking to your
12  interpretation here, your income in the end is minus
13  the strike price and minus whatever taxes you have
14  to pay on your income?
15      A.  Yes.
16      Q.  Is there any text here in this Exhibit 2
17  offer letter stating that the shares that you were
18  going to receive were Network Appliance compensating
19  you for the time you worked at WebManage?
20      A.  I would interpret the sentence "this value
21  is comprised of a value assigned shares currently
22  owned," yes.
23      Q.  Okay.  Is that converting shares that you
24  had at WebManage that become Network Appliance

87

1  shares or is that a promise or something from
2  Network Appliance telling you we are going to
3  compensate you, Mr. Mehlman, for time that you
4  worked at WebManage?
5      A.  The first sentence is time they are going
6  to compensate me at WebManage from options from
7  WebManage, yes.
8      Q.  Apart from options in this offer letter did
9  Network Appliance promise in any other way to
10  compensate you for work done at WebManage?
11      A.  Give me a second.
12      Q.  Sure.
13          (Pause.)
14      A.  Other than that section, no.
15      Q.  You got this letter on or about September
16  8th of 2000, or is this the date that it was sent
17  and you received it later, do you know?
18      A.  I received -- that's a good question.  I
19  mean, it is signed the 14th.
20      Q.  Do you have any recollection of how long
21  you had it before you signed it?
22      A.  Well, less than six days.  I mean I
23  received it between the 8th and the 14th.  So no
24  more than six days and no less than one.

88

1      Q.  So you don't have any memory, for example,
2  that you signed it the day that you got it or the
3  next day to take it home to talk about it?
4      A.  I don't, no.  I'm guessing there was delay
5  because this was done and prepared in California.
6  I'm guessing.  I don't know that for sure.  Chris
7  Carlton was in California.  I don't think she was at
8  our office at this point in time.  She was an East
9  Coast HR person.
10      Q.  Was there any organized way that WebManage
11  or Network Appliance collected all of these things
12  from WebManage employees, or by contrast were you
13  individually responsible for sending this back to
14  Network Appliance?
15      A.  Individually responsible.
16      Q.  Did you mail it back or give it?
17      A.  No.  I probably gave it to Laura Eigin.
18  I'm not a hundred percent sure.  She was the HR
19  person.
20      Q.  Did she come by at any time to do this or
21  did you walk down to give it to her?
22      A.  I imagine I just walked down to give it to
23  her.  I don't know for sure.
24      Q.  Between the time that you got this and you

89

1  dropped it off with Ms. Elgin, did you take any
2  notes or type up anything or keep any written
3  records about this offer letter?
4      A.  I kept a personal copy.
5      Q.  You didn't write up to yourself any
6  thoughts or ideas about it?
7      A.  Not specific to the contract, no.
8      Q.  Between the time that you got it and that
9  you dropped it off with Ms. Elgin, did you speak
10  about the contract or the offer letter with anyone?
11      A.  I'm sure I did, yeah; friends, family.  I
12  can't say when or who or why.  But I'm sure I
13  communicated that we were bought and I got hired,
14  sure.
15      Q.  Specific to the portion of your letter that
16  you wrote up in your interrogatory responses,
17  Exhibit 1, between the time that you got it and you
18  dropped it off with Ms. Elgin, did you speak with
19  anybody about that particular portion?
20      A.  I don't have any recollection.  I don't
21  know.  I mean -- I keep things like this pretty
22  private.  I may have talked to -- I don't believe
23  so.  I mean, this was a personal thing.
24      Q.  Do you contend in this lawsuit that this

24 (Pages 90 to 93)

Brian Mehlman
Volume 1 - August 4, 2005

90

1  offer letter sets forth the terms of your
2  employment?
3      A.  Yeah.  Along with the other paperwork.
4      Q.  The benefits documents and the invention
5  assignment?
6      A.  Yeah.
7      Q.  So that's the sum total?
8      A.  Yeah, at this point in time.  Later on I
9  had to sign some other things.
10     Q.  Do you remember what it was?
11     A.  It was a code of conduct.
12     Q.  Stuff like that?
13     A.  Yeah.
14     Q.  It mentions here in this text that there's
15 some shares currently owned with WebManage.
16     A.  Mm-hmm.
17     Q.  Those were stock options that you had some
18 rights to when you were working at WebManage?
19     A.  That's correct.
20     Q.  Were those shares that you got as a bonus
21 or part of joining the company?
22     A.  Part of -- I mean, part of my compensation
23 package that was agreed between WebManage and
24 myself.

91

1      Q.  When you started working there?
2      A.  Yes.
3      Q.  WebManage was a privately held company; is
4  that right?
5      A.  That's correct.
6      Q.  So it would have been difficult to sell the
7  shares or the options that you had with WebManage
8  when you were working at WebManage; is that right?
9      A.  I imagine so.
10     Q.  There may have been some technical ways to
11 do it, legalistic ways to do it in certain ways, but
12 they weren't openly things that you could sell on
13 the market; is that right?
14     A.  That was my understanding, yes.
15     Q.  I think you mentioned earlier that you
16 valued your WebManage shares through what you called
17 a conversion formula or magic number?
18     A.  That's correct.
19     Q.  Prior to hearing that information, had you
20 ever tried to value those shares or tried to figure
21 out what they were worth?
22     A.  Only back-of-the-napkin type of stuff based
23 on investors coming in and stuff like that, but
24 nothing concrete.  I would always try to keep up to

92

1  see that the company was growing, but no real
2  numbers.
3      Q.  And it says here that:  "The new options
4  granted under the WebManage 2000 option plan will
5  convert to the Network Appliance option plan and be
6  granted pursuant to Network Appliance's stock option
7  plan"?
8      A.  Mm-hmm.
9      Q.  So Network Appliancing kind of took over
10 the stock option plan for WebManage and converted
11 them into Network Appliance shares?
12     A.  That's correct.
13     Q.  So when you eventually received them, they
14 were part of Network Appliance option plan?
15     A.  That is correct.
16     Q.  There's a sentence toward the end of this
17 letter.  It says:  "If you have any questions,
18 please call either me," and it gives a phone number,
19 "or Mr. Basani"?
20     A.  Yes.
21     Q.  Do you know who Chris Carlton is?
22     A.  Yes.
23     Q.  Who is Chris Carlton?
24     A.  Chris Carlton is the VP of HR.

93

1      Q.  For Network Appliance?
2      A.  For Network Appliance, yes.
3      Q.  So that was somebody who had been with
4  Network Appliance and not somebody that moved over
5  from WebManage.
6      A.  That is correct.
7      Q.  Had you spoken with -- is it Ms. Or Mrs.?
8      A.  I think she was married.
9      Q.  Mr. or --
10     A.  It is a woman.
11     Q.  Had you spoken to Ms. Carlton before you
12 got this letter?
13     A.  I may have.  I'm trying to think if she
14 came -- she may have been at the party.  It was a
15 schmoozing event.  I'm sure I had nonwork-related
16 conversations with her just really briefly at the
17 party.
18     Q.  You didn't call her with any questions?
19     A.  Not her specifically, no.
20     Q.  Did you call Mr. Basani with any questions?
21     A.  Specific to this contract?
22     Q.  Yeah.
23     A.  I don't think so, no.
24     Q.  You mentioned earlier that the closing

Brian Mehlman
Volume 1 - August 4, 2005

94
1  happened sometime roughly mid-November?
2      A. That is correct.
3      Q. Do you know why it happened then?
4      A. I don't. You know, it was kind of -- that
5  whole period in my opinion was nose to the
6  grindstone to try to make this thing successful. I
7  think I was kind of an important piece in the pie.
8  The general attitude was, you know, it is going to
9  happen. So there were conversations along the way.
10 I mean, there were meetings where people brought up
11 options and stock and, you know, we are taking care
12 of it, type of attitude at the time.
13     Q. My question was more going to the actual
14 mechanics. I was going to more of the mechanics of
15 the acquisition itself.
16     A. Sure.
17     Q. Do you know why it closed in approximately
18 mid-November of 2000?
19     A. I honestly don't, no.
20     Q. Were you privy to drafts of the merger
21 agreement that was prepared between the two
22 companies?
23     A. I was not.
24     Q. Were you privy to any negotiations back and

95
1  forth about the terms of the merger?
2      A. I was not.
3      Q. Do you know if WebManage had any terms and
4  conditions that it wanted from Network Appliance
5  when it was negotiating for the merger?
6      A. Not at that time.
7      Q. Do you mean no?
8      A. What's the time period?
9      Q. In the time period while they were
10 negotiating the --
11     A. No.
12     Q. Just so I'm clear; no, or you don't know?
13     A. No, no, no, no, no. I was not privy to
14 anything at that time in terms of the merger.
15     Q. So you don't know whether they had any
16 terms or conditions?
17     A. That is correct, I didn't know.
18     Q. Now, did you ever end up calling
19 Mrs. Carlton about this particular offer letter?
20     A. I don't believe so, no.
21     Q. And did you ever call Mr. Basani about the
22 offer letter after you gave it to Ms. Elgin?
23     A. I don't believe so.
24         MR. GRAVES: I'm going to mark as

96
1  Exhibit 3 a document with a Bates numbers NetApp 17
2  through 19. I will mark as Exhibit 4 the document
3  with Bates numbers NetApp 20 through 22.
4          (Marked, Exhibit 3, Bates NetApp 17
5  through 19.)
6          (Marked, Exhibit 4, Bates NetApp 20
7  through 22.)
8          MR. GRAVES: I'm going to mark as
9  Exhibit 5 a document with Bates number NetApp 23
10 through 25.
11         (Marked, Exhibit 5, Bates NetApp 23
12 through 25.)
13     Q. If you could take a moment to look at these
14 and let me know if you recognize them.
15     A. I do.
16     Q. Are these the stock option assumption
17 agreements that exchanged your WebManage stock
18 options for Network Appliance stock options?
19     A. They are.
20     Q. And the effective date according to each of
21 them is November 13, 2000?
22     A. That is correct.
23     Q. Now, the first one is the 1999 stock option
24 plan?

97
1      A. That is correct.
2      Q. And --
3      A. As is Number 5.
4      Q. Right. The other one is for the 2000 stock
5  incentive plan?
6      A. That is correct.
7      Q. The first one that we looked at, that gave
8  you an option to purchase 3,178 shares of Network
9  Appliance stock?
10     A. That is correct.
11     Q. And the next one was for 3,792 shares?
12     A. That is correct.
13     Q. And the last one, the one from 1999, that
14 was for an option for 635 shares?
15     A. That is correct.
16     Q. Does that total up to 7,605?
17     A. I would have to do the math, but that
18 sounds about right.
19     Q. That sounds roughly about right?
20     A. Yeah.
21         Is that all you are doing with these
22 three?
23     Q. Part of this is just to authenticate
24 documents.

26 (Pages 98 to 101)

Brian Mehlman
Volume 1 - August 4, 2005

98

1       MR. GRAVES: I'll mark as Exhibit 6 the
2   document Bates number NetApp 63 to 64.
3       (Marked, Exhibit 6, Bates NetApp 63 to
4   64.)
5       Q. Have you seen this document before?
6       A. No, I don't believe I have.
7       Q. It's probably from your file. Can you look
8   it over?
9       A. This wasn't in the document discovery I
10  don't believe.
11      Q. This is something that came from Network
12  Appliance?
13      A. I would have thought I would have gotten
14  this as part of the document request. I don't
15  believe I've seen this.
16      Q. I can represent that it was produced. You
17  can tell from the Bates number on the bottom.
18      A. You're right. I apologize.
19      Q. Can you look through and let me know if
20  this all looks accurate.
21      A. (Witness complies.) I believe this is
22  accurate.
23      Q. Under the bold-faced line Employment Data,
24  it says Original Hire Date, it says November 15,

99

1   2000?
2       A. Correct.
3       Q. Do you see that?
4       A. I do.
5       Q. Is that the day that the acquisition closed
6   and you officially became a member of Network
7   Appliance, do you know?
8       A. It was in that time frame. I think this
9   may have gone out on the 14th, but yeah.
10      Q. Okay. If you will look back to Exhibit 1
11  turning to Page 3. There's a question asking you to
12  describe all efforts made to exercise vested options
13  or obtain information about stock options before
14  February 5, 2001.
15      A. Yes.
16      Q. In the answer you mentioned some
17  individuals there. Starting with Chris Liota. What
18  inquiry did you make to Chris Liota?
19      A. I mean at the time, the earlier inquiries
20  were around stock option papers. There was a
21  written inquiry about stock option sales sometime in
22  December. Most of the verbal inquiries were when
23  are the stock option papers coming? I knew what
24  they were and I was expecting them. That was with

100

1   Chris Liota.
2       Q. And Chris Liota works in Massachusetts?
3       A. No, he was NetApp California, but he spent
4   a lot of time in Massachusetts and I spent a lot of
5   time in California.
6       Q. So when you said you asked him, these were
7   face-to-face questions?
8       A. Yeah.
9       Q. And you also wrote something to him?
10      A. There was a written inquiry in December.
11  And there was also verbal inquiries from all-hands
12  that resulted in other people sending inquiries in.
13  I think one or two of those may be in my production.
14      Q. Right. I think we'll get to one of those
15  in a minute. Why don't we just stick to your own
16  inquiries.
17      A. Chris Liota was verbal. It was written to
18  a third party.
19      Q. When you say that --
20      A. Wait a minute. Let me think about that
21  written one. I apologize. The written one was to
22  Janice Mahoney.
23      Q. Let's just focus on Mr. Liota.
24      A. They were all verbal inquiries: When are

101

1   the stock option papers coming?
2       Q. Approximately how many inquiries did you
3   make?
4       A. What's that?
5       Q. Approximately how many inquiries?
6       A. Probably one or maybe two after, around the
7   acquisition times. I don't know the exact dates.
8   And then there was one that I probably made at an
9   all-hands in the January time frame.
10      Q. And on each of those occasions you asked
11  Mr. Liota essentially when are the stock option
12  papers coming?
13      A. Sure.
14      Q. What did Mr. Liota tell you on each of
15  those approximately three occasions?
16      A. They are not ready yet.
17      Q. Did you say anything back to Mr. Liota on
18  any of those three occasions?
19      A. I'd like to see them. I don't remember the
20  exact conversations.
21      Q. Sure. As best you can recall.
22      A. At the time: "When can we expect them?"
23  "They are in the works. You will get them when you
24  get them. We'll take care of it."

Brian Mehlman
Volume 1 - August 4, 2005

102

1　Q. Let's move to Lynne Murach, the next person
2　that you've listed here. Who was Lynne Murach?
3　A. She was the VP of engineering.
4　Q. For Network Appliance?
5　A. She was with WebManage and then moved to
6　Network Appliance.
7　Q. And what inquiries during this time frame
8　did you make to Ms. Murach?
9　A. Similar inquiries to Chris Liota, verbal.
10　Q. Verbal?
11　A. Verbal, yeah.
12　Q. And approximately how many inquiries did
13　you make?
14　A. Again, one or two in that time period.
15　Q. Face to face?
16　A. Face to face.
17　Q. You essentially asked her when the stock
18　option paperwork is coming?
19　A. She had her hands in the process.
20　Q. How did Ms. Murach respond?
21　A. Same attitude: "I can't do anything about
22　them. They were in the process. They will come."
23　Q. You respond to Ms. Murach when she said
24　that?

103

1　A. Again, I imagine, "I'd like to see them
2　when I can get them."
3　Q. The next person you listed was Christine
4　O'Neil?
5　A. Yes.
6　Q. Who was Christine O'Neil?
7　A. She was with WebManage, and she was our
8　site administrator and slash HR person, kind of
9　bridging the gap between our HR, because we didn't
10　really have an HR person.
11　Q. An office manager type?
12　A. An office manager type. With her it was an
13　email that I sent in December.
14　Q. What did you see in that email?
15　A. That I wanted to exercise and sell options
16　in December.
17　Q. Did you get a response back?
18　A. I did.
19　Q. What was the response?
20　A. Was that the stock paper -- the response
21　was, Janice Mahoney, that the stock was not
22　available.
23　Q. Janice Mahoney had told her?
24　A. Had told her in the email.

104

1　Q. And you've already talked about
2　Ms. Mahoney. Before you sent her an email, had you
3　spoken to her?
4　A. I don't believe at that time I knew who she
5　was. I believe that was the first time I knew who
6　she was.
7　Q. But you sent Ms. Mahoney the email based on
8　what Ms. O'Neil --
9　A. No. I had sent Christine the email. She
10　forwarded it to Janice. Janice responded to the
11　email. I think that was the progression.
12　Q. I think I've got it here. We can look at
13　it in a minute. Apart from that email, did you make
14　any other inquiries of Ms. Mahoney?
15　A. Over time, yeah.
16　Q. Limited to the date here, before February
17　5, 2001?
18　A. Yes.
19　Q. What other inquiries did you make before
20　February 5, 2001?
21　A. In late January, after Chris Liota had
22　mentioned that we could sell, I tried to get my
23　stock paperwork and still couldn't do it at that
24　point in time.

105

1　Q. When you say you tried to get it, was that
2　a conversation?
3　A. I believe that was a conversation.
4　Q. And what did you say to Ms. Mahoney?
5　A. I don't remember exactly. I mean, I do
6　remember trying to get my assumption papers in that
7　time frame. I kind of looked to her as the keeper
8　of the keys.
9　Q. How did she respond?
10　A. They are coming.
11　Q. How did you respond to that?
12　A. Okay. There's not much.
13　Q. Just trying to see what you recollect of
14　the conversations.
15　A. Right.
16　Q. The last person you've mentioned here is
17　Laura Elgin?
18　A. Yes.
19　Q. She was HR for?
20　A. East Coast, NetApp.
21　Q. Was she based in Massachusetts or somewhere
22　else?
23　A. She was based, I believe, in North
24　Carolina.

28 (Pages 106 to 109)

Brian Mehlman
Volume 1 - August 4, 2005

106

1　Q. And did you make face-to-face inquiries
2　with her?
3　A. Most of the interactions with Laura were
4　around when we actually received them, what do we do
5　to process, stuff like that.
6　Q. I'm not sure I understand your answer.
7　Maybe you can tell me more what you communicated.
8　A. When we received these papers, she was the
9　one, I believe, that delivered them to us.
10　Q. When you say these papers --
11　A. The assumption papers. They were inquiries
12　around the physical assumption papers. I don't
13　believe they were inquiries prior to me meeting
14　Laura when she was giving these option papers.
15　Q. Were your conversations with Ms. Elgin
16　about the timing of receiving the documents or just
17　about the documents themselves?
18　A. The timing of the receiving.
19　Q. What did you ask?
20　A. We had received them. The timing of
21　returning them and what can we do and can we
22　exercise at this point.
23　Q. What did she tell you?
24　A. That once they were signed and put into the

107

1　system and returned --
2　Q. Signed by whom?
3　A. By myself.
4　Q. And how did you respond to her?
5　A. I said okay. I signed them and gave them
6　back.
7　Q. You gave them to Ms. Elgin?
8　A. I don't remember who I gave them to,
9　whoever was taking them at the time.
10　Q. Now, were there any other individuals to
11　whom you made inquiries about exercising vested
12　options or getting information about the stock
13　options during this time frame?
14　A. I don't believe so, not anybody that would
15　have been in a position to do anything about it.
16　Q. What about people who weren't in a position
17　to do anything about it?
18　A. I'm sure there were conversations with
19　co-workers around options.
20　Q. Can you tell me, to the best of your
21　memory, who you had those conversations with?
22　A. I cannot.
23　Q. Maybe you had the conversations, maybe you
24　didn't, but you can't recall?

108

1　A. I can theorize. I had close friends who
2　were there.
3　Q. You're just not sure for a fact?
4　A. That it was -- yes.
5　Q. Did you ever during this time period, going
6　up to February 5, 2001 here, communicate or make a
7　statement to any of these people that the paperwork
8　was supposed to be due to you back on November,
9　whatever day in mid-November you started?
10　A. I didn't make a strong statement. I think
11　along the way I made statements like they should be
12　coming, where are they, but no.
13　Q. Further down in the document when you talk
14　about this late December, early January 2001
15　conversations with Ms. Murach, Ms. Mahoney and
16　Mr. Liota, these are the same communications that
17　you were referring to a moment ago?
18　A. That's correct.
19　Q. And there was an all-hands meeting in
20　January 2001; is that right?
21　A. That is correct.
22　Q. And you also mentioned a phone conversation
23　with Mr. Liota on about the same date?
24　A. That is correct.

109

1　Q. Was the phone conversation before or after
2　the meeting?
3　A. Probably after.
4　Q. Okay. You say the issue was pushed at the
5　all-hands meeting?
6　A. That is correct.
7　Q. What happened at the all-hands meeting?
8　A. People said where are they, where are the
9　option papers, we are expecting them. It was four
10　years ago. There's an email that follows up from
11　it.
12　Q. How many people were there?
13　A. I don't remember. Probably most of the
14　organization.
15　Q. So 50, 60?
16　A. 50. Sometimes we would get them segmented,
17　so engineering, because we didn't have a huge
18　conference room.
19　Q. Did you yourself speak at the all-hands
20　meeting?
21　A. I probably did. I was pretty vocal.
22　Q. Any recollection of what you said?
23　A. No.
24　Q. Did you help plan the all-hands meeting?

29 (Pages 110 to 113)

Brian Mehlman
Volume 1 - August 4, 2005

110

1    A. No.
2    Q. How did you learn that it was happening?
3    A. Probably via an email.
4    Q. Was there any group discussion at the
5    meeting?
6    A. "I'll look into it. It's in process. I
7    don't have an answer."
8    Q. Was there a Q and A, back and forth?
9    A. There was always a Q and A.
10    Q. Do you remember any specific questions that
11    anybody asked?
12    A. "Where are the option papers? We are
13    expecting them."
14    Q. Do you remember the responses to those
15    questions?
16    A. It was a similar response. "They are in
17    process. We are working on them. "
18    Q. You also say you had a one-on-one phone
19    conversation with Mr. Liota around the same date?
20    A. Correct.
21    Q. And you said a moment ago you think that it
22    was after the meeting?
23    A. Correct.
24    Q. What was that about?

111

1    A. I had conversations with him quite often
2    about my job responsibility. Again, where are the
3    option papers. They were taking forever. Then he
4    really pushed it at that point. I think he went and
5    found out what the answer was.
6    Q. You say here there was this email where
7    employees were told that they could exercise
8    options. You say: "However, that statement turned
9    out to be untrue."
10    A. That is correct.
11    Q. What did you mean when you wrote those
12    words?
13    A. Through conversations with Janice Mahoney,
14    it was communicated they were not in a database of
15    some sort, so they still weren't exercisable.
16    Q. When you say in a database, what did that
17    mean?
18    A. So, they -- everything is done by computers
19    these days. I think they have to be transferred and
20    put into a system which then gets managed by, I
21    think it was Solomon Smith Barney at the time.
22    Q. Exhibit 7 is a document with Bates number M
23    26 to M 27?
24    (Marked, Exhibit 7, Bates M 26 to M 27.)

112

1    Q. Is this one of the emails that you were
2    speaking about a moment ago?
3    A. That is correct.
4    Q. It looks like you've got -- there's a chain
5    of emails here?
6    A. That is correct.
7    Q. It looks like you were involved on the
8    second to the top?
9    A. That's right.
10    Q. And that's your writing there that begins
11    "Christine" and ends "Thanks, Brian"?
12    A. Correct.
13    Q. It is forwarded to other people that also
14    includes you afterwards?
15    A. Correct.
16    MR. GRAVES: Exhibit 8 is a document
17    bearing Bates number M 26 to M 27.
18    (Marked, Exhibit 8, Bates M 26 to M 27.)
19    Q. Take a moment and tell me if you recognize
20    that document.
21    A. I do.
22    Q. What is this document?
23    A. This is the document that Chris Liota sent
24    out after the all-hands.

113

1    Q. This is the email dated January 19, 2001
2    that you referred to in your answer to Number 2 on
3    Exhibit 1?
4    A. I imagine so. What page was it on?
5    Q. Page 3, down toward the bottom.
6    A. Yes.
7    Q. It says here in the email, quote:
8    "Employees may exercise any portion of their vested
9    shares by contacting Jan Mahoney," and it gives a
10    number; is that correct?
11    A. That's correct.
12    Q. Did you call Ms. Mahoney after you got the
13    email?
14    A. I did.
15    Q. That's the discussion that you had with
16    Ms. Mahoney where you said in your response to
17    Number 2 that this statement turned out to be
18    untrue?
19    A. That's correct.
20    Q. Did you call her right after you got the
21    email?
22    A. It was in that time frame.
23    Q. So soon afterwards?
24    A. Yeah.

30 (Pages 114 to 117)

Brian Mehlman
Volume 1 - August 4, 2005

114

1    Q. Back on Exhibit Number 1, if you turn the
2    page, up at the top you say that you were unable --
3       A. Exhibit 1?
4       Q. Page 4, at the top, turn to the top of page
5    4, you say: "Plaintiff," meaning yourself, "was
6    unable to exercise the options until at least early
7    February 2001"?
8       A. That's correct.
9       Q. What did you mean by that statement there?
10      A. It was really when we got the assumption
11   papers, that's when the transfer happened.
12          MR. GRAVES: Exhibit 9 is a document
13   with Bates number M 271.
14          (Marked, Exhibit 9, Bates M 271.)
15      Q. If you can take a moment and let me know if
16   you recognize that document.
17      A. Yeah.
18      Q. What is this document here?
19      A. This is something when I was preparing to
20   meet with the lawyers.
21      Q. It is a bunch of dates. There's some stock
22   price and events that you've listed here?
23      A. Yes.
24      Q. For the date January 22, 2001, it says

115

1    28,000 could actually exercise?
2       A. Correct.
3       Q. What does that mean?
4       A. Which date, sorry.
5       Q. Next to the last, January 22?
6       A. I believe I would have to go look at the
7    dates, but I think the 22nd was a Monday following
8    the 19th. So it was just -- I just assumed that we
9    couldn't do it on the day. This was going back
10   through the dates just informally to understand the
11   process. This was at a much later date that this
12   was formulated.
13      Q. So you didn't write this in 2001?
14      A. No, this was in preparation between me and
15   the lawyers.
16      Q. Let's make sure. Is this something that
17   you wrote that was intended to be shared as a
18   communication only with your lawyer.
19      A. I mean, I don't care. But this was
20   prepared at a much later date. It is just a rough
21   schedule.
22          MR. ROSENBLATT: Let me clarify. My
23   understanding about this document is that it was not
24   a communication with counsel. That's why it was

116

1    produced. And this was something that was
2    prepared -- if Mr. Mehlman's testimony is different,
3    then we have an inadvertent disclosure. But my
4    understanding of producing this document is that
5    this was prepared prior to meeting with counsel.
6       A. Just to clarify, I met with other counsel
7    prior. This was probably -- I don't remember the
8    exact date that this was prepared. This was a later
9    document. And it was just to articulate the time
10   lines in this to the best of my recollection.
11          MR. GRAVES: Why don't we go off the
12   record for a couple of minutes to figure this out.
13      A. Sure.
14          THE VIDEOGRAPHER: The time is 11:59.
15   We are off the record.
16          (Discussion off the record.)
17          THE VIDEOGRAPHER: The time is 12:02.
18   We are back on the record.
19          MR. GRAVES: After an off-the-record
20   with myself and Mr. Rosenblatt and Mr. Mehlman, we
21   have determined that this document was inadvertently
22   produced and for that reason we are going to strike
23   all the questions on Exhibit 9 in the transcript as
24   if they didn't happen. We have also withdrawn the

117

1    Exhibit 9 and something else will now become Exhibit
2    9.
3          (Marked, Exhibit 9, Bates M 271,
4    withdrawn.)
5       Q. Back before we started talking about that
6    document, we were talking in general about a call
7    you made to Ms. Mahoney and an email that you
8    received on January 19, I think it was a Friday,
9    January 19?
10      A. I believe it was a Friday.
11      Q. The email may tell you.
12      A. Friday the 19th.
13      Q. So there's a weekend of the 20th and 21st.
14   Then there's the last or next to the last week of
15   January. After you spoke to Mrs. Mahoney and you
16   mentioned that in your interrogatory responses, did
17   you arrive at any understanding as to when the
18   shares could be sold?
19      A. The option papers were forthcoming. My
20   understanding at the time is that it was still tied
21   to the conversions.
22      Q. And when you say tied to the conversions,
23   what does that mean?
24      A. The paperwork, so they could get it into

FARMER ARSENAULT BROCK, LLC

**EXHIBIT B – PART 2**

Brian Mehlman
Volume 1 - August 4, 2005

118

1    the system. It may have been in the system prior
2    to. When I communicated, I don't remember the exact
3    date, probably in this time frame, that I still
4    couldn't, that we didn't receive the paperwork. To
5    me, it was the paperwork that I wanted. Once you
6    receive the paperwork, it's my decision to do what I
7    want with them.
8        Q. Do you yourself know if the paperwork was
9    put into the database and done in late January, the
10   last week of January?
11       A. Late January was my understanding.
12       Q. Did you exercise those of your options that
13   were vested once you -- once the paperwork was done?
14       A. I did not.
15       Q. And did that have anything to do with the
16   NASDAQ values at that point?
17       A. It did.
18       Q. There had been -- I guess the recession was
19   bringing the NASDAQ down for a lot of people at that
20   point?
21       A. That is correct.
22       Q. Network Appliance, like a lot of other
23   companies, suffered a decline in its NASDAQ values
24   around early 2001?

119

1        A. That is correct.
2        Q. You are not contending in this lawsuit, are
3    you, that Network Appliance did anything unethical
4    or wrong that caused its stock values to go down?
5        A. No.
6        Q. Eventually at some point you did exercise
7    at least some of those options?
8        A. That is correct.
9        Q. You exercised some or all of them?
10       A. I'd have to go back to the numbers. A lot
11   of them stayed under water. I don't think it was
12   all of them. I don't know what the total number was
13   that I sold. We could go back and look.
14           MR. GRAVES: I'm going to mark now
15   Exhibit 9, the document with Bates number M 181.
16           (Marked, Exhibit 9, Bates M 181.)
17       Q. Do you recognize this document?
18       A. I do.
19       Q. What is this document here?
20       A. It is a sale of some options.
21       Q. These are NetApp options?
22       A. They are.
23       Q. When was the sale?
24       A. It has to be on here somewhere. 12/05/01.

120

1        Q. Were these options that were based on the
2    WebManage acquisition, or were these other options
3    that you got from NetApp?
4        A. Hold on. I believe these were incentive
5    options. The strike price is different.
6            MR. GRAVES: Exhibit 10 is a document
7    with Bates number M 182.
8            (Marked, Exhibit 10, Bates M 182.)
9            MR. GRAVES: Exhibit 11 is a document
10   with Bates number M 183.
11           (Marked, Exhibit 11, Bates M 183.)
12       Q. Do you recognize these documents?
13       A. I do.
14       Q. Are these also sales that you made of
15   Network Appliance shares?
16       A. These are also the incentive options.
17       Q. So none of these come from the WebManage-
18   related shares?
19       A. No. No, I do not believe so.
20       Q. Why did you choose to sell the options that
21   you got from the incentive options on these dates?
22       A. I'm honestly not sure if I can tell you. I
23   was above water. I don't know.
24       Q. When you say above water, what does that

121

1    mean?
2        A. It means that the strike price was lower
3    than the stock price on that day.
4        Q. So you could make a profit?
5        A. Some profit.
6        Q. Taking into account taxes and all that?
7        A. Yes.
8            MR. GRAVES: Exhibit 12 is going to be
9    document M 190.
10           (Marked, Exhibit 12, Bates M 190.)
11       Q. If you could look at this and tell me what
12   it is.
13       A. Yeah.
14       Q. What is that document?
15       A. So something that was compiled in the
16   September -- I'm guessing in the September time
17   frame of '00. It was just a record of my assets at
18   that given time.
19       Q. So you created this document?
20       A. I created this document.
21       Q. And this is a summary of your, at least
22   some of your financial assets?
23       A. Yes.
24       Q. During what time period?

32 (Pages 122 to 125)

Brian Mehlman
Volume 1 - August 4, 2005

122

1    A. I'm guessing, because it is not dated, I'm
2  guessing it was in the September of, '00 time frame.
3    Q. If you look over on the second page, 191,
4  some of these dates go all the way through November
5  2004?
6    A. Yeah, just forward-looking.  It is based on
7  my vesting schedule of my options.  This last part
8  are options.  The box is vested.
9    Q. Is everything on Page 191 -- tell me what
10  these columns represent on this page.  Is this a
11  continuation from Page 190 or is this something
12  different?
13    A. It is a continuation from 190.
14    Q. How do I read it?
15    A. The vest date column is when that pool of
16  shares become vested.  The third column is the
17  strike price.  The second to last column was the
18  proceeds, or proposed proceeds.  The right-hand one
19  is the actual proceeds.  So this was done around the
20  time that I got the contract, based on the numbers
21  that I knew, based on NASDAQ on that day.
22    Q. All right.  Let's look at the last two
23  columns there.  For example, what is the 5225 there?
24    A. 5225 was the proceeds from -- you can see

123

1  that the numbers weren't terribly accurate.  If you
2  go to the -- if you go back to my options, there was
3  a pool that were granted at 9.84.  So the 9.50 was
4  just a rough back-of-the-seat calculation at the
5  time.
6    Q. If you can look back to Exhibit 1, which is
7  your interrogatory responses.
8    A. Yeah.
9    Q. Look on Page 4, please.  Is this a summary
10  of the sales and trades that you made?
11    A. No.  I'm sorry.
12    MR. ROSENBLATT: I don't think he
13  finished.  Wait, wait.  I don't think he finished
14  his question.
15    THE WITNESS: Right.
16    Q. We have to make sure that we finish so that
17  it is clear.  Is this an accurate list of all the
18  sales and trades that you made of NetApp and
19  WebManage shares since January 1, 2000, on Page 4?
20    A. It is my understanding, yes.  Did we miss
21  one?  I don't know.  But it is my understanding.
22    Q. And you notice here that you've got
23  categories such as employees stock purchase?
24    A. Mm-hmm.

124

1    Q. WebManage options?
2    A. Mm-hmm.
3    Q. NetApp incentive options?
4    A. Mm-hmm.
5    Q. What's that first category, employee stock
6  purchase?
7    A. One of the benefits is that we could buy
8  into, we could put money into a pool and then the
9  stock got bought at some formula.  It was a part of
10  the benefits package.
11    Q. And the incentive options were the bonuses
12  that you would get from Network Appliance that
13  you've already described?
14    A. That is correct.
15    Q. WebManage options, that means the package
16  of options that you received based on the
17  acquisition?
18    A. That is correct.
19    Q. Why did you choose June 2, 2003 as the
20  first date to sell any of the WebManage options?
21    A. I don't know.  At that time the conditions
22  seemed right.  I buy and sell stock all the time.  I
23  don't really have -- I wish I was more mathematical
24  about it sometimes.

125

1    Q. I thought there was some event that caused
2  you to do it that day?
3    A. No, not to my recollection.
4    Q. In doing the stock trades that you just
5  mentioned, do you typically keep track of how the
6  NASDAQ is doing?
7    A. Sometimes.
8    Q. And did you keep track over time how NetApp
9  stock was doing on the NASDAQ?
10    A. Sometimes, sure.
11    Q. How often did you check?
12    A. Regularly.  I mean, it is in my Yahoo stock
13  thing.
14    Q. The Yahoo finance thing?
15    A. Sure.
16    Q. Did you have it set up to get updates on
17  the stock price?
18    A. Un-huh, I wasn't that into it.
19    Q. Does that mean you checked it weekly, twice
20  a week?
21    A. Twice a week would be a good number.
22    Q. It hit a real low at one point, maybe 10 or
23  $9 even?
24    A. I think it went down to 6 at one point.

