UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRIAN MEHLMAN,

    Plaintiff,

v.

NETWORK APPLIANCE, INC.,

    Defendant.

CIVIL ACTION NO. 04-12533-WGY

Hon. Judge William G. Young

**DEFENDANT NETWORK APPLIANCE, INC.'S
OPPOSITION TO PLAINTIFF BRIAN MEHLMAN'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

I.   **INTRODUCTION**

Both parties moved for summary judgment, and both agree that the dispute centers on the Court's interpretation of the parties' contract – the September 8, 2000 offer letter from Network Appliance to Mr. Mehlman. Because the dispute turns on the legal question of contract interpretation rather than disputed facts, and because its own separate motion fully sets forth the relevant issues, Network Appliance will use this opposition to briefly note problems with Mr. Mehlman's proposed contract interpretation.

In short, Mr. Mehlman seeks to transform stock options whose value was subject to the vagaries of the NASDAQ market into a *guaranteed signing bonus* at a set amount, due on his first day of work. His reading avoids key terms in the parties' Agreement, and would require the Court to pencil out those terms – such as the clause stating that his options would be delivered "following" the start of his employment, and the clause limiting the date the options would be worth around $600,000 to a single day – and to insert new meanings in their place. Indeed, Mr. Mehlman's reading depends on the extreme claim that the Agreement entitled him to stock options on his *first day of work*. The Agreement cannot be read that way because there is express language to the contrary. Moreover, Mr. Mehlman's proposed interpretation conflicts with his own admitted understanding of the way stock options work, and with Network Appliance's legal obligation to register the options with the Securities and Exchange Commission before delivering them to employees like Mr. Mehlman. Network Appliance thus respectfully requests that the Court deny Mr. Mehlman's motion.

II.   **OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mr. Mehlman's motion argues that Network Appliance breached the parties' Agreement in three ways: (1) by not giving Mr. Mehlman marketable stock options on his first day of work; (2) by not giving him options with a value of about $600,000 around October 1, 2000; and (3) by not giving him options worth about $600,000 on the day he received marketable options in early 2001. Each argument is incorrect because each is inconsistent with the terms of the parties' Agreement.

### A.   Mr. Mehlman Ignores the Contractual Term that Makes Clear that Marketable Stock Options were not Due on his First Day of Work.

Mr. Mehlman's first argument is that Network Appliance was contractually bound to give him marketable options as soon as he began work at Network Appliance, and breached the Agreement by not doing so. Indeed, Mr. Mehlman argues that the Agreement entitled him to marketable options *"upon joining* NetApp[.]" *See* Mehlman Memorandum of Points and Authorities ("MPA") at 1, 4, 5, (emphasis added); *see also* Mehlman Statement of Material Facts ¶ 12 ("he was to be granted additional stock options that would be granted *upon the commencement* of his employment with Network Appliance.") (emphasis added). This is similar to Mr. Mehlman's deposition testimony, where he repeatedly testified that he believed that the contract required delivery of marketable options on his first day of work. *See* Network Appliance's Statement of Material Facts ¶ 14; Network Appliance Memorandum of Points and Authorities ("MPA") at 7-8 (quoting transcript).

Mr. Mehlman wholly ignores the binding contractual term to the contrary: the phrase stating that he was to receive the options *"following the commencement"* of his employment. *See* Declaration of Alda Leu in Support of Network Appliance MPA, Exhibit B (attaching Agreement). As Network Appliance discussed in detail in its own motion for summary judgment, the only reasonable interpretation of that phrase is that Network Appliance would deliver the options *after* Mr. Mehlman began work, not on his very first day. *See* Network Appliance MPA at 12-15.

Mr. Mehlman's contract interpretation would require the Court to remove the phrase *"following* the commencement" and replace it with a phrase such as *"upon* the commencement." That would be contrary to the text of the document and contrary to the everyday English definition of the prepositional phrase "following the commencement." *See id.* at 13-14 (citing dictionary definitions). Nothing in the Agreement states that the options would be delivered on Mr. Mehlman's first day of work. Absent such a contractual requirement, there was no breach.

Equally important, Mr. Mehlman's proposed interpretation ignores Network Appliance's obligation, required by law, to first register the stock options with the Securities and Exchange Commission after the close of the acquisition, and before delivering them to employees. As Network Appliance explained in its own opening papers, it cannot have pre-registered Mr. Mehlman's WebManage options before Network Appliance gained ownership of them upon the close of the Network Appliance/WebManage acquisition. *See id.* at 15 (citing SEC rules). Mr. Mehlman argues that the SEC requirement is not "material" to this dispute. *See* Mehlman MPA at 2. Mr. Mehlman may find the requirement inconvenient because it disrupts the timing of his claimed entitlement, but he cannot act as if it is irrelevant. The phrase "Following the commencement of your full time employment with Network Appliance, the Company will grant you shares" means a time *after* the commencement of Mr. Mehlman's employment, and does not mean *upon* the commencement of Mr. Mehlman's employment.

Mr. Mehlman's failure to even discuss this phrase in his opening papers, and his assertion in his Affidavit that he was entitled to shares "*upon* the commencement" of his employment, is telling. Mr. Mehlman treats the phrase "following the commencement" as if it does not exist, but it does and the contract must be interpreted according to all of its terms.