Brian Mehlman
Volume 1 - August 4, 2005

126

1    Q. Maybe starting in 2002 it started to
2    rebound?
3       A. A little bit.
4       Q. And it has hit, at some point since then,
5    it has gotten up to 40 and been down to 25 and it is
6    within those ranges?
7       A. I don't remember 40, it might have.
8       Q. Close to 40, upper 30s?
9       A. That might have been after I left. I'm not
10   sure.
11      Q. On June 2nd, 2003 was the NetApp stock
12   price on the NASDAQ as high that day as it had been
13   on other days previous in 2003 and 2002?
14      A. I don't know.
15      Q. Were you electing to -- strike that. Were
16   you waiting on a day to sell your WebManage
17   options -- let me finish. Were you waiting for a
18   day when the stock price was a good price on the
19   NASDAQ to sell?
20      A. Most of my stock sells are, you know, I
21   pick a price. That might have been a limit order;
22   when it hits 25, sell. I'm guessing a couple of
23   these were limit orders. I just would pick a
24   number. I don't think there's any rhyme or reason

127

1    to it.
2       MR. GRAVES: It is 12:15 now. I was
3    going to suggest a break.
4       MR. ROSENBLATT: Off the record.
5       THE VIDEOGRAPHER: The time is 12:16.
6    We are off the record.
7       (A luncheon recess was taken.)
8
9
10
11
12      AFTERNOON SESSION
13      THE VIDEOGRAPHER: The time is 12:47.
14   We are on the record.
15      Q. Mr. Mehlman, earlier today we were looking
16   at Exhibit 12. If you look at that one.
17      A. Yes.
18      Q. On Page 191, you were telling me what the
19   column started with 5225 represented.
20      A. Yes.
21      Q. Can you tell me what the next one that has
22   4275, what that refers to?
23      A. I'm not sure if I told you what that column
24   was. That column I believe is the price to buy the

128

1    options. I think the one to the right is the
2    proceeds. I'm not a hundred percent sure. I would
3    have to go do the math. I don't know what -- it
4    must have fallen off the spreadsheet. I did this
5    based on a particular stock price on a particular
6    day.
7       Q. So there's --
8       A. You can do the math pretty easily.
9       Q. So there's more to this document than
10   what's here?
11      A. There's probably a number which is off the
12   document. You can figure it out by dividing -- I
13   have to do the math. What would it be? 9.5 into
14   5225, I believe, would tell you what the stock price
15   was that this calculation was done at.
16      Q. What is the box that you have drawn around
17   some of the entries?
18      A. Vested versus unvested.
19      Q. When you get home today, can you look and
20   see if there's more to this document?
21      A. It was a hard copy only. I don't believe I
22   have a soft copy of it. It was a number just in the
23   spreadsheet to calculate this column.
24      Q. You had mentioned also at some point today

129

1    that you had other investments. I think that this
2    document on Page 190 shows what are other
3    investments?
4       A. At this time.
5       Q. This is 2000?
6       A. This is 2000.
7       Q. On Page 190, is it correct to say that this
8    represents the holdings for different companies and
9    various other investments that you had at that time
10   period?
11      A. Yeah.
12      Q. And I think you mentioned also that you at
13   least through 2003 made trades sometimes for
14   different stocks?
15      A. Sure.
16      Q. When did you -- I think you also mentioned
17   this morning there was a point in time, maybe back
18   in the mid-'90s, when you weren't so familiar with
19   stock options and things like that?
20      A. That's correct.
21      Q. And at some point in the mid to late '90s
22   you became more familiar with markets and stock
23   options and things like that?
24      A. Sure.

34 (Pages 130 to 133)

Brian Mehlman
Volume 1 - August 4, 2005

130

1  Q. When did you start getting involved in
2  buying stocks of different companies?
3  A. A good question. Since I have been in New
4  Hampshire, probably after I left HP, probably in the
5  time frame that I worked for Fidelity.
6  Q. Mid to late '90s?
7  A. Sure. Probably.
8  Q. Could have been. Do you use brokers or did
9  you do it all yourself?
10  A. I used a broker.
11  Q. Do you, for example, place orders with
12  brokers during the day based on prices that you see
13  on different markets?
14  A. I'm not a day trader. I have a broker. He
15  may call and say I think you should do this and I
16  either will or won't.
17  Q. Did you initiate the contact yourself the
18  contact with the broker to say I'd like to buy or
19  sell a particular share?
20  A. From time to time.
21  Q. On occasions you've done that, did you look
22  at things like the price of a particular stock on a
23  market like the NASDAQ?
24  A. Yes.

131

1  Q. During the time that the markets are open,
2  the NASDAQ or any other similar market, is it your
3  understanding that the market price kind of goes up
4  and down during the course of the day?
5  A. That is correct.
6  Q. So there's an opening and a close?
7  A. That is correct.
8  Q. There's also something that's sometimes
9  referred to as a high?
10  A. That is correct.
11  Q. And typically in this time period that this
12  document Exhibit 12 represents, how often did you
13  look into your different investments?
14  A. I actually think that this was done at this
15  point in time. In probably the year prior to this I
16  had switched investment firms, so just as a
17  preparation for them. And I have just kept it
18  active since then.
19  Q. For example, during this time period when
20  you had these different holdings, did you look at
21  markets for your different shares weekly, monthly,
22  daily? What was the frequency?
23  A. To be honest, not too often. It was in
24  this time frame that I enlisted a broker for

132

1  something called managed services where I pay them
2  to watch my account. It was about a year prior to
3  this. For the most part, they will watch it for me.
4  Once in a while they will pick a stock to get into
5  but it will be for different reasons.
6  Q. Aside from communications with your broker,
7  did you ever out of curiosity, during this time
8  period that we're talking about, did you ever look
9  on the Internet to see how your shares were doing
10  for different holdings?
11  A. Sure, on occasion.
12  Q. Did you ever have any occasion on any of
13  these holdings for these companies or any other
14  companies' stocks that you have held, did you ever
15  wish that you had sold on a day where it was higher
16  then the day that you really did sell?
17  A. I don't believe that -- did I have times
18  where I lost money in the stock market? Yes. I
19  don't think I ever went back and said, Oh, I should
20  have sold it on that day.
21  Q. And without regard to a specific day, did
22  you ever have a wish after you lost money, that you
23  had sold at a time where a loss wouldn't have been
24  as great?

133

1  A. No.
2  Q. You never wished you sold off everything
3  before it started to go down or anything like that?
4  A. We all kind of have that. But I mean --
5  this is long haul. Mostly stock is long haul.
6  Q. Did you have any investments during dot-com
7  period that stocks were losing money?
8  A. There were a few that I lost money. One of
9  them is on here.
10  Q. Which one is that?
11  A. CMGI.
12  Q. I guess Lucent was probably going down
13  during that period too?
14  A. Lucent is probably one too.
15  Q. Did you ever sell off any shares during the
16  dot-com period that had gotten really low?
17  A. I'm sure I did for a loss at some point.
18  Q. So those were the losses that you were
19  referring to or were there others that you meant to
20  say too?
21  A. Can you repeat the question?
22  Q. You mentioned a few minutes ago that you
23  had some losses at one point. Were those losses
24  during the dot-com period that you just referred to

Brian Mehlman
Volume 1 - August 4, 2005

134

1  or were those --
2    A. For as long as I've been doing stocks I've
3  had gains and losses.
4    Q. And has your involvement with holding
5  stocks continued through the present?
6    A. Yes.
7    Q. You still use a broker?
8    A. Yes.
9    Q. You mentioned at one point that you changed
10  broker, but you're still using --
11    A. -- a broker, yes.
12    Q. Focusing on your NetApp shares and
13  specifically the ones that came to you as a result
14  of the WebManage acquisition, isn't it true that you
15  could have actually sold them on dates when the
16  stock was higher than it was on June 2, 2003?
17    A. Can you repeat the dates?
18    Q. You had mentioned in one of your
19  interrogatory responses that you had sold some on
20  June 2nd, 2003?
21    A. That is correct.
22    Q. Isn't it true that you could have sold them
23  on dates when the NASDAQ share value was higher than
24  it was on June 2nd, 2003?

135

1    A. I would have to go back and look at the
2  date, the stock fluctuation between receiving them
3  and selling them. I imagine there were some highs
4  in there higher than what I sold them at, yes.
5    Q. For example, in mid-February 2001 the share
6  price had gone down from what it was earlier but it
7  was nevertheless higher than it was at later points;
8  is that correct?
9    A. That is correct.
10    Q. So if you had sold them in mid-February --
11  those that were vested in February of 2001, you
12  could have made more money than you did make by
13  selling them on later dates when the price had
14  fallen?
15    A. That is a true statement.
16    Q. In your lawsuit here in regard to the
17  damages you are claiming in your lawsuit against
18  Network Appliance, are you saying that Network
19  Appliance should be responsible for the differences
20  between the dates that you did sell and that you
21  could have sold?
22    A. No. Repeat the question.
23    MR. GRAVES: Can you read it back,
24  please.

136

1    (Question read by the reporter.)
2    MR. GRAVES: Let me rephrase the
3  question.
4    Q. In your lawsuit against Network Appliance,
5  are you saying that Network Appliance should be
6  responsible for the difference between the stock
7  price on the day that you did sell and the stock
8  price on days that you could have sold but cannot
9  sell?
10    MR. ROSENBLATT: Objection as to form.
11    A. Can you rephrase the question?
12    Q. Let's break it down into pieces to make it
13  easier to understand.
14    A. Sure.
15    Q. As part of your accusation in the lawsuit,
16  you are claiming money damages.
17    A. That is correct.
18    Q. What I'm trying to find out is, are you
19  claiming that Network Appliance should have to pay
20  you money for the specific amounts of money that are
21  the differential between the money you got on the
22  dates you did sell and the money you could have
23  gotten on days that you could have sold but chose
24  not to?

137

1    A. That's something that happened after
2  receiving the stock. The answer is no. It is the
3  differential before receiving the stock according to
4  the contract.
5    Q. Just wanted to make that clear.
6    Let's back up and I want to make sure
7  that I summarize correctly what your contentions are
8  with regard to the offer letter we talked about
9  earlier. I'm going to go through this, and let me
10  know if anything is wrong --
11    A. Okay.
12    Q. -- if I've left anything out. I want to
13  make sure it is complete. As to your vested
14  shares -- I'm going to break this between vested and
15  unvested. As to your vested shares, your contention
16  in the lawsuit is that on the date of the closing,
17  on the date that you became an employee for Network
18  Appliance, you should have had all the different
19  paperwork that would have allowed you to sell those
20  of your vested shares as of that point?
21    A. That is correct, with a little bit of
22  leeway because of approximate dates, but yes.
23    Q. And as to the unvested shares, the
24  contention is a little bit different. Let me make

36 (Pages 138 to 141)

Brian Mehlman
Volume 1 - August 4, 2005

138

1  sure I've got this correct.
2      A. Sure.
3      Q. As to the unvested shares -- and by
4  unvested I mean those that did not become vested
5  until later points in time -- your contention is
6  that you should have been able to get the paperwork
7  on the day that you became an employee in order to
8  lock in a specific strike price so that in the
9  future when you sold those unvested shares after
10  they became vested you would have been able to take
11  advantage of that strike price; is that accurate?
12      A. It's a little bit more than that.
13      Q. Okay.
14      A. It is the strike price, the number of
15  shares and their value on that day, so, yes. So
16  it's not just the strike price, it is the quantity
17  as well.
18      Q. Let's walk through that carefully. When
19  you say quantity, what do you mean?
20      A. So you calculate the value of an option by
21  taking the stock price on that day less the strike
22  price and multiplying it times the quantity of
23  shares. So on that day I would have expected that
24  formula, the day that I signed the options, would be

139

1  in the ballpark of what the contract stated.
2      Q. And in addition to the quantity, I think
3  you mentioned one more thing, strike price, quantity
4  and anything else?
5      A. Those are the two more important factors,
6  yes.
7      Q. Did I leave anything out of that summary?
8      A. There's the strike price, the quantity, and
9  then the value which can be calculated on the day
10  you lock into your options.
11      Q. And that value is in that calculation?
12      A. Is of the stock market on that day.
13      Q. Has anything been left out?
14      A. No.
15      Q. Let me just -- to help walk through this,
16  why don't we mark Exhibit 13. This is the page off
17  of the Yahoo Finance. It doesn't have a Bates
18  number?
19          (Marked, Exhibit 13, Yahoo Finance
20  page.)
21      Q. If we move to the second page at the
22  bottom, this is a list of stock prices for NetApp
23  for different dates off the Yahoo Finance. If you
24  look at the bottom, it says November 15, 2000?

140

1      A. Yeah.
2      Q. Which I think was the day that you started?
3      A. Sure.
4      Q. We've got the open, the high, the low, the
5  close. And based on your knowledge of stock
6  markets, that's the sort of ups and downs of a stock
7  price on a particular day?
8      A. That is correct.
9      Q. Is it your contention, then, that as you
10  receive the 7600-odd stock options that we're
11  talking about in this case that you would have been
12  able to sell those that were vested according to the
13  fluctuations of the market on this day?
14      A. I'm not going to -- I don't think I would
15  make a claim either way. I would make a claim that
16  on that day I should have had the option papers
17  reflecting market conditions on that day.
18      Q. Walk me through what you mean by that. I'm
19  not sure I understood.
20      A. There's a piece of paper which is the
21  option assumption agreement which to me locks in the
22  agreement of those, of that stock. That, to me,
23  reflects back to the conversion, which reflects back
24  to the contract, which means I would have expected

141

1  to be locked in around that time frame. And
2  depending on the fluctuations after that point in
3  time, I would be affected.
4      Q. To be clear here, if -- is it your
5  contention -- I think I follow what you said. Is it
6  your contention that had you gotten the documents
7  that you contend you were entitled to on November 15
8  that you should have been in a position on the 15th,
9  had you so chosen, to go and try to make a sale in
10  the market that day?
11      A. In theory for vested shares, yes.
12      Q. And in fact if we do the math for these
13  various during the day prices and multiply them by
14  7605, they do come out to either a little above or
15  below 600,000. Is that right? I can do the
16  calculation.
17      A. I think it would be less. As I said, the
18  deal was done at I think a hundred dollars. So it
19  would be less. It would probably be around -- on
20  this particular day, 450. I don't know what the
21  math is, but we could go do it.
22      Q. What I'm getting at is, if I take the
23  opening, the high, or the close, and I multiply it
24  by 7605, some of them come out above 600,000, 620 or

Brian Mehlman
Volume 1 - August 4, 2005

142

1  something?
2      A.  But you've got to subtract the strike price
3  times the same number.
4      Q.  I understand.
5      A.  But, yes.
6      Q.  I'm just using this as an exercise to get
7  to your beliefs here.
8      A.  Sure.
9      Q.  Your belief is, if I understand you
10  correctly, that had you so chosen, you should have
11  been able to go out on market and take advantage of
12  these prices here as of November 15 if you wanted
13  to?
14      A.  I was locked in, that would have locked me
15  into the value.
16      Q.  When you use the phrase locked in, tell me
17  again what that means to you.
18      A.  Again, whenever I signed for stock options,
19  there's a piece of paperwork that says the value --
20  the quantity and the strike price.  On that day I
21  typically agree that this is what I'm agreeing to.
22  I wasn't given the luxury of that piece of paperwork
23  on the day that contractually I was told I was going
24  to receive it, so I couldn't physically — I wasn't

143

1  given it.  I was not given it.
2      Q.  Just to get some of the details clear, were
3  we back on November 15th and had you gotten the
4  paperwork that you contend you should have gotten
5  that day, are you saying that you should have been
6  able to sell at these types of prices here and
7  receive the proceeds minus the stock price --
8      A.  For vested shares.
9      Q.  -- minus the strike price?
10      A.  For vested shares, yes.
11      Q.  So you are backing out the strike price for
12  your net income?
13      A.  Yes.
14      Q.  When you claim damages in this lawsuit, by
15  damages I mean the amount of money that you believe
16  Network Appliance should pay you, are you backing
17  out the strike price from the income that you are
18  claiming that you would have received, or not?
19      A.  I do believe I did, yes.
20      Q.  Let's look back at Exhibit 1.
21      A.  Yes.
22      Q.  If you turn on Page 5.
23      A.  Yes.
24      Q.  There's an Interrogatory Number 5.  It asks

144

1  you to describe in detail all of the damages that
2  you are claiming here.
3      A.  Yes.
4      Q.  You wrote out an answer that goes on to
5  Page 5 and 6?
6      A.  Yes.
7      Q.  You say in excess of $450,000?
8      A.  That is correct.
9      Q.  And that number that you calculated backs
10  out the strike price that you would have had to pay?
11      A.  That is correct.
12      Q.  How did you calculate that number, 450?
13      A.  It was pretty simple.  The contract said
14  600,000 around the close.  And on the day I received
15  the stock option papers, I did the calculation of
16  the three numbers, the quantity, the strike price
17  and the stock on that day.  It comes out to about
18  157,000.  So I subtracted the two.  It comes out to
19  450 K.
20      Q.  Let me see if I follow.  Would the strike
21  price had been different on the vested and unvested
22  shares on November 15th than it was on the day in
23  January, whatever it was, that you got the
24  paperwork?

145

1      A.  Only if they had done an adjustment.
2      Q.  And when you say adjustment, what does that
3  mean?
4      A.  You either adjust the strike price or
5  adjust the number of shares to be commensurate with
6  the value that they had set in the contract, which
7  they sometimes do.  I'm under the understanding that
8  sometimes companies will adjust a strike price or
9  grant more shares when something has changed
10  dramatically to affect something like this that was
11  a contract.
12      Q.  But the offer letter didn't say that they
13  would adjust the strike price, did it?
14      A.  That's why we are here.
15      Q.  Your contention is that they should have
16  adjusted the strike price.
17      A.  That is my contention, or granted more
18  shares or done something to make up the difference
19  from what they told in the contract and what they
20  physically delivered to me on the day I received my
21  stock assumption papers.  It was a really long
22  delay, too long a delay.
23      Q.  How much money have you made from those
24  shares that you sold of Network Appliance?

38 (Pages 146 to 149)

Brian Mehlman
Volume 1 - August 4, 2005

146

1    A. Those particular shares?
2    Q. The acquisition-related ones.
3    A. I don't know the complete number. It was
4    well under -- it was all in my discovery. I think
5    it is 40 K or less range. I don't know the exact
6    number.
7    Q. And have you sold all of those shares that
8    you vested that derived from that acquisition?
9    A. I sold off, I think, most all of them that
10   were at some point above water during my tenure at
11   NetApp. There were some that I had to relinquish
12   when I left because they were under water.
13   Q. That was my next question. Did you give up
14   any unvested shares when you left the company?
15   A. There were a few.
16   Q. From the acquisition?
17   A. Not from -- yes, yes.
18   Q. Did you give up any vested shares for any
19   reason when you left the company that related back
20   to the WebManage acquisition?
21   A. I would have to go look. I don't know.
22   Q. You're not including the value of shares
23   that you had to relinquish when you left in the
24   damages that you are claiming, are you?

147

1    A. No. It was all done, upfront calculations
2    based on the contract and the values in the
3    contract.
4    Q. So if you didn't work long enough to get
5    all of the shares vested, then that wouldn't be part
6    of what you're claiming in the lawsuit?
7    A. I stayed pretty much through the full
8    vesting period. I might have been one year shy. I
9    can't remember if I stayed at NetApp four years or
10   three years.
11   Q. Whatever the numbers were, there were a few
12   at least?
13   A. There might have been a few. I don't know
14   the exact numbers.
15   Q. And for those numbers, whatever they are,
16   you are not including that as part of the lawsuit?
17   A. I would probably have to remove those from
18   it, yeah.
19   Q. You left Network Appliance sometime in
20   2004?
21   A. That is correct.
22   Q. Why did you wait until December 2004 to
23   file the lawsuit?
24   A. I was still working for Network Appliance.

148

1    I didn't want to have some sort of punitive response
2    to filing the lawsuit against the company I was
3    working for.
4    Q. We talked about some interrogatories
5    earlier where you went through the chronology of
6    people that you talked to at different points in
7    time. Let's look at the post February 2001 time
8    period.
9    A. Yes.
10   Q. I think you were at Network Appliance for
11   probably three years after that?
12   A. That's correct.
13   Q. Did you after that point ever tell Network
14   Appliance, hey, you guys owed me X, Y and Z back in
15   2000?
16   A. I didn't. It didn't really occur to me
17   that there was an issue until sometime later.
18   Q. How did you come about that it occurred to
19   you?
20   A. So, I had mentioned at one point that I had
21   worked for another individual. I actually didn't
22   mention it. There was a person on the M&A team that
23   I eventually came to work for. His name is Dan
24   McCormack. It was kind of a dotted-line management.

149

1    But off-the-cuff conversation, we got into the
2    acquisition and things about it. Things started to
3    click that maybe there was, maybe there was
4    something wrong in the way that they handled the
5    options and the option papers. It was the January
6    of 2003 ballpark. So at that point I started
7    thinking about it. At that point I had a few
8    conversations with other people. I came to the
9    conclusion that something was not quite right.
10   I learned other things about the
11   acquisition that would lend me to believe that there
12   was some neglect on the part of filing the S8
13   against what was agreed upon in the merger. So I
14   started to pursue it. Then I met and had a lawyer
15   and we are here.
16   Q. I don't want you to tell me about any
17   communication with any lawyers. When did you have
18   this communication with Mr. McCormack?
19   A. I would have to go back and figure out when
20   I worked for/with him. I have to think. 2001;
21   2002; a year and a half. It would have been early,
22   early 2003.
23   Q. And was he working for Network Appliance?
24   A. Yes, he was working for Network Appliance.

Brian Mehlman
Volume 1 - August 4, 2005

150

1     **Q. What did he tell you exactly that led**
2 **you --**
3     A. You know, we were conversing about the
4 acquisition and how I hadn't made any money off my
5 options at the time. Just through the conversation
6 I got the impression, I don't know exactly what
7 transpired, but it kicked off in my mind that
8 something may not have been quite right. I went
9 back, looked at my contract and looked at the dates
10 and assessed what was going on. I said, well, there
11 really was a big discrepancy here. I always knew
12 that I didn't make any significant money.
13     **Q. I think you mentioned a moment ago that you**
14 **talked to some other people too, not just**
15 **Mr. McCormack?**
16     A. Yes.
17     **Q. Who else did you speak to?**
18     A. At some point after that date,
19 conversations with Vijay Basani, who was the CEO.
20     **Q. Were you still working with him?**
21     A. No, I think he had departed at that point.
22     **Q. Did you contact him or he contact you?**
23     A. I contacted him.
24     **Q. What did you talk to Mr. Basani about?**

151

1     A. Is there an issue here? He told me that
2 potentially there could be an issue here, go off and
3 look into it. And I did.
4     **Q. Did you talk to anybody else?**
5     A. There may have been informal discussions
6 with maybe some other stockholders -- I mean not
7 stockholders but employees. Most of them had left
8 by that point. A lot of them had already signed
9 away all their rights to anything. I had some
10 conversations with some coworkers.
11     **Q. Do you remember any particulars about those**
12 **conversations?**
13     A. No. I can remember some of the folks that
14 I probably talked to that were in similar positions.
15     **Q. Who were they?**
16     A. I probably had conversations with Marty
17 Takessian, who was a product manager like myself.
18     **Q. Do you know how to spell his name?**
19     A. T A K E S S I A N. Wait a minute, T A K E
20 S S I A N.
21     **Q. Do you remember anybody else other than**
22 **Mr. Takessian?**
23     A. I had conversations with Rich Destrempe, D
24 E S T R E M P E. Those were probably the closest

152

1 people that I had conversations with.
2     **Q. You mentioned something about the merger**
3 **contract?**
4     A. That's correct.
5     **Q. The acquisition contract?**
6     A. That's correct.
7     **Q. Between WebManage and Network Appliance?**
8     A. Yes.
9     **Q. You weren't part of that contract yourself?**
10     A. No. Indirectly I was, sort of. But the
11 company I was with got bought.
12     **Q. I understand. What I meant is, you are not**
13 **a party to or --**
14     A. No, signing, negotiations, no.
15     **Q. Did Network Appliance promise to you in a**
16 **contract that they would file the S8 SEC document by**
17 **any particular date?**
18     A. I think the term was "promptly" or
19 something to that effect.
20     **Q. In a contract with you?**
21     A. No, in the merger agreement.
22     **Q. So Network Appliance did not promise to you**
23 **any date on which they would file the S8.**
24     A. No, but I don't think it is pertinent in

153

1 the end, but no.
2     **Q. You said they mentioned in a document that**
3 **they would file promptly?**
4     A. Promptly.
5     **Q. Did it give a date?**
6     A. It did not.
7     MR. GRAVES: Why don't we take a
8 five-minute break. We are close to being done.
9     THE VIDEOGRAPHER: Off the record at
10 1:17.
11     (A recess was taken.)
12     THE VIDEOGRAPHER: The time is 1:22. We
13 are on the record.
14     **Q. You mentioned earlier this morning that in**
15 **your offer letter there was a reference to the**
16 **acquisition closing approximately or around October**
17 **of 2000, October 1st, I think?**
18     A. Correct.
19     **Q. Do you remember that? Do you know if**
20 **WebManage or the law firm that WebManage hired to**
21 **represent it during the merger played any role in**
22 **why the acquisition closed in November rather than**
23 **October?**
24     A. I am not privy. I had the October date.

40 (Pages 154 to 157)

Brian Mehlman
Volume 1 - August 4, 2005

154

1  Q. If WebManage or the law firm that it had
2  hired to do the merger was any part of the cause of
3  why it happened in November and not October, would
4  you blame it on Network Appliance?
5  A. I don't -- NetApp did the contract. So I'm
6  going by that. I don't know the -- I don't know how
7  to answer that question.
8  Q. Well, WebManage did have a law firm that
9  had to go over drafts and negotiate, didn't it?
10  A. I imagine there were lawyers on both sides,
11  yes.
12  Q. All I am asking you, if they were part of
13  the reasons or if they caused it to happen in
14  November rather than October, that wouldn't be
15  Network Appliance's fault, would it?
16  A. If that was the case and there was that
17  much uncertainty, I don't think I would have issued
18  a contract until it was better understood where
19  things would fall.
20  Q. My question is a little bit different,
21  which is, after they sent you the letter --
22  A. Yes.
23  Q. -- and if -- I'm just asking if you would
24  blame Network Appliance if during that period, if

155

1  WebManage's law firm were the ones that played any
2  role for having things happen in November rather
3  than October?
4  A. I would.
5  Q. You would still blame them?
6  A. I would still blame NetApp, yes.
7  Q. It would be Network Appliance's fault, just
8  so I'm clear, if the lawyers working for WebManage
9  were responsible for any part of that happening?
10  A. I think it would be NetApp's responsibility
11  to meet contracts that they signed even if there was
12  uncertainty, even if there was a third party that
13  caused them to not be able to meet the terms of the
14  contract. All contracts kind of work that way. If
15  there's a third party that affects the terms of the
16  contract, yes, I would still hold NetApp
17  responsible.
18  Q. There wasn't any date certain for the
19  closing in the offer letter, was there?
20  A. Approximate.
21  Q. Only approximate?
22  A. October, whatever was in the letter.
23  Q. That was approximate?
24  A. I don't think six weeks is approximate.

156

1  Q. It wasn't a date certain listed in the
2  offer letter, was it?
3  A. Approximately -- was it October 1? It
4  closed six weeks later. That's a long time. That's
5  not approximate.
6  Q. That's actually not my question. My
7  question is, there's no date certain for the closing
8  listed in the offer letter, is there?
9  A. It says approximate.
10  Q. So to answer the question --
11  A. There is no firm date, that is correct.
12  Q. You mentioned that you had a broker in the
13  fall of 2000 that you were working with for some
14  shares and stuff like that?
15  A. Yes.
16  Q. Who was your broker then?
17  A. Either Morgan Stanley or Dean Witter. It
18  is now Morgan Stanley Dean Witter. I can't remember
19  who they were at the time.
20  Q. Do you remember the name of the person
21  regardless of the company?
22  A. Yes.
23  Q. What was the person's name?
24  A. Robert Streed.

157

1  Q. Can you spell it?
2  A. Robert, R O B E R T, Streed, S T R E E D.
3  Q. Did you tell Mr. Streed that you were
4  expecting to have some shares come in when you
5  became a NetApp employee?
6  A. I did.
7  Q. You told him to expect those?
8  A. I told him -- I had been working with him
9  for a year. He kind of knew a lot of things. Up in
10  New Hampshire we have more personal relationships
11  with some of our people like investors. He was
12  aware that I was working for a company that got
13  bought and I had equity and stock options, yes.
14  Q. So you told him that some shares would be
15  coming and that some portion of those you would be
16  able to sell?
17  A. I told him that my expectation was, yes, I
18  have stock, the stock has value. It should be -- I
19  expect it to come at some point, yes.
20  Q. Was that a face-to-face meeting or on the
21  telephone?
22  A. I had both with him. I'm sure it was both.
23  Q. Did either of you take notes in the
24  face-to-face meeting?

Brian Mehlman
Volume 1 - August 4, 2005

158

1  A. He might have. I don't know if that's what
2  he does. I don't know.
3  Q. Do you know in general if your broker
4  typically takes notes or sometimes takes notes?
5  A. I don't think I ever -- I imagine he has a
6  phone log and stuff like that. I think they are
7  required to. Back then they might not have had the
8  requirement. I don't know the answer.
9  Q. What city does he work out of?
10  A. Nashua, New Hampshire.
11  Q. Is he still your broker today?
12  A. He is.
13  Q. And he works for MSDW?
14  A. I don't know if it is MS or DW, yeah. I
15  think it is now Morgan Stanley.
16  Q. Is it possible that he might have some
17  notes or information about what you told him about
18  the WebManage stuff that you told him in the fall of
19  2000?
20  A. He might have a recollection of some
21  conversations.
22  Q. Now, focusing on that 2000 time period
23  after you got this offer letter and when you became
24  an employee on a certain date. In your mind at that

159

1  time you were expecting the shares to come more
2  quickly than they eventually did?
3  A. That is correct.
4  Q. And back in your mind at that time period
5  when you were expecting the shares to arrive more
6  quickly than they eventually did, were you sitting
7  there thinking that they were supposed to be there
8  back on November 15th or that they just should come
9  quickly?
10  A. I was expecting some event where they would
11  say, okay, everything is done, everything is wrapped
12  up, here is all the paperwork, you are now
13  officially a stock option holder and things are
14  done.
15  Q. You had mentioned that they had kind of a
16  party and some people had been out there, and things
17  like that?
18  A. Yeah.
19  Q. Did you believe that after you joined and
20  became an employee, did you believe that they would
21  at some point have an all-hands meeting or party or
22  some communication that everything was done on the
23  shares? Is that what you were looking for?
24  A. I would imagine. I mean there was a lot of

160

1  stuff going on at that time. We were trying to make
2  the acquisition successful. I actually think I was
3  an employee way back in early September when I
4  signed the offer letter. My payroll was probably
5  NetApp payrolls.
6  Q. Were they NetApp payrolls, do you know?
7  A. I don't know for sure. I submitted what
8  pay stubs I could find, but they may predate or
9  postdate that.
10  Q. That's all my questions.
11  MR. ROSENBLATT: I anticipate that
12  Mr. Mehlman will be at trial in this matter. As a
13  result, I have no questions, thank you.
14  THE VIDEOGRAPHER: The time is 1:30.
15  The deposition is concluded. This is the end of
16  cassette two. We are off the record.

161

1  CERTIFICATE OF COURT REPORTER
2  I, David A. Arsenault, Registered
3  Professional Reporter, do certify that the
4  deposition of BRIAN MEHLMAN, in the matter of
5  Mehlman v Network Appliance, on August 4, 2005, was
6  stenographically recorded by me; that the witness
7  provided satisfactory evidence of identification, as
8  prescribed by Executive Order 455 (03-13) issued by
9  the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
11  the Commonwealth of Massachusetts; that the
12  transcript produced by me is a true and accurate
13  record of the proceedings to the best of my ability;
14  that I am neither counsel for, related to, nor
15  employed by any of the parties to the above action;
16  and further that I am not a relative or employee of
17  any attorney or counsel employed by the parties
18  thereto, nor financially or otherwise interested in
19  the outcome of the action.
20
21  _____  8/15/05
22  David A. Arsenault, RPR
23
24

161

1          CERTIFICATE OF COURT REPORTER

2              I, David A. Arsenault, Registered

3     Professional Reporter, do certify that the

4     deposition of BRIAN MEHLMAN, in the matter of

5     Mehlman v Network Appliance, on August 4, 2005, was

6     stenographically recorded by me; that the witness

7     provided satisfactory evidence of identification, as

8     prescribed by Executive Order 455 (03-13) issued by

9     the Governor of the Commonwealth of Massachusetts,

10    before being sworn by me, a Notary Public in and for

11    the Commonwealth of Massachusetts; that the

12    transcript produced by me is a true and accurate

13    record of the proceedings to the best of my ability;

14    that I am neither counsel for, related to, nor

15    employed by any of the parties to the above action;

16    and further that I am not a relative or employee of

17    any attorney or counsel employed by the parties

18    thereto, nor financially or otherwise interested in

19    the outcome of the action.

20

21    _____    8/15/05

22    David A. Arsenault, RPR

23

24

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| Brian Mehlman | \* |
| Plaintiff | \* |
|  | \* Civil Action No. 04-12533-WGY |
| v. | \* |
|  | \* |
| Network Appliance, Inc. | \* |
|  | \* |
| Defendants | \* |
|  | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff Brian Mehlman responds to defendant's First Set of Interrogatories as follows:

### Interrogatories

**Interrogatory No. 1:**

Identify with precision all options held by Plaintiff to purchase Network Appliance stock from January 2000 to the present including grant date, strike price, exercise date, number of shares, value of shares as of November 13, 2001 and value of shares as of February 5, 2001 for each option grant.

**OBJECTION:**

Plaintiff objects to this interrogatory to the extent that it seeks information about options granted after the merger between Network Appliance and WebManage Technologies since such information is irrelevant to any claims or defenses in this matter and is not reasonably calculated to the discovery of admissible evidence.



EXHIBIT
Mehlman 1
8.4.05  DA

**ANSWER:**

Without waiving the foregoing objection, plaintiff provides the following information. Plaintiff received a total of nine option grants during his employment at both WebManage Technologies and Network Appliance. Three of the option grants were obtained prior to February 5, 2001, are relevant to the claims, and are therefore presented below. Six of the option grants were obtained in recognition of plaintiff's performance some time after the merger between Network Appliance and are therefore not presented.

Stock option agreements for relevant stock option grants are provided separately as part of the request for production of documents. Option values on November 13, 2000 and February 5, 2001 are as follows (prices used are closing stock value as reported by www.yahoo.com):

November 13, 2000

| Option Grants | Quantity | Strike Price | NTAP Stock | Vested Value | Unvested Value |
|---|---|---|---|---|---|
| WMT-99a vested | 106 | 19.67 | 84.50 | 6,871.98 | |
| WMT-99a unvested | 529 | 19.67 | 84.50 | | 34,295.07 |
| WMT-99b vested | 1589 | 9.84 | 84.50 | 118,634.74 | |
| WMT-99b unvested | 1589 | 9.84 | 84.50 | | 118,634.74 |
| WMT-00 vested | 0 | 0.00 | 84.50 | 0.00 | 0.00 |
| WMT-00 unvested | 3792 | 33.82 | 84.50 | | 192,178.56 |
| | | | Sub-total | 125,506.72 | 345,108.37 |
| | | | Total | | 470,615.09 |

February 5, 2001

| Option Grants | Quantity | Strike Price | NTAP Stock | Vested Value | Unvested Value |
|---|---|---|---|---|---|
| WMT-99a vested | 106 | 19.67 | 43.31 | 2,505.84 | |
| WMT-99a unvested | 529 | 19.67 | 43.31 | | 12,505.56 |
| WMT-99b vested | 2118 | 9.84 | 43.31 | 70,889.46 | |
| WMT-99b unvested | 1059 | 9.84 | 43.31 | | 35,444.73 |
| WMT-00 vested | 0 | 0.00 | 43.31 | 0.00 | 0.00 |
| WMT-00 unvested | 3792 | 33.82 | 43.31 | | 35,986.08 |
| | | | Sub-total | 73,395.30 | 83,936.37 |
| | | | Total | | 157,331.67 |

2

**Interrogatory No. 2:**

Identify and describe all efforts by Plaintiff to exercise vested options or obtain information related to Network Appliance stock options prior to February 5, 2001.

**ANSWER:**

Plaintiff inquired multiple times about exercising options. These inquiries were both verbal and written. Inquiries were made during the period between November 2000-January 2001 to at least the following five individuals: Chris Liotta, Business Unit Manager, Lynn Murach, VP of Engineering, Christine O'neil, site administrator, Janice Mahoney, Stock Administrator, and Laura Ellgin, human resources. All responses led plaintiff to believe that stock option assumption agreements and the ability to exercise would be coming soon. Written inquiry was first made on December 6, 2000. Plaintiff desired to sell options prior to the end of calendar year 2000. Plaintiff was told that Janice Mahoney would be handling the issuance of stock option agreements, but that stock administration had not received any information on the conversion of options.

In late December 2000 and Early January 2001, plaintiff had one on one conversations with Lynn Murach, Janice Mahoney, and Chris Liotta, none of whom were able to resolve getting stock assumption papers issued.

The issue was pushed both at an all hands meeting on January 11, 2001 and during a one on one phone conversation with Chris Liotta on or around January 11, 2001. These conversations resulted in an e-mail date January 19, 2001 where employees were told that they could exercise options. However, that statement turned out to be untrue. Stock could still not be exercised until stock options were entered into a database which occurred after receipt of Stock

3

Assumption agreements which were issued on or around January 31, 2001.  Plaintiff was unable to exercise options until at least early February, 2001.