### B.    Mr. Mehlman Avoids the Fact that a Firm Closing Date was Never Set.

Mr. Mehlman's second argument for summary judgment is that Network Appliance breached the Agreement by not giving him stock options around October 1, 2000 that had a value of about $600,000. *See* Mehlman MPA at 1 ("plaintiff was promised stock options, upon joining NetApp as a full time employee, that would have an approximate value of $600,000 on or about October 1, 2000."). He makes this argument based on the language in the Agreement that states "The effective date of the position will be upon the close of the acquisition of WebManage by Network Appliance, which is anticipated to be around October 1, 2000," and the fact that the closing took place on November 13.

Mr. Mehlman's error is that he treats Network Appliance's tentative estimate of when the acquisition of WebManage would close as an absolute guarantee of the date when the

shares would be worth $600,000. Mr. Mehlman is wrong because, as Network Appliance discusses in its own motion, the estimate of when the deal would close was plainly just that – an anticipatory estimate – and not a binding promise. As a matter of law, such anticipatory phrases are not promises subject to a breach of contract claim. *See* Network Appliance MPA at 11-12 (citing cases). Mr. Mehlman admitted that the Agreement did not contain a date certain for the closing. *See id.* at 6-7 (quoting deposition transcript).

In any event, Mr. Mehlman's argument does not support a breach of contract. The "approximate value" of the stock options was indeed about $600,000 on the actual date of the "closing," November 13, 2000, just as it had been on October 1. Specifically, the value was $642,622.50 on November 13. *See* Network Appliance Statement of Material Facts ¶¶ 18-19.

### C. Mr. Mehlman Ignores the Fact that the "Value" of the Stock Options was to be Measured Only on One Specific Date.

Mr. Mehlman's third argument appears to be that Network Appliance was contractually bound to deliver options with a market value that was fixed at $600,000 no matter when the options were delivered. To support this argument, he claims that the "value" of the options expressed in the Agreement "did not state, as it could have, that the value of the stock options referred to in the offer letter was based on the stock value as of a particular date." *See* Mehlman MPA at 6.

The problem with Mr. Mehlman's argument is that, contrary to his assertion above, the Agreement most certainly *does* state that the value of the stock options was based on the "value" *as of a particular date.* Indeed, the Agreement places a temporal limitation on the "value" by making that date the closing of the acquisition:

> [T]he Company will grant to you options that have an approximate value *at the closing* of $600,000.

*See* Leu Declaration Exhibit B (emphasis added). The sole purpose of the phrase "at the closing" is plainly to place a temporal limit on the date when the "approximate value" of the shares would be $600,000.

The parties agree that the "closing" – the closing of the Network Appliance/WebManage acquisition – took place on November 13, 2000. According to the plain text of the Agreement, that was the sole date on which the "approximate value" was to be measured. And as noted above, the value of the shares was indeed approximately $600,000 on November 13, 2000. *See* Network Appliance Statement of Material Facts ¶¶ 18-19.

Thus, Mr. Mehlman is wrong when he claims that Network Appliance was contractually bound to give him stock options worth $600,000 on the date it delivered the shares; the options were only required to be worth around $600,000 on the "closing" date of November 13, 2000.

It should be emphasized that Mr. Mehlman's present interpretation of the Agreement is contrary to the way that stock markets – and stock options – work. Across America, employees take stock options in technology companies with the understanding that they can gain in value, lose value, or even prove worthless. This was especially true during the "dot com" era of 2000. Employees like Mr. Mehlman understand how markets like the NASDAQ work, and how stock options fluctuate in value. He even testified that he did not believe that the Agreement gave him $600,000 in guaranteed income. *See* Network Appliance MPA at 4-6 (quoting deposition transcript regarding Mr. Mehlman's understanding of the market, options, and the Agreement); Leu Declaration Exhibit B (transcript).

In addition, the Agreement provided that Mr. Mehlman's stock options were to be delivered according to a vesting schedule, under which he would gradually receive vested options over the course of several years. *See id*. Exhibit B (Agreement; "Vesting in the new option shares will be in installments during your service with the Network Appliance (12/48 upon your first anniversary and 1/48th monthly thereafter."). If Mr. Mehlman's contract interpretation were correct, and if Network Appliance owed him $600,000 when the options were delivered, it would somehow have to provide that guaranteed value over the course of several years, no matter how the NASDAQ performed. Nothing in the Agreement states any such thing. To the contrary, the Agreement places a temporal limitation on the "approximate value" and also provides that Mr. Mehlman's options are to vest slowly, over time. The

Agreement does not guarantee that those options would have a total value of $600,000 at the times of their issuance, regardless of market performance.

### D.     The Drafter of the Agreement is Unknown.

Finally, Mr. Mehlman asserts without evidence, and without personal knowledge, that Network Appliance drafted the Agreement. Network Appliance does not know who drafted the Agreement – whether it was WebManage, Network Appliance, persons representing both companies, or a third party. *See* Leu Declaration Exhibit I (Network Appliance's Response to Interrogatory No. 1). Mr. Mehlman lacks personal knowledge for his assertion, and it should be disregarded.

## III.    CONCLUSION

For these reasons, Network Appliance respectfully requests an order denying Mr. Mehlman's motion for partial summary judgment, and granting Network Appliance's own motion for summary judgment.

DATED: January 6, 2006                    NETWORK APPLIANCE, INC.

By its attorneys,

/S/ Tait Graves
James A. DiBoise (*pro hac vice*)
Tait Graves, (*pro hac vice*)
Alda C. Leu, (*pro hac vice*)
Wilson Sonsini Goodrich & Rosati
Professional Corporation
One Market, Spear Street Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2156

/S/ Michael D. D'Orsi
Of Counsel:

Michael S. D'Orsi (BBO #566960)
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 720-2880