**Interrogatory No. 3:**

Identify all sales or trades by Plaintiff of any Network Appliance or WebManage shares or options after January 1, 2000.

**ANSWER:**

All stock sales are documented in statements from Solomon Smith Barney as part of the production of documents.  Summary of stock sales is as follows:

| | |
|---|---|
| 12/5/01 | 425 shares, employee stock purchase |
| 11/18/02 | 300 shares, employee stock purchase |
| 12/02/02 | 302 shares, employee stock purchase |
| 6/2/03 | 306 shares, employee stock purchase |
| 6/2/03 | 3178 shares, Webmanage options |
| 12/02/03 | 316 shares, employee stock purchase |
| 6/1/04 | 319 shares, employee stock purchase |
| 9/14/04 | 812 shares, NetApp incentive options |
| 9/14/04 | 583 shares, NetApp incentive options |
| 9/28/04 | 1124 shares, NetApp incentive options |
| 9/30/04 | 791 shares, NetApp incentive options |
| 10/01/04 | 770 shares, NetApp incentive options |
| 10/14/04 | 12 shares, employee stock purchase |

**Interrogatory No. 4:**

Describe in detail every term of every contract Plaintiff claims Network Appliance breached.

**ANSWER:**

Network Appliance presented Plaintiff an offer letter for employment on September 8, 2000, a copy of which is provided in response to the interrogatories and in response to the request for production of documents. This letter set forth a contract under which Plaintiff would join Network Appliance. Plaintiff alleges the following term was breached:

> "The effective date of the position will be upon the close of the acquisition of
> WebManage by Network Appliance, which is anticipated to be around October 1, 2000.
> Following the commencement of your full-time employment with Network Appliance,
> the Company will grant to you options that have an approximate value at the closing of
> $600,000. This value is comprised of a value assigned shares currently owned
> ($347,264) with WebManage and options given upon joining Network Appliance
> ($252,736). Options presently owned under the old WebMange Plan will convert to
> Network Appliance 2000 plan but will continue to have the same vesting schedule as the
> old WebManage plan. The new options granted under the WebManage 2000 option plan
> will convert to the Network Appliance option plan and will be granted pursuant to
> Network Appliance's stock option plan"

**Interrogatory No. 5:**

Describe in detail all damages Plaintiff claims to have suffered as a result of the alleged wrongdoing by Network Appliance.

**ANSWER:**

In excess of $450,000. The difference between what the contract promised (vested and unvested options with approximate value of $600K) and what the plaintiff actually received (vested and unvested options with an approximate value of $157K). Further, plaintiff lost the opportunity to obtain re-invest proceeds that were due plaintiff from Network Appliance stock options. In addition, as stated in response to Interrogatory No. 6, the value of plaintiff's services

5

as evidenced by the offer letter included stock/stock option compensation of $600K over a four year period but plaintiff received significantly less than the compensation promised.

**Interrogatory No. 6:**

Describe in detail any duty or obligation you claim Network Appliance owes you under a theory of quantum meruit, including but not limited to exactly what duty or obligation you contend Network Appliance owes you and upon what basis that duty or obligation arose.

**ANSWER:**

Network Appliance presented in the terms of the offer letter/employment agreement the value of plaintiff's services if he was to commence employment with Network Appliance. This value was comprised of salary, bonus and stock options with a value of "approximately "600,000." Plaintiff accepted employment, commenced employment and continued to work with Network Appliance in good standing until June, 2004. Nevertheless, the options provided to plaintiff had substantially less value.

In addition, prior to joining Network Appliance, Plaintiff had been employed at WebManage Technologies as a significant contributor in the development of technologies that greatly benefited Network Appliance. Plaintiff received stock options as partial compensation for time served at WebManage Technologies. Plaintiff alleges that defendant gained significant benefit from plaintiff's efforts during his employment at WebManage Technologies although plaintiff was not compensated commensurate with the value gained by the defendant.

6

**Interrogatory No. 7:**

To the extend you contend that you or Network Appliance performed any term of any contract between You and Network Appliance, in whole or in part, describe in detail such performance of each term.

**ANSWER:**

Plaintiff fulfilled the terms of the contract. He commenced employment with Network Appliance and was employed in good standing until June of 2004. Network Appliance fulfilled its duty to pay salary and bonuses to plaintiff. Defendant failed in its obligation to (1) issue options to plaintiff with a value of $600K and (2) provide the value of plaintiff's services of approximately $600K. Instead, defendant provided options with an approximate value of $157K

**Interrogatory No. 8:**

Describe in detail all efforts by you to mitigate any injuries you allege Defendant caused.

**ANSWER:**

As described in response to Interrogatory 2, I spoke with and otherwise communicated with a number of defendant's employees in an effort to exercise options. I did my best to get the best possible value out of the options that were ultimately provided.

AS TO OBJECTIONS:

Brian Mehlman

By his attorneys,

COOK, LITTLE, ROSENBLATT
& MANSON, P.L.L.C.

Dated: _____4/14/05_____    By: _____

Arnold Rosenblatt, Esquire
650 Elm Street
Manchester, NH 03101
(603) 621-7100

**AS TO ANSWERS:**

On this 13 day of _____APRil_____, 2005, I hereby make oath that the foregoing answers to interrogatories are true.

By _____
Brian Mehlman

STATE OF NEW HAMPSHIRE
COUNTY OF _Hillsborough_

Personally appeared before the undersigned, Brian Mehlman, on this 13th day of _April_, 2005, and made oath that the foregoing answers to interrogatories are true.

_____
Justice of the Peace/Notary Public

My Commission Expires: _____

PAULA E. LAFLAMME
★ NOTARY PUBLIC - NEW HAMPSHIRE ★
My Commission Expires May 29, 2007

8



**Network**Appliance®

September 8, 2000

Brian Mehlman
25 Hazel Ave.
Nashua, NH 03062

Dear Brian:

We are pleased to offer you the position of Product Marketing with Network Appliance, Inc. (the "Company") at a starting bi-weekly salary of $3,846.15, (annualized at $100,000). In addition, your target bonus will be 10% of your annual salary based on company and individual performance as outlined in the FY01 Incentive Plan. The effective date of the position will be upon the close of the acquisition of WebManage by Network Appliance, which is anticipated to be around October 1, 2000.

Following the commencement of your full-time employment with Network Appliance, the Company will grant to you options that have an approximate value at the closing of $600,000. This value is comprised of a value assigned shares currently owned ($347,264) with WebManage and options given upon joining Network Appliance ($252,736). Options presently owned under the old WebManage plan will convert to Network Appliance 2000 plan but will continue to have the same vesting schedule as the old WebManage plan. The new options granted under the WebManage 2000 option plan will convert to the Network Appliance option plan and will be granted pursuant to Network Appliance's stock option plan and will have a term of ten (10) years. Vesting in the new option shares will be in installments during your service with the Network Appliance (12/48th upon your first anniversary and 1/48th monthly thereafter).

As a regular employee of the Company, you will be entitled to all such benefits, including medical, dental and life insurance, as are provided to other employees of the Company. The Company reserves the right to modify, amend or terminate any employee benefits at any time for any reason.

Employment with the Company is for no specific period of time. As a result, either you or the Company are free to terminate the employment relationship at any time for any reason, with or without cause. This is the full and complete agreement between us on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time-to-time, the "at-will" nature of your employment may only be changed in an express writing signed by you and the President of the Company.

EXHIBIT

Mehlman 2

8·4·05   M

BM

NetApp 000001

Your employment pursuant to this offer is contingent on you executing the enclosed Proprietary Information and Inventions Agreement and upon you providing the Company with the legally required proof of your identity and authorization to work in the United States. In addition, your employment is pursuant upon a satisfactory background check.

This letter sets forth the terms of your employment with us and supersedes any prior representations or agreements, whether written or oral. A duplicate original of this offer is enclosed for your records. To accept this offer, please sign and return this letter and the executed Proprietary Information and Inventions Agreement to me.

We look forward to having you join us. If you have any questions, please call either me at (408) 822-6200 or Vijay Basani.

Sincerely,

NETWORK APPLIANCE, INC.

Chris Carlton
Vice President, Human Resources

I have read and accept this employment offer.

Date: 9/14/00          Signature:

Mehlman, Brian

| | |
|---|---|
| **From:** | Liotta, Chris [chris.liotta@netapp.com] |
| **Sent:** | Friday, January 19, 2001 7:50 PM |
| **To:** | dl-codec |
| **Cc:** | Mahoney, Janice; Stubblefield, Mason; Bryant, Thom |
| **Subject:** | All Hands Meeting Follow Up |

This email responds to the two questions that required follow up from the
Codec All Hands Meeting on 1/11.  It was a kick to be on the
videoconference
and I look forward to seeing everyone in person next week.

Stock Options

The last legal hurdle required to convert the WMT options was completed
this
week (with the filing of the S-8 and the subsequent registering of the
shares).  Employees may exercise any portion of their vested shares by
contacting Jan Mahoney at (949) 635 9401 (administrative info is
provided on
the internal website as well).  The exercise can be either a cash
transaction or a same day sale.  I am unaware of any trading
restrictions
resulting from the acquisition, but you should speak directly with Jan
if
you have a specific question.  Option assumption agreements will be
delivered within the next few weeks.

Offices vs Cubes

The Tewksbury facility will be all cubes.  We will have the option of
building cubes or offices in the 'permanent' space that Thom Bryant is
currently researching.

****************
Have you logged into NOW today? - NetApp On the Web -
http://now.netapp.com

Chris Liotta
Senior Vice President & General Manager
Content Delivery Business Unit
Network Appliance, Inc.



EXHIBIT
Mehlman 8
8·4·05 OA

M0028

**District of Massachusetts (Boston)**
**CIVIL DOCKET FOR CASE #: 1:04-cv-12533-WGY**

Mehlman v. Network Appliance, Inc.
Assigned to: Chief Judge William G. Young
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 12/02/2004
Jury Demand: Both
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Brian Mehlman**
           represented by  **Arnold Rosenblatt**
Cook, Little, Rosenblatt & Manson, p.l.l.c.
650 Elm Street
Manchester, NH 03101
603-621-7102
Email: arosenblatt@clrm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Network Appliance, Inc.**
           represented by  **C. Tait Graves**
Wilson, Sonsini, Goodrich Rosati, P.C.
One Market Spear Tower
Suite 3300
San Francisco, CA 94105
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James A. DiBoise**
Wilson, Sonsini, Goodrich, Rosati, P.C.
One Market, Spear Market Tower
Suite 3300
San Francisco, CA 91405
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alda C. Leu**
Wilson, Sonsini, Goodrich & Rosati, P.C.
One Market, Spear Tower
Suite 3300
San Francisco, CA 91405
*ATTORNEY TO BE NOTICED*

**Michael S. D'Orsi**
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street
33rd Floor
Boston, MA 02108
617-720-2880
Fax: 617-720-3554
Email: msd@dcglaw.com
*ATTORNEY TO BE NOTICED*

| | | Replies,if any, due by 2/28/2005. HEARING SET FOR 3/3/05 AT 2PM....NOTICE TO FOLLOW (Smith, Bonnie) (Entered: 02/07/2005) |
|---|---|---|
| 02/07/2005 | 14 | NOTICE of Hearing on Motion 5 MOTION to Dismiss, 7 MOTION Judicial Notice: Motion Hearing set for 3/3/2005 02:00 PM before Chief Judge William G. Young. The hearing will take place at: BOSTON UNIVERSITY LAW SCHOOL, LAW AUDITORIUM, GROUND FLOOR, 765 COMMONWEALTH AVE., BOSTON. (Smith, Bonnie) (Entered: 02/07/2005) |
| 02/23/2005 | | Judge William G. Young : Electronic ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added C. Tait Graves for Network Appliance, Inc. cc/cl. (Bell, Marie) (Entered: 02/23/2005) |
| 02/23/2005 | | Judge William G. Young : Electronic ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added James A. DiBoise for Network Appliance, Inc. cc/cl. (Bell, Marie) (Entered: 02/23/2005) |
| 02/23/2005 | | Judge William G. Young : Electronic ORDER entered granting 12 Motion for Leave to Appear Pro Hac Vice Added Alda C. Leu for Network Appliance, Inc. cc/cl. (Bell, Marie) (Entered: 02/23/2005) |
| 02/25/2005 | 15 | Opposition re 5 MOTION to Dismiss *and Memorandum of Reasons* filed by Brian Mehlman. (Rosenblatt, Arnold) (Entered: 02/25/2005) |
| 02/25/2005 | 16 | Opposition re 7 MOTION Judicial Notice *and Memorandum of Reasons* filed by Brian Mehlman. (Rosenblatt, Arnold) (Entered: 02/25/2005) |
| 02/28/2005 | 17 | REPLY to Response to Motion re 5 MOTION to Dismiss filed by Network Appliance, Inc.. (D'Orsi, Michael) (Entered: 02/28/2005) |
| 02/28/2005 | 18 | REPLY to Response to Motion re 7 MOTION Judicial Notice filed by Network Appliance, Inc.. (D'Orsi, Michael) (Entered: 02/28/2005) |
| 03/03/2005 | | Electronic Clerk's Notes for proceedings held before Judge William G. Young : Motion Hearing held on 3/3/2005 re 5 MOTION to Dismiss filed by Network Appliance, Inc.,, Motions terminated: 5 MOTION to Dismiss filed by Network Appliance, Inc.. Hearing held. After hearing the Motion is allowed in part, denied in part. Plaintiff has 10 days to replead the breach of covenant of good faith and fair dealing. The parties have 2 weeks to file a joint case management proposal. Trial set for Running trial list as of March, 2006. (Court Reporter WOMACK.) (Smith, Bonnie) (Entered: 03/04/2005) |
| 03/16/2005 | 19 | JOINT STATEMENT re scheduling conference. (Attachments: # 1 Exhibit A -- Plaintiff Certification# 2 Exhibit B -- Defendant Certification)(D'Orsi, Michael) (Entered: 03/16/2005) |
| 03/23/2005 | | Judge William G. Young : Electronic ORDER entered. re 19 JOINT STATEMENT re scheduling conference. SO ORDERED AS THE CASE MANAGEMENT SCHEDULING ORDER. Discovery due by 11/18/2005. Dispositive Motions due by 12/2/2005. cc/cl.(Bell, Marie) (Entered: 03/29/2005) |
| 03/28/2005 | 20 | Letter from Arnold Rosenblatt advising the Court that the Plaintiff respectfully declines the opportunity to re-plead extended by the Court. (Bell, Marie) (Entered: 03/30/2005) |
| 04/12/2005 | | Judge William G. Young : Electronic ORDER entered. re 20 Letter from Arnold Rosenblatt advising the Court that the Plaintiff respectfully declines the opportunity to re-plead extended by the Court. UPON RECEIPT OF THIS LETTER, THE COURT DISMISSES THE CLAIM FOR THE BREACH OF THE IMPLIED CONVENANT OF GOOD FAITH AND FAIR DEALING. cc/cl.(Bell, Marie) (Entered: 04/14/2005) |

# EXHIBIT D

**WSGR**  Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105-1126

PHONE 415.947.2000
FAX 415.947.2099

www.wsgr.com

May 27, 2005

Arnie Rosenblatt
Cook, Little, Rosenblatt & Manson
650 Elm Street
Manchester, NH 03101

Re:    **Brian Mehlman v. Network Appliance, Case No. 04-12533-WGY**

Dear Arnie:

Pursuant to our discussion over the status of the complaint and need for an answer, Network Appliance believes that only the following paragraphs of plaintiff's First Amended Complaint remain in the lawsuit: Paragraphs 1-16, 27 (but only as to incorporating Paragraphs 1-16), 28-30, and the prayer for relief. If you agree, please sign below, and Network Appliance will answer as to these paragraphs by Tuesday, June 7, 2005.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Tait Graves

Brian Mehlman hereby stipulates that only Paragraphs 1-16, 27 (but only as to incorporating Paragraphs 1-16), 28-30, and the prayer for relief in his First Amendment Complaint remain in this lawsuit, and that Network Appliance may file an answer to these paragraphs by Tuesday, June 7, 2005.

Date: _May 31_, 2005

Arnie Rosenblatt
Counsel for Plaintiff Brian Mehlman

C:\NrPortbl\PALIB1\CTG\2665085_1.DOC

PALO ALTO    AUSTIN    KIRKLAND    NEW YORK    RESTON    SALT LAKE CITY    SAN FRANCISCO

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Arnie Rosenblatt
May 26, 2005
Page 2

cc:  Michael D'Orsi

# EXHIBIT E

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 06:00 PM 11/13/2000
001570503 - 3067692

# CERTIFICATE OF MERGER

## OF

## WEBMANAGE TECHNOLOGIES, INC.,
### a Delaware corporation,

### with and into

## NETWORK APPLIANCE, INC.,
### a California corporation

### Pursuant to Section 252 of the
### Delaware General Corporation Law

Network Appliance, Inc., a corporation organized and existing pursuant to the California Corporations Code ("California Code"), does hereby certify that:

1. The name and the state and date of incorporation of each of the constituent corporations (the "Constituent Corporations") are as follows:

> WebManage Technologies, Inc. was incorporated on July 9, 1999 in the State of Delaware pursuant to the Delaware General Corporation Law ("DGCL").

> Network Appliance, Inc. was incorporated on April 21, 1992 in the State of California pursuant to the California Code; and

2. An Agreement and Plan of Merger has been approved, adopted, certified, executed, and acknowledged by each of the Constituent Corporations in accordance with the requirements of Section 252 of the DGCL.

3. Network Appliance, Inc. shall be the surviving corporation in the merger (the "Surviving Corporation"). The name of the Surviving Corporation shall be "Network Appliance, Inc."

4. The Articles of Incorporation of Network Appliance, Inc., shall constitute the Articles of Incorporation of the Surviving Corporation.

5. The executed Agreement and Plan of Merger is on file at the principal place of business of the Surviving Corporation. The address of the principal place of business of the Surviving Corporation is:

> 495 East Java Drive
> Sunnyvale, California 94089

LANLIB1\KR-A\79421.01(#K#N#1\1.DOC)

6. A copy of the Agreement and Plan of Merger will be furnished by the Surviving Corporation, on request and without cost, to any stockholder of any of the Constituent Corporations.

7. Network Appliance, Inc. hereby agrees that it may be served with process in Delaware in any proceeding for enforcement of any obligation of WebManage Technologies, Inc., as well as for the enforcement of any obligation of Network Appliance, Inc. arising from the merger, including any suit or other proceeding to enforce the right of any stockholders as determined in appraisal proceedings pursuant to Section 262 of the DGCL, and Network Appliance, Inc. hereby irrevocably appoints the Secretary of State of Delaware as its agent to accept service of process in any such suit or other proceedings and a copy of such process shall be mailed by the Secretary of State to Network Appliance, Inc. at the following address:

> 495 East Java Drive
> Sunnyvale, California 94089

The undersigned declares under penalty of perjury that the matters set forth herein are true and correct of his own knowledge.

NetApp 000355

IN WITNESS WHEREOF, Network Appliance, Inc. has caused this Certificate of Merger to be signed by the undersigned, its authorized officer, as of the ___13___ day of November, 2000.

NETWORK APPLIANCE, INC.

By: _____
Name: Jeffrey R Allen
Title: CFO

LANLIB1\A2M\0660646.02(#@DY02!.DOC)

NetApp 000356

*State of Delaware*

## *Office of the Secretary of State*    PAGE  1

---

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"WEBMANAGE TECHNOLOGIES, INC.", A DELAWARE CORPORATION,

WITH AND INTO "NETWORK APPLIANCE, INC." UNDER THE NAME OF "NETWORK APPLIANCE, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF CALIFORNIA, AS RECEIVED AND FILED IN THIS OFFICE THE THIRTEENTH DAY OF NOVEMBER, A.D. 2000, AT 6 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

NetApp 000353

*Edward J. Freel, Secretary of State*

3315629   8100M

001570503

AUTHENTICATION: 0790580

DATE: 11-14-00

# EXHIBIT F

A0555769

**AGREEMENT OF MERGER**
**OF**
**WEBMANAGE TECHNOLOGIES, INC.**
**AND**
**NETWORK APPLIANCE, INC.**

ENDORSED - FILED
in the office of the Secretary of State
of the State of California

NOV 1 3 2000

BILL JONES, Secretary of State

This Agreement of Merger, dated as of the 13th day of November, 2000 ("Agreement of Merger"), between WebManage Technologies, Inc., a Delaware corporation (the "Company"), and Network Appliance, Inc., a California corporation ("Acquiror").

**RECITALS**

A.     The Company and Acquiror have entered into a Merger Agreement and Plan of Merger (the "Merger Agreement") providing for certain representations, warranties, covenants and agreements in connection with the transactions contemplated hereby. This Agreement of Merger and the Merger Agreement are intended to be construed together to effectuate their purpose.

B.     The Boards of Directors of the Company and Acquiror deem it advisable and in their mutual best interests and in the best interests of the stockholders of the Company, that the Company be acquired by Acquiror through a merger ("Merger") of the Company with and into Acquiror.

C.     The Boards of Directors of Acquiror and the Company and the stockholders of the Company have approved the Merger.

**AGREEMENTS**

The parties hereto hereby agree as follows:

1.     The Company shall be merged with and into Acquiror and Acquiror shall be the surviving corporation.  Acquiror is sometimes referred to herein as the "Surviving Corporation."

2.     The Merger shall become effective at such time (the "Effective Time") as this Agreement of Merger and the officers' certificate of Acquiror and the Company are filed with the Secretary of State of the State of California pursuant to Section 1103 of the Corporations Code of the State of California.

3.     At the Effective Time of the Merger (i) all shares of Common Stock of the Company, par value $.01 per share (the "Company Common Stock"), and all shares of Series A Preferred Stock of the Company, par value $.01 per share, and Series B Preferred Stock of the Company, par value $.01 per share (collectively, the "Company Preferred Stock" and together with the Company Common Stock, the "Company Capital Stock"), that are owned directly or indirectly by the Company or any subsidiary of the Company shall be cancelled, and no securities of Acquiror or other consideration shall be delivered in exchange therefor; (ii) each of the issued and outstanding shares of Acquiror shall remain outstanding as one validly issued, fully paid and nonassessable share of the capital stock of Acquiror; (iii) each of the issued and outstanding shares of Company Capital Stock (other than shares, if any, held by persons who have demanded and perfected dissenters' rights for

such shares in accordance with the Corporations Code of the State of Delaware and who, as of the Effective Time, have not effectively withdrawn or lost such dissenters' rights, referred to hereinafter as "Dissenting Shares," and those shares being cancelled under (i) above) shall be converted automatically into and exchanged for shares of Acquiror's Common Stock, no par value (the "Acquiror Common Stock"), equal to 0.02543.

4.   Any Dissenting Shares shall not be converted into Acquiror Common Stock but shall be converted into the right to receive such consideration as may be determined to be due with respect to such Dissenting Shares pursuant to the law of the State of Delaware. If after the Effective Time any Dissenting Shares shall lose their status as Dissenting Shares, then as of the occurrence of the event which causes the loss of such status, such shares shall be converted into Acquiror Common Stock in accordance with Section 3.

5.   The conversion of the Company Common Stock into Acquiror Common Stock as provided by this Agreement of Merger shall occur automatically at the Effective Time of the Merger without action by the holders thereof. Each holder of Company Capital Stock shall thereupon be entitled to receive shares of Acquiror Common Stock in accordance with the Merger Agreement.

6.   At the Effective Time of the Merger, the separate existence of the Company shall cease, and Acquiror shall succeed, without other transfer, to all of the rights and properties of the Company and shall be subject to all the debts and liabilities thereof in the same manner as if Acquiror had itself incurred them. All rights of creditors and all liens upon the property of each corporation shall be preserved unimpaired, provided that such liens upon property of the Company shall be limited to the property affected thereby immediately prior to the Effective Time of the Merger.

7.   This Agreement of Merger is intended as a plan of reorganization within the meaning of Section 368 of the Internal Revenue Code of 1986, as amended.

8.   (a) At the Effective Time, the articles of incorporation of Acquiror, as in effect immediately prior to the Effective Time, shall be the articles of incorporation of the Surviving Corporation from and after the Effective Time until thereafter amended as provided by law and such articles of incorporation and by-laws of the Surviving Corporation.

(b)   The by-laws of Acquiror, as in effect immediately prior to the Effective Time, shall be the by-laws of the Surviving Corporation until thereafter amended as provided by such by-laws, the articles of incorporation and applicable law.

(c)   The directors and officers of Acquiror immediately prior to the Effective Time shall be the directors and officers of the Surviving Corporation.

9.   (a)   Notwithstanding the approval of Merger Agreement by the stockholders of the Company, this Agreement of Merger shall terminate forthwith in the event that the Merger Agreement shall be terminated as therein provided.

(b)   In the event of the termination of this Agreement of Merger as provided above, this Agreement of Merger shall forthwith become void and there shall be no

NetApp 000359

liability on the part of the Company or Acquiror or their respective officers or directors, except as otherwise provided in the Merger Agreement.

(c)    This Agreement of Merger may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one agreement.

(d)    This Agreement of Merger may be amended by the parties hereto any time before or after approval hereof by the stockholders of the Company, but, after such approval, no amendments shall be made which by law require the further approval of such shareholders without obtaining such approval.  This Agreement of Merger may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

(e)    This Agreement of Merger may only be amended and/or terminated prior to the Effective Time.

NetApp 000360

IN WITNESS WHEREOF, the parties have executed this Agreement of Merger as of the date first written above.

WEBMANAGE TECHNOLOGIES, INC.

By:
    Name: Vijay Basani
    Title: President

By:
    Name: Jayapal Basani
    Title: Secretary

NETWORK APPLIANCE, INC.

By:
    Name: Daniel J. Warmenhoven
    Title: President

By:
    Name: Jeffry R. Allen
    Title: Secretary

IN WITNESS WHEREOF, the parties have executed this Agreement of Merger as of the date first written above.

WEBMANAGE TECHNOLOGIES, INC.

By:_____
    Name: Vijay Basani
    Title: President

By:_____
    Name: Jayapal Basani
    Title: Secretary

NETWORK APPLIANCE, INC.

By:_____
    Name: Daniel J. Warmenhoven
    Title: President

By:_____
    Name: Jeffry R. Allen
    Title: Secretary

NetApp 000362

# OFFICERS' CERTIFICATE
## OF
### NETWORK APPLIANCE, INC.

Daniel J. Warmenhoven, President, and Jeffry R. Allen, Secretary, of Network Appliance, Inc., a corporation duly organized and existing under the laws of the State of California (the "Corporation"), do hereby certify:

1.    That they are the duly elected, acting and qualified President and Secretary, respectively, of the Corporation.

2.    That the Agreement of Merger in the form attached was duly approved by the Board of Directors of the Corporation in accordance the California Corporations Code.

3.    No vote of the shareholders of the Corporation was required pursuant to Section 1201(b) of the California Corporations Code.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

Executed in Sunnyvale, California this 10th day of NOV, 2000.


_____
Daniel J. Warmenhoven, President


_____
Jeffry R. Allen, Secretary

NetApp 000363

OFFICERS' CERTIFICATE
OF
WEBMANAGE TECHNOLOGIES, INC.

Vijay Basani, President, and Jayapal Basani, Secretary, of WebManage Technologies, Inc., a corporation duly organized and existing under the laws of the State of Delaware (the "Corporation"), do hereby certify:

1.  That they are the duly elected, acting and qualified President and the Secretary, respectively, of the Corporation.

2.  There are three authorized classes of shares, consisting of 30,000,000 shares of Common Stock, 3,000,000 shares of Series A Preferred Stock and 5,000,000 shares of Series B Preferred Stock. There were 6,493,663 shares of Common Stock, 1,091,800 shares of Series A Preferred Stock and 4,510,000 shares of Series B Preferred Stock outstanding and entitled to vote on the Agreement of Merger in the form attached.

3.  The Agreement of Merger in the form attached was duly approved by the board of directors of the Corporation in accordance with the Delaware Corporations Code.

4.  Approval of the Agreement of Merger by the holders of at least a majority of the outstanding shares of Common Stock, Series A Preferred Stock and Series B Preferred Stock (voting together), by the holders of at least a majority of the outstanding shares of Common Stock, by the holders of at least a majority of the outstanding shares of Series A Preferred Stock, and by the holders of at least a majority of the outstanding shares of Series B Preferred Stock as required. The percentage of the outstanding shares of each class of the Corporation's shares entitled to vote on the Agreement of Merger which voted to approve the Agreement of Merger equaled or exceeded the voting percentage required.

5.  All of the outstanding shares of Series A Preferred Stock and Series B Preferred Stock which were entitled to vote on the Agreement of Merger and any securities convertible into either Series A Preferred Stock or Series B Preferred Stock were converted into shares of Common Stock after such vote and prior to the effective time of the Merger.

NetApp 000364

Each of the undersigned declares under penalty of perjury that the statements contained in the foregoing certificate are true of their own knowledge.     Executed in Manchester, New Hampshire on November 10, 2000.

By: _____
Vijay Basani
President

By: _____
Jayapal Basani
Secretary

**NetApp 000365**



# EXHIBIT G

NTAP: Historical Prices for NETWORK APPLIANCE - Yahoo! Finance    Page 2 of 4

Case 1:04-cv-12333-WGY    Document 31-9    Filed 12/02/2005    Page 1 of 3

Yahoo!  My Yahoo!  Mail

# YAHOO! FINANCE

**Sign In**
New User? Sign Up

Search the Web

[Search]

Finance Home – Help

Tuesday, September 27, 2005, 2:46PM ET - U.S. Markets close in 1 hour and 14 minutes. Dow **+0.09%** Nasdaq **-0.2**
To track stocks &

## Quotes & Info

Enter Symbol(s):
e.g. YHOO, ^DJI

[GO] Symbol Lookup | Finance Searc

## Network Appliance Inc. (NTAP)

At 2:31PM ET: **23.95** ⬇

      

+ $100 cash          Free Trades          Still Just $7.          Trade with Fidelity

## Historical Prices

Get **Historical Prices** for: [GO]

### SET DATE RANGE

ADVERTISEMENT

**Start Date:** Nov | 10 | 2000    Eg. Jan 1, 2003

**End Date:** Feb | 15 | 2001

- ⦿ Daily
- ◯ Weekly
- ◯ Monthly
- ◯ Dividends Only

[Get Prices]

First | Prev | Next | Last

**PRICES**

| Date | Open | High | Low | Close | Volume | Adj Close* |
|------|------|------|-----|-------|--------|-----------|
| 15-Feb-01 | 43.88 | 48.00 | 43.75 | 45.00 | 14,693,200 | 45.00 |
| 14-Feb-01 | 40.00 | 42.88 | 37.94 | 42.12 | 10,170,500 | 42.12 |
| 13-Feb-01 | 39.88 | 43.06 | 38.50 | 39.69 | 12,252,100 | 39.69 |
| 12-Feb-01 | 37.12 | 39.75 | 33.50 | 39.12 | 16,287,200 | 39.12 |
| 9-Feb-01 | 37.97 | 39.39 | 35.25 | 38.00 | 37,762,900 | 38.00 |
| 8-Feb-01 | 39.00 | 40.31 | 34.50 | 35.19 | 24,927,200 | 35.19 |
| 7-Feb-01 | 43.38 | 43.62 | 37.00 | 38.62 | 20,183,800 | 38.62 |
| 6-Feb-01 | 43.31 | 46.50 | 43.31 | 44.88 | 9,050,700 | 44.88 |
| 5-Feb-01 | 45.56 | 47.50 | 41.38 | 43.31 | 10,308,800 | 43.31 |
| 2-Feb-01 | 47.25 | 48.25 | 46.00 | 46.75 | 13,539,800 | 46.75 |
| 1-Feb-01 | 47.50 | 47.94 | 43.31 | 46.56 | 33,060,600 | 46.56 |
| 31-Jan-01 | 58.75 | 59.75 | 53.00 | 53.62 | 9,793,200 | 53.62 |
| 30-Jan-01 | 60.00 | 60.88 | 56.62 | 58.12 | 7,046,100 | 58.12 |
| 29-Jan-01 | 55.94 | 60.25 | 55.62 | 59.94 | 7,452,200 | 59.94 |
| 26-Jan-01 | 55.62 | 59.56 | 55.48 | 56.50 | 11,007,700 | 56.50 |
| 25-Jan-01 | 60.50 | 60.88 | 55.06 | 56.50 | 12,061,300 | 56.50 |



E*TRADE SECURITIES LLC

POWER E*TRADE

**100**

COMMISSION-FREE TRADES
STOCK AND OPTIONS

▸ APPLY NOW

E*TRADE FINANCIAL

NTAP: Historical Prices for NETWORK APPLIANCE - Yahoo! Finance    Page 3 of 4

Case 1:04-cv-1833-WGY  Document 31-9  Filed 12/02/2005    Page 2 of 3

| | | | | | |
|---|---|---|---|---|---|
| 24-Jan-01 | 66.00 | 66.50 | 58.62 | 61.38 26,326,600 | 61.38 |
| 23-Jan-01 | 67.44 | 74.98 | 66.62 | 73.56 12,258,100 | 73.56 |
| 22-Jan-01 | 65.81 | 68.38 | 64.12 | 66.88  7,278,800 | 66.88 |
| 19-Jan-01 | 70.88 | 70.94 | 67.00 | 67.31  9,339,600 | 67.31 |
| 18-Jan-01 | 64.42 | 68.75 | 60.75 | 67.31 11,021,100 | 67.31 |
| 17-Jan-01 | 63.62 | 66.25 | 62.12 | 63.12 11,605,300 | 63.12 |
| 16-Jan-01 | 58.19 | 60.19 | 56.12 | 58.12  6,690,500 | 58.12 |
| 12-Jan-01 | 59.50 | 61.12 | 56.12 | 58.12 11,300,700 | 58.12 |
| 11-Jan-01 | 55.00 | 63.81 | 54.56 | 60.44 13,217,600 | 60.44 |
| 10-Jan-01 | 49.38 | 57.25 | 47.75 | 56.44 16,038,700 | 56.44 |
| 9-Jan-01 | 55.94 | 57.75 | 50.00 | 51.25 14,525,800 | 51.25 |
| 8-Jan-01 | 53.06 | 55.94 | 48.19 | 55.94 11,679,300 | 55.94 |
| 5-Jan-01 | 64.81 | 66.00 | 54.31 | 54.62 10,555,200 | 54.62 |
| 4-Jan-01 | 60.77 | 67.23 | 60.50 | 66.38 13,012,700 | 66.38 |
| 3-Jan-01 | 48.81 | 67.75 | 47.06 | 64.00 21,823,900 | 64.00 |
| 2-Jan-01 | 57.69 | 58.25 | 48.50 | 51.44 15,112,500 | 51.44 |
| 29-Dec-00 | 73.06 | 73.25 | 62.25 | 64.19  9,679,400 | 64.19 |
| 28-Dec-00 | 70.06 | 74.94 | 69.62 | 72.50  5,395,800 | 72.50 |
| 27-Dec-00 | 67.38 | 73.25 | 65.50 | 70.75  6,643,600 | 70.75 |
| 26-Dec-00 | 70.12 | 73.38 | 62.56 | 68.00  7,692,200 | 68.00 |
| 22-Dec-00 | 60.62 | 69.75 | 60.19 | 68.88 10,891,000 | 68.88 |
| 21-Dec-00 | 53.31 | 63.25 | 53.00 | 54.62 14,362,600 | 54.62 |
| 20-Dec-00 | 54.88 | 59.00 | 51.25 | 53.75 14,618,400 | 53.75 |
| 19-Dec-00 | 66.38 | 74.31 | 60.00 | 60.12 11,542,300 | 60.12 |
| 18-Dec-00 | 66.75 | 70.25 | 64.25 | 65.69 11,173,000 | 65.69 |
| 15-Dec-00 | 66.88 | 68.00 | 61.06 | 65.19 12,957,900 | 65.19 |
| 14-Dec-00 | 73.94 | 74.50 | 67.00 | 69.12 10,966,400 | 69.12 |
| 13-Dec-00 | 85.75 | 85.81 | 72.50 | 72.75  9,761,400 | 72.75 |
| 12-Dec-00 | 82.75 | 84.86 | 79.88 | 82.69  7,579,300 | 82.69 |
| 11-Dec-00 | 88.06 | 89.56 | 81.25 | 84.38  9,669,400 | 84.38 |
| 8-Dec-00 | 83.69 | 88.56 | 83.00 | 87.19 10,461,000 | 87.19 |
| 7-Dec-00 | 73.00 | 79.38 | 71.88 | 75.38  9,025,700 | 75.38 |
| 6-Dec-00 | 78.00 | 86.38 | 74.50 | 76.38 16,527,500 | 76.38 |
| 5-Dec-00 | 62.69 | 82.00 | 61.62 | 81.56 20,875,100 | 81.56 |
| 4-Dec-00 | 53.69 | 60.31 | 52.06 | 57.88  9,922,100 | 57.88 |
| 1-Dec-00 | 51.25 | 59.88 | 50.75 | 53.94 15,481,000 | 53.94 |
| 30-Nov-00 | 46.62 | 52.00 | 44.75 | 49.38 15,545,800 | 49.38 |
| 29-Nov-00 | 52.62 | 52.88 | 46.00 | 50.00 13,328,200 | 50.00 |
| 28-Nov-00 | 54.50 | 57.00 | 50.00 | 52.22 12,128,000 | 52.22 |

| 27-Nov-00 | 65.00 | 65.94 | 54.38 | 54.44 | 10,660,200 | 54.44 |
| 24-Nov-00 | 61.12 | 63.00 | 59.25 | 62.88 | 3,489,500 | 62.88 |
| 22-Nov-00 | 60.25 | 64.25 | 56.12 | 58.50 | 8,191,200 | 58.50 |
| 21-Nov-00 | 66.25 | 68.00 | 60.50 | 61.00 | 9,588,800 | 61.00 |
| 20-Nov-00 | 61.75 | 71.00 | 61.00 | 67.25 | 12,480,700 | 67.25 |
| 17-Nov-00 | 73.38 | 74.50 | 64.00 | 64.56 | 14,874,200 | 64.56 |
| 16-Nov-00 | 75.38 | 80.12 | 72.50 | 72.81 | 12,140,400 | 72.81 |
| 15-Nov-00 | 77.31 | 82.38 | 73.12 | 76.12 | 32,848,700 | 76.12 |
| 14-Nov-00 | 93.00 | 98.00 | 88.75 | 96.25 | 10,183,300 | 96.25 |
| 13-Nov-00 | 81.62 | 90.48 | 78.50 | 84.50 | 14,477,400 | 84.50 |
| 10-Nov-00 | 92.06 | 96.50 | 88.75 | 90.25 | 12,555,800 | 90.25 |

* Close price adjusted for dividends and splits.

First | Prev | Next | Last

⬇ Download To Spreadsheet

✉ Add to Portfolio    ✿ Set Alert    ✉ Email to a Friend

Get **Historical Prices** for Another Symbol:    [ GO ] Symbol Lookup

- **Stock Screener**                                    • Splits
- **Mergers & Acquisitions**

Copyright © 2005 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**Quotes delayed,** except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

**EXHIBIT H – PART 1**

<PAGE>    1

As filed with the Securities and Exchange Commission on January 16, 2001
                                    Registration No. 333-_____
================================================================================
                    SECURITIES AND EXCHANGE COMMISSION

                          Washington, D.C. 20549

                                FORM S-8

                        REGISTRATION STATEMENT

                                  Under

                      The Securities Act of 1933

                        NETWORK APPLIANCE, INC.
            (Exact name of registrant as specified in its charter)

<TABLE>
<S>                                      <C>
          CALIFORNIA                            77-0307520
(State or other jurisdiction             (IRS Employer Identification No.)
of incorporation or organization)
</TABLE>


            495 EAST JAVA DRIVE, SUNNYVALE, CA 94089
          (Address of principal executive offices) (Zip Code)


        WEBMANAGE TECHNOLOGIES, INC. 1997 STOCK OPTION PLAN
              (AS ASSUMED BY NETWORK APPLIANCE, INC.)

        WEBMANAGE TECHNOLOGIES, INC. 1999 STOCK OPTION PLAN
              (AS ASSUMED BY NETWORK APPLIANCE, INC.)

      WEBMANAGE TECHNOLOGIES, INC. 2000 STOCK INCENTIVE PLAN
              (AS ASSUMED BY NETWORK APPLIANCE, INC.)
                      -----------------------
                        (Full title of the Plans)


                      DANIEL J. WARMENHOVEN
              CHIEF EXECUTIVE OFFICER AND DIRECTOR
                    NETWORK APPLIANCE, INC.
              495 EAST JAVA DRIVE, SUNNYVALE, CA 94089
              (Name and address of agent for service)
                          (408) 822-6000
          (Telephone number, including area code, of agent for service)

                    CALCULATION OF REGISTRATION FEE

<TABLE>
<CAPTION>
================================================================================

| Title of Securities to be Registered | Amount to be Registered (1) | Proposed Maximum Offering Price per Share | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| WebManage Technologies, Inc. 1997 Stock Option Plan Common Stock, $0.001 par value | 15,003 shares | 3.94 (2) | $59,111.82 (2) | $14.78 |
| WebManage Technologies, Inc. 1999 Stock Option Plan Common Stock, $0.001 par value | 74,050 shares | 17.10 (2) | $1,266,366.30 (2) | $316.59 |
| WebManage Technologies, Inc. 2000 Stock Incentive Plan Common Stock, $0.001 par value | 166,288 shares | 33.04 (2) | $5,494,155.52 (2) | $1,373.54 |
| | | | Aggregate Registration Fee: | $1,704.91 |

================================================================================
</TABLE>

NetApp 000070

(1)    This Registration Statement shall also cover any additional shares of
       Registrant's Common Stock which become issuable under the WebManage
       Technologies, Inc. 1997 Stock Option Plan (as assumed by Registrant),
       WebManage Technologies, Inc. 1999 Stock Option Plan (as assumed by
       Registrant) and/or the WebManage Technologies, Inc. 2000 Stock Incentive
       Plan (as assumed by Registrant) by reason of any stock dividend, stock
       split, recapitalization or other similar transaction effected without
       the Registrant's receipt of consideration which results in an increase

in the number of the Registrant's outstanding shares of Common Stock.

(2)    Calculated solely for purposes of this offering under Rule 457(h) of the Securities Act of 1933, as amended, on the basis of the weighted average exercise price of the outstanding options.

21

NetApp 000071

<PAGE>    2

PART II

INFORMATION REQUIRED IN THE REGISTRATION STATEMENT

Item 3. Incorporation of Documents by Reference

Network Appliance, Inc. (the "Registrant") hereby incorporates by reference into this Registration Statement the following documents previously filed with the Securities and Exchange Commission (the "Commission"):

(a)    The Registrant's Annual Report on Form 10-K and Form 10-K/A for the fiscal year ended April 30, 2000, filed with the Commission on July 12, 2000, pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and as amended on July 13, 2000;

(b)    The Registrant's Quarterly Reports on Form 10-Q for the fiscal quarters ended July 28, 2000 and October 27, 2000, filed with the Commission on September 11, 2000 and December 11, 2000, respectively; and

(c)    The Registrant's Registration Statement No. 000-27130 on Form 8-A filed with the Commission on November 1, 1995, in which there is described the terms, rights and provisions applicable to the Registrant's Common Stock.

All reports and definitive proxy or information statements filed pursuant to Section 13(a), 13(c), 14 or 15(d) of the 1934 Act after the date of this Registration Statement and prior to the filing of a post-effective amendment which indicates that all securities offered hereby have been sold or which de-registers all securities then remaining unsold shall be deemed to be incorporated by reference into this Registration Statement and to be a part hereof from the date of filing of such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Registration Statement to the extent that a statement contained herein or in any subsequently filed document which also is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Registration Statement.

Item 4. Description of Securities

Not Applicable.

Item 5. Interests of Named Experts and Counsel

Not Applicable.

Item 6. Indemnification of Directors and Officers

Section 317 of the California Corporations Code authorizes a court to award, or a corporation's Board of Directors to grant, indemnity to directors and officers in terms sufficiently broad to permit indemnification (including reimbursement of expenses incurred) under certain circumstances for liabilities arising under the Securities Act of 1933, as amended, (the "1933 Act"). The Registrant's Restated Articles of Incorporation, as amended, and Bylaws provide for indemnification of its directors, officers, employees and other agents to the maximum extent permitted by the California Corporations Code.

Item 7. Exemption from Registration Claimed

Not Applicable.

II-1

NetApp 000072

`<PAGE>  3`

Item 8. Exhibits

```
<TABLE>
<CAPTION>
Exhibit Number          Exhibit
--------------          -------
<S>                     <C>
```

| Exhibit Number | Exhibit |
|---|---|
| 4 | Instruments Defining the Rights of Stockholders. Reference is made to Registrant's Registration Statements No. 000-27130 on Form 8-A, together with the amendments and exhibits thereto, which are incorporated herein by reference pursuant to Items 3(c). |
| 5 | Opinion and consent of Brobeck, Phleger & Harrison LLP. |
| 23.1 | Independent Auditors' Consent. |
| 23.2 | Consent of Brobeck, Phleger & Harrison LLP is contained in Exhibit 5. |
| 24 | Power of Attorney. Reference is made to page II-4 of this Registration Statement. |
| 99.1 | WebManage Technologies, Inc. 1997 Stock Option Plan. |
| 99.2 | Form of WebManage Technologies, Inc. Stock Option Agreement for 1997 Stock Option Plan. |
| 99.3 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 1997 Stock Option Plan. |
| 99.4 | WebManage Technologies, Inc. 1999 Stock Option Plan. |
| 99.5 | Form of WebManage Technologies, Inc. Stock Option Agreement for 1999 Stock Option Plan. |
| 99.6 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 1999 Stock Option Plan. |
| 99.7 | WebManage Technologies, Inc. 2000 Stock Incentive Plan. |
| 99.8 | Form of WebManage Technologies, Inc. Stock Option Agreement for 2000 Stock Incentive Plan. |
| 99.9 | Form of Stock Option Assumption Agreement for WebManage Technologies, Inc. 2000 Stock Incentive Plan. |

`</TABLE>`

Item 9. Undertakings

    A. The undersigned Registrant hereby undertakes: (1) to file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement: (i) to include any prospectus required by Section 10(a)(3) of the 1933 Act, (ii) to reflect in the prospectus any facts or events arising after the effective date of this Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this Registration Statement and (iii) to include any material information with respect to the plan of distribution not previously disclosed in this Registration Statement or any material change to such information in this Registration Statement; provided, however, that clauses (1)(i) and (1)(ii) shall not apply if the information required to be included in a post-effective amendment by those clauses is contained in periodic reports filed by the Registrant pursuant to Section 13 or Section 15(d) of the 1934 Act that are incorporated by reference into this Registration Statement; (2) that for the purpose of determining any liability under the 1933 Act each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof; and (3) to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the WebManage Technologies, Inc. 1997 Stock Option Plan (as assumed by Registrant), WebManage Technologies, Inc. 1999 Stock Option Plan (as assumed by Registrant) and the WebManage Technologies, Inc. 2000 Stock Incentive Plan (as assumed by Registrant).

NetApp 000073

    B. The undersigned Registrant hereby undertakes that, for purposes of determining any liability under the 1933 Act, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the 1934 Act that is incorporated by reference into this Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the

offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

      C. Insofar as indemnification for liabilities arising under the 1933 Act may be permitted to directors, officers or controlling persons of the Registrant pursuant to the indemnification provisions summarized in Item 6 or otherwise, the Registrant has been advised that, in the opinion of the Commission, such indemnification is

II-2

NetApp 000074

&lt;PAGE&gt;    4

against public policy as expressed in the 1933 Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the 1933 Act and will be governed by the final adjudication of such issue.

II-3

NetApp 000075

<PAGE>    5

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-8, and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Sunnyvale, State of California on this 15th day of January, 2001.

NETWORK APPLIANCE, INC.

By: /s/ DANIEL J. WARMENHOVEN
-------------------------------------
Daniel J. Warmenhoven
Chief Executive Officer and Director

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Daniel J. Warmenhoven and Jeffry R. Allen, and each of them, as such person's true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for such person and in such person's name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this Registration Statement, and to file same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as such person might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or his or her substitutes, may lawfully do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

<TABLE>
<CAPTION>

| Signature | Title | Date |
|-----------|-------|------|
| <S> | <C> | <C> |
| /s/ DANIEL J. WARMENHOVEN<br>-------------------------------------<br>Daniel J. Warmenhoven | Chief Executive Officer<br>and Director<br>(Principal Executive Officer) | January 15, 2001 |
| /s/ JEFFRY A. ALLEN<br>-------------------------------------<br>Jeffry R. Allen | Executive Vice President, Finance<br>and Operations, Chief Financial<br>Officer and Secretary<br>(Principal Financial and Accounting<br>Officer) | January 15, 2001 |
| /s/ DONALD T. VALENTINE<br>-------------------------------------<br>Donald T. Valentine | Chairman of the Board and Director | January 15, 2001 |
| /s/ SANJIV AHUJA<br>-------------------------------------<br>Sanjiv Ahuja | Director | January 15, 2001 |

</TABLE>

II-4

NetApp 000076

```
<PAGE>    6

<TABLE>
<CAPTION>
<S>                                      <C>                          <C>
/s/ CAROL A. BARTZ                       Director
------------------------------------                                 January 15, 2001
Carol A. Bartz

/s/ LARRY R. CARTER                      Director
------------------------------------                                 January 15, 2001
Larry R. Carter

/s/ MICHAEL R. HALLMAN                   Director
------------------------------------                                 January 15, 2001
Michael R. Hallman

/s/ ROBERT T. WALL                       Director
------------------------------------                                 January 15, 2001
Robert T. Wall

/s/ DR. SACHIO SEMMOTO                   Director
------------------------------------                                 January 15, 2001
Dr. Sachio Semmoto
</TABLE>
```

II-5

NetApp 000077

<PAGE>    7

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

EXHIBITS

TO

FORM S-8

UNDER

SECURITIES ACT OF 1933

NETWORK APPLIANCE, INC.

NetApp 000078

```
<PAGE>    8
```

EXHIBIT INDEX

```
<TABLE>
<CAPTION>
Exhibit Number          Exhibit
--------------          -------
<S>                     <C>
    4                   Instruments Defining the Rights of Stockholders. Reference
                        is made to Registrant's Registration Statements No.
                        000-27130 on Form 8-A, together with the amendments and
                        exhibits thereto, which are incorporated herein by
                        reference pursuant to Items 3(c).

    5                   Opinion and consent of Brobeck, Phleger & Harrison LLP.

  23.1                  Independent Auditors' Consent.

  23.2                  Consent of Brobeck, Phleger & Harrison LLP is contained in
                        Exhibit 5.

   24                   Power of Attorney. Reference is made to page II-4 of this
                        Registration Statement.

  99.1                  WebManage Technologies, Inc. 1997 Stock Option Plan.

  99.2                  Form of WebManage Technologies, Inc. Stock Option
                        Agreement for 1997 Stock Option Plan.

  99.3                  Form of Stock Option Assumption Agreement for WebManage
                        Technologies, Inc. 1997 Stock Option Plan.

  99.4                  WebManage Technologies, Inc. 1999 Stock Option Plan.

  99.5                  Form of WebManage Technologies, Inc. Stock Option
                        Agreement for 1999 Stock Option Plan.

  99.6                  Form of Stock Option Assumption Agreement for WebManage
                        Technologies, Inc. 1999 Stock Option Plan.

  99.7                  WebManage Technologies, Inc. 2000 Stock Incentive Plan.

  99.8                  Form of WebManage Technologies, Inc. Stock Option
                        Agreement for 2000 Stock Incentive Plan.

  99.9                  Form of Stock Option Assumption Agreement for WebManage
</TABLE>                Technologies, Inc. 2000 Stock Incentive Plan.

</TEXT>
</DOCUMENT>
```

NetApp 000079

<PAGE>   1

EXHIBIT 5

OPINION AND CONSENT OF BROBECK, PHLEGER & HARRISON LLP

January 16, 2001

Network Appliance, Inc.
495 East Java Drive
Sunnyvale, CA 94089

Re:    Network Appliance, Inc. - Registration Statement for Offering of
       an Aggregate of 255,341 Shares of Common Stock

Dear Ladies and Gentlemen:

        We have acted as counsel to Network Appliance, Inc., a California
corporation (the "Company"), in connection with the registration on Form S-8
(the "Registration Statement") under the Securities Act of 1933, as amended, of
(a) 15,003 shares of the Company's common stock reserved for issuance under the
WebManage Technologies, Inc. 1997 Stock Option Plan as assumed by the Company
(the "1997 Plan"), (b) 74,050 shares of the Company's common stock reserved for
issuance under the WebManage Technologies, Inc. 1999 Stock Option Plan as
assumed by the Company (the "1999 Plan") and (c) 166,288 shares of the Company's
common stock reserved for issuance under the WebManage Technologies, Inc. 2000
Stock Incentive Plan as assumed by the Company (the "2000 Plan")

        This opinion is being furnished in accordance with the requirements
of Item 8 of Form S-8 and Item 601(b)(5)(i) of Regulation S-K.

        We have reviewed the Company's charter documents and the corporate
proceedings taken by the Company with respect to the assumption of the 1997
Plan, the 1999 Plan, and the 2000 Plan and the options outstanding thereunder in
connection with the Company's acquisition of WebManage Technologies, Inc. Based
on such review, we are of the opinion that if, as and when the shares of the
Company's common stock are issued and sold (and the consideration therefor
received) pursuant to the provisions of option agreements for the outstanding
options assumed under the 1997 Plan, the 1999 Plan, and the 2000 Plan and in
accordance with the Registration Statement, such shares will be duly authorized,
legally issued, fully paid and nonassessable.

        We consent to the filing of this opinion letter as Exhibit 5 to the
Registration Statement.

        This opinion letter is rendered as of the date first written above
and we disclaim any obligation to advise you of facts, circumstances, events or
developments which hereafter may be brought to our attention and which may
alter, affect or modify the opinion expressed herein. Our opinion is expressly
limited to the matters set forth above and we render no opinion, whether by
implication or otherwise, as to any other matters relating to the Company, the
1997 Plan, the 1999 Plan, the 2000 Plan or the shares of the Company's common
stock issuable under such plans.

                            Very truly yours,

                            /s/ Brobeck, Phleger & Harrison LLP

                            BROBECK, PHLEGER & HARRISON LLP

</TEXT>
</DOCUMENT>

NetApp 000081

&lt;PAGE&gt;    1

EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT

We consent to the incorporation by reference in this Registration Statement of
Network Appliance, Inc. on Form S-8 of our report dated May 16, 2000 (June 13,
2000 as to Note 11), appearing in the Annual Report on Form 10-K of Network
Appliance, Inc. for the year ended April 30, 2000.

/s/ Deloitte & Touche LLP
Deloitte & Touche LLP

San Jose, California
January 15, 2001

&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;

NetApp 000083

<PAGE>   1

WebManage Technologies, Inc.                          EXHIBIT 99.1
Stock Option Plan 1997

WEBMANAGE TECHNOLOGIES. INC.

1997 STOCK OPTION PLAN

1.      PURPOSE OF THE PLAN

The WebManage Technologies, Inc. 1997 Stock Option Plan (the "Plan") is intended
to promote the growth of the WebManage Technologies, Inc. (the "Company") by
attracting and motivating directors, officers, employees, consultants,
independent contractors, vendors, suppliers and other persons whose efforts are
deemed worthy of encouragement through the incentive effects of stock options.

2.      DEFINITIONS

As used herein, the following definitions shall apply:

(a) "Board" shall mean the Committee if one has been appointed or, if no
Committee has been appointed, the Board of Directors of the Company.

(b) "Code" shall mean the Internal Revenue Code of 1986, as amended, the rules
and regulations promulgated thereunder and the interpretations thereof, all as
from time to time in effect.

(c) "Committee" shall mean the Committee appointed by the Board in accordance
with Section 3(a) below, if one is appointed.

(d) "Common Stock" shall mean the no par value common stock of the Company.

(e) "Company" shall mean WebManage Technologies, Inc., a Delaware corporation.

(f) "Consultant" shall mean any person who is engaged by the Company or any
Parent or Subsidiary of the Company to render consulting or advisory services,
whether or not compensation is paid to such individual.

(g) "Continuous Status" shall mean the absence of any interruption or
termination of service as an Employee, Consultant or other person providing
services on a regular basis to the Company or its Parent or any Subsidiary.
Continuous Status shall not be considered interrupted in the case of sick leave,
military leave, or any other leave of absence approved by the Board, provided
that either such leave is for a period of not more than ninety (90) days or
reemployment upon the expiration of such leave is provided or guaranteed by
contract or statute.

(h) "Director" shall mean any person serving on the Board.


"Employee" shall mean any person, including Officers and Directors, employed by
the Company or its Parent or any Subsidiary of the Company.

0) "Fair Market Value" shall mean the value of a share of Common Stock on the
date of the grant of the Option as determined, in good faith, by the Board or
the Committee and such determination shall be conclusive for all purposes. The
Board or Committee shall take into account such factors affecting value as it,
in its sole and absolute discretion, may deem relevant.

NetApp 000085

<PAGE>    2
WebManage Technologies, Inc.
Stock Option Plan 1997

(k) "Officer" shall mean any person, which may include Directors, employed by the Company or its Parent or any Subsidiary of the Company who has been elected an officer by the respective Board of Directors.

(1) "Option" shall mean a stock option issued pursuant to the Plan. Options may be either "Incentive Options," which are defined as options intended to meet the requirements of Section 422 of the Code, or "Nonqualified Options," which are defined as Options not intended to meet such requirements of the Code.

(M) "Option Agreement" shall mean the written agreement setting forth the terms and conditions of an Option.

(n) "Optioned Stock" shall mean the Common Stock subject to an option.

(o) "Optionee" shall mean a person or entity to whom an Option has been granted.

(p) "Parent" shall mean a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(q) "Plan" shall mean the WebManage Technologies, Inc. 1997 Stock Option Plan.

(r) "Share" shall mean a share of Common Stock of the Company, as may be adjusted in accordance with Section 6 below.

(s) "Subsidiary" shall mean a "subsidiary corporation" of the Company, whether now or hereafter existing, as defined in Section 424(f) of the Code.

3.    ADMINISTRATION OF THE PLAN

(a) By the Board or by the Committee. The Plan shall be administered by the Board or, if appointed by the Board, by a Committee; provided, however, if the Company shall have registered a class of equity securities pursuant to Section 12 of the Securities Exchange Act of 1934, then the Plan shall be administered by the Board or, if appointed, by a Committee of two or more directors, all of which shall be "disinterested" as defined in Rule 16b-3 under the Securities Exchange Act of 1934. The Board and the Committee shall have full authority to administer the Plan, including authority to interpret and construe any provision of the Plan and to adopt such rules and regulations for administering the Plan as it may deem necessary in order to comply with the requirements of the Plan, or in order that any Option that is intended to be an Incentive Option will be classified as an incentive stock option under the Code, or in order to conform to any regulation or to any change in any law or regulation applicable thereto. The Board may reserve to itself any of the authority granted to the Committee as set forth herein, and it may perform and discharge all of the functions and responsibilities of the Committee at any time that a duly constituted Committee is not appointed and serving.

(b) Actions of the Board and the Committee. All actions taken and all interpretations and determinations made by the Board or by the Committee in good faith (including determinations of Fair Market Value) shall be final and binding upon all Optionees, the Company and all other interested persons. No member of the Board or the Committee shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan, and all

NetApp 000086

<PAGE>  3
WebManage Technologies, Inc.
Stock Option Plan 1997

members of the Board or the Committee shall, in addition to their rights as
directors, be fully protected by the Company with respect to any such action,
determination or interpretation.

(c) Powers of the Board and the Committee. Subject to the provisions of the
Plan, the Board and, if appointed, the Committee shall have the authority, in
their discretion to:

(i) determine, upon review of the relevant information, the Fair Market Value of
the Common Stock;

(ii) determine the persons to whom Options shall be granted, the time or times
at which Options shall be granted, the number of shares to be represented by
each Option and the exercise price per share;

(iii) interpret the Plan;

(iv) prescribe, amend, and rescind rules and regulations relating to the Plan;

(v) determine whether an Option granted shall be an Incentive Option or a
Nonqualified option and to determine the terms and provisions of each Option
granted (which need not be identical) and, with the consent of the holder
thereof, to modify or amend each Option, including reductions in the exercise
price thereof;

(vi) accelerate or defer (with the consent of the Optionee) the exercise date of
any Option;

(vii) authorize any person to execute on behalf of the Company any instrument
required to effectuate the grant of an Option previously granted by the Board;
and

(viii) make all other determinations deemed necessary or advisable for the
administration of the Plan.

4.    ELIGIBILITY AND PARTICIPATION

(a) Eligibility. Grants of Options may be made to any Employee or Consultant
(which may include Officers and/or Directors) of the Company or of its Parent or
Subsidiary, or any independent contractor, vendor, supplier or any other person
providing services to the Company or a Parent or Subsidiary whose efforts are
deemed worthy of encouragement by the Board; provided, however, that an
Incentive Option may only be granted to an Employee.

(b) Participation by Director. Members of the Board who are either eligible for
Options or have been granted Options may vote on any matters affecting the
administration of the Plan or the grant of any Options pursuant to the Plan,
except that no such member shall act upon the granting of an Option to himself,
but any such member may be counted in determining the existence of a quorum at
any meeting of the Board and may be counted as part of an action by unanimous
written consent during or with respect to which action is taken to grant Options
to him.

5.    EXERCISE PRICE; CONSIDERATION; AND FORM OF OPTION AGREEMENT

(a) Exercise Price. The exercise price of any Incentive Option shall be not less
than one hundred percent (100%) of the Fair Market Value of a share of Common
Stock on the date of the grant of the Option. The exercise price of a
Nonqualified Option shall be determined in the sole discretion of the Board and
may be at less than the Fair Market Value on the date of the grant of the
Option. If an Incentive Option is granted to an Optionee who then owns stock
possessing more than 10% of the total combined voting power of all classes of
stock of the Company or its

NetApp 000087

<PAGE>  4
WebManage Technologies, Inc.
Stock Option Plan 1997

Parent or any Subsidiary, then the exercise price of such Incentive Option shall be at least one hundred ten percent (1 10 %) of the Fair Market Value of the Company's Common Stock on the date of the grant of such Option.

(b) Consideration. The exercise price shall be paid in full, at the time of exercise of the Option, by personal or bank cashier's check or in such other form of lawful consideration as the Board or the Committee may approve from time to time, including, without limitation, the transfer of outstanding shares of Common Stock as provided in Section 7(c) or the Optionee's promissory note in form satisfactory to the Company and bearing interest at a rate of not less than the relevant applicable federal rate as defined in Section 1274(d)(1) of the Code as in effect at such time, as determined by the then most recently published applicable Revenue Ruling by the Internal Revenue Service.

   (c)    Form of Option Agreement. Each Option shall be evidenced by an Option Agreement specifying the number of shares which may be purchased upon exercise of the Option and containing such terms and provisions as the Board or the Committee may determine, subject to the provisions of the Plan.

6.    SHARES OF COMMON STOCK SUBJECT TO THE PLAN

(a) Number. The aggregate number of shares of Common Stock subject to Options which may be granted under the Plan shall be 2,000,000 subject to adjustment as herein below provided. To the extent any Option granted under the Plan shall expire or terminate unexercised or for any reason become unexercisable, the shares subject to such Option shall thereafter be available for future grants under the Plan.

(b) Capital Changes. Except as hereinafter provided, no adjustment shall be made in the number of shares of Common Stock issued to an Optionee, or in any other rights of the Optionee upon exercise of an Option, by reason of any dividend, distribution or other right granted to stockholders for which the record date is prior to the date of exercise of the Optionee's Option. In the event any change is made to the shares of Common Stock (whether by reason of a merger, consolidation, reorganization, recapitalization, stock dividend, stock split, combination of shares, exchange of shares, change in corporate structure or otherwise), appropriate adjustments shall be made in: (i) the number of shares of Common Stock theretofore made subject to Options, and in the exercise price of such shares; and (ii) the aggregate number of shares which may be made subject to Options.

7.    EXERCISE OF STOCK OPTIONS

(a) Time of Exercise. Subject to the provisions of the Plan, including without limitation Section 7(d) and Section 8, the Board or the Committee, in its discretion, shall determine the time when an Option, or a portion of an Option, shall become exercisable, and the time when an Option, or a portion of an Option, shall expire; provided, however, that (i) an Incentive Option shall expire, to the extent not exercised, no later than the tenth (10th) anniversary of the date on which it was granted; and (ii) any Incentive Option granted to any person who owns shares possessing more than 10% of the total combined voting power or value of all classes of stock of the Company or of its Parent or a Subsidiary shall have a term of not to exceed five (5) years. Such time or times shall be set forth in the Option Agreement evidencing such Option.

(b) Notice of Exercise. An Optionee electing to exercise an Option shall give written notice to the Company, as specified by the Option Agreement, of the Optionee's election to purchase a specified number of shares, such notice shall be accompanied by the instrument evidencing such Option and any other documents required by the Company, and shall tender the exercise price of

NetApp 000088

<PAGE>    5
WebManage Technologies, Inc.
Stock Option Plan 1997

the shares that the Optionee has elected to purchase. If the notice of election to exercise is given by the executor or administrator of a deceased Optionee, or by the person or persons to whom the Option has been transferred by the Optionee's will or the applicable laws of descent and distribution, the Company will be under no obligation to deliver shares pursuant to such exercise unless and until the Company is satisfied that the person or persons giving such notice is or are entitled to exercise the Option.

(c) Exchange of Outstanding Stock. The Board, in its sole discretion, may permit an Optionee to surrender to the Company shares of Common Stock previously acquired by the Optionee at least six (6) months prior to such surrender as part or full payment for the exercise of an Option. Such surrendered shares shall be valued at their Fair Market Value on the date of exercise of the Option.

(d) Termination of Continuous Status Before Exercise. Unless otherwise provided in the terms of an Option Agreement, the vested portion of an Option held by an Optionee who is an Employee or a Consultant, as the case may be, at the date of grant of such Option, may be exercised by the Optionee at any time while the Optionee is an Employee or a Consultant, respectively, or within 30-days of termination, and has maintained Continuous Status with the Company or its Parent or any Subsidiary from the date of the grant of the Option (other than the Optionee's death, retirement or disability as provided below) until 30-days prior to the date of the exercise of the Option. Any Option held by the Optionee at such time as he/she is no longer an Employee or Consultant or Continuous Status is not maintained shall be deemed to have been forfeited and be of no further force or effect. In no event, however, may any Option be exercised after the expiration of its term.

(e) Death. If an Optionee dies at a time when the Optionee is entitled to exercise an Option, then at any time or times within thirty (30) days after the Optionee's death (or such further period as the Board may allow) such Option may be exercised, as to all or any of the shares which the Optionee was entitled to purchase immediately prior to the Optionee's death by (i) the Optionee's executor or administrator or the person(s) to whom the Option is transferred by will or the applicable laws of descent and distribution or (ii) the Optionee's designated beneficiary, and except as so exercised such Option will expire at the end of such period. In no event, however, may any Option be exercised after the expiration of its term.

(f) Retirement and Disability. If an Optionee retires from service at age 65 or older or retires at less than age 65 with the consent of the Board or becomes "disabled" (as hereinafter defined) at a time when the Optionee is entitled to exercise an Option, then, at any time or times within thirty (30) days of the date of such retirement or within thirty (30) days of the date of such disability, the Optionee may exercise such Option as to all or any of the shares which the Optionee was entitled to purchase under such Option immediately prior to such retirement or disability. Except as so exercised, such Option shall expire at the end of such period. In no event, however, may any Option be exercised after the expiration of its term. As used herein, "disabled" shall mean that the Optionee is permanently and totally disabled so as to be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than three (3) months.

(g) Disposition of Terminated Stock Options. Any shares of Common Stock subject to Options which have been terminated as provided above shall not thereafter be eligible for purchase by the Optionee but shall again be available for grant by the Board to other Optionees.

NetApp 000089

<PAGE>  6
WebManage Technologies, Inc.
Stock Option Plan 1997

      (h)      Stock Redemption Agreement. As a condition to the exercise of an Option by an Optionee, the Board or Committee may require the Optionee to execute and deliver a Stock Redemption Agreement, Shareholder Agreement or other agreement in such form as the Board or Committee shall approve and providing for appropriate restrictions on transfer of the Common Stock acquired pursuant to such exercise.

8.     SPECIAL PROVISIONS RELATING TO INCENTIVE OPTIONS

(a) $100,000.00 Limit. The Company shall not grant Incentive Options under the Plan to any Optionee to the extent that the aggregate Fair Market Value (determined as of the date of grant) of the Common Stock covered by such Incentive Options which are exercisable for the first time during any calendar year, when combined with the aggregate Fair Market Value of all stock covered by Incentive Options granted to such Optionee after December 31, 1986 by the Company, its Parent or a Subsidiary thereof which are exercisable for the first time during the same calendar year, exceeds $100,000.

(b) Grants to Employees Only. Incentive Options shall be granted only to persons who, on the date of grant, are Employees of the Company or its Parent or a Subsidiary of the Company.

9.     NO CONTRACT OF EMPLOYMENT

Unless otherwise expressed in a writing signed by an authorized officer of the Company, all Employees of the Company are hired for an unspecified period of time and are considered to be "at-will employees." Nothing in this Plan shall confer upon any Optionee the right to continue in the employ of the Company, its Parent or any Subsidiary, nor shall it limit or restrict in any way the right of the Company, its Parent or any such Subsidiary to discharge the Optionee at any time for any reason whatsoever, with or without cause.

10.    NO RIGHTS AS A STOCKHOLDER

An Optionee shall have no rights as a stockholder with respect to any shares of Common Stock subject to an Option.

11.    NONTRANSFERABILITY OF OPTIONS; DEATH OF OPTIONEE

No Option acquired by an Optionee under the Plan shall be assignable or transferable by an Optionee, other than by will or the laws of descent and distribution, and such Options are exercisable, during the Optionee's lifetime, only by Optionee; provided, however, that (i) a transfer may be made pursuant to a qualified domestic relations order (as defined in the Code or as permitted by Title I of the Employee Retirement Income Security Act ("ERISA") or the rules thereunder) and (ii) any Option Agreement issued under the Plan may provide for the designation of a beneficiary of the Optionee (which may be an individual or trustee) who may exercise the Option after the Optionee's death and enjoy the economic benefits thereof, subject to the consent of Optionee's spouse where required by law. Subject to Section 7(e), in the event of Optionee's death, the Option may be exercised by the personal representative of the Optionee's estate or, if

NetApp 000090

<PAGE>    7
WebManage Technologies, Inc.
Stock Option Plan 1997

no personal representative has been appointed, by the successor(s) in interest determined under the Optionee's will or under the applicable laws of descent and distribution.

12.    LIQUIDATION OR MERGER OF THE COMPANY

(a) Liquidation. In the event of a proposed dissolution or liquidation of the Company, the Option shall terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board. The Board may, in the exercise of its sole discretion in such instances, declare that any Option shall terminate as of a date fixed by the Board and give each Optionee the right to exercise such Option as to all or any part of the Shares covered by an Option, including Shares as to which the Option would not otherwise be exercisable.

(b) Sale of Assets, Merger or Consolidation or Change of Control. The Board may provide for immediate vesting of any or all Options, and allow such Options to be fully exercised without regard to the normal vesting schedule of such Options, in the event of a proposed sale of all or substantially all of the assets of the Company, or a merger or consolidation of the Company with or into another corporation, a liquidation, or a "change of control" (as defined below); provided, however, that if the Board determines that such immediate vesting is not appropriate, then the Options, if the event is a merger or consolidation, shall be assumed or an equivalent option shall be substituted by such successor corporation (or a parent or subsidiary of such successor corporation) as a condition to the completion of such transaction. The term "Change in Control" shall be deemed to have occurred if (i) any "person" or "group" (as defined in or as pursuant to section 13(d) and (14)d of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), becomes a "beneficial owner" (as defined in Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of securities of the Company representing thirty percent (30%) or more of the combined voting power of the Common Stock (and the preferred stock, if any) outstanding which votes generally for the election of directors; or (ii) the Company or any of its Subsidiaries sell, in one or more transactions, other than in the ordinary course of business, assets constituting in the aggregate all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis.

13.    AMENDMENTS; DISCONTINUATION OF PLAN

The Board may from time to time alter, amend, suspend or discontinue the Plan, including, where applicable, any modifications or amendments as it shall deem advisable for any reason, including satisfying the requirements of any law or regulation or any change thereof; provided, however, that no such action shall adversely affect the rights and obligations with respect to Options at any time outstanding under the Plan; and provided further, that no such action shall, without the approval of the stockholders of the Company, (i) materially increase the maximum number of shares of Common Stock that may be made subject to Options (unless necessary to effect the adjustments required by Section 6(b)), (ii) materially increase the benefits accruing to Optionees under the Plan, or (iii) materially lessen the requirements as to eligibility for participation in the Plan. No such amendment shall materially adversely affect the rights of any Optionee under any Option previously granted without such Optionee's prior consent.

14.    REGISTRATION OF OPTIONED STOCK

The Options shall not be exercisable unless the purchase of such Optioned Stock is pursuant to an applicable effective registration statement under the Securities Act of 1933, as amended, or unless, in the opinion of counsel to the Company, the proposed purchase of such Optioned Stock would be exempt from the registration requirements of the Securities Act of 1933, as amended.

NetApp 000091

<PAGE>   8
WebManage Technologies, Inc.
Stock Option Plan 1997

15.    WITHHOLDING TAXES; SATISFIED BY WITHHOLDING OPTIONED SHARES

(a) General. The Company, its Parent or any Subsidiary may take such steps as it may deem necessary or appropriate for the withholding of any taxes which the Company, its Parent or any Subsidiary is required by law or regulation of any governmental authority, whether Federal, state or local, domestic or foreign, to withhold in connection with any Option including, but not limited to, requiring the Optionee to pay such tax at the time of exercise or the withholding of issuance of shares of Common Stock to be issued upon the exercise of any Option until the Optionee reimburses the Company for the amount the Company is required to withhold with respect to such taxes, or, at the Company's sole discretion, canceling any portion of such issuance of Common Stock in any amount sufficient to reimburse itself for the amount it is required to so withhold.

(b) Satisfying Taxes by Withholding Optioned Shares. Option Agreements under the Plan may, at the discretion of the Board, contain a provision to the effect that all Federal and state taxes required to be withheld or collected from an Optionee upon exercise of an Option may be satisfied by the withholding of a sufficient number of exercised Optioned Stock which, valued at Fair Market Value on the date or exercise, would be equal to the total withholding obligation of the Optionee for the exercise of such Option; provided, however, that if the Company is a public reporting corporation, no person who is an "officer" of the Company as such term is defined in Rule 3b-2 under the Securities Exchange Act of 1934 may elect to satisfy the withholding of Federal and state taxes upon the exercise of an option by the withholding of Optioned Stock unless such election is made either (i) at least six (6) months prior to the date that the exercise of the Option becomes a taxable event or (ii) during any of the periods beginning on the third business day following the date on which the Company issues a news release containing the operating results of a fiscal quarter or fiscal year and ending on the twelfth business day following such date. Such election shall be deemed made upon receipt of notice thereof by an officer of the Company, by mail, personal delivery or by facsimile message, and shall (unless notice to the contrary is provided to the Company) be operative for all option exercises which occur during the twelve (12) month period following election.

16.    EFFECTIVE DATE AND TERM OF PLAN

The Plan is effective as of the date of adoption by the Board and Options may be granted at any time on or after such date; provided, however, that the Plan shall terminate if the stockholders of the Company do not approve and adopt it within twelve (12) months of such date. No Options shall be granted subsequent to ten (10) years after the effective date of the Plan; however, Options outstanding subsequent to ten (10) years after the effective date of the Plan shall continue to be governed by the provisions of the Plan until exercised or terminated in accordance with the Plan or the respective Option Agreements.


ADOPTED BY THE BOARD OF DIRECTORS
ON _____, 199____


APPROVED BY THE STOCKHOLDERS
ON _____, 199____


ATTEST:

```
<PAGE>    9
WebManage Technologies, Inc.
Stock Option Plan 1997


--------------------------------
Secretary


</TEXT>
</DOCUMENT>
```

NetApp 000093

<PAGE>    1

EXHIBIT 99.2

WEBMANAGE TECHNOLOGIES, INC.

STOCK OPTION AGREEMENT
UNDER ITS
1997 STOCK OPTION PLAN

This STOCK OPTION AGREEMENT (this "Agreement") is issued to the Optionee hereinbelow set forth pursuant to the WebManage Technologies, Inc. 1997 Stock Option Plan (the "Plan") of WebManage Technologies, Inc., a New Hampshire corporation (the "Company").

1. OPTIONEE; BASIC TERMS.

The Optionee is hereby granted an option to purchase the number of fully paid and non-assessable shares of the Common Stock of the Company at the option price hereinbelow set forth, subject to the terms and conditions of this Agreement.

2. DEFINITIONS.

(a) "CODE" shall mean the Internal Revenue Code of 1986, as amended, the rules and regulations promulgated thereunder and the interpretations thereof, all as from time to time in effect.

(b) "EXERCISE DATES" shall mean the following dates after which the Option may be exercised in the increments set forth below:

| Exercise Dates | Optioned Stock |
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |

(c) "GRANT DATE" shall mean the date of grant of the Option, being _____, 199___.

(d) "INCENTIVE OPTION" shall mean an option described in Section 422 of the Code. To qualify for favorable tax treatment provided by an incentive option, the shares purchased upon exercise must be held for a period of two (2) years from the date of the option grant and for a period of one (1) year after the shares are transferred to Optionee.

(e) "NONQUALIFIED OPTION" shall mean an option other than an Incentive Option, the exercise of which generally results in an immediate taxable event.

(f) "OPTION" shall have the meaning set forth in Section 3(a) hereof.

NetApp 000095

<PAGE>    2

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

(g) "OPTIONED STOCK" shall mean _____ (____) shares of the no par value Common Stock of the Company.

(h) "OPTIONEE" shall mean _____.

(i) "PURCHASE PRICE" shall mean the price per share for the Optioned Stock and shall be $ _____.

(j) "VESTING PERIOD" shall mean a period of _____(____) years commencing on the Grant Date.

(k) Unless otherwise indicated, all capitalized terms set forth in this Agreement shall have the meaning provided to them under the Plan, a copy of which Optionee acknowledges having received.

3. GRANT OF OPTION.

(a) As of the Grant Date, the Company hereby grants to the Optionee an option (the "Option") to purchase the Optioned Stock upon the terms and conditions set forth below.

(b) This Option is intended to be a(n) (check one only):

[ ]    Incentive Option (only employees of the Company are eligible)

[ ]    Nonqualified Option

(c) The Optionee's relationship to the Company is as a(n) (if applicable, check more than one):

[ ]    Officer

[ ]    Director

[ ]    Employee

[ ]    Consultant

[ ]    Other Person providing services

-2-

NetApp 000096

<PAGE>   3

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

4. DURATION OF OPTION.

(a) INCENTIVE OPTION: If this Option is an Incentive Option, as designated in Section 3(b), it shall expire one day short of ten (10) years from the Grant Date, provided, however, for any Optionee who owns more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company, this Option shall expire one day short of five (5) years from the Grant Date.

(b) NONQUALIFIED OPTION: If this Option is a Nonqualified Option, as designated in Section 3(b), it shall expire ten (10) years from the Grant Date.

5. PURCHASE PRICE.

The Purchase Price for the Optioned Stock has been determined by the Board of Directors of the Company and: (a) may or may not be less than the Fair Market Value on the Grant Date if the Option is a Nonqualified Option, (b) shall be equal to at least one-hundred percent (100%) of the Fair Market Value if the Option is an Incentive Option, or (c) shall be equal to at least one-hundred ten percent (110%) of the Fair Market Value if the Option is an Incentive Option and Optionee holds more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company or of its Parent or any Subsidiary.

6. EXERCISABILITY. Subject to the provisions of this Agreement, including without limitation Section 10 regarding termination of Optionee's employment, consulting or other relationship with the Company and Section 14(b) regarding Incentive Options, this Option shall vest in annual increments over the Vesting Period equal to the total number of shares of Optioned Stock divided by the number of years in the Vesting Period. Optioned Stock, to the extent vested shall become exercisable, in one or more installments (to the nearest whole number) on the Exercise Dates, to the extent of the total number of Shares of the Optioned Stock set forth next to such Exercise Date in the definition thereof. The number of shares of Optioned Stock which become exercisable each year, to the extent not previously exercised, shall accumulate until exercised in accordance with and subject to the terms and conditions of this Agreement.

7. METHOD OF EXERCISE AND PAYMENT.

(a) EXERCISE. This Option may be exercised from time to time, in whole or in part, to the extent exercisable, only by delivery to an officer of the Company of the original of this Option with an appropriate Notice of Exercise of Stock Option duly signed by the Optionee, together

-3-

NetApp 000097

<PAGE>    4

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

with the full Purchase Price of the shares purchased pursuant to the exercise of the Option and an executed Stock Redemption Agreement pursuant to Section 7(b) hereof; provided, however, that this Option may not be exercised if such exercise would violate any law or governmental order or regulation. Payment for the shares of Optioned Stock purchased pursuant to any exercise shall be made in full at the time of such exercise, in any of the following methods, as determined by the Board of Directors and as may be elected by the Optionee:

(i)    may ____ or may not ____ pay in cash or by check payable to the order of the Company;

(ii)   may ____ or may not ____ pay in Common Stock of the Company already owned by the Optionee for a period of six (6) months prior to such exercise, valued as of the date of exercise of the Option at Fair Market Value; or

(iii)  may ____ or may not ____ pay by a promissory note payable to the order of the Company; if a promissory note is tendered, such note shall bear interest at an interest rate determined by, and shall be subject to such terms and conditions as are prescribed by, the Board as set forth in the form of promissory note then utilized under the Plan.

(b) STOCK REDEMPTION AGREEMENT. The Optionee shall execute and deliver to the Company, together with the Notice of Exercise of Stock Option and payment in full of the Purchase Price, duplicate originals of a Stock Redemption Agreement in the form set forth in Exhibit 1 attached to this Agreement. The Company shall not issue any shares of Optioned Stock to the Optionee unless and until Optionee executes and delivers such Stock Redemption Agreement.

(c) TAX WITHHOLDINGS. Optionee agrees to have withheld from any remuneration payable to such Optionee by the Company and/or to pay to the Company, at the time of exercise of the Option, an amount which is required to be withheld or paid pursuant to any Federal, state or local tax or revenue laws or regulations, as may be determined by the Company. The Optionee may not satisfy such tax withholding by instructing the Company to withhold such number of shares of Optioned Stock that would equal the total tax obligations required to be withheld.

8. NON-TRANSFERABILITY. This Option shall not be transferred, sold, pledged, assigned, hypothecated, or disposed of in any manner by Optionee other than by will or the laws of descent and distribution to the extent hereinafter set forth; provided, however, that a transfer hereof may be made pursuant to a qualified domestic relations order (as defined in the Code or as permitted

-4-

NetApp 000098

&lt;PAGE&gt;    5

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

by Title I of the Employee Retirement Income Security Act ("ERISA") or the rules
thereunder) and, provided further, that Optionee may designate a beneficiary
(which may be an individual or trustee) who may exercise the Option after
Optionee's death and enjoy the economic benefits thereof, subject to the consent
of Optionee's spouse where required by law. This Option may be exercised during
the Optionee's lifetime only by the Optionee or, upon the Optionee's legal
incapacity to act on the Optionee's own behalf, by the Optionee's conservator or
other lawful representative. The Option shall be null and void and without
effect upon any attempted assignment or transfer, except as hereinabove
provided, including without limitation, any purported assignment, whether
voluntary of by operation of law, pledge, hypothecation or other disposition
contrary to the provisions hereof, or levy of execution, attachment, trustee
process or similar process, whether legal or equitable, upon the Option.

9. TERMINATION. To the extent that this Option shall not have been exercised in
full prior to its termination or expiration date, whichever shall be sooner, it
shall terminate and become void and of no effect.

10. CESSATION OF CONTINUOUS STATUS -- TERMINATION, RETIREMENT, DEATH OR
DISABILITY. If the Optionee shall voluntarily or involuntarily cease Continuous
Status (as such term is defined in the Plan) (hereinafter referred to as a
"Termination"), the Option of the Optionee shall terminate immediately upon the
Termination and the Optionee in such event shall have no right after such
Termination to exercise any unexercised Option that the Optionee might have
exercised on or prior to the Termination; provided, however, that if the
Termination is due to (i) retirement by the Optionee on or after attaining the
age of sixty-five (65) years, (ii) the disability of the Optionee or (iii) the
death of the Optionee, then the Optionee or the representative of the estate of
the Optionee shall have the privilege of exercising the entire unexercised
vested portion of this Option, provided that such exercise be accomplished (a)
prior to the expiration of this Option and (b) either within thirty (30) days of
the Optionee's retirement, within thirty (30) days of the Optionee's disability,
or within thirty (30) days after the date of death of the Optionee, as the case
may be.

11. STOCK SPLITS AND CAPITAL ADJUSTMENTS. If, prior to the complete exercise of
this Option, there shall be declared and paid a stock dividend upon the Common
Stock of the Company or if such stock shall be split up, converted, exchanged or
reclassified, this Option, to the extent that it has not been exercised, shall
entitle the holder, upon the future exercise of this Option, to such number and
kind of securities or other property, subject to the terms of the Option, to
which the holder would be entitled had he actually owned the stock subject to
the unexercised portion of the Option at the time of the occurrence of such
stock dividend, split up, conversion, exchange, reclassification or
substitution; and the aggregate purchase price upon the future exercise of the

-5-

NetApp 000099

<PAGE>  6

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

Option shall be the same as if shares of Common Stock of the Company originally optioned were being purchased as provided herein.

12. ACCELERATION OF EXERCISE DATE.

    (a) SALE OF ASSETS, MERGER, CONSOLIDATION AND CHANGE OF CONTROL. The Board of Directors of the Company may, but shall not be required, to provide for immediate vesting of any or all outstanding unexercised Options in the event of any proposed merger, acquisition or sale of the Company (other than a merger, acquisition or sale with respect to which a majority of the members of the Board of Directors of the Company prior to the merger, acquisition or sale continue to be a majority of the Board of Directors of the resulting corporation after such merger, acquisition or sale), all pursuant to and subject to the terms and conditions of the Plan including, without limitation, the limitations upon vesting imposed by Section 8 of the Plan.

13. COMPLIANCE WITH SECURITIES LAWS.

    (a) POSTPONE ISSUANCE. Notwithstanding any provision of this Option to the contrary, the Company may postpone the issuance and delivery of shares upon any exercise of this Option until one of the following conditions shall be met:

    (i) The shares of Optioned Stock with respect to which such Option has been exercised are at the time of the issue of such shares effectively registered under applicable Federal and state securities laws now in force or hereafter enacted or amended; or

    (ii) Counsel for the Company shall have given an opinion that registration of such shares under applicable Federal and state securities laws, as now in force or hereafter enacted or amended, is not required.

    (b) INVESTMENT REPRESENTATION. In the event that for any reason the shares of Optioned Stock to be issued upon exercise of the Option shall not be effectively registered under the Securities Act of 1933 (the "1933 Act"), upon any date on which the Option is exercised in whole or in part, the Company shall be under no further obligation to issue shares of Optioned Stock unless the Optionee shall give a written representation to the Company, in form satisfactory to the Company, that such person is acquiring the shares of Optioned Stock issued pursuant to such exercise of the Option for investment and not with a view to, or for sale in connection with, the distribution of any such shares, and that he/she will make no transfer of the same except in compliance with the 1933 Act and the rules and regulations promulgated

-6-

NetApp 000100

&lt;PAGE&gt;  7

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

thereunder and then in force, and in such event, the Company may place an
"investment legend" upon any certificate for the shares of Optioned Stock issued
by reason of such exercise.

14.  SPECIAL RULES REGARDING INCENTIVE OPTIONS.

        (a) NOTICE OF TRANSFER. If this Option is an Incentive Option, then the
employee-Optionee hereby agrees to notify the Company in writing within three
(3) days after any sale, transfer or other disposition of shares acquired upon
the exercise of this Option which occurs within either twelve (12) months
following the date of exercise or twenty-four (24) months following the Grant
Date.

        (b) $100,000 PER YEAR EXERCISE LIMIT. If this option is an Incentive
Option, then it shall be exercisable in accordance with the above schedule of
Section 6, but in no event shall it be exercised to the extent that the
aggregate fair market value of Optioned Stock, which is exercisable for the
first time during any calendar year, when combined with the aggregate fair
market value of all stock covered by incentive stock options (as defined in the
Code) granted to Optionee after December 31, 1986 by the Company, its parent or
a subsidiary of the Company which are exercisable for the first time during the
same calendar year, exceeds $100,000.

15.  NO AGREEMENT OF EMPLOYMENT. Neither the grant of this Option nor this
Agreement shall be deemed to create any agreement with, or obligation by, the
Company to employ the Optionee for any period of time, it being understood that
employment is strictly "at will" in the absence of any written agreement to the
contrary and, in the absence of such written agreement, such person may be
terminated by the Company at any time, with or without cause.

16.  ASSIGNMENT OF INVENTIONS, ETC.; NON-DISCLOSURE OF CONFIDENTIAL INFORMATION.
As further consideration for the issuance of the Option, the Optionee, if the
Optionee is an Employee of the Company, agrees as follows:

        (a) ASSIGNMENT OF INVENTIONS. Any and all trade secrets, inventions and
proprietary information which either (i) relates at the time of conception or
reduction to practice to the company or its business, or actual or demonstrably
anticipated research or development of the Company or (ii) results from any work
performed by the Optionee for the Company is hereby assigned to, and shall
become the absolute property of, the Company and shall at all times and for all
purposes be regarded as acquired and held by the Optionee in a fiduciary
capacity for the sole benefit of the Company, and the Optionee agrees that, upon
request, the Optionee will promptly make all disclosures, execute all
assignments, instruments and papers, and perform all acts whatsoever necessary
or desired by the Company to vest and confirm in it, its successors,

-7-

NetApp 000101

<PAGE>   8

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

assigns and nominees, all rights created or contemplated by this subsection (a) and which may be necessary or desirable to enable the Company, its successors, assigns, and nominees to secure and enjoy the full benefits and advantages thereof.

(b) NONDISCLOSURE OF CONFIDENTIAL INFORMATION. The Optionee shall not, during the period of employment by the Company or at any time thereafter, directly or indirectly use, divulge, furnish or make accessible to anyone other than the Company, its directors and officers other than in the regular course of the business of the Company or any of its subsidiaries, any knowledge or information with respect to (i) confidential, secret or proprietary plans, data (including financial and cost data), specifications, procedures and techniques, methods, technology, "knowhow" or material relating to the business, products, services (whether existing or under development) or activities of the Company or its subsidiaries, (ii) any confidential business plans or surveys of the Company or its subsidiaries, (iii) any other confidential or secret aspect of the business, products, services or activities of the Company or its subsidiaries, or (iv) any customer usages and requirements or any customer lists of the Company or its subsidiaries. The Optionee shall not, upon leaving the employ of the Company, without the prior written consent of the Board of Directors of the Company, take any data, customer lists, reports, studies, compilations, business plans, presentations/proposals, letters, memoranda, notes or other writings or documents whatever, or copies thereof, which reflect or deal with any of the confidential information described in this Section 16(b).

(c) REMEDIES. The Optionee acknowledges that a breach of the provisions of this Agreement will cause the Company irreparable injury for which the Company cannot be reasonably or adequately compensated in damages. The Company shall, therefore, be entitled, in addition to all other remedies available to it, to injunctive and/or other equitable relief to prevent a breach of this Agreement, or any part of it, and to secure its enforcement, and any termination of Optionee as a result of a violation of this Section 16 shall be deemed "for cause."

17. SUBJECT TO PLAN. This Option is issued subject and pursuant to the provisions of the Plan, receipt of a copy of which the Optionee acknowledges. A determination of the Board of Directors or the Committee established pursuant to the Plan as to any questions which may arise with respect to the interpretation of the provisions of this Option and of the Plan shall be final. The Board of Directors or the Committee may authorize and establish such rules and regulations, and revisions thereof, not inconsistent with the provisions of the Plan, as it may deem advisable. Any provision hereof which is inconsistent with, or contrary to, the terms and conditions of the Plan shall be superseded and governed by the Plan.

-8-

NetApp 000102

&lt;PAGE&gt;    9

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

18. SEVERABILITY. If any condition, term or provision of this Agreement is determined by a court to be illegal or in conflict with any law, state or Federal, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if this Agreement did not contain the particular condition, term or provision determined to be unenforceable.

19. ENTIRE AGREEMENT; NEW HAMPSHIRE LAW. This Agreement contains the entire understanding and agreement between the parties hereto respecting the within subject matter, and there are no representations, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this Agreement that are not fully expressed herein. The Company is a New Hampshire corporation, and this Agreement shall be governed by and construed in accordance with the laws of the State of New Hampshire.

        WITNESS the signature of its duly authorized officer of the Company as of the date of grant hereof.

                        THE COMPANY:

                        WEBMANAGE TECHNOLOGIES, INC.


------------------------        By:
Witness                            -----------------------------

                                Title:
                                     --------------------------


                        -9-

NetApp 000103

```
<PAGE>    10

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1997 Stock Option Plan

THE OPTIONEE:

Acknowledged and Agreed to*:


-----------------------------------
Signature

-----------------------------------
Print Name

-----------------------------------
Street Address

-----------------------------------
City, State, Zip Code

-----------------------------------
Social Security No.


*IF you have any "Inventions" to except from Section 16, you must IDENTIFY ALL
SUCH INVENTIONS below, or, if the statement is not applicable, you must write
NONE below.


       None.
----------------------------------------------------------------------

----------------------------------------------------------------------

----------------------------------------------------------------------
```

-10-

```
</TEXT>
</DOCUMENT>
```

NetApp 000104

```
<DOCUMENT>
<TYPE>          EX-99.3
<FILENAME>      f68554orex99-3.txt
<DESCRIPTION>   Exhibit 99.3
<TEXT>
```

NetApp 000105

<PAGE>   1

EXHIBIT 99.3

NETWORK APPLIANCE, INC.

STOCK OPTION ASSUMPTION AGREEMENT
WEBMANAGE TECHNOLOGIES, INC.

1997 STOCK OPTION PLAN

OPTIONEE: _____,

STOCK OPTION ASSUMPTION AGREEMENT effective as of the 13th day of November, 2000.

WHEREAS, the undersigned individual ("Optionee") holds one or more outstanding options to purchase shares of the common stock of WebManage Technologies, Inc., a Delaware corporation ("WebManage"), which were granted to Optionee under WebManage Technologies, Inc. 1997 Stock Option Plan (the "Plan").

WHEREAS, each of those options is evidenced by a Stock Option Agreement (the "Option Agreement") issued to Optionee under the Plan.

WHEREAS, WebManage has been acquired by Network Appliance, Inc., a California corporation ("NetApp"), through the merger of WebManage with and into NetApp (the "Merger") pursuant to the Agreement and Plan of Merger by and among NetApp and WebManage, dated August 31, 2000 (the "Merger Agreement").

WHEREAS, the provisions of the Merger Agreement require the obligations of WebManage under each outstanding option under the Plan to be assumed by NetApp at the consummation of the Merger and the holder of each outstanding option to be issued an agreement evidencing the assumption of such option.

WHEREAS, pursuant to the provisions of the Merger Agreement, the exchange ratio (the "Exchange Ratio") in effect for the Merger is 0.02543 of a share of NetApp common stock ("NetApp Stock") for each outstanding share of WebManage common stock ("WebManage Stock") (rounded down to the nearest whole number of shares of NetApp Stock).

WHEREAS, the purpose of this Agreement is to evidence the assumption by NetApp of the outstanding options held by Optionee at the time of the consummation of the Merger (the "Effective Time") and to reflect certain adjustments to those options which have become necessary in connection with their assumption by NetApp in the Merger.

NOW, THEREFORE, it is hereby agreed as follows:

1. The number of shares of WebManage Stock subject to the options held by Optionee immediately prior to the Effective Time (the "WebManage Options") and the exercise price payable per share are set forth below. NetApp hereby assumes, as of the Effective Time, all

NetApp 000106

<PAGE>    2

the duties and obligations of WebManage under each of the WebManage Options. In
connection with such assumption, the number of shares of NetApp Stock
purchasable under each WebManage Option hereby assumed and the exercise price
payable thereunder have been adjusted to reflect the Exchange Ratio.
Accordingly, the number of shares of NetApp Stock subject to each WebManage
Option hereby assumed shall be as specified for that option below, and the
adjusted exercise price payable per share of NetApp Stock under the assumed
WebManage Option shall also be as indicated for that option below.

<TABLE>
<CAPTION>

| WEBMANAGE STOCK OPTIONS | | NETAPP ASSUMED OPTIONS | |
|---|---|---|---|
| # of Shares of WebManage Common Stock | Exercise Price per Share | # of Shares of NetApp Common Stock | Adjusted Exercise Price per Share |
| <S> | <C> $ | <C> | <C> $ |

</TABLE>

    2. The intent of the foregoing adjustments to each assumed
WebManage Option is to assure that the spread between the aggregate fair market
value of the shares of NetApp Stock purchasable under each such option and the
aggregate exercise price as adjusted pursuant to this Agreement will not,
immediately after the consummation of the Merger, be greater than the spread
which existed, immediately prior to the Merger, between the then aggregate fair
market value of the WebManage Stock subject to the WebManage Option and the
aggregate exercise price in effect at such time under the Option Agreement. Such
adjustments are also intended to preserve, immediately after the Merger, on a
per share basis, the same ratio of exercise price per option share to fair
market value per share which existed under the WebManage Option immediately
prior to the Merger.

    3. Each WebManage Option shall continue to have a maximum term
of ten (10) years from the date of grant, subject to earlier termination (as
provided in the applicable Option Agreement) following Optionee's cessation of
service or employment.

    4. The following provisions shall govern each WebManage Option
hereby assumed by NetApp:

        (a) Unless the context otherwise requires, all
references in each Option Agreement and the applicable Plan (to
the extent incorporated into such Option Agreement) shall be
adjusted as follows: (i) all references to the "Company" shall
mean NetApp, (ii) all references to "Stock," "Common Stock" or
"Shares" shall mean shares of NetApp Stock, (iii) all references
to the "Board" shall mean the Board of Directors of NetApp and
(iv) all references to the "Committee" shall mean the
Compensation Committee of the NetApp Board of Directors.

        (b) Except as modified by this Agreement, the grant date
and the expiration date of each assumed WebManage Option and all
other provisions which govern either the exercise or the
termination of the assumed WebManage Option shall remain the
same as set forth in the Option Agreement applicable to that
option, and the provisions of the applicable Plan and the Option
Agreement

2

NetApp 000107

<PAGE>    3

shall accordingly govern and control Optionee's rights under this Agreement to purchase NetApp Stock under the assumed WebManage Option.

(c) Each WebManage Option assumed by NetApp which was originally designated as an Incentive Stock Option under the federal tax laws shall retain such Incentive Stock Option status to the maximum extent allowed by law.

(d) Each WebManage Option hereby assumed by NetApp shall continue to vest and become exercisable in accordance with the same installment vesting schedule in effect for that option under the applicable Option Agreement immediately prior to the Effective Time; except, that the number of shares subject to each such installment shall be adjusted to reflect the Exchange Ratio.

(e) For purposes of applying any and all provisions of the Option Agreement and the applicable Plan relating to Optionee's status as an employee or a consultant of WebManage, Optionee shall be deemed to continue in such status as an employee or a consultant for so long as Optionee renders services as an employee or a consultant to NetApp or any present or future majority-owned NetApp subsidiary. Accordingly, the provisions of the Option Agreement governing the termination of the assumed WebManage Options upon Optionee's cessation of service as an employee or a consultant of WebManage shall hereafter be applied on the basis of Optionee's cessation of employee or consultant status with NetApp and its subsidiaries, and each assumed WebManage Option shall accordingly terminate, within the designated time period in effect under the Option Agreement for that option, following such cessation of employee or consultant status.

(f) The adjusted exercise price payable for the NetApp Stock subject to each assumed WebManage Option shall be payable in any of the forms authorized under the Option Agreement applicable to that option. For purposes of determining the holding period of any shares of NetApp Stock delivered in payment of such adjusted exercise price, the period for which such shares were held as WebManage Stock prior to the Merger shall be taken into account.

(g) In order to exercise each assumed WebManage Option, Optionee must deliver to NetApp a written notice of exercise in which the number of shares of NetApp Stock to be purchased thereunder must be indicated. The exercise notice must be accompanied by payment of the adjusted exercise price payable for the purchased shares of NetApp Stock and should be delivered to NetApp at the following address:

Network Appliance, Inc.
495 East Java Drive
Sunnyvale, CA 94089
Attention:  Janice Mahoney

3

NetApp 000108

<PAGE>    4

5. Except to the extent specifically modified by this Option Assumption Agreement, all of the terms and conditions of each Option Agreement as in effect immediately prior to the Merger shall continue in full force and effect and shall not in any way be amended, revised or otherwise affected by this Stock Option Assumption Agreement.

IN WITNESS WHEREOF, Network Appliance, Inc. has caused this Stock Option Assumption Agreement to be executed on its behalf by its duly-authorized officer as of the 13th day of November, 2000.

NETWORK APPLIANCE, INC.

By: _____

Name:
Title:

ACKNOWLEDGMENT

The undersigned acknowledges receipt of the foregoing Stock Option Assumption Agreement and understands that all rights and liabilities with respect to each of his or her WebManage Options hereby assumed by NetApp are as set forth in the Option Agreement, the applicable Plan and such Stock Option Assumption Agreement.

_____

_____, OPTIONEE

DATED: _____, 2000

4

</TEXT>
</DOCUMENT>

NetApp 000109

<PAGE>   1

WebManage Technologies, Inc.
Stock Option Plan 1999

EXHIBIT 99.4

WEBMANAGE TECHNOLOGIES, INC.

1999 STOCK OPTION PLAN

1.    PURPOSE OF THE PLAN

The WebManage Technologies, Inc. 1999 Stock Option Plan (the "Plan") is intended
to promote the growth of the WebManage Technologies, Inc. (the "Company") by
attracting and motivating directors, officers, employees, consultants,
independent contractors, vendors, suppliers and other persons whose efforts are
deemed worthy of encouragement through the incentive effects of stock options.

2.    DEFINITIONS

As used herein, the following definitions shall apply:

(a) "Board" shall mean the Committee if one has been appointed or, if no
Committee has been appointed, the Board of Directors of the Company.

(b) "Code" shall mean the Internal Revenue Code of 1986, as amended, the rules
and regulations promulgated thereunder and the interpretations thereof, all as
from time to time in effect.

(c) "Committee" shall mean the Committee appointed by the Board in accordance
with Section 3(a) below, if one is appointed.

(d) "Common Stock" shall mean the no par value common stock of the Company.

(e) "Company" shall mean WebManage Technologies, Inc., a Delaware corporation.

(f) "Consultant" shall mean any person who is engaged by the Company or any
Parent or Subsidiary of the Company to render consulting or advisory services,
whether or not compensation is paid to such individual.

(g) "Continuous Status" shall mean the absence of any interruption or
termination of service as an Employee, Consultant or other person providing
services on a regular basis to the Company or its Parent or any Subsidiary.
Continuous Status shall not be considered interrupted in the case of sick leave,
military leave, or any other leave of absence approved by the Board, provided
that either such leave is for a period of not more than ninety (90) days or
reemployment upon the expiration of such leave is provided or guaranteed by
contract or statute.

(h) "Director" shall mean any person serving on the Board.

"Employee" shall mean any person, including Officers and Directors, employed by
the Company or its Parent or any Subsidiary of the Company.

0) "Fair Market Value" shall mean the value of a share of Common Stock on the
date of the grant of the Option as determined, in good faith, by the Board or
the Committee and such determination shall be conclusive for all purposes. The
Board or Committee shall take into account such factors affecting value as it,
in its sole and absolute discretion, may deem relevant.

NetApp 000111

&lt;PAGE&gt;   2

WebManage Technologies, Inc.
Stock Option Plan 1999

(k) "Officer" shall mean any person, which may include Directors, employed by the Company or its Parent or any Subsidiary of the Company who has been elected an officer by the respective Board of Directors.

(1) "Option" shall mean a stock option issued pursuant to the Plan. Options may be either "Incentive Options," which are defined as options intended to meet the requirements of Section 422 of the Code, or "Nonqualified Options," which are defined as Options not intended to meet such requirements of the Code.

(M) "Option Agreement" shall mean the written agreement setting forth the terms and conditions of an Option.

(n) "Optioned Stock" shall mean the Common Stock subject to an option.

(o) "Optionee" shall mean a person or entity to whom an Option has been granted.

(p) "Parent" shall mean a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(q) "Plan" shall mean the WebManage Technologies, Inc. 1999 Stock Option Plan.

(r) "Share" shall mean a share of Common Stock of the Company, as may be adjusted in accordance with Section 6 below.

(s) "Subsidiary" shall mean a "subsidiary corporation" of the Company, whether now or hereafter existing, as defined in Section 424(f) of the Code.

3.   ADMINISTRATION OF THE PLAN

(a) By the Board or by the Committee. The Plan shall be administered by the Board or, if appointed by the Board, by a Committee; provided, however, if the Company shall have registered a class of equity securities pursuant to Section 12 of the Securities Exchange Act of 1934, then the Plan shall be administered by the Board or, if appointed, by a Committee of two or more directors, all of which shall be "disinterested" as defined in Rule 16b-3 under the Securities Exchange Act of 1934. The Board and the Committee shall have full authority to administer the Plan, including authority to interpret and construe any provision of the Plan and to adopt such rules and regulations for administering the Plan as it may deem necessary in order to comply with the requirements of the Plan, or in order that any Option that is intended to be an Incentive Option will be classified as an incentive stock option under the Code, or in order to conform to any regulation or to any change in any law or regulation applicable thereto. The Board may reserve to itself any of the authority granted to the Committee as set forth herein, and it may perform and discharge all of the functions and responsibilities of the Committee at any time that a duly constituted Committee is not appointed and serving.

(b) Actions of the Board and the Committee. All actions taken and all interpretations and determinations made by the Board or by the Committee in good faith (including determinations of Fair Market Value) shall be final and binding upon all Optionees, the Company and all other interested persons. No member of the Board or the Committee shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan, and all

NetApp 000112

<PAGE>  3

WebManage Technologies, Inc.
Stock Option Plan 1999

members of the Board or the Committee shall, in addition to their rights as
directors, be fully protected by the Company with respect to any such action,
determination or interpretation.

(c) Powers of the Board and the Committee. Subject to the provisions of the
Plan, the Board and, if appointed, the Committee shall have the authority, in
their discretion to:

(i) determine, upon review of the relevant information, the Fair Market Value of
the Common Stock;

(ii) determine the persons to whom Options shall be granted, the time or times
at which Options shall be granted, the number of shares to be represented by
each Option and the exercise price per share;

(iii) interpret the Plan;

(iv) prescribe, amend, and rescind rules and regulations relating to the Plan;

(v) determine whether an Option granted shall be an Incentive Option or a
Nonqualified option and to determine the terms and provisions of each Option
granted (which need not be identical) and, with the consent of the holder
thereof, to modify or amend each Option, including reductions in the exercise
price thereof;

(vi) accelerate or defer (with the consent of the Optionee) the exercise date of
any Option;

(vii) authorize any person to execute on behalf of the Company any instrument
required to effectuate the grant of an Option previously granted by the Board;
and

(viii) make all other determinations deemed necessary or advisable for the
administration of the Plan.

4.     ELIGIBILITY AND PARTICIPATION

(a) Eligibility. Grants of Options may be made to any Employee or Consultant
(which may include Officers and/or Directors) of the Company or of its Parent or
Subsidiary, or any independent contractor, vendor, supplier or any other person
providing services to the Company or a Parent or Subsidiary whose efforts are
deemed worthy of encouragement by the Board; provided, however, that an
Incentive Option may only be granted to an Employee.

(b) Participation by Director. Members of the Board who are either eligible for
Options or have been granted Options may vote on any matters affecting the
administration of the Plan or the grant of any Options pursuant to the Plan,
except that no such member shall act upon the granting of an Option to himself,
but any such member may be counted in determining the existence of a quorum at
any meeting of the Board and may be counted as part of an action by unanimous
written consent during or with respect to which action is taken to grant Options
to him.

5.     EXERCISE PRICE; CONSIDERATION; AND FORM OF OPTION AGREEMENT

(a) Exercise Price. The exercise price of any Incentive Option shall be not less
than one hundred percent (100%) of the Fair Market Value of a share of Common
Stock on the date of the grant of the Option. The exercise price of a
Nonqualified Option shall be determined in the sole discretion of the Board and
may be at less than the Fair Market Value on the date of the grant of the
Option. If an Incentive Option is granted to an Optionee who then owns stock
possessing more than 10% of the total combined voting power of all classes of
stock of the Company or its

<PAGE>    4

WebManage Technologies, Inc.
Stock Option Plan 1999

Parent or any Subsidiary, then the exercise price of such Incentive Option shall be at least one hundred ten percent (1 10 %) of the Fair Market Value of the Company's Common Stock on the date of the grant of such Option.

(b) Consideration. The exercise price shall be paid in full, at the time of exercise of the Option, by personal or bank cashier's check or in such other form of lawful consideration as the Board or the Committee may approve from time to time, including, without limitation, the transfer of outstanding shares of Common Stock as provided in Section 7(c) or the Optionee's promissory note in form satisfactory to the Company and bearing interest at a rate of not less than the relevant applicable federal rate as defined in Section 1274(d)(1) of the Code as in effect at such time, as determined by the then most recently published applicable Revenue Ruling by the Internal Revenue Service.

(c)    Form of Option Agreement. Each Option shall be evidenced by an Option Agreement specifying the number of shares which may be purchased upon exercise of the Option and containing such terms and provisions as the Board or the Committee may determine, subject to the provisions of the Plan.

6.    SHARES OF COMMON STOCK SUBJECT TO THE PLAN

(a) Number. The aggregate number of shares of Common Stock subject to Options which may be granted under the Plan shall be 2,000,000 subject to adjustment as herein below provided. To the extent any Option granted under the Plan shall expire or terminate unexercised or for any reason become unexercisable, the shares subject to such Option shall thereafter be available for future grants under the Plan.

(b) Capital Changes. Except as hereinafter provided, no adjustment shall be made in the number of shares of Common Stock issued to an Optionee, or in any other rights of the Optionee upon exercise of an Option, by reason of any dividend, distribution or other right granted to stockholders for which the record date is prior to the date of exercise of the Optionee's Option. In the event any change is made to the shares of Common Stock (whether by reason of a merger, consolidation, reorganization, recapitalization, stock dividend, stock split, combination of shares, exchange of shares, change in corporate structure or otherwise), appropriate adjustments shall be made in: (i) the number of shares of Common Stock theretofore made subject to Options, and in the exercise price of such shares; and (ii) the aggregate number of shares which may be made subject to Options.

7.    EXERCISE OF STOCK OPTIONS

(a) Time of Exercise. Subject to the provisions of the Plan, including without limitation Section 7(d) and Section 8, the Board or the Committee, in its discretion, shall determine the time when an Option, or a portion of an Option, shall become exercisable, and the time when an Option, or a portion of an Option, shall expire; provided, however, that (i) an Incentive Option shall expire, to the extent not exercised, no later than the tenth (10th) anniversary of the date on which it was granted; and (ii) any Incentive Option granted to any person who owns shares possessing more than 10% of the total combined voting power or value of all classes of stock of the Company or of its Parent or a Subsidiary shall have a term of not to exceed five (5) years. Such time or times shall be set forth in the Option Agreement evidencing such Option.

(b) Notice of Exercise. An Optionee electing to exercise an Option shall give written notice to the Company, as specified by the Option Agreement, of the Optionee's election to purchase a specified number of shares, such notice shall be accompanied by the instrument evidencing such Option and any other documents required by the Company, and shall tender the exercise price of

NetApp 000114

<PAGE>    5

WebManage Technologies, Inc.
Stock Option Plan 1999

the shares that the Optionee has elected to purchase. If the notice of election to exercise is given by the executor or administrator of a deceased Optionee, or by the person or persons to whom the Option has been transferred by the Optionee's will or the applicable laws of descent and distribution, the Company will be under no obligation to deliver shares pursuant to such exercise unless and until the Company is satisfied that the person or persons giving such notice is or are entitled to exercise the Option.

(c) Exchange of Outstanding Stock. The Board, in its sole discretion, may permit an Optionee to surrender to the Company shares of Common Stock previously acquired by the Optionee at least six (6) months prior to such surrender as part or full payment for the exercise of an Option. Such surrendered shares shall be valued at their Fair Market Value on the date of exercise of the Option.

(d) Termination of Continuous Status Before Exercise. Unless otherwise provided in the terms of an Option Agreement, the vested portion of an Option held by an Optionee who is an Employee or a Consultant, as the case may be, at the date of grant of such Option, may be exercised by the Optionee at any time while the Optionee is an Employee or a Consultant, respectively, or within 30-days of termination, and has maintained Continuous Status with the Company or its Parent or any Subsidiary from the date of the grant of the Option (other than the Optionee's death, retirement or disability as provided below) until 30-days prior to the date of the exercise of the Option. Any Option held by the Optionee at such time as he/she is no longer an Employee or Consultant or Continuous Status is not maintained shall be deemed to have been forfeited and be of no further force or effect. In no event, however, may any Option be exercised after the expiration of its term.

(e) Death. If an Optionee dies at a time when the Optionee is entitled to exercise an Option, then at any time or times within thirty (30) days after the Optionee's death (or such further period as the Board may allow) such Option may be exercised, as to all or any of the shares which the Optionee was entitled to purchase immediately prior to the Optionee's death by (i) the Optionee's executor or administrator or the person(s) to whom the Option is transferred by will or the applicable laws of descent and distribution or (ii) the Optionee's designated beneficiary, and except as so exercised such Option will expire at the end of such period. In no event, however, may any Option be exercised after the expiration of its term.

(f) Retirement and Disability. If an Optionee retires from service at age 65 or older or retires at less than age 65 with the consent of the Board or becomes "disabled" (as hereinafter defined) at a time when the Optionee is entitled to exercise an Option, then, at any time or times within thirty (30) days of the date of such retirement or within thirty (30) days of the date of such disability, the Optionee may exercise such Option as to all or any of the shares which the Optionee was entitled to purchase under such Option immediately prior to such retirement or disability. Except as so exercised, such Option shall expire at the end of such period. In no event, however, may any Option be exercised after the expiration of its term. As used herein, "disabled" shall mean that the Optionee is permanently and totally disabled so as to be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than three (3) months.

(g) Disposition of Terminated Stock Options. Any shares of Common Stock subject to Options which have been terminated as provided above shall not thereafter be eligible for purchase by the Optionee but shall again be available for grant by the Board to other Optionees.

NetApp 000115

<PAGE>    6

WebManage Technologies, Inc.
Stock Option Plan 1999

    (h)      Stock Redemption Agreement. As a condition to the exercise of an Option by an Optionee, the Board or Committee may require the Optionee to execute and deliver a Stock Redemption Agreement, Shareholder Agreement or other agreement in such form as the Board or Committee shall approve and providing for appropriate restrictions on transfer of the Common Stock acquired pursuant to such exercise.

8.     SPECIAL PROVISIONS RELATING TO INCENTIVE OPTIONS

(a) $100,000.00 Limit. The Company shall not grant Incentive Options under the Plan to any Optionee to the extent that the aggregate Fair Market Value (determined as of the date of grant) of the Common Stock covered by such Incentive Options which are exercisable for the first time during any calendar year, when combined with the aggregate Fair Market Value of all stock covered by Incentive Options granted to such Optionee after December 31, 1986 by the Company, its Parent or a Subsidiary thereof which are exercisable for the first time during the same calendar year, exceeds $100,000.

(b) Grants to Employees Only. Incentive Options shall be granted only to persons who, on the date of grant, are Employees of the Company or its Parent or a Subsidiary of the Company.

9.     NO CONTRACT OF EMPLOYMENT

Unless otherwise expressed in a writing signed by an authorized officer of the Company, all Employees of the Company are hired for an unspecified period of time and are considered to be "at-will employees." Nothing in this Plan shall confer upon any Optionee the right to continue in the employ of the Company, its Parent or any Subsidiary, nor shall it limit or restrict in any way the right of the Company, its Parent or any such Subsidiary to discharge the Optionee at any time for any reason whatsoever, with or without cause.

10.     NO RIGHTS AS A STOCKHOLDER

An Optionee shall have no rights as a stockholder with respect to any shares of Common Stock subject to an Option.

11.     NONTRANSFERABILITY OF OPTIONS; DEATH OF OPTIONEE

No Option acquired by an Optionee under the Plan shall be assignable or transferable by an Optionee, other than by will or the laws of descent and distribution, and such Options are exercisable, during the Optionee's lifetime, only by Optionee; provided, however, that (i) a transfer may be made pursuant to a qualified domestic relations order (as defined in the Code or as permitted by Title I of the Employee Retirement Income Security Act ("ERISA") or the rules thereunder) and (ii) any Option Agreement issued under the Plan may provide for the designation of a beneficiary of the Optionee (which may be an individual or trustee) who may exercise the Option after the Optionee's death and enjoy the economic benefits thereof, subject to the consent of Optionee's spouse where required by law. Subject to Section 7(e), in the event of Optionee's death, the Option may be exercised by the personal representative of the Optionee's estate or, if

NetApp 000116

<PAGE>    7

WebManage Technologies, Inc.
Stock Option Plan 1999

no personal representative has been appointed, by the successor(s) in interest
determined under the Optionee's will or under the applicable laws of descent and
distribution.

12.    LIQUIDATION OR MERGER OF THE COMPANY

(a) Liquidation. In the event of a proposed dissolution or liquidation of the
Company, the Option shall terminate immediately prior to the consummation of
such proposed action, unless otherwise provided by the Board. The Board may, in
the exercise of its sole discretion in such instances, declare that any Option
shall terminate as of a date fixed by the Board and give each Optionee the right
to exercise such Option as to all or any part of the Shares covered by an
Option, including Shares as to which the Option would not otherwise be
exercisable.

(b) Sale of Assets, Merger or Consolidation or Change of Control. The Board may
provide for immediate vesting of any or all Options, and allow such Options to
be fully exercised without regard to the normal vesting schedule of such
Options, in the event of a proposed sale of all or substantially all of the
assets of the Company, or a merger or consolidation of the Company with or into
another corporation, a liquidation, or a "change of control" (as defined below);
provided, however, that if the Board determines that such immediate vesting is
not appropriate, then the Options, if the event is a merger or consolidation,
shall be assumed or an equivalent option shall be substituted by such successor
corporation (or a parent or subsidiary of such successor corporation) as a
condition to the completion of such transaction. The term "Change in Control"
shall be deemed to have occurred if (i) any "person" or "group" (as defined in
or as pursuant to section 13(d) and (14)d of the Securities Exchange Act of
1934, as amended (the "Exchange Act"), becomes a "beneficial owner" (as defined
in Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of
securities of the Company representing thirty percent (30%) or more of the
combined voting power of the Common Stock (and the preferred stock, if any)
outstanding which votes generally for the election of directors; or (ii) the
Company or any of its Subsidiaries sell, in one or more transactions, other than
in the ordinary course of business, assets constituting in the aggregate all or
substantially all of the assets of the Company and its Subsidiaries on a
consolidated basis.

13.    AMENDMENTS; DISCONTINUATION OF PLAN

The Board may from time to time alter, amend, suspend or discontinue the Plan,
including, where applicable, any modifications or amendments as it shall deem
advisable for any reason, including satisfying the requirements of any law or
regulation or any change thereof; provided, however, that no such action shall
adversely affect the rights and obligations with respect to Options at any time
outstanding under the Plan; and provided further, that no such action shall,
without the approval of the stockholders of the Company, (i) materially increase
the maximum number of shares of Common Stock that may be made subject to Options
(unless necessary to effect the adjustments required by Section 6(b)), (ii)
materially increase the benefits accruing to Optionees under the Plan, or (iii)
materially lessen the requirements as to eligibility for participation in the
Plan. No such amendment shall materially adversely affect the rights of any
Optionee under any Option previously granted without such Optionee's prior
consent.

14.    REGISTRATION OF OPTIONED STOCK

The Options shall not be exercisable unless the purchase of such Optioned Stock
is pursuant to an applicable effective registration statement under the
Securities Act of 1933, as amended, or unless, in the opinion of counsel to the
Company, the proposed purchase of such Optioned Stock would be exempt from the
registration requirements of the Securities Act of 1933, as amended.

NetApp 000117

<PAGE>    8

WebManage Technologies, Inc.
Stock Option Plan 1999

15.    WITHHOLDING TAXES; SATISFIED BY WITHHOLDING OPTIONED SHARES

(a) General. The Company, its Parent or any Subsidiary may take such steps as it may deem necessary or appropriate for the withholding of any taxes which the Company, its Parent or any Subsidiary is required by law or regulation of any governmental authority, whether Federal, state or local, domestic or foreign, to withhold in connection with any Option including, but not limited to, requiring the Optionee to pay such tax at the time of exercise or the withholding of issuance of shares of Common Stock to be issued upon the exercise of any Option until the Optionee reimburses the Company for the amount the Company is required to withhold with respect to such taxes, or, at the Company's sole discretion, canceling any portion of such issuance of Common Stock in any amount sufficient to reimburse itself for the amount it is required to so withhold.

(b) Satisfying Taxes by Withholding Optioned Shares. Option Agreements under the Plan may, at the discretion of the Board, contain a provision to the effect that all Federal and state taxes required to be withheld or collected from an Optionee upon exercise of an Option may be satisfied by the withholding of a sufficient number of exercised Optioned Stock which, valued at Fair Market Value on the date or exercise, would be equal to the total withholding obligation of the Optionee for the exercise of such Option; provided, however, that if the Company is a public reporting corporation, no person who is an "officer" of the Company as such term is defined in Rule 3b-2 under the Securities Exchange Act of 1934 may elect to satisfy the withholding of Federal and state taxes upon the exercise of an option by the withholding of Optioned Stock unless such election is made either (i) at least six (6) months prior to the date that the exercise of the Option becomes a taxable event or (ii) during any of the periods beginning on the third business day following the date on which the Company issues a news release containing the operating results of a fiscal quarter or fiscal year and ending on the twelfth business day following such date. Such election shall be deemed made upon receipt of notice thereof by an officer of the Company, by mail, personal delivery or by facsimile message, and shall (unless notice to the contrary is provided to the Company) be operative for all option exercises which occur during the twelve (12) month period following election.

16.    EFFECTIVE DATE AND TERM OF PLAN

The Plan is effective as of the date of adoption by the Board and Options may be granted at any time on or after such date; provided, however, that the Plan shall terminate if the stockholders of the Company do not approve and adopt it within twelve (12) months of such date. No Options shall be granted subsequent to ten (10) years after the effective date of the Plan; however, Options outstanding subsequent to ten (10) years after the effective date of the Plan shall continue to be governed by the provisions of the Plan until exercised or terminated in accordance with the Plan or the respective Option Agreements.


ADOPTED BY THE BOARD OF DIRECTORS
ON _____, 199____


APPROVED BY THE STOCKHOLDERS
ON _____, 199____


ATTEST:

NetApp 000118

```
<PAGE>    9

WebManage Technologies, Inc.
Stock Option Plan 1999

-------------------------------
Secretary




</TEXT>
</DOCUMENT>
```

NetApp 000119

# EXHIBIT H – PART 2

<PAGE>    1

EXHIBIT 99.5

WEBMANAGE TECHNOLOGIES, INC.

STOCK OPTION AGREEMENT
UNDER ITS
1999 STOCK OPTION PLAN

This STOCK OPTION AGREEMENT (this "Agreement") is issued to the Optionee hereinbelow set forth pursuant to the WebManage Technologies, Inc. 1999 Stock Option Plan (the "Plan") of WebManage Technologies, Inc., a New Hampshire corporation (the "Company").

1. OPTIONEE; BASIC TERMS.

The Optionee is hereby granted an option to purchase the number of fully paid and non-assessable shares of the Common Stock of the Company at the option price hereinbelow set forth, subject to the terms and conditions of this Agreement.

2. DEFINITIONS.

(a) "CODE" shall mean the Internal Revenue Code of 1986, as amended, the rules and regulations promulgated thereunder and the interpretations thereof, all as from time to time in effect.

(b) "EXERCISE DATES" shall mean the following dates after which the Option may be exercised in the increments set forth below:

| Exercise Dates | Optioned Stock |
|----------------|----------------|
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |
| -------------- | -------------- |

(c) "GRANT DATE" shall mean the date of grant of the Option, being _____, 199___.

(d) "INCENTIVE OPTION" shall mean an option described in Section 422 of the Code. To qualify for favorable tax treatment provided by an incentive option, the shares purchased upon exercise must be held for a period of two (2) years from the date of the option grant and for a period of one (1) year after the shares are transferred to Optionee.

(e) "NONQUALIFIED OPTION" shall mean an option other than an Incentive Option, the exercise of which generally results in an immediate taxable event.

(f) "OPTION" shall have the meaning set forth in Section 3(a) hereof.

NetApp 000121

&lt;PAGE&gt;    2

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

(g) "OPTIONED STOCK" shall mean _____ (____) shares of the no par value Common Stock of the Company.

(h) "OPTIONEE" shall mean_____.

(i) "PURCHASE PRICE" shall mean the price per share for the Optioned Stock and shall be $_____.

(j) "VESTING PERIOD" shall mean a period of_____(____) years commencing on the Grant Date.

(k) Unless otherwise indicated, all capitalized terms set forth in this Agreement shall have the meaning provided to them under the Plan, a copy of which Optionee acknowledges having received.

3. GRANT OF OPTION.

(a) As of the Grant Date, the Company hereby grants to the Optionee an option (the "Option") to purchase the Optioned Stock upon the terms and conditions set forth below.

(b) This Option is intended to be a(n) (check one only):

[ ]        Incentive Option (only employees of the Company are eligible)

[ ]        Nonqualified Option

(c) The Optionee's relationship to the Company is as a(n) (if applicable, check more than one):

[ ]        Officer

[ ]        Director

[ ]        Employee

[ ]        Consultant

[ ]        Other Person providing services

-2-

NetApp 000122

<PAGE>    3

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

4. DURATION OF OPTION.

(a) INCENTIVE OPTION: If this Option is an Incentive Option, as designated in Section 3(b), it shall expire one day short of ten (10) years from the Grant Date, provided, however, for any Optionee who owns more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company, this Option shall expire one day short of five (5) years from the Grant Date.

(b) NONQUALIFIED OPTION: If this Option is a Nonqualified Option, as designated in Section 3(b), it shall expire ten (10) years from the Grant Date.

5. PURCHASE PRICE.

The Purchase Price for the Optioned Stock has been determined by the Board of Directors of the Company and: (a) may or may not be less than the Fair Market Value on the Grant Date if the Option is a Nonqualified Option, (b) shall be equal to at least one-hundred percent (100%) of the Fair Market Value if the Option is an Incentive Option, or (c) shall be equal to at least one-hundred ten percent (110%) of the Fair Market Value if the Option is an Incentive Option and Optionee holds more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Company or of its Parent or any Subsidiary.

6. EXERCISABILITY. Subject to the provisions of this Agreement, including without limitation Section 10 regarding termination of Optionee's employment, consulting or other relationship with the Company and Section 14(b) regarding Incentive Options, this Option shall vest in annual increments over the Vesting Period equal to the total number of shares of Optioned Stock divided by the number of years in the Vesting Period. Optioned Stock, to the extent vested shall become exercisable, in one or more installments (to the nearest whole number) on the Exercise Dates, to the extent of the total number of Shares of the Optioned Stock set forth next to such Exercise Date in the definition thereof. The number of shares of Optioned Stock which become exercisable each year, to the extent not previously exercised, shall accumulate until exercised in accordance with and subject to the terms and conditions of this Agreement.

7. METHOD OF EXERCISE AND PAYMENT.

(a) EXERCISE. This Option may be exercised from time to time, in whole or in part, to the extent exercisable, only by delivery to an officer of the Company of the original of this Option with an appropriate Notice of Exercise of Stock Option duly signed by the Optionee, together

-3-

NetApp 000123

&lt;PAGE&gt;    4

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

with the full Purchase Price of the shares purchased pursuant to the exercise of
the Option and an executed Stock Redemption Agreement pursuant to Section 7(b)
hereof; provided, however, that this Option may not be exercised if such
exercise would violate any law or governmental order or regulation. Payment for
the shares of Optioned Stock purchased pursuant to any exercise shall be made in
full at the time of such exercise, in any of the following methods, as
determined by the Board of Directors and as may be elected by the Optionee:

     (i)    may ___ or may not ___ pay in cash or by check payable to the
            order of the Company;

     (ii)   may ___ or may not ___ pay in Common Stock of the Company
            already owned by the Optionee for a period of six (6) months
            prior to such exercise, valued as of the date of exercise of the
            Option at Fair Market Value; or

     (iii)  may ___ or may not ___ pay by a promissory note payable to the
            order of the Company; if a promissory note is tendered, such
            note shall bear interest at an interest rate determined by, and
            shall be subject to such terms and conditions as are prescribed
            by, the Board as set forth in the form of promissory note then
            utilized under the Plan.

     (b) STOCK REDEMPTION AGREEMENT. The Optionee shall execute and deliver
to the Company, together with the Notice of Exercise of Stock Option and payment
in full of the Purchase Price, duplicate originals of a Stock Redemption
Agreement in the form set forth in Exhibit 1 attached to this Agreement. The
Company shall not issue any shares of Optioned Stock to the Optionee unless and
until Optionee executes and delivers such Stock Redemption Agreement.

     (c) TAX WITHHOLDINGS. Optionee agrees to have withheld from any
remuneration payable to such Optionee by the Company and/or to pay to the
Company, at the time of exercise of the Option, an amount which is required to
be withheld or paid pursuant to any Federal, state or local tax or revenue laws
or regulations, as may be determined by the Company. The Optionee may not
satisfy such tax withholding by instructing the Company to withhold such number
of shares of Optioned Stock that would equal the total tax obligations required
to be withheld.

8. NON-TRANSFERABILITY. This Option shall not be transferred, sold, pledged,
assigned, hypothecated, or disposed of in any manner by Optionee other than by
will or the laws of descent and distribution to the extent hereinafter set
forth; provided, however, that a transfer hereof may be made pursuant to a
qualified domestic relations order (as defined in the Code or as permitted

-4-

NetApp 000124

<PAGE>    5

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

by Title I of the Employee Retirement Income Security Act ("ERISA") or the rules thereunder) and, provided further, that Optionee may designate a beneficiary (which may be an individual or trustee) who may exercise the Option after Optionee's death and enjoy the economic benefits thereof, subject to the consent of Optionee's spouse where required by law. This Option may be exercised during the Optionee's lifetime only by the Optionee or, upon the Optionee's legal incapacity to act on the Optionee's own behalf, by the Optionee's conservator or other lawful representative. The Option shall be null and void and without effect upon any attempted assignment or transfer, except as hereinabove provided, including without limitation, any purported assignment, whether voluntary of by operation of law, pledge, hypothecation or other disposition contrary to the provisions hereof, or levy of execution, attachment, trustee process or similar process, whether legal or equitable, upon the Option.

9. TERMINATION. To the extent that this Option shall not have been exercised in full prior to its termination or expiration date, whichever shall be sooner, it shall terminate and become void and of no effect.

10. CESSATION OF CONTINUOUS STATUS -- TERMINATION, RETIREMENT, DEATH OR DISABILITY. If the Optionee shall voluntarily or involuntarily cease Continuous Status (as such term is defined in the Plan) (hereinafter referred to as a "Termination"), the Option of the Optionee shall terminate immediately upon the Termination and the Optionee in such event shall have no right after such Termination to exercise any unexercised Option that the Optionee might have exercised on or prior to the Termination; provided, however, that if the Termination is due to (i) retirement by the Optionee on or after attaining the age of sixty-five (65) years, (ii) the disability of the Optionee or (iii) the death of the Optionee, then the Optionee or the representative of the estate of the Optionee shall have the privilege of exercising the entire unexercised vested portion of this Option, provided that such exercise be accomplished (a) prior to the expiration of this Option and (b) either within thirty (30) days of the Optionee's retirement, within thirty (30) days of the Optionee's disability, or within thirty (30) days after the date of death of the Optionee, as the case may be.

11. STOCK SPLITS AND CAPITAL ADJUSTMENTS. If, prior to the complete exercise of this Option, there shall be declared and paid a stock dividend upon the Common Stock of the Company or if such stock shall be split up, converted, exchanged or reclassified, this Option, to the extent that it has not been exercised, shall entitle the holder, upon the future exercise of this Option, to such number and kind of securities or other property, subject to the terms of the Option, to which the holder would be entitled had he actually owned the stock subject to the unexercised portion of the Option at the time of the occurrence of such stock dividend, split up, conversion, exchange, reclassification or substitution; and the aggregate purchase price upon the future exercise of the

-5-

NetApp 000125

<PAGE>  6

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

Option shall be the same as if shares of Common Stock of the Company originally optioned were being purchased as provided herein.

12. ACCELERATION OF EXERCISE DATE.

(a) SALE OF ASSETS, MERGER, CONSOLIDATION AND CHANGE OF CONTROL. The Board of Directors of the Company may, but shall not be required, to provide for immediate vesting of any or all outstanding unexercised Options in the event of any proposed merger, acquisition or sale of the Company (other than a merger, acquisition or sale with respect to which a majority of the members of the Board of Directors of the Company prior to the merger, acquisition or sale continue to be a majority of the Board of Directors of the resulting corporation after such merger, acquisition or sale), all pursuant to and subject to the terms and conditions of the Plan including, without limitation, the limitations upon vesting imposed by Section 8 of the Plan.

13. COMPLIANCE WITH SECURITIES LAWS.

(a) POSTPONE ISSUANCE. Notwithstanding any provision of this Option to the contrary, the Company may postpone the issuance and delivery of shares upon any exercise of this Option until one of the following conditions shall be met:

(i) The shares of Optioned Stock with respect to which such Option has been exercised are at the time of the issue of such shares effectively registered under applicable Federal and state securities laws now in force or hereafter enacted or amended; or

(ii) Counsel for the Company shall have given an opinion that registration of such shares under applicable Federal and state securities laws, as now in force or hereafter enacted or amended, is not required.

(b) INVESTMENT REPRESENTATION. In the event that for any reason the shares of Optioned Stock to be issued upon exercise of the Option shall not be effectively registered under the Securities Act of 1933 (the "1933 Act"), upon any date on which the Option is exercised in whole or in part, the Company shall be under no further obligation to issue shares of Optioned Stock unless the Optionee shall give a written representation to the Company, in form satisfactory to the Company, that such person is acquiring the shares of Optioned Stock issued pursuant to such exercise of the Option for investment and not with a view to, or for sale in connection with, the distribution of any such shares, and that he/she will make no transfer of the same except in compliance with the 1933 Act and the rules and regulations promulgated

-6-

NetApp 000126

&lt;PAGE&gt;   7

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

thereunder and then in force, and in such event, the Company may place an
"investment legend" upon any certificate for the shares of Optioned Stock issued
by reason of such exercise.

14. SPECIAL RULES REGARDING INCENTIVE OPTIONS.

(a) NOTICE OF TRANSFER. If this Option is an Incentive Option, then the
employee-Optionee hereby agrees to notify the Company in writing within three
(3) days after any sale, transfer or other disposition of shares acquired upon
the exercise of this Option which occurs within either twelve (12) months
following the date of exercise or twenty-four (24) months following the Grant
Date.

(b) $100,000 PER YEAR EXERCISE LIMIT. If this option is an Incentive
Option, then it shall be exercisable in accordance with the above schedule of
Section 6, but in no event shall it be exercised to the extent that the
aggregate fair market value of Optioned Stock, which is exercisable for the
first time during any calendar year, when combined with the aggregate fair
market value of all stock covered by incentive stock options (as defined in the
Code) granted to Optionee after December 31, 1986 by the Company, its parent or
a subsidiary of the Company which are exercisable for the first time during the
same calendar year, exceeds $100,000.

15. NO AGREEMENT OF EMPLOYMENT. Neither the grant of this Option nor this
Agreement shall be deemed to create any agreement with, or obligation by, the
Company to employ the Optionee for any period of time, it being understood that
employment is strictly "at will" in the absence of any written agreement to the
contrary and, in the absence of such written agreement, such person may be
terminated by the Company at any time, with or without cause.

16. ASSIGNMENT OF INVENTIONS, ETC.; NON-DISCLOSURE OF CONFIDENTIAL INFORMATION.
As further consideration for the issuance of the Option, the Optionee, if the
Optionee is an Employee of the Company, agrees as follows:

(a) ASSIGNMENT OF INVENTIONS. Any and all trade secrets, inventions and
proprietary information which either (i) relates at the time of conception or
reduction to practice to the company or its business, or actual or demonstrably
anticipated research or development of the Company or (ii) results from any work
performed by the Optionee for the Company is hereby assigned to, and shall
become the absolute property of, the Company and shall at all times and for all
purposes be regarded as acquired and held by the Optionee in a fiduciary
capacity for the sole benefit of the Company, and the Optionee agrees that, upon
request, the Optionee will promptly make all disclosures, execute all
assignments, instruments and papers, and perform all acts whatsoever necessary
or desired by the Company to vest and confirm in it, its successors,

-7-

NetApp 000127

<PAGE>    8

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

assigns and nominees, all rights created or contemplated by this subsection (a) and which may be necessary or desirable to enable the Company, its successors, assigns, and nominees to secure and enjoy the full benefits and advantages thereof.

(b) NONDISCLOSURE OF CONFIDENTIAL INFORMATION. The Optionee shall not, during the period of employment by the Company or at any time thereafter, directly or indirectly use, divulge, furnish or make accessible to anyone other than the Company, its directors and officers other than in the regular course of the business of the Company or any of its subsidiaries, any knowledge or information with respect to (i) confidential, secret or proprietary plans, data (including financial and cost data), specifications, procedures and techniques, methods, technology, "knowhow" or material relating to the business, products, services (whether existing or under development) or activities of the Company or its subsidiaries, (ii) any confidential business plans or surveys of the Company or its subsidiaries, (iii) any other confidential or secret aspect of the business, products, services or activities of the Company or its subsidiaries, or (iv) any customer usages and requirements or any customer lists of the Company or its subsidiaries. The Optionee shall not, upon leaving the employ of the Company, without the prior written consent of the Board of Directors of the Company, take any data, customer lists, reports, studies, compilations, business plans, presentations/proposals, letters, memoranda, notes or other writings or documents whatever, or copies thereof, which reflect or deal with any of the confidential information described in this Section 16(b).

(c) REMEDIES. The Optionee acknowledges that a breach of the provisions of this Agreement will cause the Company irreparable injury for which the Company cannot be reasonably or adequately compensated in damages. The Company shall, therefore, be entitled, in addition to all other remedies available to it, to injunctive and/or other equitable relief to prevent a breach of this Agreement, or any part of it, and to secure its enforcement, and any termination of Optionee as a result of a violation of this Section 16 shall be deemed "for cause."

17. SUBJECT TO PLAN. This Option is issued subject and pursuant to the provisions of the Plan, receipt of a copy of which the Optionee acknowledges. A determination of the Board of Directors or the Committee established pursuant to the Plan as to any questions which may arise with respect to the interpretation of the provisions of this Option and of the Plan shall be final. The Board of Directors or the Committee may authorize and establish such rules and regulations, and revisions thereof, not inconsistent with the provisions of the Plan, as it may deem advisable. Any provision hereof which is inconsistent with, or contrary to, the terms and conditions of the Plan shall be superseded and governed by the Plan.

-8-

NetApp 000128

<PAGE>   9

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

18. SEVERABILITY. If any condition, term or provision of this Agreement is
determined by a court to be illegal or in conflict with any law, state or
Federal, the validity of the remaining portions or provisions shall not be
affected, and the rights and obligations of the parties shall be construed and
enforced as if this Agreement did not contain the particular condition, term or
provision determined to be unenforceable.

19. ENTIRE AGREEMENT; NEW HAMPSHIRE LAW. This Agreement contains the entire
understanding and agreement between the parties hereto respecting the within
subject matter, and there are no representations, agreements, arrangements or
understandings, oral or written, between the parties hereto relating to the
subject matter of this Agreement that are not fully expressed herein. The
Company is a New Hampshire corporation, and this Agreement shall be governed by
and construed in accordance with the laws of the State of New Hampshire.

       WITNESS the signature of its duly authorized officer of the Company as
of the date of grant hereof.

                          THE COMPANY:

                          WEBMANAGE TECHNOLOGIES, INC.


-----------------------------         By:
Witness                               ------------------------------------

                                          Title:
                                          ----------------------------

                             -9-

NetApp 000129

```
<PAGE>    10

WebManage Technologies, Inc.
Stock Option Agreement
Under its
1999 Stock Option Plan

THE OPTIONEE:

Acknowledged and Agreed to*:


-----------------------------------
Signature

-----------------------------------
Print Name

-----------------------------------
Street Address

-----------------------------------
City, State, Zip Code

-----------------------------------
Social Security No.


*IF you have any "Inventions" to except from Section 16, you must IDENTIFY ALL
SUCH INVENTIONS below, or, if the statement is not applicable, you must write
NONE below.


          None.
-----------------------------------------------------------------------
-----------------------------------------------------------------------
-----------------------------------------------------------------------


                                 -10-
</TEXT>
</DOCUMENT>
```

NetApp 000130

<PAGE>    1

EXHIBIT 99.6

NETWORK APPLIANCE, INC.

STOCK OPTION ASSUMPTION AGREEMENT
WEBMANAGE TECHNOLOGIES, INC.

1999 STOCK OPTION PLAN

OPTIONEE: _____,

STOCK OPTION ASSUMPTION AGREEMENT effective as of the 13th day of November, 2000.

WHEREAS, the undersigned individual ("Optionee") holds one or more outstanding options to purchase shares of the common stock of WebManage Technologies, Inc., a Delaware corporation ("WebManage"), which were granted to Optionee under WebManage Technologies, Inc. 1999 Stock Option Plan (the "Plan").

WHEREAS, each of those options is evidenced by a Stock Option Agreement (the "Option Agreement") issued to Optionee under the Plan.

WHEREAS, WebManage has been acquired by Network Appliance, Inc., a California corporation ("NetApp"), through the merger of WebManage with and into NetApp (the "Merger") pursuant to the Agreement and Plan of Merger by and among NetApp and WebManage, dated August 31, 2000 (the "Merger Agreement").

WHEREAS, the provisions of the Merger Agreement require the obligations of WebManage under each outstanding option under the Plan to be assumed by NetApp at the consummation of the Merger and the holder of each outstanding option to be issued an agreement evidencing the assumption of such option.

WHEREAS, pursuant to the provisions of the Merger Agreement, the exchange ratio (the "Exchange Ratio") in effect for the Merger is 0.02543 of a share of NetApp common stock ("NetApp Stock") for each outstanding share of WebManage common stock ("WebManage Stock") (rounded down to the nearest whole number of shares of NetApp Stock).

WHEREAS, the purpose of this Agreement is to evidence the assumption by NetApp of the outstanding options held by Optionee at the time of the consummation of the Merger (the "Effective Time") and to reflect certain adjustments to those options which have become necessary in connection with their assumption by NetApp in the Merger.

NOW, THEREFORE, it is hereby agreed as follows:

1. The number of shares of WebManage Stock subject to the options held by Optionee immediately prior to the Effective Time (the "WebManage Options") and the exercise price payable per share are set forth below. NetApp hereby assumes, as of the Effective Time, all

NetApp 000132

\<PAGE\>    2

the duties and obligations of WebManage under each of the WebManage Options. In connection with such assumption, the number of shares of NetApp Stock purchasable under each WebManage Option hereby assumed and the exercise price payable thereunder have been adjusted to reflect the Exchange Ratio. Accordingly, the number of shares of NetApp Stock subject to each WebManage Option hereby assumed shall be as specified for that option below, and the adjusted exercise price payable per share of NetApp Stock under the assumed WebManage Option shall also be as indicated for that option below.

\<TABLE\>
\<CAPTION\>

| WEBMANAGE STOCK OPTIONS | | NETAPP ASSUMED OPTIONS | |
|---|---|---|---|
| # of Shares of WebManage Common Stock | Exercise Price per Share | # of Shares of NetApp Common Stock | Adjusted Exercise Price per Share |
| \<S\> | \<C\> $ | \<C\> | \<C\> $ |

\</TABLE\>

2. The intent of the foregoing adjustments to each assumed WebManage Option is to assure that the spread between the aggregate fair market value of the shares of NetApp Stock purchasable under each such option and the aggregate exercise price as adjusted pursuant to this Agreement will not, immediately after the consummation of the Merger, be greater than the spread which existed, immediately prior to the Merger, between the then aggregate fair market value of the WebManage Stock subject to the WebManage Option and the aggregate exercise price in effect at such time under the Option Agreement. Such adjustments are also intended to preserve, immediately after the Merger, on a per share basis, the same ratio of exercise price per option share to fair market value per share which existed under the WebManage Option immediately prior to the Merger.

3. Each WebManage Option shall continue to have a maximum term of ten (10) years from the date of grant, subject to earlier termination (as provided in the applicable Option Agreement) following Optionee's cessation of service or employment.

4. The following provisions shall govern each WebManage Option hereby assumed by NetApp:

(a) Unless the context otherwise requires, all references in each Option Agreement and the applicable Plan (to the extent incorporated into such Option Agreement) shall be adjusted as follows: (i) all references to the "Company" shall mean NetApp, (ii) all references to "Stock," "Common Stock" or "Shares" shall mean shares of NetApp Stock, (iii) all references to the "Board" shall mean the Board of Directors of NetApp and (iv) all references to the "Committee" shall mean the Compensation Committee of the NetApp Board of Directors.

(b) Except as modified by this Agreement, the grant date and the expiration date of each assumed WebManage Option and all other provisions which govern either the exercise or the termination of the assumed WebManage Option shall remain the same as set forth in the Option Agreement applicable to that option, and the provisions of the applicable Plan and the Option Agreement

2

NetApp 000133

<PAGE>   3

shall accordingly govern and control Optionee's rights under this Agreement to purchase NetApp Stock under the assumed WebManage Option.

(c) Each WebManage Option assumed by NetApp which was originally designated as an Incentive Stock Option under the federal tax laws shall retain such Incentive Stock Option status to the maximum extent allowed by law.

(d) Each WebManage Option hereby assumed by NetApp shall continue to vest and become exercisable in accordance with the same installment vesting schedule in effect for that option under the applicable Option Agreement immediately prior to the Effective Time; except, that the number of shares subject to each such installment shall be adjusted to reflect the Exchange Ratio.

(e) For purposes of applying any and all provisions of the Option Agreement and the applicable Plan relating to Optionee's status as an employee or a consultant of WebManage, Optionee shall be deemed to continue in such status as an employee or a consultant for so long as Optionee renders services as an employee or a consultant to NetApp or any present or future majority-owned NetApp subsidiary. Accordingly, the provisions of the Option Agreement governing the termination of the assumed WebManage Options upon Optionee's cessation of service as an employee or a consultant of WebManage shall hereafter be applied on the basis of Optionee's cessation of employee or consultant status with NetApp and its subsidiaries, and each assumed WebManage Option shall accordingly terminate, within the designated time period in effect under the Option Agreement for that option, following such cessation of employee or consultant status.

(f) The adjusted exercise price payable for the NetApp Stock subject to each assumed WebManage Option shall be payable in any of the forms authorized under the Option Agreement applicable to that option. For purposes of determining the holding period of any shares of NetApp Stock delivered in payment of such adjusted exercise price, the period for which such shares were held as WebManage Stock prior to the Merger shall be taken into account.

(g) In order to exercise each assumed WebManage Option, Optionee must deliver to NetApp a written notice of exercise in which the number of shares of NetApp Stock to be purchased thereunder must be indicated. The exercise notice must be accompanied by payment of the adjusted exercise price payable for the purchased shares of NetApp Stock and should be delivered to NetApp at the following address:

Network Appliance, Inc.
495 East Java Drive
Sunnyvale, CA 94089
Attention:  Janice Mahoney

3

NetApp 000134

<PAGE>    4

        5. Except to the extent specifically modified by this Option
Assumption Agreement, all of the terms and conditions of each Option Agreement
as in effect immediately prior to the Merger shall continue in full force and
effect and shall not in any way be amended, revised or otherwise affected by
this Stock Option Assumption Agreement.

        IN WITNESS WHEREOF, Network Appliance, Inc. has caused this
Stock Option Assumption Agreement to be executed on its behalf by its
duly-authorized officer as of the 13th day of November, 2000.

                        NETWORK APPLIANCE, INC.


                        By:
                            ----------------------------------
                        Name:
                        Title:


                        ACKNOWLEDGMENT

        The undersigned acknowledges receipt of the foregoing Stock
Option Assumption Agreement and understands that all rights and liabilities with
respect to each of his or her WebManage Options hereby assumed by NetApp are as
set forth in the Option Agreement, the applicable Plan and such Stock Option
Assumption Agreement.

                        -----------------------------------
                        ----------------------, OPTIONEE


DATED:  _____, 2000


</TEXT>                            4
</DOCUMENT>

<PAGE>   1

EXHIBIT 99.7

WEBMANAGE TECHNOLOGIES, INC.
2000 STOCK INCENTIVE PLAN

ARTICLE ONE

GENERAL PROVISIONS

I.   PURPOSE OF THE PLAN

This 2000 Stock Incentive Plan is intended to promote the interests of WebManage Technologies, Inc., a Delaware corporation, by providing eligible persons with the opportunity to acquire a proprietary interest, or otherwise increase their proprietary interest, in the Corporation as an incentive for them to remain in the service of the Corporation.

Capitalized terms shall have the meanings assigned to such terms in the attached Appendix.

II.   STRUCTURE OF THE PLAN

A. The Plan shall consist of the Discretionary Option Grant Program under which eligible persons may, at the discretion of the Plan Administrator, be granted options to purchase shares of Common Stock.

B. The provisions of Articles One and Three shall apply to the equity program under the Plan and shall accordingly govern the interests of all persons under the Plan.

III.   ADMINISTRATION OF THE PLAN

A. Administration of the Discretionary Option Grant with respect to all persons eligible to participate in those programs may, at the Board's discretion, be vested in the Primary Committee or a Secondary Committee, or the Board may retain the power to administer those programs with respect to all such persons.

B. Members of the Primary Committee or any Secondary Committee shall serve for such period of time as the Board may determine and may be removed by the Board at any time. The Board may also at any time terminate the functions of any Secondary Committee and reassume all powers and authority previously delegated to such committee.

C. Each Plan Administrator shall, within the scope of its administrative functions under the Plan, have full power and authority to establish such rules and regulations as it may deem appropriate for proper administration of the Discretionary Option Grant and to make such determinations under, and issue such interpretations of, the provisions of such program and any outstanding options or stock issuances thereunder as it may deem necessary or advisable. Decisions of the Plan Administrator within the scope of its administrative functions under the Plan shall be final and binding on all parties who have an interest in the Discretionary Option Grant under its jurisdiction or any stock option or stock issuance thereunder.

NetApp 000137

<PAGE>  2

D. Service on the Primary Committee or the Secondary Committee shall constitute service as a Board member, and members of each such committee shall accordingly be entitled to full indemnification and reimbursement as Board members for their service on such committee. No member of the Primary Committee or the Secondary Committee shall be liable for any act or omission made in good faith with respect to the Plan or any option grants or stock issuances under the Plan.

IV.    ELIGIBILITY

A. The persons eligible to participate in the Discretionary Option Grant are as follows:

(i) Employees,

(ii) non-employee members of the Board or the board of directors of any Parent or Subsidiary, and

(iii) consultants and other independent advisors who provide services to the Corporation (or any Parent or Subsidiary).

B. Each Plan Administrator shall, within the scope of its administrative jurisdiction under the Plan, have full authority (subject to the provisions of the Plan) to determine, with respect to the option grants under the Discretionary Option Grant Program, which eligible persons are to receive option grants, the time or times when such option grants are to be made, the number of shares to be covered by each such grant, the status of the granted option as either an Incentive Option or a Non-Statutory Option, the time or times when each option is to become exercisable, and the vesting schedule (if any) applicable to the option shares and the maximum term for which the option is to remain outstanding.

V.    STOCK SUBJECT TO THE PLAN

A. The stock issuable under the Plan shall be shares of authorized but unissued or reacquired Common Stock. The maximum number of shares of Common Stock which may be issued over the term of the Plan shall not exceed 5,000,000 shares.

B. No one person participating in the Plan may receive options and direct stock issuances for more than 5,000,000 shares of Common Stock in the aggregate per calendar year, beginning with the 2000 calendar year.

C. Shares of Common Stock subject to outstanding options shall be available for subsequent issuance under the Plan to the extent (i) the options expire or terminate for any reason prior to exercise in full or (ii) the options are cancelled in accordance with the cancellation-regrant provisions of Article Two. In addition, any unvested shares issued under the Plan and subsequently repurchased by the Corporation, at the option exercise or direct issue price paid per share, pursuant to the Corporation's repurchase rights under the Plan shall be added back to the number of shares of Common Stock reserved for issuance under the Plan and shall

2

<PAGE>    3

accordingly be available for reissuance through one or more subsequent option grants. Should the exercise price of an option under the Plan be paid with shares of Common Stock or should shares of Common Stock otherwise issuable under the Plan be withheld by the Corporation in satisfaction of the withholding taxes incurred in connection with the exercise of an option or the vesting of a stock issuance under the Plan, then the number of shares of Common Stock available for issuance under the Plan shall be reduced by the gross number of shares for which the option is exercised or which vest under the stock issuance, and not by the net number of shares of Common Stock issued to the holder of such option or stock issuance.

D. Should any change be made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration, appropriate adjustments shall be made to (i) the maximum number and/or class of securities issuable under the Plan, (ii) the maximum number and/or class of securities for which any one person may be granted options and direct stock issuances per calendar year, and (iii) the number and/or class of securities and the exercise price per share in effect under each outstanding option in order to prevent the dilution or enlargement of benefits thereunder. The adjustments determined by the Plan Administrator shall be final, binding and conclusive.

3

NetApp 000139

<PAGE>    4

ARTICLE TWO

DISCRETIONARY OPTION GRANT PROGRAM

I.    OPTION TERMS

Each option shall be evidenced by one or more documents in the form approved by the Plan Administrator; provided, however, that each such document shall comply with the terms specified below. Each document evidencing an Incentive Option shall, in addition, be subject to the provisions of the Plan applicable to such options.

A.    Exercise Price.

1. The exercise price per share shall be fixed by the Plan Administrator but shall not be less than one hundred percent (100%) of the Fair Market Value per share of Common Stock on the option grant date.

2. The exercise price shall become immediately due upon exercise of the option and shall be payable in one or more of the forms specified below:

(i) cash or check made payable to the Corporation,

(ii) shares of Common Stock held for the requisite period necessary to avoid a charge to the Corporation's earnings for financial reporting purposes and valued at Fair Market Value on the Exercise Date, or

(iii) to the extent the option is exercised for vested shares, through a special sale and remittance procedure pursuant to which the Optionee shall concurrently provide irrevocable instructions to (a) the Corporation to effect the immediate sale of the purchased shares and remit to the Corporation, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate exercise price payable for the purchased shares plus all applicable Federal, state and local income and employment taxes required to be withheld by the Corporation by reason of such exercise and (b) the Corporation to deliver the certificates for the purchased shares directly to such brokerage firm in order to complete the sale transaction.

Except to the extent such sale and remittance procedure is utilized, payment of the exercise price for the purchased shares must be made on the Exercise Date.

B. Exercise and Term of Options. Each option shall be exercisable at such time or times, during such period and for such number of shares as shall be determined by the Plan Administrator and set forth in the documents evidencing the option. However, no option shall have a term in excess of ten (10) years measured from the option grant date.

4

NetApp 000140

<PAGE>    5

C.    Effect of Termination of Service.

1. The following provisions shall govern the exercise of any options held by the Optionee at the time of cessation of Service or death:

(i) Any option outstanding at the time of the Optionee's cessation of Service for any reason shall remain exercisable for such period of time thereafter as shall be determined by the Plan Administrator and set forth in the documents evidencing the option, but no such option shall be exercisable after the expiration of the option term.

(ii) Any option exercisable in whole or in part by the Optionee at the time of death may be exercised subsequently by the personal representative of the Optionee's estate or by the person or persons to whom the option is transferred pursuant to the Optionee's will or in accordance with the laws of descent and distribution.

(iii) During the applicable post-Service exercise period, the option may not be exercised in the aggregate for more than the number of vested shares for which the option is exercisable on the date of the Optionee's cessation of Service. Upon the expiration of the applicable exercise period or (if earlier) upon the expiration of the option term, the option shall terminate and cease to be outstanding for any vested shares for which the option has not been exercised. However, the option shall, immediately upon the Optionee's cessation of Service, terminate and cease to be outstanding to the extent the option is not otherwise at that time exercisable for vested shares.

(iv) Should the Optionee's Service be terminated for Misconduct, then all outstanding options held by the Optionee shall terminate immediately and cease to be outstanding.

2. The Plan Administrator shall have the discretion, exercisable either at the time an option is granted or at any time while the option remains outstanding, to:

(i) extend the period of time for which the option is to remain exercisable following the Optionee's cessation of Service from the period otherwise in effect for that option to such greater period of time as the Plan Administrator shall deem appropriate, but in no event beyond the expiration of the option term, and/or

(ii) permit the option to be exercised, during the applicable post-Service exercise period, not only with respect to the number of vested shares of Common Stock for which such option is exercisable at the time of the Optionee's cessation of Service but also with respect to one or more additional installments in which the Optionee would have vested under the option had the Optionee continued in Service.

5

NetApp 000141

<PAGE>   6

D. Stockholder Rights. The holder of an option shall have no stockholder rights with respect to the shares subject to the option until such person shall have exercised the option, paid the exercise price and become a holder of record of the purchased shares.

E. Repurchase Rights. The Plan Administrator shall have the discretion to grant options which are exercisable for unvested shares of Common Stock. Should the Optionee cease Service while holding such unvested shares, the Corporation shall have the right to repurchase, at the exercise price paid per share, any or all of those unvested shares. The terms upon which such repurchase right shall be exercisable (including the period and procedure for exercise and the appropriate vesting schedule for the purchased shares) shall be established by the Plan Administrator and set forth in the document evidencing such repurchase right.

F. Limited Transferability of Options. During the lifetime of the Optionee, Incentive Options shall be exercisable only by the Optionee and shall not be assignable or transferable other than by will or by the laws of descent and distribution following the Optionee's death. Non-Statutory Options shall be subject to the same limitation, except that a Non-Statutory Option may, in connection with the Optionee's estate plan, be assigned in whole or in part during the Optionee's lifetime to one or more members of the Optionee's immediate family or to a trust established exclusively for one or more such family members. The assigned portion may only be exercised by the person or persons who acquire a proprietary interest in the option pursuant to the assignment. The terms applicable to the assigned portion shall be the same as those in effect for the option immediately prior to such assignment and shall be set forth in such documents issued to the assignee as the Plan Administrator may deem appropriate.

II.    INCENTIVE OPTIONS

The terms specified below shall be applicable to all Incentive Options. Except as modified by the provisions of this Section II, all the provisions of Articles One, Two and Three shall be applicable to Incentive Options. Options which are specifically designated as Non-Statutory Options when issued under the Plan shall not be subject to the terms of this Section II.

A. Eligibility. Incentive Options may only be granted to Employees.

B. Exercise Price. The exercise price per share shall not be less than one hundred percent (100%) of the Fair Market Value per share of Common Stock on the option grant date.

C. Dollar Limitation. The aggregate Fair Market Value of the shares of Common Stock (determined as of the respective date or dates of grant) for which one or more options granted to any Employee under the Plan (or any other option plan of the Corporation or any Parent or Subsidiary) may for the first time become exercisable as Incentive Options during any one (1) calendar year shall not exceed the sum of One Hundred Thousand Dollars ($100,000). To the extent the Employee holds two (2) or more such options which become exercisable for the first time in the same calendar year, the foregoing limitation on the exercisability of such options as Incentive Options shall be applied on the basis of the order in which such options are granted.

6

NetApp 000142

<PAGE>   7

D. 10% Stockholder. If any Employee to whom an Incentive Option is granted is a 10% Stockholder, then the exercise price per share shall not be less than one hundred ten percent (110%) of the Fair Market Value per share of Common Stock on the option grant date, and the option term shall not exceed five (5) years measured from the option grant date.

III.     CORPORATE TRANSACTION/CHANGE IN CONTROL

A. In the event of any Corporate Transaction, each outstanding option shall automatically accelerate so that each such option shall, immediately prior to the effective date of the Corporate Transaction, become fully exercisable with respect to the total number of shares of Common Stock at the time subject to such option and may be exercised for any or all of those shares as fully-vested shares of Common Stock. However, an outstanding option shall not so accelerate if and to the extent: (i) such option is, in connection with the Corporate Transaction, either to be assumed by the successor corporation (or parent thereof) or to be replaced with a comparable option to purchase shares of the capital stock of the successor corporation (or parent thereof), (ii) such option is to be replaced with a cash incentive program of the successor corporation which preserves the spread existing on the unvested option shares at the time of the Corporate Transaction and provides for subsequent payout in accordance with the same vesting schedule applicable to such option or (iii) the acceleration of such option is subject to other limitations imposed by the Plan Administrator at the time of the option grant. The determination of option comparability under clause (i) above shall be made by the Plan Administrator, and its determination shall be final, binding and conclusive.

B. All outstanding repurchase rights shall also terminate automatically, and the shares of Common Stock subject to those terminated rights shall immediately vest in full, in the event of any Corporate Transaction, except to the extent: (i) those repurchase rights are to be assigned to the successor corporation (or parent thereof) in connection with such Corporate Transaction or (ii) such accelerated vesting is precluded by other limitations imposed by the Plan Administrator at the time the repurchase right is issued.

C. Immediately following the consummation of the Corporate Transaction, all outstanding options shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof).

D. Each option which is assumed in connection with a Corporate Transaction shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to the Optionee in consummation of such Corporate Transaction had the option been exercised immediately prior to such Corporate Transaction. Appropriate adjustments to reflect such Corporate Transaction shall also be made to (i) the exercise price payable per share under each outstanding option, provided the aggregate exercise price payable for such securities shall remain the same, (ii) the maximum number and/or class of securities available for issuance over the remaining term of the Plan and (iii) the maximum number and/or class of securities for which any one person may be granted stock options and direct stock issuances under the Plan per calendar year.

7

NetApp 000143

<PAGE>    8

E. The Plan Administrator shall have full power and authority to grant options under the Discretionary Option Grant Program which will automatically accelerate in whole or in part in the event the Optionee's Service subsequently terminates by reason of an Involuntary Termination within a designated period (not to exceed twelve (12) months) following the effective date of any Corporate Transaction in which those options are assumed or replaced and do not otherwise accelerate. Any options so accelerated shall remain exercisable for fully-vested shares until the earlier of (i) the expiration of the option term or (ii) the expiration of the one (1)-year period measured from the effective date of the Involuntary Termination. In addition, the Plan Administrator may provide that one or more of the Corporation's outstanding repurchase rights with respect to shares held by the Optionee at the time of such Involuntary Termination shall immediately terminate in whole or in part, and the shares subject to those terminated rights shall accordingly vest.

F. The Plan Administrator shall have full power and authority to grant options under the Discretionary Option Grant Program which will automatically accelerate in whole or in part in the event the Optionee's Service subsequently terminates by reason of an Involuntary Termination within a designated period (not to exceed twelve (12) months) following the effective date of any Change in Control. Each option so accelerated shall remain exercisable for fully-vested shares until the earlier of (i) the expiration of the option term or (ii) the expiration of the one (1)-year period measured from the effective date of the Involuntary Termination. In addition, the Plan Administrator may provide that one or more of the Corporation's outstanding repurchase rights with respect to shares held by the Optionee at the time of such Involuntary Termination shall immediately terminate in whole or in part, and the shares subject to those terminated rights shall accordingly vest.

G. The portion of any Incentive Option accelerated in connection with a Corporate Transaction or Change in Control shall remain exercisable as an Incentive Option only to the extent the applicable One Hundred Thousand Dollar limitation is not exceeded. To the extent such dollar limitation is exceeded, the accelerated portion of such option shall be exercisable as a Non-Qualified Option under the Federal tax laws.

H. The outstanding options shall in no way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

IV.    CANCELLATION AND REGRANT OF OPTIONS

The Plan Administrator shall have the authority to effect, at any time and from time to time, with the consent of the affected option holders, the cancellation of any or all outstanding options under the Discretionary Option Grant Program and to grant in substitution new options covering the same or different number of shares of Common Stock but with an exercise price per share based on the Fair Market Value per share of Common Stock on the new grant date.

8

NetApp 000144

<PAGE>    9

ARTICLE THREE

MISCELLANEOUS

I.    TAX WITHHOLDING

A. The Corporation's obligation to deliver shares of Common Stock upon the exercise of stock options or the issuance or vesting of such shares under the Plan shall be subject to the satisfaction of all applicable Federal, state and local income and employment tax withholding requirements.

B. The Plan Administrator may, in its discretion, provide any or all holders of Non-Statutory Options or unvested shares of Common Stock under the Plan with the right to use shares of Common Stock in satisfaction of all or part of the Withholding Taxes to which such holders may become subject in connection with the exercise of their options or the vesting of their shares. Such right may be provided to any such holder in either or both of the following formats:

(i) Stock Withholding: The election to have the Corporation withhold, from the shares of Common Stock otherwise issuable upon the exercise of such Non-Statutory Option or the vesting of such shares, a portion of those shares with an aggregate Fair Market Value equal to the percentage of the Withholding Taxes (not to exceed one hundred percent (100%)) designated by the holder.

(ii) Stock Delivery: The election to deliver to the Corporation, at the time the Non-Statutory Option is exercised or the shares vest, one or more shares of Common Stock previously acquired by such holder (other than in connection with the option exercise or share vesting triggering the Withholding Taxes) with an aggregate Fair Market Value equal to the percentage of the Withholding Taxes (not to exceed one hundred percent (100%)) designated by the holder.

II.    EFFECTIVE DATE AND TERM OF THE PLAN

A. The Plan became effective on the Plan Effective Date.

B. The Plan shall terminate upon the earliest of (i) August 31, 2010, (ii) the date on which all shares available for issuance under the Plan shall have been issued as fully-vested shares pursuant to option exercises or direct stock issuances under the Plan or (iii) the termination of all outstanding options in connection with a Corporate Transaction. Upon such Plan termination, all outstanding stock options and unvested stock issuances shall continue to have force and effect in accordance with the provisions of the documents evidencing such options or issuances.

9

NetApp 000145

<PAGE>   10

### III.    AMENDMENT OF THE PLAN

A. The Board shall have complete and exclusive power and authority to amend or modify the Plan in any or all respects. However, no such amendment or modification shall adversely affect any rights and obligations with respect to options or unvested stock issuances at the time outstanding under the Plan unless the Optionee or the Participant consents to such amendment or modification. In addition, certain amendments may require stockholder approval pursuant to applicable laws or regulations. Subject to the foregoing limitations, the Plan Administrator may make option grants and direct stock issuances under the Plan at any time before the date fixed herein for the termination of the Plan.

B. Options to purchase shares of Common Stock may be granted under the Discretionary Option Grant that are in each instance in excess of the number of shares then available for issuance under the Plan, provided any excess shares actually issued under those programs are held in escrow until there is obtained stockholder approval of an amendment sufficiently increasing the number of shares of Common Stock available for issuance under the Plan. If such stockholder approval is not obtained within twelve (12) months after the date the first such excess grants or issuances are made, then (i) any unexercised options granted on the basis of such excess shares shall terminate and cease to be outstanding and (ii) the Corporation shall promptly refund to the Optionees and the Participants the exercise or purchase price paid for any excess shares issued under the Plan and held in escrow, together with interest (at the applicable Short Term Federal Rate) for the period the shares were held in escrow, and such shares shall thereupon be automatically cancelled and cease to be outstanding.

### IV.    REGULATORY APPROVALS

A. The implementation of the Plan, the granting of any option under the Plan and the issuance of any shares of Common Stock either upon the exercise of any option shall be subject to the Corporation's procurement of all approvals and permits required by regulatory authorities having jurisdiction over the Plan, the options granted under it and the shares of Common Stock issued pursuant to it.

B. No shares of Common Stock or other assets shall be issued or delivered under the Plan unless and until there shall have been compliance with all applicable requirements of Federal and state securities laws.

### V.    USE OF PROCEEDS

Any cash proceeds received by the Corporation from the sale of shares of Common Stock under the Plan shall be used for general corporate purposes.

### VI.    NO EMPLOYMENT/SERVICE RIGHTS

Nothing in the Plan shall confer upon the Optionee or the Participant any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Corporation (or any Parent or Subsidiary employing or retaining such

NetApp 000146

<PAGE>    11

person) or of the Optionee or the Participant, which rights are hereby expressly reserved by each, to terminate such person's Service at any time for any reason, with or without cause.

11

NetApp 000147

<PAGE>    12

## APPENDIX

The following definitions shall be in effect under the Plan:

A. BOARD shall mean the Corporation's Board of Directors.

B. CHANGE IN CONTROL shall mean a change in ownership or control of the Corporation effected through either of the following transactions:

(i) the acquisition, directly or indirectly, by any person or related group of persons (other than the Corporation or a person that directly or indirectly controls, is controlled by, or is under common control with, the Corporation), of beneficial ownership (within the meaning of Rule 13d-3 of the 1934 Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities pursuant to a tender or exchange offer made directly to the Corporation's stockholders, or

(ii) a change in the composition of the Board over a period of thirty-six (36) consecutive months or less such that a majority of the Board members ceases, by reason of one or more contested elections for Board membership, to be comprised of individuals who either (A) have been Board members continuously since the beginning of such period or (B) have been elected or nominated for election as Board members during such period by at least a majority of the Board members described in clause (A) who were still in office at the time the Board approved such election or nomination.

C. CODE shall mean the Internal Revenue Code of 1986, as amended.

D. COMMON STOCK shall mean the Corporation's common stock.

E. CORPORATE TRANSACTION shall mean either of the following stockholder-approved transactions to which the Corporation is a party:

(i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction; or

(ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

A-1

NetApp 000148

<PAGE>   13

F. CORPORATION shall mean WebManage Technologies, Inc., a Delaware corporation, and any corporate successor to all or substantially all of the assets or voting stock of WebManage Technologies, Inc. which shall by appropriate action adopt the Plan.

G. DISCRETIONARY OPTION GRANT PROGRAM shall mean the discretionary option grant program in effect under the Plan.

H. EMPLOYEE shall mean an individual who is in the employ of the Corporation (or any Parent or Subsidiary), subject to the control and direction of the employer entity as to both the work to be performed and the manner and method of performance.

I. EXERCISE DATE shall mean the date on which the Corporation shall have received written notice of the option exercise.

J. FAIR MARKET VALUE per share of Common Stock on any relevant date shall be determined by the Board of Directors.

K. INCENTIVE OPTION shall mean an option which satisfies the requirements of Code Section 422.

L. INVOLUNTARY TERMINATION shall mean the termination of the Service of any individual which occurs by reason of:

(i) such individual's involuntary dismissal or discharge by the Corporation for reasons other than Misconduct, or

(ii) such individual's voluntary resignation following (A) a change in his or her position with the Corporation which materially reduces his or her level of responsibility, (B) a reduction in his or her level of compensation (including base salary, fringe benefits and participation in corporate-performance based bonus or incentive programs) by more than fifteen percent (15%) or (C) a relocation of such individual's place of employment by more than fifty (50) miles, provided and only if such change, reduction or relocation is effected by the Corporation without the individual's consent.

M. MISCONDUCT shall mean the commission of any act of fraud, embezzlement or dishonesty by the Optionee or Participant, any unauthorized use or disclosure by such person of confidential information or trade secrets of the Corporation (or any Parent or Subsidiary), or any other intentional misconduct by such person adversely affecting the business or affairs of the Corporation (or any Parent or Subsidiary) in a material manner. The foregoing definition shall not be deemed to be inclusive of all the acts or omissions which the Corporation (or any Parent or Subsidiary) may consider as grounds for the dismissal or discharge of any Optionee, Participant or other person in the Service of the Corporation (or any Parent or Subsidiary).

N. 1934 ACT shall mean the Securities Exchange Act of 1934, as amended.

A-2

NetApp 000149

<PAGE>  14

O. NON-STATUTORY OPTION shall mean an option not intended to satisfy the requirements of Code Section 422.

P. OPTIONEE shall mean any person to whom an option is granted under the Discretionary Option Grant Program.

Q. PARENT shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, provided each corporation in the unbroken chain (other than the Corporation) owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

R. PERMANENT DISABILITY OR PERMANENTLY DISABLED shall mean the inability of the Optionee or the Participant to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment expected to result in death or to be of continuous duration of twelve (12) months or more.

S. PLAN shall mean the Corporation's 2000 Stock Incentive Plan, as set forth in this document.

T. PLAN ADMINISTRATOR shall mean the particular entity, whether the Primary Committee, the Board or the Secondary Committee, which is authorized to administer the Discretionary Option Grant Program with respect to one or more classes of eligible persons, to the extent such entity is carrying out its administrative functions under those programs with respect to the persons under its jurisdiction.

U. PLAN EFFECTIVE DATE shall mean _____.

V. PRIMARY COMMITTEE shall mean the committee of two (2) or more non-employee Board members appointed by the Board to administer the Discretionary Option Grant Program.

W. SECONDARY COMMITTEE shall mean a committee of two (2) or more Board members appointed by the Board to administer the Discretionary Option Grant Program with respect to eligible persons.

X. SERVICE shall mean the provision of services to the Corporation (or any Parent or Subsidiary) by a person in the capacity of an Employee, a non-employee member of the board of directors or a consultant or independent advisor, except to the extent otherwise specifically provided in the documents evidencing the option grant or stock issuance.

Y. SUBSIDIARY shall mean any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, provided each corporation (other than the last corporation) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

A-3

NetApp 000150

<PAGE>   15

      Z. 10% STOCKHOLDER shall mean the owner of stock (as determined under Code Section 424(d)) possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Corporation (or any Parent or Subsidiary).

      AA. WITHHOLDING TAXES shall mean the Federal, state and local income and employment withholding taxes to which the holder of Non-Statutory Options or unvested shares of Common Stock may become subject in connection with the exercise of those options or the vesting of those shares.

<div align="center">A-4</div>

&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;

NetApp 000151

<PAGE>    1

EXHIBIT 99.8

WEBMANAGE TECHNOLOGIES, INC.
STOCK OPTION AGREEMENT

RECITALS

A. The Board has adopted the Plan for the purpose of retaining the services of selected Employees, non-employee members of the Board and consultants and other independent advisors who provide services to the Corporation.

B. Optionee is to render valuable services to the Corporation, and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the Corporation's grant of an option to Optionee.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in the attached Appendix.

NOW, THEREFORE, it is hereby agreed as follows:

1. GRANT OF OPTION. The Corporation hereby grants to Optionee, as of the Grant Date, an option to purchase up to the number of Option Shares specified in the Grant Notice. The Option Shares shall be purchasable from time to time during the option term specified in Paragraph 2 at the Exercise Price.

2. OPTION TERM. This option shall have a term of ten (10) years measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 5 or 6.

3. LIMITED TRANSFERABILITY. This option shall be neither transferable nor assignable by Optionee other than by will or by the laws of descent and distribution following Optionee's death and may be exercised, during Optionee's lifetime, only by Optionee. However, if this option is designated a Non-Statutory Option in the Grant Notice, then this option may also be assigned, in whole or in part during Optionee's lifetime in accordance with the Optionee's estate plan, to one or more members of the Optionee's immediate family or to a trust established exclusively for one or more such family members. The assigned portion may only be exercised by the person or persons who acquire a proprietary interest in the option pursuant to the assignment. The terms applicable to the assigned portion shall be the same as those in effect for the option immediately prior to such assignment and shall be set forth in such documents issued to the assignee as the Plan Administrator may deem appropriate.

4. DATES OF EXERCISE. This option shall become exercisable for the Option Shares in one or more installments as specified in the Grant Notice. As the option becomes exercisable for such installments, those installments shall accumulate and the option shall remain exercisable for the accumulated installments until the Expiration Date or sooner termination of the option term under Paragraph 5 or 6.

5. CESSATION OF SERVICE. The option term specified in Paragraph 2 shall terminate (and this option shall cease to be outstanding) prior to the Expiration Date should any of the following provisions become applicable:

(i) Should Optionee cease to remain in Service for any reason (other than death, Permanent Disability or Misconduct) while this option is outstanding, then Optionee shall have a period of three (3) months (commencing with the date of such cessation of Service) during which to exercise this option, but in no event shall this option be exercisable at any time after the Expiration Date.

(ii) Should Optionee die while this option is outstanding, then the personal representative of Optionee's estate or the person or persons to whom the option is transferred pursuant to Optionee's will or in accordance with the laws of descent and distribution shall have the right to exercise this option. Such right shall lapse, and this option shall cease to be outstanding, upon the earlier of (A) the expiration of the twelve (12)- month period measured from the date of Optionee's death or (B) the Expiration Date.

(iii) Should Optionee cease Service by reason of Permanent Disability while this option is outstanding, then Optionee shall have a period of twelve (12) months (commencing with the date of such cessation of Service) during which to exercise this option. In no event shall this option be exercisable at any time after the Expiration Date.

NetApp 000153

(iv) Should Optionee's Service be terminated for Misconduct, then this option shall terminate immediately and cease to remain outstanding.

(v) During the applicable post-Service exercise period, this option may not be exercised in the aggregate for more than the number of vested Option Shares for which the option is exercisable at the time of Optionee's cessation of Service. Upon the expiration of such exercise period or (if earlier) upon the Expiration Date, this option shall terminate and cease to be outstanding for any vested Option Shares for which the option has not been exercised. However, this option shall, immediately upon Optionee's cessation of Service for any reason, terminate and cease to be outstanding with respect to any Option Shares in which Optionee is not otherwise at that time vested or for which this option is not otherwise at that time exercisable.

6. SPECIAL ACCELERATION OF OPTION.

(a) This option, to the extent outstanding at the time of a Corporate Transaction but not otherwise fully exercisable, shall automatically accelerate so that this option shall, immediately prior to the effective date of the Corporate Transaction, become exercisable for all of the Option Shares at the time subject to this option and may be exercised for any or all of those Option Shares as fully-vested shares of Common Stock. No such acceleration of this option, however, shall occur if and to the extent: (i) this option is, in connection with the Corporate Transaction, either to be assumed by the successor corporation (or parent thereof) or to be replaced with a comparable option to purchase shares of the capital stock of the successor corporation (or parent thereof) or (ii) this option is to be replaced with a cash incentive program of the successor corporation which preserves the spread existing on the Option Shares at the time of the Corporate Transaction (the excess of the Fair Market Value of those Option Shares over the aggregate Exercise Price payable for such shares) and provides for subsequent pay-out in accordance with the option exercise schedule set forth in the Grant Notice. The determination of option comparability under clause (i) shall be made by the Plan Administrator, and such determination shall be final, binding and conclusive.

(b) Immediately following the Corporate Transaction, this option, to the extent not previously exercised, shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c) If this option is assumed in connection with a Corporate Transaction, then this option shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to Optionee in consummation of such Corporate Transaction had the option been exercised immediately prior to such Corporate Transaction, and appropriate adjustments shall also be made to the Exercise Price, provided the aggregate Exercise Price shall remain the same.

(d) This Agreement shall not in any way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

7. ADJUSTMENT IN OPTION SHARES. Should any change be made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration, appropriate adjustments shall be made to (i) the total number and/or class of securities subject to this option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

8. STOCKHOLDER RIGHTS. The holder of this option shall not have any stockholder rights with respect to the Option Shares until such person shall have exercised the option, paid the Exercise Price and become a holder of record of the purchased shares.

9. MANNER OF EXERCISING OPTION.

(a) In order to exercise this option with respect to all or any part of the Option Shares for which this option is at the time exercisable, Optionee (or any other person or persons exercising the option) must take the following actions:

(i) Execute and deliver to the Corporation a Notice of Exercise for the Option Shares for which the option is exercised.

NetApp 000154

&lt;PAGE&gt;    3

(ii) Pay the aggregate Exercise Price for the purchased shares in one or more of the following forms:

(A) cash or check made payable to the Corporation;

(B) shares of Common Stock held by Optionee (or any other person or persons exercising the option) for the requisite period necessary to avoid a charge to the Corporation's earnings for financial reporting purposes and valued at Fair Market Value on the Exercise Date; or

(C) through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the option) shall concurrently provide irrevocable instructions (I) to a Corporation to effect the immediate sale of the purchased shares and remit to the Corporation, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased shares plus all applicable Federal, state and local income and employment taxes required to be withheld by the Corporation by reason of such exercise and (II) to the Corporation to deliver the certificates for the purchased shares in order to complete the sale transaction.

Except to the extent the sale and remittance procedure is utilized in connection with the option exercise, payment of the Exercise Price must accompany the Notice of Exercise delivered to the Corporation in connection with the option exercise.

(iii) Furnish to the Corporation appropriate documentation that the person or persons exercising the option (if other than Optionee) have the right to exercise this option.

(iv) Make appropriate arrangements with the Corporation (or Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all Federal, state and local income and employment tax withholding requirements applicable to the option exercise.

(b) As soon as practical after the Exercise Date, the Corporation shall issue to or on behalf of Optionee (or any other person or persons exercising this option) a certificate for the purchased Option Shares, with the appropriate legends affixed thereto.

(c) In no event may this option be exercised for any fractional shares.

10. COMPLIANCE WITH LAWS AND REGULATIONS.

(a) The exercise of this option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Corporation and Optionee with all applicable requirements of law relating thereto.

(b) The inability of the Corporation to obtain approval from any regulatory body having authority deemed by the Corporation to be necessary to the lawful issuance and sale of any Common Stock pursuant to this option shall relieve the Corporation of any liability with respect to the non-issuance or sale of the Common Stock as to which such approval shall not have been obtained. The Corporation, however, shall use its best efforts to obtain all such approvals.

11. SUCCESSORS AND ASSIGNS. Except to the extent otherwise provided in Paragraphs 3 and 6, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Corporation and its successors and assigns and Optionee, Optionee's assigns and the legal representatives, heirs and legatees of Optionee's estate.

12. NOTICES. Any notice required to be given or delivered to the Corporation under the terms of this Agreement shall be in writing and addressed to the Corporation at its principal corporate offices. Any notice required to be given or delivered to Optionee shall be in writing and addressed to Optionee at the address indicated below Optionee's signature line on the Grant Notice. All notices shall be deemed effective upon personal delivery or upon deposit in the U.S. mail, postage prepaid and properly addressed to the party to be notified.

3.

NetApp 000155

<PAGE>   4

13. CONSTRUCTION. This Agreement and the option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the terms of the Plan. All decisions of the Plan Administrator with respect to any question or issue arising under the Plan or this Agreement shall be conclusive and binding on all persons having an interest in this option.

14. GOVERNING LAW. The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of Delaware without resort to that State's conflict-of-laws rules.

15. EXCESS SHARES. If the Option Shares covered by this Agreement exceed, as of the Grant Date, the number of shares of Common Stock which may without stockholder approval be issued under the Plan, then this option shall be void with respect to those excess shares, unless stockholder approval of an amendment sufficiently increasing the number of shares of Common Stock issuable under the Plan is obtained in accordance with the provisions of the Plan.

16. ADDITIONAL TERMS APPLICABLE TO AN INCENTIVE OPTION. In the event this option is designated an Incentive Option in the Grant Notice, the following terms and conditions shall also apply to the grant:

(a) This option shall cease to qualify for favorable tax treatment as an Incentive Option if (and to the extent) this option is exercised for one or more Option Shares: (A) more than three (3) months after the date Optionee ceases to be an Employee for any reason other than death or Permanent Disability or (B) more than twelve (12) months after the date Optionee ceases to be an Employee by reason of Permanent Disability.

(b) No installment under this option shall qualify for favorable tax treatment as an Incentive Option if (and to the extent) the aggregate Fair Market Value (determined at the Grant Date) of the Common Stock for which such installment first becomes exercisable hereunder would, when added to the aggregate value (determined as of the respective date or dates of grant) of the Common Stock or other securities for which this option or any other Incentive Options granted to Optionee prior to the Grant Date (whether under the Plan or any other option plan of the Corporation) first become exercisable during the same calendar year, exceed One Hundred Thousand Dollars ($100,000) in the aggregate. Should such One Hundred Thousand Dollar ($100,000) limitation be exceeded in any calendar year, this option shall nevertheless become exercisable for the excess shares in such calendar year as a Non-Statutory Option.

(c) Should the exercisability of this option be accelerated upon a Corporate Transaction, then this option shall qualify for favorable tax treatment as an Incentive Option only to the extent the aggregate Fair Market Value (determined at the Grant Date) of the Common Stock for which this option first becomes exercisable in the calendar year in which the Corporate Transaction occurs does not, when added to the aggregate value (determined as of the respective date or dates of grant) of the Common Stock or other securities for which this option or one or more other Incentive Options granted to Optionee prior to the Grant Date (whether under the Plan or any other option plan of the Corporation) first become exercisable during the same calendar year, exceed One Hundred Thousand Dollars ($100,000) in the aggregate. Should the applicable One Hundred Thousand Dollar ($100,000) limitation be exceeded in the calendar year of such Corporate Transaction, the option may nevertheless be exercised for the excess shares in such calendar year as a Non-Statutory Option.

(d) Should Optionee hold, in addition to this option, one or more other options to purchase Common Stock which become exercisable for the first time in the same calendar year as this option, then the foregoing limitations on the exercisability of such options as Incentive Options shall be applied on the basis of the order in which such options are granted.

17. LEAVE OF ABSENCE. The following provisions shall apply upon the Optionee's commencement of an authorized leave of absence:

(a) The exercise schedule in effect under the Grant Notice shall be frozen as of the first day of the authorized leave, and the option shall not become exercisable for any additional installments of the Option Shares during the period Optionee remains on such leave.

4.

NetApp 000156

<PAGE>    5

        (b) Should Optionee resume active Employee status within sixty (60) days after the start date of the authorized leave, Optionee shall, for purposes of the exercise schedule set forth in the Grant Notice, receive Service credit for the entire period of such leave. If Optionee does not resume active Employee status within such sixty (60)-day period, then no Service credit shall be given for the period of the leave.

        (c) If the option is designated as an Incentive Stock Option in the Grant Notice, then the following additional provision shall apply:

        If the leave of absence continues for more than ninety (90) days, then the option shall automatically convert to a Non-Statutory Option under the federal tax laws on the ninety-first (91st) day of such leave, unless the Optionee's reemployment rights are guaranteed by statute or by written agreement. Following any such conversion of the option, all subsequent exercises of such option, whether effected before or after Optionee's return to active Employee status, shall result in an immediate taxable event, and the Corporation shall be required to collect from Optionee the federal, state and local income and employment withholding taxes applicable to such exercise.

        (d) In no event shall this option become exercisable for any additional Option Shares or otherwise remain outstanding if Optionee does not resume Employee status prior to the Expiration Date of the option term.

IN WITNESS WHEREOF, the Company has caused this agreement to be executed by a duly authorized officer of the Company as of the date of grant hereof.

                        WEBMANAGE TECHNOLOGIES, INC.
                        (the "Company")

                        By:

------------------------------      ------------------------------------
Witness                        Vijay Basani, President and CEO

Acknowledged and agreed to this ____ day of _____, 2000:

------------------------------
(the "Optionee")

5.

NetApp 000157

<PAGE>    6

<div align="center">EXHIBIT I

NOTICE OF EXERCISE</div>

      I hereby notify WebManage Technologies, Inc. (the "Corporation") that I elect to purchase shares of the Corporation's Common Stock (the "Purchased Shares") at the option exercise price of $ per share (the "Exercise Price") pursuant to that certain option (the "Option") granted to me under the Corporation's 2000 Stock Incentive Plan.

      Concurrently with the delivery of this Exercise Notice to the Corporation, I shall hereby pay to the Corporation the Exercise Price for the Purchased Shares in accordance with the provisions of my agreement with the Corporation (or other documents) evidencing the Option and shall deliver whatever additional documents may be required by such agreement as a condition for exercise. Alternatively, I may utilize the sale and remittance procedure specified in my agreement to effect payment of the Exercise Price.

Date: _____, 200_

Optionee: _____

Address: _____

Print name in exact manner
it is to appear on the
stock certificate:                    _____

Address to which certificate
is to be sent, if different
from address above:                   _____

                                      _____

                                      _____

Social Security Number:               _____

Employee Number:                      _____

<div align="center">APPENDIX</div>

      The following definitions shall be in effect under the Agreement:

    A. AGREEMENT shall mean this Stock Option Agreement.

    B. BOARD shall mean the Corporation's Board of Directors.

    C. CODE shall mean the Internal Revenue Code of 1986, as amended.

    D. COMMON STOCK shall mean the Corporation's common stock.

    E. CORPORATE TRANSACTION shall mean either of the following stockholder-approved transactions to which the Corporation is a party:

NetApp 000158

<PAGE>  7

(i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction, or

(ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

F. CORPORATION shall mean WebManage Technologies, Inc., a Delaware corporation.

G. EMPLOYEE shall mean an individual who is in the employ of the Corporation, subject to the control and direction of the employer entity as to both the work to be performed and the manner and method of performance.

H. EXERCISE DATE shall mean the date on which the option shall have been exercised in accordance with Paragraph 9 of the Agreement.

I. EXERCISE PRICE shall mean the exercise price per share as specified in the Grant Notice.

J. EXPIRATION DATE shall mean the date on which the option expires as specified in the Grant Notice.

K. FAIR MARKET VALUE per share of Common Stock on any relevant date shall be determined by the Board.

L. GRANT DATE shall mean the date of grant of the option as specified in the Grant Notice.

M. GRANT NOTICE shall mean the Notice of Grant of Stock Option accompanying the Agreement, pursuant to which Optionee has been informed of the basic terms of the option evidenced hereby.

N. INCENTIVE OPTION shall mean an option which satisfies the requirements of Code Section 422.

O. MISCONDUCT shall mean the commission of any act of fraud, embezzlement or dishonesty by Optionee, any unauthorized use or disclosure by Optionee of confidential information or trade secrets of the Corporation, or any other intentional misconduct by Optionee adversely affecting the business or affairs of the Corporation in a material manner. The foregoing definition shall not be deemed to be inclusive of all the acts or omissions which the Corporation may consider as grounds for the dismissal or discharge of Optionee or any other individual in the Service of the Corporation.

P. NON-STATUTORY OPTION shall mean an option not intended to satisfy the requirements of Code Section 422.

Q. NOTICE OF EXERCISE shall mean the notice of exercise in the form attached hereto as Exhibit I.

R. OPTION SHARES shall mean the number of shares of Common Stock subject to the option as specified in the Grant Notice.

S. OPTIONEE shall mean the person to whom the option is granted as specified in the Grant Notice.

T. PARENT shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, provided each corporation in the unbroken chain (other than the Corporation) owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

U. PERMANENT DISABILITY shall mean the inability of Optionee to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is expected to result in death or has lasted or can be expected to last for a continuous period of twelve (12) months or more.

V. PLAN shall mean the Corporation's 2000 Stock Incentive Plan.

W. PLAN ADMINISTRATOR shall mean either the Board or a committee of Board members, to the extent the committee is at the time responsible for the administration of the Plan.

NetApp 000159

A-7.

NetApp 000160

<PAGE>    8

    X. SERVICE shall mean the Optionee's performance of services for the Corporation (or any Parent or Subsidiary) in the capacity of an Employee, a non-employee member of the board of directors or a consultant or independent advisor.

    Y. SUBSIDIARY shall mean any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, provided each corporation (other than the last corporation) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

<div align="center">A-8.</div>

</TEXT>
</DOCUMENT>

NetApp 000161

<PAGE>    1

EXHIBIT 99.9

NETWORK APPLIANCE, INC.

STOCK OPTION ASSUMPTION AGREEMENT
WEBMANAGE TECHNOLOGIES, INC.

2000 STOCK INCENTIVE PLAN

OPTIONEE: _____,

STOCK OPTION ASSUMPTION AGREEMENT effective as of the 13th day of November, 2000.

WHEREAS, the undersigned individual ("Optionee") holds one or more outstanding options to purchase shares of the common stock of WebManage Technologies, Inc., a Delaware corporation ("WebManage"), which were granted to Optionee under WebManage Technologies, Inc. 2000 Stock Incentive Plan (the "Plan").

WHEREAS, each of those options is evidenced by a Stock Option Agreement (the "Option Agreement") issued to Optionee under the Plan.

WHEREAS, WebManage has been acquired by Network Appliance, Inc., a California corporation ("NetApp"), through the merger of WebManage with and into NetApp (the "Merger") pursuant to the Agreement and Plan of Merger by and among NetApp and WebManage, dated August 31, 2000 (the "Merger Agreement").

WHEREAS, the provisions of the Merger Agreement require the obligations of WebManage under each outstanding option under the Plan to be assumed by NetApp at the consummation of the Merger and the holder of each outstanding option to be issued an agreement evidencing the assumption of such option.

WHEREAS, pursuant to the provisions of the Merger Agreement, the exchange ratio (the "Exchange Ratio") in effect for the Merger is 0.02543 of a share of NetApp common stock ("NetApp Stock") for each outstanding share of WebManage common stock ("WebManage Stock") (rounded down to the nearest whole number of shares of NetApp Stock).

WHEREAS, the purpose of this Agreement is to evidence the assumption by NetApp of the outstanding options held by Optionee at the time of the consummation of the Merger (the "Effective Time") and to reflect certain adjustments to those options which have become necessary in connection with their assumption by NetApp in the Merger.

NOW, THEREFORE, it is hereby agreed as follows:

1. The number of shares of WebManage Stock subject to the options held by Optionee immediately prior to the Effective Time (the "WebManage Options") and the exercise price payable per share are set forth below. NetApp hereby assumes, as of the Effective Time, all

NetApp 000163

&lt;PAGE&gt;    2

the duties and obligations of WebManage under each of the WebManage Options. In connection with such assumption, the number of shares of NetApp Stock purchasable under each WebManage Option hereby assumed and the exercise price payable thereunder have been adjusted to reflect the Exchange Ratio. Accordingly, the number of shares of NetApp Stock subject to each WebManage Option hereby assumed shall be as specified for that option below, and the adjusted exercise price payable per share of NetApp Stock under the assumed WebManage Option shall also be as indicated for that option below.

&lt;TABLE&gt;
&lt;CAPTION&gt;

| WEBMANAGE STOCK OPTIONS | | NETAPP ASSUMED OPTIONS | |
|---|---|---|---|
| # of Shares of WebManage Common Stock | Exercise Price per Share | # of Shares of NetApp Common Stock | Adjusted Exercise Price per Share |
| &lt;S&gt; | &lt;C&gt; $ | &lt;C&gt; | &lt;C&gt; $ |

&lt;/TABLE&gt;

2. The intent of the foregoing adjustments to each assumed WebManage Option is to assure that the spread between the aggregate fair market value of the shares of NetApp Stock purchasable under each such option and the aggregate exercise price as adjusted pursuant to this Agreement will not, immediately after the consummation of the Merger, be greater than the spread which existed, immediately prior to the Merger, between the then aggregate fair market value of the WebManage Stock subject to the WebManage Option and the aggregate exercise price in effect at such time under the Option Agreement. Such adjustments are also intended to preserve, immediately after the Merger, on a per share basis, the same ratio of exercise price per option share to fair market value per share which existed under the WebManage Option immediately prior to the Merger.

3. Each WebManage Option shall continue to have a maximum term of ten (10) years from the date of grant, subject to earlier termination (as provided in the applicable Option Agreement) following Optionee's cessation of service or employment.

4. The following provisions shall govern each WebManage Option hereby assumed by NetApp:

(a) Unless the context otherwise requires, all references in each Option Agreement and the applicable Plan (to the extent incorporated into such Option Agreement) shall be adjusted as follows: (i) all references to the "Company" or "Corporation" shall mean NetApp, (ii) all references to "Common Stock" shall mean shares of NetApp Stock, (iii) all references to the "Board" shall mean the Board of Directors of NetApp and (iv) all references to the "Plan Administrator" shall mean the Compensation Committee of the NetApp Board of Directors.

(b) Except as modified by this Agreement, the grant date and the expiration date of each assumed WebManage Option and all other provisions which govern either the exercise or the termination of the assumed WebManage Option shall remain the same as set forth in the Option Agreement applicable to that option, and the provisions of the applicable Plan and the Option Agreement

2

<PAGE>    3

shall accordingly govern and control Optionee's rights under this Agreement to purchase NetApp Stock under the assumed WebManage Option.

(c) Each WebManage Option assumed by NetApp which was originally designated as an Incentive Stock Option under the federal tax laws shall retain such Incentive Stock Option status to the maximum extent allowed by law.

(d) Each WebManage Option hereby assumed by NetApp shall continue to vest and become exercisable in accordance with the same installment vesting schedule in effect for that option under the applicable Option Agreement immediately prior to the Effective Time; except, that the number of shares subject to each such installment shall be adjusted to reflect the Exchange Ratio.

(e) For purposes of applying any and all provisions of the Option Agreement and the applicable Plan relating to Optionee's status as an employee or a consultant of WebManage, Optionee shall be deemed to continue in such status as an employee or a consultant for so long as Optionee renders services as an employee or a consultant to NetApp or any present or future majority-owned NetApp subsidiary. Accordingly, the provisions of the Option Agreement governing the termination of the assumed WebManage Options upon Optionee's cessation of service as an employee or a consultant of WebManage shall hereafter be applied on the basis of Optionee's cessation of employee or consultant status with NetApp and its subsidiaries, and each assumed WebManage Option shall accordingly terminate, within the designated time period in effect under the Option Agreement for that option, following such cessation of employee or consultant status.

(f) The adjusted exercise price payable for the NetApp Stock subject to each assumed WebManage Option shall be payable in any of the forms authorized under the Option Agreement applicable to that option. For purposes of determining the holding period of any shares of NetApp Stock delivered in payment of such adjusted exercise price, the period for which such shares were held as WebManage Stock prior to the Merger shall be taken into account.

(g) In order to exercise each assumed WebManage Option, Optionee must deliver to NetApp a written notice of exercise in which the number of shares of NetApp Stock to be purchased thereunder must be indicated. The exercise notice must be accompanied by payment of the adjusted exercise price payable for the purchased shares of NetApp Stock and should be delivered to NetApp at the following address:

Network Appliance, Inc.
495 East Java Drive
Sunnyvale, CA 94089
Attention:  Janice Mahoney

3

NetApp 000165

<PAGE>    4

          5. Except to the extent specifically modified by this Option
Assumption Agreement, all of the terms and conditions of each Option Agreement
as in effect immediately prior to the Merger shall continue in full force and
effect and shall not in any way be amended, revised or otherwise affected by
this Stock Option Assumption Agreement.

          IN WITNESS WHEREOF, Network Appliance, Inc. has caused this
Stock Option Assumption Agreement to be executed on its behalf by its
duly-authorized officer as of the 13th day of November, 2000.

                              NETWORK APPLIANCE, INC.


                              By:
                                 ---------------------------------
                              Name:
                              Title:


                         ACKNOWLEDGMENT

          The undersigned acknowledges receipt of the foregoing Stock
Option Assumption Agreement and understands that all rights and liabilities with
respect to each of his or her WebManage Options hereby assumed by NetApp are as
set forth in the Option Agreement, the applicable Plan and such Stock Option
Assumption Agreement.

                              -----------------------------------
                              _____, OPTIONEE

DATED:  _____, 2000


</TEXT>                          4
</DOCUMENT>
</SUBMISSION>

NetApp 000166

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BRIAN MEHLMAN,<br><br>    Plaintiff,<br><br>  v.<br><br>NETWORK APPLIANCE, INC.,<br><br>    Defendant. | CIVIL ACTION NO. 04-12533-WGY |

## DEFENDANT NETWORK APPLIANCE, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

These responses are made solely for the purpose of this action. Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility, and to any and all other objections on any grounds that would require the exclusion of any statements contained herein if such interrogatory were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are expressly reserved and may be interposed at the time of trial.

The following responses are based upon information and writings presently available to and located by Network Appliance and its attorneys. Network Appliance has not completed its investigation of the facts relating to this case, discovery in this action, or its preparation for trial. The answers herein to the interrogatories are given without prejudice to Network Appliance's right to produce evidence of any additional facts.

Network Appliance' responses shall not be deemed to constitute admissions that (a) any particular document or thing exists, is relevant, non-privileged, or admissible into evidence, or (b) any statement or characterization in an interrogatory is accurate or complete.

No incidental or implied admissions are intended by the responses herein. The fact that Network Appliance has answered or objected to any interrogatory should not be taken as an admission that Network Appliance accepts or admits the existence of any "facts" set forth or

assumed by such interrogatory. The fact that Network Appliance has answered part or all of any interrogatory is not intended to be, and shall not be construed to be, a waiver by Network Appliance of any part of any objection to the interrogatory.

## GENERAL OBJECTIONS

Network Appliance makes the following general objections whether or not separately set forth in response to each interrogatory and each and every instruction and definition by Mr. Mehlman:

1. Network Appliance objects to the extent that Mr. Mehlman's interrogatories seek material reflecting attorney-client communications and/or material protected by the work-product doctrine, each such interrogatory is overbroad and seeks information that is beyond the scope of discovery permitted by the Federal Rules of Civil Procedure. Network Appliance will not divulge information that is protected from discovery by the attorney-client privilege or by the work-product doctrine.

2. Network Appliance objects to the interrogatories to the extent that they call for information not reasonably available to or not within the possession, custody, or control of Network Appliance. The responses herein are based on information reasonably available to Network Appliance and documents within Network Appliance's possession, custody, or control, including Network Appliance's knowledge of the same.

3. Network Appliance objects to the interrogatories as uncertain, overbroad, and unduly burdensome to the extent that interrogatories relate to matters outside the scope of Mr. Mehlman's complaint, and accordingly, are not limited to events relevant to this lawsuit.

4. Network Appliance objects that this set of interrogatories violates Federal Rule of Civil Procedure No. 33(a) because many of the interrogatories are compound and thus the total number of interrogatories exceeds that allowed under the Federal Rules.

5. Network Appliance objects to Instruction E to the extent that it seeks a privilege log of documents created after the onset of litigation. Network Appliance will only identify documents created before the onset of litigation in its privilege log. The parties can meet and confer regarding the production of a privilege log.

6.     Network Appliance objects to the definition of the term "Identify" as overly broad and unduly burdensome.

<div align="center"><strong><u>RESPONSES</u></strong></div>

## <u>INTERROGATORY NO. 1</u>:

Identify all persons involved in preparing or authorizing the written offer to Brian Mehlman setting forth the terms of proposed employment with Network Appliance in September 2000. With respect to each such person identified, describe that person's role in drafting or authorizing such written employment offer.

## <u>RESPONSE TO INTERROGATORY NO. 1</u>:

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine.

Subject to these objections and its general objections, Network Appliance is currently uncertain which individual(s) drafted the letter; Network Appliance believes that Mason Stubblefield, Brobeck Phleger & Harrison LLP, and possibly WebManage management had a role in drafting and approving the letter. As to Brobeck, any communications, thoughts, impressions, and so forth regarding the offer letter are privileged/and or work product and will not be disclosed. Chris Carlton, then Network Appliance's Vice President of Human Resources, signed the letter but did not draft it. Network Appliance is continuing its investigation as to whether others were involved.

## <u>INTERROGATORY NO. 2</u>:

Identify all persons with responsibility for preparing, authorizing and/or filing a form S-8 pertaining to the addition and/or merger of WebManage Technologies, Inc. by and/or with Network Appliance in 2000. With respect to each such person identified, describe that person's role in preparing, authorizing and/or filing such form S-8.

## RESPONSE TO INTERROGATORY NO. 2:

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Subject to these objections and its general objections, Network Appliance responds as follows:

As to preparation, Mark Bradford of Brobeck Phleger & Harrison prepared the S-8 document; any communications between Network Appliance and Brobeck, and the thoughts, impressions, and so forth of Mr. Bradford and Brobeck regarding the S-8 are privileged/and or work product and will not be disclosed. Without waiving such protections, Network Appliance simply reports the fact that Mr. Bradford and Brobeck prepared the document released to the SEC. Brobeck's public statement is available at <www.sec.gov>.

As to approval, Network Appliance General Counsel Andrew Kryder, the Network Appliance Board of Directors, and Network Appliance CFO Jeffry A. Allen were involved in the approval of the S-8. Any communications between Network Appliance and its in-house counsel, and the thoughts, impressions, and so forth of in-house counsel regarding the S-8 are privileged/and or work product and will not be disclosed. Without waiving such protections, Network Appliance simply reports the fact that Mr. Kryder was involved in the approval of the form S-8.

In addition, Lucy Lee of Network Appliance coordinated comments and assisted with the preparation of the form S-8. Those reviewing the filing material and/or involved in preparation included Mason Stubblefield (Network Appliance's Director of Compensation); Janice Mahoney (Network Appliance's Manager of Stock Administration); Leslie Paulides (Network Appliance's Vice President of Finance), Michael Giannini (Network Appliance's Director of Finance), and at least four outside auditors from Deloitte & Touche.

## INTERROGATORY NO. 3:

Describe the circumstances under which Network Appliance filed an S-8 with respect to any acquisition or transaction other than the transaction with WebManage during the period January 1, 2000 through December 31, 2002. In answering this interrogatory and describing such circumstances, (a) identify any other parties involved, (b) identify the persons responsible

for preparing and filing such form S-8, and (c) state the length of time between the closing of such transaction and the filing of the S-8.

**RESPONSE TO INTERROGATORY NO. 3:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance objects that this request is overly broad and unduly burdensome, and that the phrase "closing of the transaction" is unclear. Network Appliance objects that this request is compound. In addition, detailed information concerning Network Appliance's S-8 filings can be found by performing a filings search for Network Appliance at the SEC website <www.sec.gov>. Subject to these objections and its general objections, Network Appliance responds as follows:

(a) During the specified time period, and apart from the WebManage-related S-8, Network Appliance filed form S-8s with the SEC on six occasions. Some filings included more than one form S-8. Four of these filing dates did not include form S-8s related to another party. Two included form S-8 filings related to another party, namely Network Appliance's acquisition of Orca Systems, Inc.

(b) Lucy Lee of Network Appliance was the primary person at Network Appliance responsible for preparing and filing each such form S-8; others worked under her direction and outside counsel were often involved as well. However, every S-8 filing also requires a long process of obtaining various approvals from different departments within Network Appliance, as well as outside counsel and outside auditors for Network Appliance. Much of that information is reflected by each Network Appliance S-8 filing available on the SEC website <www.sec.gov.>. Network Appliance will not supply information protected by the attorney-client privilege and/or the work product doctrine.

(c) As to the length of time between the filing of the form S-8 and the "closing of such transaction," that information is as follows:

(1) S-8 for Network Appliance 1999 stock option plan: transaction date was October 26, 1999, filing date was March 13, 2000 – approximately four and a half months;

2630370_1.DOC

(2)  S-8 for Network Appliance Employee Stock Purchase Plan:  transaction date was October 8, 1999, filing date was July 13, 2000 – approximately nine months;

(3)  S-8 for Network Appliance Employee Stock Purchase Plan:  transaction date was October 26, 1999, filing date was July 13, 2000 – approximately eight and a half months;

(4)  S-8 for Network Appliance 1995 Stock Incentive Plan:  transaction date was October 8, 1998, filing date was July 13, 2000 – approximately one year and nine months;

(5)  S-8 for Network Appliance and the Orca Systems 1999 stock option plan: transaction date was June 14, 2000, filing date was July 13, 2000 – approximately one month;

(6)  S-8 for Network Appliance and Orca Systems 1999 stock option plan and option grants for compensation agreements:  transaction date was June 14, 2000, filing date was August 30, 2000 – approximately two and a half months;

(7)  S-8 for Network Appliance 1995 Stock Incentive Plan:  transaction date was October 11, 2000, filing date was March 21, 2001 – approximately five months;

(8)  S-8 for Network Appliance 1999 Stock Incentive Plan and for Employee Stock Purchase Plan:  transaction dates were August 29, 2002, filing date was October 30, 2002 – approximately two months.

**INTERROGATORY NO. 4:**

State the date upon which the form S-8 concerning the Network Appliance/WebManage transaction was filed.

**RESPONSE TO INTERROGATORY NO. 4:**

Subject to its general objections, Network Appliance responds:  January 16, 2001.

**INTERROGATORY NO. 5:**

State the why the form S-8 referred to in response to the previous interrogatory was not filed prior to that date.

**RESPONSE TO INTERROGATORY NO. 5:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine.  Subject to this objection and its general objections, Network Appliance responds that it promptly filed the form

S-8 on January 16, 2001 in circumstances under which, among other things, Network Appliance first had to prepare a necessary 10-Q filing for the quarter that ended in late October 2000 (filed December 11, 2000), and also had to undertake all the various work and obtain approvals from numerous parties necessary to file the form S-8, including issues specific to the details of the WebManage transaction.  That work and approvals included reconciliation problems with WebManage options for certain employees, exercise conflicts with certain grants, work on conversion ratios and rounding, obtaining Board of Directors minutes and obtaining Board of Directors signatures, obtaining representation letters for the filing from Network Appliance management, in-house and outside counsel, obtaining an audit consent form from outside auditors, review of financial statements, and work on subsequent events procedure.  When that work was completed and the approvals were obtained, Network Applied filed the form S-8. January 15, 2001 was a federal holiday.  (*See* <www.opm.gov/fedhol/2001.asp>).  The form S-8 was filed promptly and well within the normal window of time for such filings.

**INTERROGATORY NO. 6:**

Identify all employees and former employees of WebManage who received any stock options as a result of the acquisition of WebManage by Network Appliance.

**RESPONSE TO INTERROGATORY NO. 6:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine.  Network Appliance objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence because the request is not tailored to the subject matters involved in this action pursuant to Federal Rule of Civil Procedure No. 26(b)(1). Specifically, Mr. Melhman alleges breach of a contract between himself and Network Appliance; therefore only the terms and performance/alleged nonperformance of that alleged contract are at issue in this lawsuit.  Subject to the foregoing and its general objections, Network Appliance identifies Mr. Mehlman and is willing to meet and confer regarding the scope of this interrogatory.

**INTERROGATORY NO. 7:**

With respect to each person identified above, state, (a) whether they were provided with options, (b) whether they were able to exercise such options, and if so when, and (c) indicate whether they have initiated any legal action or asserted any claim based on an alleged inability to exercise options or an alleged failure to provide such person with the full value of options.

**RESPONSE TO INTERROGATORY NO. 7:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence because the request is not tailored to the subject matters involved in this action pursuant to Federal Rule of Civil Procedure No. 26(b)(1). Specifically, Mr. Melhman alleges breach of a contract between himself and Network Appliance; therefore only the terms and performance/alleged nonperformance of that alleged contract are at issue in this lawsuit. Subject to the foregoing and its general objections, Network Appliance is willing to meet and confer regarding the scope of this interrogatory. As to Mr. Mehlman, Network Appliance provided him the options as stated in his offer letter, pursuant to the vesting schedule as stated in his offer letter and the other terms of the letter. Mr. Mehlman was able to exercise the small minority of his options that were then vested upon the filing of the form S-8 in January 2001 – though he apparently chose not to do so. Mr. Mehlman has initiated legal action against Network Appliance.

**INTERROGATORY NO. 8:**

Identify all persons who communicated with Mehlman concerning his offer letter, his options, and any effort to exercise options. With respect to each such person identified, (a) identify all documents evidencing, referring or relating to such communications, (b) state the substance of such conversations, and (c) indicate when such communications took place.

**RESPONSE TO INTERROGATORY NO. 8:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance

-8-

objects that this request is compound, and that "effort to exercise options" is unclear. Subject to these objections and its general objections, Network Appliance responds that Chris Carlton signed the offer letter, but Network Appliance is unsure whether anyone had specific communications about the letter with Mr. Mehlman. As to Mr. Mehlman's options, Mr. Mehlman asked questions in an email to Christine O'Neil relating to the conversion of former WebManage options. Chris Liotta responded to a question raised at a January 11, 2001 meeting by stating, among other things, that "employees may exercise any portion of their vested shares" in a January 19, 2001 email to recipients that included Mr. Mehlman. Mr. Mehlman also sought information about his option vesting schedule in July 2001 and March 2002 email communications with Janice Mahoney of Network Appliance. Network Appliance is continuing its investigation into whether there were other such communications.

**INTERROGATORY NO. 9:**

State the period of time during which Mehlman was employed by Network Appliance.

**RESPONSE TO INTERROGATORY NO. 9:**

Subject to its general objections, Network Appliance responds: November 15, 2000 through July 2, 2004.

**INTERROGATORY NO. 10:**

Identify all expert witnesses that you expect to call as witnesses at the trial of the above case.

**RESPONSE TO INTERROGATORY NO. 10:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance objects that this interrogatory is premature as discovery has just begun in this action. Subject to these objections and its general objections, Network Appliance responds that it currently has no expert witnesses, but agrees to meet and confer with Mr. Mehlman at a more appropriate stage of the litigation regarding the production and exchange of expert information and materials discoverable under the Federal Rules.

2630370_1.DOC

**INTERROGATORY NO. 11:**

State the substance of the facts and opinions to which each of your experts will testify, stating which expert will testify with respect to each fact and opinion.

**RESPONSE TO INTERROGATORY NO. 11:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance objects that this interrogatory is premature as discovery has just begun in this action. Subject to these objections and its general objections, Network Appliance responds that it currently has no expert witnesses, but agrees to meet and confer with Mr. Mehlman at a more appropriate stage of the litigation regarding the production and exchange of expert information and materials discoverable under the Federal Rules.

**INTERROGATORY NO. 12:**

Identify all notes, reports and any other documents whatsoever that have been prepared by or on behalf of any expert witnesses that you intend to call as witnesses at the trial of the above case.

**RESPONSE TO INTERROGATORY NO. 12:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance objects that this interrogatory is premature as discovery has just begun in this action. Subject to these objections and its general objections, Network Appliance responds that it currently has no expert witnesses, but agrees to meet and confer with Mr. Mehlman at a more appropriate stage of the litigation regarding the production and exchange of expert information and materials discoverable under the Federal Rules.

**INTERROGATORY NO. 13:**

Identify all documents that have been provided to each expert witness.

**RESPONSE TO INTERROGATORY NO. 13:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance

2630370_1.DOC

objects that this interrogatory is premature as discovery has just begun in this action. Subject to these objections and its general objections, Network Appliance responds that it currently has no expert witnesses, but agrees to meet and confer with Mr. Mehlman at a more appropriate stage of the litigation regarding the production and exchange of expert information and materials discoverable under the Federal Rules.

**INTERROGATORY NO. 14:**

Identify with precision all options held by plaintiff to purchase Network Appliance stock from January 2000 to the present including grant date, strike price, exercise date, number of shares, value of the share as of November 13, 2001 and value of the shares as of February 5, 2001 for each option grant.

**RESPONSE TO INTERROGATORY NO. 14:**

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence because the request is not tailored to the subject matters involved in this action pursuant to Federal Rule of Civil Procedure No. 26(b)(1). Options held by Mr. Mehlman beyond February 5, 2001 are not the subject matter of this action. Network Appliance also objects that this request is compound. Network Appliance objects that this information is equally available to Mr. Mehlman. Network Appliance also objects that the date "November 13, 2000" is not the correct date of the relevant closing. Network Appliance also objects that the term "exercise date" is unclear as to whether it refers to a vesting schedule or dates that Mr. Mehlman actually sold shares, or something else. Network Appliance also objects that the term "grant date" is unclear because the grants were originally from WebManage; Network Appliance believes that the acquisition date is the date Mr. Mehlman intended by that term.

Subject to these objections and its general objections, Network Appliance responds as follows (historical NASDAQ share values can be viewed on <quotes.nasdaq.com> for NTAP):

| Acquisition date | Database entry date | ID number | Strike Price | Number of options | Number of vested shares as of January 16, 2001 | Share value as of November 15, 2000 (close) | Share value as of January 22, 2001 (close) | Value of options on November 15, 2000 |
|---|---|---|---|---|---|---|---|---|
| November 15, 2000 (WM99) | December 21, 2000 | 5439 | $19.67 | 635 | 105 | $76.125 | $66.875 | $48,339.375 |
| November 15, 2000 (WM99) | January 12, 2001 | 5494 | $9.84 | 3178 | 2118 (529.67 shares vested on Jan. 5, 2001) | $76.125 | $66.875 | $241,925.25 |
| November 15, 2000 (WM00) | January 14, 2001 | 5532 | $33.82 | 3792 | 0 | $76.125 | $66.875 | $288,666.00 |
| | | | | | | | Total | $578,930.62 |

## INTERROGATORY NO. 15:

Identify and describe all efforts by plaintiff to exercise vested options or obtain information related to Network Appliance stock options prior to February 5, 2001.

## RESPONSE TO INTERROGATORY NO. 15:

Network Appliance objects to the extent that this interrogatory calls for material protected by the attorney-client privilege and/or the work product doctrine. Network Appliance objects to this interrogatory as overly broad and unduly burdensome. Network Appliance objects that it lacks the information necessary to respond to this interrogatory. Network Appliance objects that the information requested is within the possession of Mr. Mehlman. Subject to these objections and its general objections, and to the extent it has knowledge, Network Appliance responds that Mr. Mehlman asked questions in an email to Christine O'Neil relating to the conversion of former WebManage options. Chris Liotta responded to a question raised at a January 11, 2001 meeting by stating, among other things, that "employees may exercise any

portion of their vested shares" in a January 19, 2001 email to recipients that included Mr. Mehlman. Mr. Mehlman also sought information about his option vesting schedule in July 2001 and March 2002 email communications with Janice Mahoney of Network Appliance. It does not appear that Mr. Mehlman sold any vested shares until June 2003 (*See* NetApp 000010, NetApp 000026-32). Network Appliance is continuing its investigation into whether there were other such communications, efforts, or sales.

DATED: April 25, 2005

NETWORK APPLIANCE, INC.

By its attorneys,

James A. DiBoise (*pro hac vice*)
Tait Graves, (*pro hac vice*)
Alda C. Leu, (*pro hac vice*)
Wilson Sonsini Goodrich & Rosati
Professional Corporation
One Market, Spear Street Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2156


Of Counsel:

Michael S. D'Orsi (BBO #566960)
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 720-2880

2630370_1.DOC

DEFENDANT NETWORK APPLIANCES RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
CASE NO. 04-12533-WGY

## VERIFICATION

I, Dana Varney, declare:

1.      I am the Legal Business Services Manager for defendant Network Appliance.  I am authorized to make this Verification on behalf of Network Appliance.

2.      I have read the foregoing, DEFENDANT NETWORK APPLIANCE'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES. As to those matters therein, I am informed and to the best of my knowledge believe the matters therein to be true, and on that ground allege that the matters stated therein are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th day of April 2005, at Sunnyvale, California.

_Dana L. Varney_

2630370_1.DOC